# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RICHARD KAPUSCINSKI, Personal
Representative of the Estate of
DAVID KAPUSCINSKI, Deceased,

                                                                Case No.: 2:17-cv-11281

        Plaintiff,                                 Honorable: Arthur J. Tarnow
                                                Mag. Judge Anthony P. Patti

v.

OFFICER NICHOLAS B. MITCHELL,
OFFICER GARY ROBINSON,
CITY OF ROCKWOOD, and
CITY OF GIBRALTER, Jointly and Severally,

        Defendants.
_____

**\*\*\*\*   ORAL ARGUMENT REQUESTED   \*\*\***

# PLAINTIFF'S JOINT
# MEMORANDUM OF LAW IN OPPOSITION TO
# MOTIONS FOR SUMMARY JUDGMENT FILED BY DEFENDANTS
# AT DKT. NO. 22 AND DKT. NO. 25

                    By: Geoffrey N. Fieger (P30441)
                        Todd J. Weglarz (P48035)
                        Attorneys for Plaintiff
                        *Fieger, Fieger Kenney & Harrington, P.C.*
                        19390 W. Ten Mile Road
                        Southfield, MI 48075
                        (248) 355-5555

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

INDEX OF AUTHORITIES ............................................................................................. ii

STATEMENT OF QUESTIONS PRESENTED ............................................................. iii

CONTROLLING AND MOST RELEVANT AUTHORITIES .................................... iv

INTRODUCTION .............................................................................................................. 1

STATEMENT OF RELEVANT FACTS ........................................................................ 1

STANDARD OF REVIEW ............................................................................................... 9

LEGAL ARGUMENT ...................................................................................................... 10

I.    Qualified Immunity and the Fourth Amendment ........................................... 10

   A.    General principles related to taser use. ................................................... 13

   B.    Defendants Robinson and Mitchell's Constitutional violations. ........................ 14

   C.    Plaintiff's rights were clearly established. ............................................. 19

II.   State Law Assault & Battery Claims ................................................................ 21

III.  *Monell* municipal liability claims. ..................................................................... 23

CONCLUSION AND RELIEF REQUESTED ............................................................. 25

# INDEX OF AUTHORITIES

**Cases**

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)......................................................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................9

*Baker v. City of Hamilton,* 471 F.3d 601 (6th Cir. 2006)........................................20

Bass v. Robinson, 167 F.3d 1041 (6th Cir.1999) ....................................................14

*Binay v. Bettendorf,* 601 F.3d 640 (6th Cir. 2010) .................................................18

*Dunn v. Matatall*, 549 F.3d 348 (6th Cir. 2008)......................................................15

*Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690 (6th Cir. 2006)..................24

*Gradisher v. City of Akron,* 794 F.3d 574 (6th Cir. 2015) .....................................16

*Graham v. Connor*, 490 U.S. 386 (1989) ......................................................... passim

*Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505 (6th Cir.2012) ...............15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................11

*Hays v. Jefferson County*, 668 F.2d 869 (6th Cir. 1982).........................................25

*Hope v Pelzer,* 536 U.S. 730 (2002) .......................................................................19

*Landis v. Baker,* 297 Fed. Appx. 453 (6th Cir. 2008) ............................................20

*Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013)......................12

*Miller v. Sanilac County*, 606 F.3d 240 (6th Cir. 2010)..........................................24

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)...............................................................11

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) ...........................................23

*Odom v. Wayne County,* 482 Mich. 459, 760 N.W.2d 217 (2008) ........................22

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .......................................................23

*Pearson v. Callahan,* 555 U.S. 223 (2009)..............................................................12

*Saucier v. Katz,* 533 U.S. 194, (2001) ....................................................................13

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................................11

*Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998) ...................................12

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005)..............................24

*Tolan v. Cotton,* 572 U.S. 650 (2014)......................................................................19

*U.S. v. Sierra Brokerage Services, Inc.*, 712 F.3d 321 (6th Cir. 2013) ...................9

*United States v. Alston,* 375 F.3d 408 (6th Cir. 2004)............................................14

*United States v. Mendenhall,* 446 U.S. 544 (1980) ................................................14

*VanVorous v. Burmeister,* 262 Mich. App. 467, 687 N.W.2d 132 (2004).............22

*West v. Atkins*, 487 U.S. 42 (1988) .........................................................................11

*White v. City of Vassar*, 157 Mich. App. 282, 403 N.W.2d 124 (1987).................21

*Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990)........................................11

**Statutes**

42 U.S.C. § 1983 ............................................................................................. 10, 11

42 U.S.C. §1983 .......................................................................................................10

U.S. Const. amend. IV .............................................................................................12

## STATEMENT OF QUESTIONS PRESENTED

I.    Defendants seek summary judgment in this case based on the doctrine of qualified immunity. However, multiple factual issues exist that preclude this Court from determining as a matter of law whether Officer Gary Robinson and Officer Nicholas Mitchell are entitled to qualified immunity for the serious injuries that they inflicted upon Mr. Kapuscinski in violation of his Fourth Amendment right to be free to excessive force. Is summary judgment inappropriate in this case based on the factual issues that can only be resolved by the jury?

                   Plaintiff says:          Yes
                   Defendants say:          No

II.   Based on the evidence described in Plaintiff's Memorandum of Law, is Plaintiff entitled to pursue his state law claims of assault and battery related to the fatal tazing of David Kapuscinski?

                   Plaintiff says:          Yes
                   Defendants say:          No

III.  Does an actionable *Monell* claim exist against the City of Gibraltar and the City of Rockwood police departments for their failure to instruct their officers on proper taser deployment, including not deploying the probes near the heart to avoid cardiac complications such as dysrhythmia and cardiac capture?

                   Plaintiff says:          Yes
                   Defendants say:          No

## CONTROLLING AND MOST RELEVANT AUTHORITIES

*Graham v. Connor*, 490 U.S. 386 (1989)
*Binay v. Bettendorf,* 601 F.3d 640 (6th Cir. 2010)
*Odom v. Wayne County,* 482 Mich. 459, 760 N.W.2d 217 (2008)
*Saucier v. Katz,* 533 U.S. 194, (2001)

## INTRODUCTION

David Kapuscinski died on April 16, 2015, after two taser darts were lodged just inches from his heart by Officer Gary Robinson and Officer Nicholas Mitchell. The taser darts were lodged in an area known to law enforcement as "dart to heart." "Dart to heart" instructs officers to focus taser deployment on the arms, legs, and back so as to maintain a distance between the chest and the taser darts. This distance is necessary because of the known link between electrifying the taser and cardiac dysrhythmia. A cardiac dysrhythmia is exactly what David Kapuscinski experienced. The manner and means in which these officers tazed David Kapuscinski constitutes excessive force that violated David's Fourth Amendment rights. He was tazed while laying on the floor, naked, in the midst of a psychiatric crisis. Defendants are not entitled to qualified immunity as a matter of law. Defendants' motion for summary judgment should be denied.

## STATEMENT OF RELEVANT FACTS

David Kapuscinski was 39 years old at the time of his death. His short journey in life was not easy.  He was physically beaten by his father as a child, and struggled with mental illness throughout much of life. (Exhibit A, Excerpts of Records from Guidance Center) At one point, David was diagnosed with major

1

depressive disorder, attention deficit hyperactivity disorder, substance abuse, and anxiety. *Id.* Later in life, he was diagnosed with bipolar disorder. Compounding his struggles with mental illness, David had also been sexually abused by a police officer as a child, and struggled throughout his adult life with unresolved issues related to that abuse. (Exhibit A and Exhibit B, Gibraltar Police Department Records).

In April of 2015, David was in a relationship with Christina Beneteau. Christina resided at an apartment at 14680 Middle Gibraltar Road, in Gibraltar, Michigan, with her two children: Angelo (then 12) and Alice (then 9). David had been with Christina for several months. While he did not formally reside at the apartment, he often stayed there. David was very supportive of Christina and helped take care of her children. Prior to the incident that occurred on April 16, 2015, there had never been any prior domestic incidents between Christina and David. (Exhibit B and Exhibit E, Michigan State Police Records, Statements of Christina, Angelo, and Alice Beneteau).

At 3:22 a.m. on April 16, 2015, Officer Robinson from the Gibraltar Police Department and Officer Mitchell from the Rockwood Police Department were talking to each other while sitting in their respective patrol cars in the parking lot

of Carlson High School. (Exhibit B) It was at this time[1] both officers were dispatched to Beneteau's apartment for a "domestic in progress", and were told that the caller was a 10 year old boy who would be waiting outside. (Exhibit B; Exhibit G, MSP Audio Stmt Mitchell; Exhibit I, Deposition of N. Mitchell, p. 49; Exhibit J, Deposition of G. Robinson, p. 34). The Trenton Police Department was also requested to assist on the run. (Exhibit C and Exhibit D, Trenton PD Records)

Officers Robinson and Mitchell proceeded to the apartment complex, with Defendant Robinson leading the way.[2] Defendant Mitchell's patrol car was equipped with a dash cam video camera, the audio to which is captured through a microphone secured to Mitchell's uniform. The video is always recording, but the audio is allegedly manually controlled by Defendant Mitchell. (Exhibit I, pp. 52-53).

According to the video, the officers arrive at the apartment complex two minutes after they left the high school parking lot. They approach a young boy who is standing at the entrance door to the building (Angelo). Angelo said nothing but

---

[1] The Gibraltar PD records indicate the dispatch was made at 3:22 am; the Rockwood PD records indicate 3:28 am. (Exhibit B and Exhibit C, Rockwood Police Department Records).

[2] Because the incident was in Gibraltar, Defendant Robinson (a Gibraltar officer), was considered the officer in charge. (Exhibit J, pp. 39-40). Defendant Mitchell accompanied Robinson on the run because of the cities' "mutual aid" policy. *Id.* at 37. Mitchell was present to provide back-up assistance if necessary. (Exhibit I, p. 54).

pointed the officers to the stairs leading to the upstairs units.[3] Angelo does not appear to be visibly upset in the video. (Exhibit C, Exhibit F, Exhibit I, p. 55).

The officers walked upstairs and knocked on Christina's apartment door (at this point in-car video's audio kicks "on"). A few seconds later, Defendant Robinson is heard saying "how you doin'? …… Police Department". A young child (Alice) starts to cry. "Where's Mom and Dad at", asks Robinson. The child is afraid of the police and says "no, no". Robinson again asks "where's mom and Dad at". (Exhibit F and Exhibit I, pp. 57-58, 61-62). The child was very upset by the officers' presence and reluctant to tell the police where her mom and dad were, though she ultimately pointed to a back bedroom.  (Exhibit I, pp. 59-60; Exhibit J, pp. 39, 45-46).

Robinson and Mitchell walked to the bedroom and upon entering, observed a completely nude, unarmed, male (Kapuscinski) and a half nude female (Christina), on the edge of the bed, each laying on their sides in a 69-style sexual position. They appeared to be engaged in a sex act.[4] This was the first time either officer had ever seen David Kapuscinski. Neither Mitchell nor Robinson had any

_____

[3] There is no audio at this part of the in-car video. (Exhibit F).
[4] Mitchell described the two being in a 69 sexual position, with Kapuscinski being completely nude and unarmed. (Exhibit I, pp. 64, 70). In his audio statement to State Police, Mitchell said it looked like a weird sex act when they walked in. Mitchell also told State Police that the girlfriend admitted to Mitchell that she was giving a good blowjob to Kapuscinski. (Exhibit G, MSP Audio Interview of Mitchell).

prior knowledge or understanding of Kapuscinski's background, alleged arrest or criminal history, or any of the conduct or actions later alleged to have taken place between Kapuscinski and Christina or Kapuscinski and Christina's children (other than the dispatch call saying there was a "domestic in progress"). (Exhibit I, pp. 43-44; Exhibit J, pp. 33-34).

Once in the bedroom, Defendant Robinson can be heard on the dash cam audio yelling "stop!" and "get off of her!" a couple of times.[5] (Exhibit F) When David did not comply, Defendant Robinson drew his taser. As he did this, he observed that Defendant Mitchell had also drawn his taser; Officer Mitchell's laser lights for his taser were already painted on David. (Exhibit J, pp. 58-59).

Officer Robinson deployed his taser first[6], from close range, and struck David in the right arm, in the area of the elbow. (Exhibit J, pp. 60, 62-66, 69, 71-72, Deposition Exhibit #6]. Robinson observed both taser darts stick in Kapuscinski. This caused a 5 second charge to be released. The taser was effective and caused Kapuscinski to immediately separate from Christina. (Exhibit J, pp. 73-75). After this first taze, Kapuscinski fell off the bed and onto the floor, landing on

---

[5] Significantly, what is *not* heard on the audio is anything being said, let alone yelled, by Kapuscinski. Robinson testified Kapuscinski was yelling he was going to kill her just as loud as Robinson was yelling "get off of her". Robinson admitted that though he is heard on Mitchell's mic'd audio, Kapuscinski is not. (Exhibit J, pp. 54-56).

[6] Robinson was carrying a yellow X26 Taser that night, as well as a 40 caliber Glock firearm, and was first officer to deploy Taser at scene. (Exhibit J, pp. 42, 59).

his back, and Christina was able to get off the bed and was now no longer at risk of harm. (Exhibit I, pp. 94-96, 100-101; Exhibit J, p. 82).  While Kapuscinski was on the floor, Robinson then pressed his taser trigger a second time, activating a 6 second firing/charge. Two seconds into this second tazing cycle, Defendant Robinson can be heard screaming "turn over!", "turn over now!", multiple times. (Exhibit F and Exhibit J, Deposition Exhibit #10 Taser Data Report). Robinson was telling him to turn over because he wanted Kapuscinski face down so he could handcuff him. (Exhibit J, p. 79). On the in-car audio, Robinson is heard screaming "turn over!", "turn over now!" for nine straight seconds.  Kapuscinski never responded.  When asked what Kapuscinski was doing while being told repeatedly to turn over, Robinson could only reply "He wasn't turning over".  (Exhibit F and Exhibit J, p. 81).

After nine straight seconds of Kapuscinsky not responding to the commands to turn over, Defendant Mitchell then deployed his Taser, without any advance warning, striking Kapuscinski with two darts in the upper chest, and almost directly over the heart. (Exhibit D; Exhibit F; Exhibit I, pp. 113, 116]. Mitchell fired one five second cycle, after which Kapuscinski never woke up or responded again. (Exhibit C; Exhibit G; Exhibit K, Mitchell Taser Data Rpt)  Mitchell's taser can be heard in the in-car video audio.  Mitchell deployed his taser 4 minutes and 12 seconds into the video, and 18 seconds after Robinson deployed his taser the

6

first time. One second into Mitchell's five second taze, Robinson simultaneously triggered his taser for another five second firing cycle (Robinson's fourth consecutive firing[7] in a span of 18 seconds. (Exhibit F; Exhibit J, pp. 85-86; Dep Ex #10 Taser Data Rpt; Exhibit K)

A very significant fact in this case is Robinson's screaming "***Roll over right now or I'm gonna Taze you again***!" at 4:20 into the in-car video. This command / threat was issued *after* Mitchell's lethal – and only – taze, and a couple seconds after Robinson's fourth and last taser firing. (Exhibit F) Robinson testified that he gave that instruction *before* Kapuscinski attempted to get up (after falling on the ground after the first taze). (Exhibit J, p. 83). Defendants' entire defense is that Mitchell's taze to the chest was necessitated by Kapuscinski getting back or attempting to get up after not listening to commands to turn over for cuffing. Because Defendants inflicted the chest shot on a naked, unarmed, unresisting man who remained on the ground and on his back, said actions were nothing more than punishment for Kapuscinski's failure to roll over as instructed.

This command by Robinson is also significant because it contradicts Defendants' defense that they knew Robinson's taser was "useless" after the first firing. This statement is evidence that Robinson not only fired four times, but he

---

[7] Robinson's taser data report shows he fired his taser four times for periods of 5, 6, 5, and 4 seconds respectively and consecutively. (Exhibit J, Dep Ex #10)

successfully fired/tazed Kapuscinski four times. Screaming "I'm going to taze you *again*" can only mean that Robinson was firing an active taser.

After being tazed in the chest, Kapuscinski was handcuffed by Defendant Robinson. Kapuscinski was still on his back and Robinson had to roll him on his stomach to cuff him. (Exhibit J, pp. 105-106). Two minutes after the last taze, Robinson and Mitchell noticed that Kapuscinski defecated on himself. (Exhibit F) Officers never checked Kapuscinski's vital signs. (Exhibit J, p. 107-108). According to the audio and the chronology created by a subsequent Michigan State Police Investigation, it took between four and six minutes for the officers to realize that David was not breathing and initiate CPR. It was a Trenton police officer who arrived on the scene later (at about 3:32 am) and noted that Kapuscinski had two darts in the middle of his chest and was not breathing. (Exhibit D; Exhibit E; Exhibit F) Rescue breathes were also later attempted. (Exhibit J, p. 103). However, David never regained consciousness and was never resuscitated. He was pronounced dead at Beaumont-Trenton by Emergency Department staff at 0438.

Following this incident, an autopsy was performed by the Wayne County Medical Examiner to determine the cause of death. The medical examiner noted that David was 5'9" and weighed about 150 lbs. (Exhibit L, Autopsy Report). By comparison, Officer Robinson weighed approximately 220 lbs at the time, and Mitchell weighed 200 lbs. (Exhibit I, p. 46; Exhibit J, p. 28).

The medical examiner found taser probe marks on David's right arm and on left chest near his heart. (Exhibit L). After examining the body, both gross and microscopically, reviewing the toxicology, and the history provided to him by the police departments and hospital, the medical examiner determined Kapuscinski's cause of death to be cardiac arrhythmia secondary to the use of a stun gun. David's death was ruled a homicide. *Id.*

Dr. Werner Spitz, MD, reviewed this case, and likewise determined Kapuscinski's cause of death was secondary to cardiac arrhythmia caused by Defendants' tazings.  Dr. Spitz also found additional an additional set of tazer wounds burns in the middle of torso, at the bottom of the ribcage.  Thus, Dr. Spitz found evidence of at *least* three separate taser burns wounds, which contradicts Defendants' position they only tazed Decedent twice. (Exhibit N, Spitz Report / Affidavit).

## STANDARD OF REVIEW

Defendants' Motions for Summary Judgment are brought pursuant to Fed. R. Civ. P. 56(c). "A movant is entitled to summary judgment when it shows that there is no genuine dispute as to any material fact." *U.S. v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-327 (6th Cir. 2013). In determining whether there is a genuine issue of material fact, ***the record is viewed in the light most favorable to the nonmoving party****. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A material fact is "one that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Credibility determinations, weighing the evidence, and drawing legitimate inferences from the facts are jury functions, not those of the judge . . . ." *Id.* at 255.

Despite this standard of review, the Defendants' Motion for Summary Judgment entirely ignores the Plaintiff-favorable view of the evidence. Defendants' Statement of Facts ignores those portions of testimony that establish actionable claims under 42 U.S.C. § 1983. Summary judgment is not appropriate in a case such as this when the evidence presents a sufficient factual disagreement to require submission to a jury.

## LEGAL ARGUMENT

### I.      Qualified Immunity and the Fourth Amendment

**Summary judgment is not proper when multiple factual issues exist that preclude this Court from determining as a matter of law whether Officer Robinson and Officer Mitchell are entitled to qualified immunity for the fatal injuries that they inflicted upon Mr. Kapuscinski in violation of his Fourth Amendment right to be free to excessive force.**

42 U.S.C. §1983 provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the United States Constitution and the laws of

10

the United States. *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

To state a claim under §1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States has been violated, and (2) that the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Defendants' motion seems to admit that they were acting under color or law. Therefore, the only issue is whether, viewing the evidence in the light most favorable to Plaintiff and making all reasonable inferences in Plaintiff's favor, did Defendants deprive Plaintiff of a federally protected right?

Qualified immunity is immunity from suit rather than a mere defense to liability. *Scott v. Harris*, 550 U.S. 372, 376 (2007) quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Qualified immunity protects public officials from liability for civil damages if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Martin v.*

11

*City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

As the Supreme Court explained in *Scott, supra,* "courts are required to resolve a 'threshold question: [t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Scott,* 550 U.S. 377 citing *Saucier v Katz*, 533 U.S. 194, 201 (2001). "If, and only if, the court finds a violation of a constitutional right, 'the next sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Scott, supra.*

If the legal question of immunity is completely dependent upon which view of the facts the jury accepts, the District Court should not grant summary judgment. *Id.* "[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of … force." *Id.* quoting *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Here, based on the totality of the facts, Defendants are not entitled to qualified immunity.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, … against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It prohibits officers from utilizing excessive force and committing impermissible seizures. In assessing Plaintiff's claimed Fourth Amendment violations, this Court is faced with two questions. First, taking

the evidence in the light most favorable to Plaintiff, do the facts alleged show the officers' conduct violated a constitutional right? *Saucier v. Katz,* 533 U.S. 194, 200-201 (2001). Second, were the constitutional rights alleged by Plaintiff clearly established at the time of the incident? *Id.* If both of these questions are answered in the affirmative, the officers are not entitled to qualified immunity.

A.     *General principles related to taser use.*

Before discussing the clearly established constitutional rights that Defendants violated, it is important to discuss some of the realities of taser usage. The use of a taser, depending on the circumstances, can amount to excessive force. (Exhibit I, p. 34). If a taser is deployed (energized) more than it needs to be, that can amount to excessive force. *Id.* Also, important to this litigation, officers cannot use tasers for punitive measures. (Exhibit I, p. 36) Tasers are only to be used if there is a risk of harm or a threatened harm to the officer. *Id.* at 37. An officer cannot "deploy a Taser on a subject simply because the subject is not responding or listening" to the officer. *Id.* at 37.

When an officer deploys a taser, they are to aim for a "preferred target area." (Exhibit J, p. 16-18). This includes the arms, back, and legs. *Id.* at 17. Officers are to avoid the face, chest, and groin when feasible. *Id.* at 17. Officers are trained to avoid the chest because of the risk of cardiac injury. *Id.* at 17-18. As Officer Mitchell explained, the chest is avoided to prevent the known risk of

cardiac capture. (Exhibit I, p. 25) "Dart to heart" instructs officers to increase the distance between the heart and the darts when deploying a taser. (Exhibit J, p. 18)

B.    *Defendants Robinson and Mitchell's Constitutional violations.*

"In addressing an excessive force claim brought under § 1983, the analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham*, 490 U.S. at 394. "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments. *Id*. Because Plaintiff was a free person at the time of the incident, and the use of force occurred in the course of a seizure, Plaintiff's claims arise under the Fourth Amendment and its "objective reasonableness standard." *Id*. at 395; *Bass v. Robinson,* 167 F.3d 1041, 1045 (6th Cir. 1999).

A Fourth Amendment seizure occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *United States v. Alston,* 375 F.3d 408, 411 (6th Cir. 2004). Seizure can result from the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980).

The "objective reasonableness standard" depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene. *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008). Relevant considerations in determining the reasonableness of the force used are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id*. citing *Graham*, 490 U.S. at 396. In the context of tasers, this Circuit has also stated that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505, 509 (6th Cir.2012). Non-compliance, however, does not constitute active resistance unless it is paired with other active signs of resistance, such as verbal hostility. *Eldridge v. City of Warren,* 533 Fed. Appx. 529, 535 (6th Cir. 2013); *Harris v. City of Circleville,* 583 F.3d 356, 366 (6th Cir. 2009).

In this case, the jury could conclude Defendants' act of tazing Mr. Kapuscinski while he was laying/kneeling on the floor completely naked was unconstitutionally excessive. The first factor looks to the severity of the crime at issue. While domestic assault is a serious crime, Christina was removed from the situation when the second tazing occurred. Christina was longer at risk of harm; "[h]er life is no longer being threatened." (Exhibit I, p. 95). At the point that

15

Officer Mitchell's taser was deployed, from the audio and testimony, it appears that the only activity David was undertaking was not following the officer's instructions to roll over. Based on the specific facts of this case, including the officers' testimony that you can't deploy a taser for a simple failure to follow commands, this factor weighs in Plaintiff's favor.

The second *Graham* factor considers whether the suspect posed an immediate threat to the safety of the police officers or others. This factor too weighs in Plaintiff's favor. At the time that Officer Mitchell deployed his taser, the only people in the room were the officers and David. David was naked and obviously unarmed. He had never stood and had been merely kicking while laying on the floor. He never kicked the officers and never swung at the officers. Even after an earlier attempt to taze him, David did not swing at or charge at the officers. While he may have been obstinate, David was not a threat to the safety of the police officers or others while confined to the bedroom, naked, and unarmed.

The final *Graham* factor considers whether the suspect actively resisted arrest or attempted to evade arrest by flight. We know that David never attempted to evade arrest by flight: he never completely stood up. David also did not "resist arrest" as that term has been defined in this Circuit. In order for a plaintiff to resist arrest, they must actively resist arrest and refuse to be handcuffed. *Gradisher v. City of Akron,* 794 F.3d 574, 585 (6th Cir. 2015). When they refuse to be

handcuffed, the taser may be used to subdue them. *Id.,* citation omitted. However, when the suspect is compliant or stops resisting, tazing can result in a finding of excessive force. "In determining whether officers used excessive force, courts have placed great weight on officers' failure to warn a suspect before deploying a taser." *Id.* at 586, citation omitted.

Applying the factors discussed in *Graham, supra,* Officer Mitchell's act of deploying his taser at David's bare chest, directly near his heart, amounted to excessive force. David was 50 lbs lighter than Officer Mitchell and 70 lbs lighter than Officer Robinson. Nothing prevented either officer from taking him down with a tackle maneuver if they truly felt threatened. One was never even attempted. Officer Mitchell also never warned David that he would be tazing him. Moreover, David was not standing or charging the officers immediately before being tazed. At best, he was merely "attempting to stand." Testimony establishes that he had been laying on his back kicking into the air. He had never struck either officer previously. The officers had no knowledge of what David had done before their arrival. David was six feet away from them. He was unarmed. To taze him under these circumstances was excessive and unconstitutional. Officer Mitchell's 'dart to the heart' violated David's rights under the Fourth Amendment.

Plaintiff's claims of excessive force apply equally to both Officer Robinson and Officer Mitchell. While Officer Robinson did not pull the trigger on the second

17

tazing, that fact does not absolve him from responsibility. As the Sixth Circuit has observed, "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) *supervised the officer who used excessive force*, or (3) owed the victim a duty of protection against the use of excessive force.' " *Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir. 2010) (quoting *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir. 1997)), emphasis added. Liability can attach upon a showing that the officer "either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id.* To establish that an officer not directly involved owed a duty of care, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id.*, cleaned up.

As it relates to Officer Robinson, three important facts make him liable for Officer Mitchell's tazing, in addition to his own acts of tazing David. First, Officer Robinson was the officer in charge. He was the only Gibraltar Police Officer responding to a call. Second, Officer Robinson was able to visualize Officer Mitchell's taser laser as it 'painted' David prior to it being deployed. (Exhibit J, p. 58, 59) He would have seen the laser light pointed over David's heart. Third, Officer Robinson testified that he was physically positioned in front of Officer Mitchell throughout this incident. *Id.* at 46, 63-65. He could have intervened.

From the known facts, viewed favorable to Plaintiff, we know that Officer Robinson was supervising Officer Mitchell at the time that the taser was deployed, and we also know that Officer Robinson would have seen the taser aimed at David before deployment (because of the laser) and could have intervened, either because of his position in the room or his authority. Applying these facts to the supervisory responsibility discussed in *Binay,* a jury could certainly find that Officer Robinson is liable for violating David Kapuscinski's constitutional rights. Consequently, summary judgment should be denied as to both officers as it relates to the qualified immunity.

C.    *Plaintiff's rights were clearly established.*

The "clearly established" prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation. *Tolan v. Cotton,* 572 U.S. 650 (2014) citing *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). If the governmental actor's conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" the governmental actors are shielded from liability. *Hope,* 536 U.S. at 739. "'[T]he salient question … is whether the state of the law' at the time of the of an incident provided 'fair warning' to the defendants' that their alleged [conduct] was unconstitutional." *Tolan,* quoting from *Hope,* 536 U.S. at 741. In making this

19

determination, the Court looks to decisions of the Supreme Court and then to decisions of this Circuit and other courts within this circuit. *Baker v. City of Hamilton,* 471 F.3d 601, 606 (6th Cir. 2006).

Both the right to be free from unreasonable seizures, *California v. Hodari,* 499 U.S. 621 (1991), and the right to be free from the use of excessive force under the Fourth Amendment, *Graham,* 490 U.S. at 392–93, are clearly established. *Adams v. Metiva*, 31 F.3d 375, 386-387 (6th Cir. 1994).  In the context of taser use, this Circuit has noted that "officers should have known that the gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker,* 297 Fed. Appx. 453, 463 (6th Cir. 2008). In that case, the plaintiff was electrified multiple times with a taser while near a body of water with an officer standing on his back. Quoting provisions in the taser manual addressing the use of tasers near water, the Court stated that "officers should have known that the use of a taser in stun mode, in rapid succession on a suspect who is surrounded by officers, in a prone position in a muddy swamp, who has only one arm beneath him, and who has just been struck several times with a baton would be a violation of a constitutional right." *Id.* at 464.

Consistent with *Landis* and other authorities from this Circuit, Defendants Robinson and Mitchell should have known that their conduct violated a constitutional right. Here, David was tazed while naked and positioned on the floor

20

either on his back or his hands and knees - not standing. This was after being tazed multiple times by Officer Robinson. Similar to *Landis,* literature was available to Defendants that warned them of the dangers associated with tazing David in the chest. That literature was ignored even though preferred target areas were available to Officer Mitchell. Also like *Landis,* David was essentially surrounded by the officers in the bedroom blocking the doorway. Since precedent from this Circuit was such in April of 2015 that Defendants had notice that their actions toward Mr. Kapuscinski violated clearly established statutory or constitutional rights of which a reasonable person would have known, Defendants are not entitled to qualified immunity. Defendants' motions should be denied.


## II.   State Law Assault & Battery Claims

**Based on the evidence described above, Plaintiff is entitled to pursue his state law claims of assault and battery related to the fatal tazing of David Kapuscinski.**

In addition to his federal claims, Plaintiff also has actionable state law claims for assault and battery. Michigan's appellate courts have long recognized that if an officer uses excessive force against a suspect, the officer may be held liable for assault and battery, which is an intentional tort. *White v. City of Vassar*, 157 Mich. App. 282, 293, 403 N.W.2d 124 (1987). Assault is "an intentional unlawful offer of corporal injury to another person by force, or force unlawfully

directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *VanVorous v. Burmeister,* 262 Mich. App. 467, 482-83, 687 N.W.2d 132 (2004) (quoting *Espinoza v. Thomas*, 189 Mich. App. 110, 119, 472 N.W.2d 16 (1991)). Battery is "a willful and harmful or offensive touching of another person which results from an act intended to cause such contact." *Id*. at 483, quoting *Espinoza*, 189 Mich. App. at 119.

As the Michigan Supreme Court recognized in *Odom,* "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." *Odom v. Wayne County,* 482 Mich. 459, 474, 760 N.W.2d 217 (2008) (citing Prosser, Torts (4th ed.), § 132, p. 987-90). Nor will governmental immunity protect the officer if the officer acted with "'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'" *Odom,* 482 Mich. at 474 (quoting *Veldman v. Grand Rapids*, 275 Mich. 100, 113, 265 N.W. 790 (1936) and *Amperse v. Winslow*, 75 Mich. 234, 245, 42 N.W. 823 (1889)).

A police officer making an arrest may use reasonable force. *VanVorous,* 262 Mich. App. at 480. The force reasonably necessary is the measure of force that "an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary. Thus, similar to the analysis

22

used above, the standard for evaluating Plaintiff's assault and battery claim is an objective one under the circumstances." *Id*. at 481 (quoting *Brewer v. Perrin*, 132 Mich. App. 520, 528, 349 N.W.2d 198 (1984)).

Here, as discussed in the preceding sections, the facts of this case are such that the trier of fact could find Defendants Robinson and Mitchell liable for the intentional torts of assault and battery. Applying Rule 56 to the specific facts of this case, it would be improper to decide these claims as a matter of law. The factual issues in this case can only be determined by the trier of fact. Summary judgment should be denied as to Plaintiff's state law claims.

### III.   *Monell* **municipal liability claims.**

> **Actionable *Monell* claims exist against the City of Gibraltar and the City of Rockwood police departments for their failure to instruct their officers on proper taser deployment techniques, including not deploying the probes near the heart to avoid cardiac complications such as arrhythmia and cardiac capture.**

A municipality may be held liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Social Servs*., 436 U.S. 658, 694 (1978). With municipal liability, there must be an "affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal

policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694.)

To succeed with a claim for failure to supervise or train, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). When failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially

certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982).

Here, the jury should decide whether actionable *Monell* claims exist against the City of Gibraltar and the City of Rockwood police departments. These municipalities should be liable for their inadequate training of the officers in the safe and proper use of a taser. For example, the Gibraltar PD only required officers to engage in four hours of training with this potentially deadly weapon. (Exhibit J, p. 21). The inadequacies of their training program are evidenced by Officer Robinson's testimony about his training in which he repeatedly stated that he was "assuming" certain consequences could result when failing to deploy a taser in a "preferred target area." *Id.* at 17-18. Gibraltar PD also lacked any specific process for reporting taser incidents or documenting use of force with taser-specific forms at the time of this incident. *Id.* at 25, 61. Similar deficiencies also existed with the Rockwood PD. In light of these deficiencies, summary judgment is not proper on Plaintiff's *Monell* claims.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, Defendants' motions for summary judgment should be denied in their entirety.

Date: October 30, 2018

Respectfully Submitted,
___/s/Todd J. Weglarz_____
By: Geoffrey N. Fieger (P30441)
Todd J. Weglarz (P48035)
Attorneys for Plaintiff

*Fieger, Fieger Kenney & Harrington, P.C.*
19390 W. Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Certificate of Service

Todd Weglarz hereby certifies on October 30, 2018, he caused a copy of this document to be served upon all parties of record, and that such service was made electronically upon each counsel of record so registered with the CM/ECF system.

/s/ Todd Weglarz

26