# EXHIBIT I

**MITCHELL, OFFICER NICHOLAS BILL**
06/28/2018                                                                                          Pages 1–4

---

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
 2                 SOUTHERN DIVISION
 3
 4   RICHARD KAPUSCINSKI, Personal
     Representative of the Estate of
 5   DAVID KAPUSCINSKI, Deceased,
 6            Plaintiff,
                                 Case No. 2:17-c-v-11281
 7        vs.                    Hon. Arthur J. Tarnow
                                 Mag. Judge Anthony P. Patti
 8   OFFICER NICHOLAS B. MITCHELL,
     OFFICER GARY ROBINSON, CITY OF
 9   ROCKWOOD, and CITY OF GIBRALTAR,
     Jointly and Severally,
10
             Defendants.
11   _____/
12        DEPOSITION OF OFFICER NICHOLAS BILL MITCHELL
13   Taken by the Plaintiff on the 28th of June, 2018, at the
14   offices of the Gibraltar Police Department, 29450 Munro,
15   Gibraltar, Michigan, at 9:13 a.m.
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3            MR. TODD J. WEGLARZ (P48035)
              Fieger Fieger Kenny & Harrington PC
 4            19390 West 10 Mile Road
              Southfield, Michigan 48075
 5            (248)355-5555
 6
 7   For Defendants Mitchell and City of Rockwood:
 8            MS. LAUREL F. MCGIFFERT (P31667)
              Plunkett Cooney
 9            150 West Jefferson, Suite 800
              Detroit, Michigan 48226
10            (313)983-4751
11
12   For Defendants Robinson and City of Gibraltar:
13            MS. AUDREY J. FORBUSH (P41744)
              Plunkett Cooney
14            111 East Court Street, Suite 1B
              Flint, Michigan 48502
15            (810)342-7014
16
17   Also Present:
18            Officer Gary Robinson
              Chief Randy Krause
19            Ms. Danielle Chidiac
20
21   REPORTED BY:
22            Ms. Leah M. Witt, CSR-8825
              Certified Shorthand Reporter
23            (248)644-8888
24
25
```

Page 3

```
 1                    TABLE OF CONTENTS
 2   WITNESS:                                          PAGE
 3   OFFICER NICHOLAS BILL MITCHELL
 4       Direct Examination by Mr. Weglarz              4
         Cross-Examination by Ms. Forbush             169
 5       Cross-Examination by Ms. McGiffert           173
         Redirect Examination by Mr. Weglarz          175
 6       Recross-Examination by Ms. McGiffert         178
 7
 8
 9   EXHIBITS:                                       MARKED
10       Exhibit 1    Taser Manual                     18
11       Exhibit 2    Bedroom Photograph               67
12       Exhibit 3    Mitchell Report                 151
13       Exhibit 4    Taser Use Report                160
14       Exhibit 5    Kapucinski Photgraph            176
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Gibraltar, Michigan
 2   Thursday, June 28, 2018 - 9:13 a.m.
 3            OFFICER NICHOLAS BILL MITCHELL
 4        HAVING BEEN CALLED BY THE PLAINTIFF AND SWORN:
 5            MR. WEGLARZ:  We're here for the deposition
 6   of Officer Nicholas Mitchell, is that correct?
 7            THE WITNESS:  Yes.
 8            MR. WEGLARZ:  Taken pursuant to Notice and
 9   agreement of counsel.  Officer Mitchell, my name is
10   Todd Weglarz.  I represent the plaintiff in this case.
11   I'm going to ask you some questions today about
12   yourself and about what you recall happening on the
13   evening of April the 16th of 2015.  If you do not
14   understand a question, let me know and I'll do my best
15   to rephrase.  If you need to stop, take a break, talk
16   to your counsel, use the restroom, whatever, just say
17   so and we can do that, fair enough?
18            THE WITNESS:  Okay.
19            DIRECT EXAMINATION
20   BY MR. WEGLARZ:
21   Q.  All right.  For the record, your full and complete
22       name, please.
23   A.  Nicholas Bill Mitchell.
24   Q.  Date of birth, please?
25   A.  July 16th, 1989.
```

Page 5

1   Q.   Did you review anything to prepare yourself for your
2        deposition?
3   A.   Yes, I did.
4   Q.   And tell me what you reviewed.
5   A.   I reviewed the folder here of documents -- I believe
6        you have the same documents -- including my report run.
7   Q.   All right.  So included in that folder is your report,
8        and I take it that is the complaint record for the
9        Rockwood Police Department?
10  A.   Yes.
11  Q.   Anything else that represents your report pertaining to
12       this incident?
13  A.   By that would you mean video on a speed report?
14  Q.   Okay.  Well, the complaint record report is what you
15       authored, correct?
16  A.   Yes.
17  Q.   And that's for the Rockwood PD?
18  A.   Yes.
19  Q.   And we'll talk about that shortly.  Right now I'm just
20       interested in what you consider your report pertaining
21       to this incident, if there's anything more than that.
22  A.   Just my report.
23  Q.   Okay.  Did you author or note anything else about this
24       incident other than that report?
25  A.   No, I did not.

Page 6

1   Q.   Also included in that binder would be what?
2   A.   The Michigan State Police report, the medical
3        examiner's report, the Rockwood Police Department Taser
4        use logs, the Rockwood Police Department Taser policy,
5        old reports from 1999, the subject of the report being
6        a -- some kind of a check fraud involving
7        Mr. Kapuscinski, my Taser certification, and Taser
8        warnings.  I believe that is it.
9             MS. McGIFFERT:  Counsel, if you would just
10       allow me, I did provide him with this binder, and they
11       are the documents that we provided to you that are
12       Bates numbered RW0001 through RW0166.
13            MR. WEGLARZ:  And I appreciate that.  And all
14       those documents do sound familiar, so I appreciate you
15       identifying those.
16  BY MR. WEGLARZ:
17  Q.   Did you review or look at anything else to prepare
18       yourself for the deposition other than the records you
19       just identified for me?
20  A.   The dash cam video and radio traffic.
21  Q.   All right.  And the dash cam video is the video that
22       was from your unit or car for that evening?
23  A.   Yes.
24  Q.   Okay.  And really it's just a video it looks like
25       primarily of the outside of that apartment complex,

Page 7

1        correct?
2   A.   Yes.
3   Q.   With the audio of you and others being inside and
4        wherever you happened to be that evening?
5   A.   Yes.
6   Q.   And that audio is from the microphone that you had
7        where?
8   A.   What?  Repeat that, I'm sorry.
9   Q.   The audio is from a microphone I take it, and that
10       microphone was physically where during that evening?
11  A.   I believe it was on my belt.
12  Q.   Okay.  Anything else that you reviewed?
13  A.   No.
14  Q.   Have you had your deposition taken before?
15  A.   Yes.
16  Q.   How many times?
17  A.   Once.
18  Q.   And when was this other time?
19  A.   I don't recall the exact --
20  Q.   Ballpark.
21  A.   -- date.  Three to four years ago.
22  Q.   And was it a lawsuit filed against the police
23       department?
24  A.   No.
25  Q.   Okay.  What type of case did that involve?

Page 8

1   A.   Civil landlord issue where I was a witness.
2   Q.   To your knowledge, have you ever been named as a
3        defendant in a lawsuit before?
4   A.   Not to my knowledge.
5   Q.   Have you ever filed a lawsuit yourself before?
6   A.   No, I have not.
7   Q.   Have you ever been arrested or charged with a crime?
8   A.   No, I have not.
9   Q.   Where did you go to high school?
10  A.   Allen Park High School.
11  Q.   I'm assuming you graduated?
12  A.   Yes.
13  Q.   And when?
14  A.   2007.
15  Q.   Did you undergo any education after graduating from
16       high school?
17  A.   Yes.
18  Q.   Describe that for me, please.
19  A.   I did one year at Wayne State University and then
20       transferred to Schoolcraft College where I obtained a
21       associate's degree in criminal justice and completed
22       the police academy.
23  Q.   And when did you obtain the associate's degree?
24  A.   2010.
25  Q.   When did you do the police academy?

Page 9

1   A.   2010.
2   Q.   And you finished it in 2010 as well?
3   A.   Yes.  The police academy was the last semester of my
4        associate's degree.
5   Q.   And that was through Schoolcraft?
6   A.   Yes.
7   Q.   And when you finished the academy, what was your
8        ranking out of your class?
9   A.   I don't recall.
10  Q.   Can you give me an estimate?
11  A.   Probably somewhere in the middle.  Thirty, twenty.
12            MS. McGIFFERT:  Don't guess.
13  BY MR. WEGLARZ:
14  Q.   Somewhere in the middle?
15  A.   Somewhere in the middle.
16  Q.   Okay.  I deposed a trooper once who was the absolute
17       very last in his class, so being in the middle is good.
18       You're currently employed?
19  A.   Yes.
20  Q.   Where?
21  A.   City of Rockwood.
22  Q.   And how long have you been employed by the city of
23       Rockwood?
24  A.   Almost six years.
25  Q.   And when you first hired in with the city of Rockwood,

Page 10

1        what was your job title?
2   A.   Patrolman.
3   Q.   And has that job title been the same since you've been
4        employed by the city of Rockwood?
5   A.   Yes.
6   Q.   Have you worked in law enforcement anywhere else other
7        than through the city of Rockwood?
8   A.   As a volunteer, unpaid.
9   Q.   Where?
10  A.   The city of Taylor auxiliary.
11  Q.   And when did you start doing that?
12  A.   2012.
13  Q.   Are you still doing it?
14  A.   No.
15  Q.   And when did you stop?
16  A.   2012.
17  Q.   And why did you do that?
18  A.   I was hired -- oh, why did I?
19  Q.   Yeah.
20  A.   To get experience for resume.
21  Q.   And why did you stop?
22  A.   I was hired with the city of Rockwood.
23  Q.   Gotcha.  That covers all of your law enforcement
24       employment?
25  A.   Yes.

Page 11

1   Q.   Okay.  Any other places where you've worked, even if
2        it's outside of law enforcement?
3   A.   Previously as a security guard and also for the parks
4        and recreation department for the city of Allen Park.
5   Q.   And during what time period did you work in that
6        capacity?
7            MS. McGIFFERT:  Which one?
8   BY MR. WEGLARZ:
9   Q.   Oh, those are two separate things?
10  A.   Yes.
11  Q.   My apologies.  All right.  So let's break that down.
12       The security guard employment, that was where?
13  A.   The company was called Guardsmark, and I was contracted
14       to the Solutia chemical plant in Trenton.
15  Q.   What time period?
16  A.   December 2010 until August 2012.
17  Q.   Anywhere else where you worked as a security guard?
18  A.   No.
19  Q.   All right.  And then you worked for the parks and rec
20       department for Allen Park?
21  A.   Yes.
22  Q.   What time period?
23  A.   It would have been about September 2006 through
24       August 2012.
25  Q.   And what did you do there?

Page 12

1   A.   In the winter I primarily was a Zamboni driver in
2        charge of keeping care of the ice arena and in the
3        summer cutting grass in the ball fields, taking care
4        of -- maintaining ball fields.
5   Q.   Do you skate?
6   A.   Yes.
7   Q.   Figured you did.  They got a nice arena there.
8   A.   Yes.
9   Q.   Been there several times.  Anywhere else where you've
10       been employed?
11  A.   Previous to that, in high school a mini golf course in
12       Taylor.
13  Q.   What time period?
14  A.   It would have been the summer of 2007.
15  Q.   What was the name of the place?
16  A.   Midway Golf.
17  Q.   I have not been to that facility several times or at
18       all.  Anywhere else where you've worked?
19  A.   No.
20  Q.   Have you ever been disciplined or reprimanded by any of
21       your employers at any time?
22  A.   Yes.
23            MS. McGIFFERT:  I'm just going to place an
24       objection to this entire line of questioning.
25            MR. WEGLARZ:  Sure.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 13—16

---

Page 13

1  BY MR. WEGLARZ:
2  Q.  Which employers?
3  A.  City of Rockwood.
4  Q.  Okay.  And how many times?
5  A.  Once.
6  Q.  And when was that?
7  A.  If I could refer to the document.
8  Q.  And it doesn't have to be exact --
9        MS. McGIFFERT:  Want me to help him?
10 BY MR. WEGLARZ:
11 Q.  -- though I appreciate you --
12       MS. McGIFFERT:  Want me to help him?
13 BY MR. WEGLARZ:
14 Q.  -- wanting to be precise.
15       MS. McGIFFERT:  Do you want me to help him?
16       MR. WEGLARZ:  I don't care.
17       MS. McGIFFERT:  Excuse me.
18       THE WITNESS:  February 5th, 2013.
19 BY MR. WEGLARZ:
20 Q.  And that was in connection with what incident?
21 A.  Damage to a patrol vehicle.
22 Q.  And what happened for there to be damage to the patrol
23      vehicle?
24 A.  I lost control in snow and ice.
25 Q.  And what was the discipline that was given?

---

Page 14

1  A.  A verbal written warning I believe.  Written verbal
2      warning.
3  Q.  Okay.  Any other reprimands, discipline, in service,
4      anything?
5  A.  Not that I'm aware of.
6  Q.  All right.  And that's the only time through any
7      employer that you've had throughout your lifetime,
8      correct?
9  A.  Yes.
10 Q.  Okay.  When you went to the police academy, did you
11      receive any type of training on the use of Tasers?
12 A.  No.
13 Q.  I take it at some point in time you did receive some
14      Taser training.
15 A.  Yes.
16 Q.  And can you tell me when you received Taser training?
17 A.  Once again, if I can look at the document.
18 Q.  Absolutely.  And I can tell you, all my questions, if
19      you need assistance in your response by having to refer
20      to records, please feel free to do so.
21 A.  My initial Taser training was completed August 31st,
22      2012.
23 Q.  And tell me what that initial Taser training consisted
24      of.
25 A.  It consisted of classroom lectures, a PowerPoint

---

Page 15

1  presentation, including videos, also hands-on training
2  where you have to deploy a Taser.  Also -- I believe
3  that's it.
4        MS. McGIFFERT:  What was the question, Todd?
5        MR. WEGLARZ:  To just tell me what his
6  initial Taser training consisted of.
7        MS. McGIFFERT:  Okay.
8  BY MR. WEGLARZ:
9  Q.  And how many hours total did all of this take?
10 A.  I don't recall.
11 Q.  And is it something that was several days, several
12      weeks?
13 A.  It was done over the course of one day.
14 Q.  So several hours.  I take it you completed that
15      training successfully?
16 A.  Yes.
17 Q.  And did that training involve in discussing the ideal
18      target area?
19 A.  Yes.
20 Q.  And what was -- how was that explained to you as to
21      what the ideal target area was?
22       MR. FORBUSH:  I'm just going to object to the
23      form of the question.  I think the term is the
24      preferred target area.
25       MS. McGIFFERT:  Join.

---

Page 16

1  BY MR. WEGLARZ:
2  Q.  Go ahead.
3  A.  The preferred target area --
4  Q.  But you're okay with my -- I said ideal, right?  You
5      didn't disagree with ideal, did you?
6  A.  I believe the wording in the presentations is
7      preferred.
8  Q.  Okay.
9  A.  The preferred target areas, when feasible, would be the
10      abdomen, legs, and the back.
11 Q.  Who put on the training, by the way?
12 A.  At the time it was Sergeant Krause, who is now the
13      chief of police.
14 Q.  Did anyone else assist with that training?
15 A.  Not that I recall.
16 Q.  Any reps from the Taser company?
17 A.  Not that I recall.
18 Q.  And was it explained why the abdomen, legs, and back
19      areas are the preferred target area?
20 A.  Yes.
21 Q.  Okay.  And tell me what the explanation was.
22 A.  There are bigger muscle groups there to cause -- or to
23      make the Taser more effective.
24 Q.  Any other reasons that were given?
25 A.  I believe -- if I can refer to the Taser manual?

---

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 17

1   Q.   Sure.
2   A.   **It increases the dart-to-heart distance.**
3   Q.   Any other reasons?
4   A.   **Not that I'm aware of.**
5   Q.   Did the training ever explain, mention, or advise that
6        hitting certain areas can cause an increase in the risk
7        of harm to the recipient of the Taser?
8   A.   **I'm not sure.**
9   Q.   Have you ever heard of that?
10  A.   **I believe it has a low probability.  If I can refer to**
11       **the Taser warnings.  It does say that in rare**
12       **circumstances that there is a low probability.**
13  Q.   A low probability of what?
14  A.   **Inducing extra heartbeats.**
15  Q.   And inducing extra heartbeats can occur if you hit what
16       area?
17  A.   **I am not sure.**
18  Q.   Have you ever heard that if the Taser strikes the chest
19       area, that that can increase the risk of harm to the
20       subject?
21  A.   **If it's in the Taser -- let me refer to the Taser**
22       **manual again here.**
23  Q.   Sure.
24           MS. FORBUSH:  I'm sorry, could you repeat the
25       question?

Page 18

1            MR. WEGLARZ:  Can you read it back, please?
2            (At 9:32 a.m., the court reporter read back:
3        "Question: Have you ever heard that if the
4        Taser strikes the chest area, that that can
5        increase the risk of harm to the subject?")
6        **THE WITNESS:  The way that I read it, when**
7   **possible, avoid the frontal chest area near the heart**
8   **to reduce the risk.  I'm not seeing anywhere where it**
9   **increases the risk.**
10  BY MR. WEGLARZ:
11  Q.   Okay.  And you're looking at the Taser CEW Warnings,
12       Instructions, and Information that's provided to law
13       enforcement, correct?
14  A.   **Yes.**
15  Q.   We're actually going to mark that as Exhibit 1 since
16       we're talking about it at length here.
17           MS. McGIFFERT:  What do you want to mark?
18           MR. WEGLARZ:  The Taser warnings that he's
19       looking at right there.
20           (At 9:34 a.m., Exhibit 1 marked)
21  BY MR. WEGLARZ:
22  Q.   If I could see that just for a second.  Thank you,
23       officer.  And just for the record, Exhibit Number 1
24       consists of four pages, and they do have Bates stamps
25       on them, RW1 through RW4.  And, Officer Mitchell, the

Page 19

1        information contained on Exhibit 1 would have been
2        provided to you during your training, is that correct?
3   A.   **Yes.**
4   Q.   Your initial training on the Tasers, correct?
5   A.   **Yes.**
6   Q.   Okay.  And on page 1 -- and by the way, do they even
7        give you a copy of this?
8   A.   **I don't recall if I was given a copy or not.**
9   Q.   All right.  So if a copy wasn't provided, they at least
10       went through the substance of Exhibit Number 1,
11       correct?
12  A.   **Yes.**
13  Q.   And you're aware of all the information set forth on
14       Exhibit Number 1 here during your initial Taser
15       training.
16  A.   **Yes.**
17  Q.   And I believe on page 1 of Exhibit 1, do you see where
18       they have a section that says Warning and it discusses
19       cardiac capture?
20  A.   **Yes.**
21  Q.   And it says, "CEW exposure in the chest area near the
22       heart has a low probability of inducing extra heart
23       beats" known as cardiac capture?
24  A.   **Yes.**
25  Q.   Okay.  You were aware of that after you received your

Page 20

1        training --
2   A.   **Yes.**
3   Q.   -- correct?  And it says, "In rare circumstances,
4        cardiac capture could lead to cardiac arrest."
5   A.   **Yes.**
6   Q.   Okay.  And you're aware of that, correct?
7   A.   **Yes.**
8   Q.   You were aware of that after you received your initial
9        training, correct?
10  A.   **Yes.**
11  Q.   And that would be one of the reasons as to why the
12       preferred target area does not include the chest area,
13       correct?
14  A.   **Yes.**
15  Q.   If you do deploy a Taser and hit the chest area, that
16       increases the risk of cardiac arrest to that person,
17       correct?
18           MS. McGIFFERT:  I'm going to --
19           MS. FORBUSH:  Objection.  Foundation.
20           MS. McGIFFERT:  -- object as to form and
21       foundation as well.
22           **THE WITNESS:  I do not read anything in there**
23       **about increasing in that paragraph.**
24  BY MR. WEGLARZ:
25  Q.   Do you believe that if you deploy a Taser hitting the

Page 21

1    chest area, that the risk of cardiac arrest is greater
2    than if you were to use the Taser and hit the abdomen
3    or the back or the leg area?
4              MS. FORBUSH: Object to foundation.
5              MS. McGIFFERT: Same. Join.
6              THE WITNESS: I would have no idea. I'm not
7    a doctor.
8    BY MR. WEGLARZ:
9    Q.   Well, no, but you are someone who's trained in Tasers
10        who has an understanding of the preferred target area,
11        correct?
12   A.   Correct, but I would not know if that would increase it
13        or not.
14   Q.   Do you agree that deploying a Taser in the area of the
15        chest near the heart does involve some risk of cardiac
16        injury?
17             MS. McGIFFERT: Object as to foundation.
18             THE WITNESS: I would not know.
19   BY MR. WEGLARZ:
20   Q.   Was that ever explained to you during your training
21        that if you deploy a Taser in the chest area near the
22        heart, that that could cause cardiac injury or harm?
23   A.   As it's worded in the document, in rare circumstances
24        and it is a low probability.
25   Q.   Would you -- was it ever explained to you during your

Page 22

1         training that, hey, if you deploy a Taser and you hit
2         the chest area near the heart, that could cause cardiac
3         injury, even cardiac arrest?
4    A.   As the document states, in rare circumstances and has a
5         low probability.
6    Q.   I understand that's what the document says. I just
7         want to know, when you left that training that was
8         provided by Sergeant Krause, correct?
9    A.   At the time sergeant, now chief, yes.
10   Q.   Yes. Did you leave that training with the
11        understanding that, you know what, in general I should
12        probably try avoiding hitting the chest area when I
13        deploy Tasers because that could cause cardiac injury
14        or harm to the subjects?
15   A.   When I left the training, I had the knowledge that's
16        written here, that it has a low probability, it is rare
17        circumstances, there are preferred target areas to hit
18        when feasible.
19   Q.   Okay. And I appreciate that, you pointing out what it
20        shows in the document, but I just want to know your
21        overall understanding, not just based on what's in the
22        document. And you didn't even know if you were
23        provided a copy of the document, correct?
24   A.   Correct, I don't know if I was provided a physical
25        copies, but copies were -- have been made available.

Page 23

1    Q.   Okay. And I'm sure the training consisted more of just
2         reading that four-page document, correct?
3    A.   More -- can you repeat that one more time?
4    Q.   Your Taser training consisted of more than just going
5         through that four-page document --
6    A.   Yes.
7    Q.   -- that we marked as Exhibit Number 1, right?
8    A.   Yes.
9    Q.   When you finished that training, did you walk away with
10        the understanding that, in general, you should try, if
11        possible, to avoid hitting the chest area because that
12        could cause cardiac injury?
13   A.   I was trained to, when feasible, avoid the chest area.
14        When practical, avoid intentionally targeting the face
15        area, the chest area, the breast, the groin, the
16        genitals, and preexisting injury areas.
17   Q.   All right. And was your understanding that you should,
18        in general, try to avoid the chest area because if you
19        do hit the chest area, that could cause injury?
20   A.   When feasible, avoid hitting the non-preferred target
21        areas, yes.
22   Q.   Right. Including the chest.
23   A.   The chest would be above the abdomen area. It would be
24        not in the preferred target areas to hit, when
25        feasible.

Page 24

1         And one of the reasons why you would try to avoid the
2         chest area is to try to avoid cardiac injury.
3              MS. McGIFFERT: I'm just going to place an
4         objection. The question's been asked and answered
5         multiple times, but go ahead.
6              THE WITNESS: As I've read several times here
7         from the document, that it has a low probability of
8         inducing any extra heartbeats, cardiac capture, and in
9         rare circumstances. So in the rare circumstances and
10        low probability, I would need to avoid the
11        non-preferred areas when feasible.
12   BY MR. WEGLARZ:
13   Q.   And what are the other non-preferred areas besides the
14        chest?
15   A.   The face, eyes, head, throat.
16   Q.   So if you hit the face, the eyes, the head, or the
17        throat, does that also cause a low probability of
18        inducing extra heartbeats?
19   A.   I'm not sure.
20   Q.   Is that your understanding?
21   A.   It does not say in the training anywhere that it could.
22   Q.   Since receiving that initial training, have you tried
23        to avoid hitting the chest area when deploying Tasers?
24   A.   Yes.
25   Q.   And why?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                                    Pages 25–28

Page 25

1   A.   It's not one of the preferred target areas of the
2        Taser.
3   Q.   And one of these reasons being because if you hit a
4        non-preferred target area, that could cause harm or
5        injury?
6   A.   There is a low probability of any cardiac capture and
7        in rare circumstances.
8   Q.   But even though there's a low probability, that means
9        that could cause injury, correct?
10  A.   To a low probability, yes.
11  Q.   And was avoidance of the chest area also discussed
12       during lecture and the PowerPoint that you described?
13  A.   I believe so.
14  Q.   And did they also discuss the low probability of
15       cardiac capture?
16  A.   I believe so.
17  Q.   And the low probability of cardiac capture leading to
18       cardiac arrest?
19  A.   I'm not sure.
20  Q.   What is your understanding as to what cardiac capture
21       is?
22  A.   I'm not sure.
23  Q.   Do you have any idea as to what it means?
24  A.   Just would know that it would be something with the
25       heart.  I do not know.

Page 26

1   Q.   Is it a good thing or bad thing?
2   A.   I would assume a bad thing.
3   Q.   Did you have any other Taser training beyond the
4        initial training that you've described for us back in
5        August of 2012?
6   A.   Yes.
7   Q.   And describe the other training on Tasers you received.
8   A.   Up until this incident, just a yearly recertification.
9   Q.   And what's involved with getting your yearly
10       recertification?
11  A.   You just have to take the class again.
12  Q.   The same one-day training course that you took
13       initially in August of 2012?
14  A.   Yes.
15  Q.   Is there anything that's different when you take it
16       every year?  Is it updated?
17  A.   I believe it's updated.
18  Q.   Okay.  And did you take that one-day Taser training on
19       an annual basis from August of 2012 up to the present?
20  A.   Yes.
21  Q.   And you've always passed it?
22  A.   Yes.
23  Q.   Okay.  Do you recall any changes being made throughout
24       these annual trainings?
25  A.   I don't recall what the changes would be, no.

Page 27

1   Q.   I'm just interested in knowing as you sit here today,
2        do you recall anything being different or them flagging
3        something out, hey, we're going to do this now instead
4        of what we told you from before?
5   A.   No.
6   Q.   You also mentioned that that includes hands-on
7        training?
8   A.   Hands-on use of the Taser, yes.
9   Q.   Okay.  And what do you do as part of that training?
10  A.   You deploy two cartridges.
11  Q.   And what's your target?
12  A.   There's a cardboard cutout.
13  Q.   And does this cardboard cutout look like a person?
14  A.   It's shaped as a torso from the waist up.
15  Q.   And where are you supposed to deploy those two
16       cartridges on that cutout which depicts a torso from
17       the waist up?
18  A.   It would be just anywhere on it.  There's not any
19       specific area.  It's not a picture of a person, whether
20       it be facing one way or facing the other way.  It's
21       just cardboard, and you just deploy into the cardboard.
22  Q.   And when you deploy these two cartridges, do you try to
23       hit the chest area?
24  A.   There's no area drawn on the cardboard.  It could be
25       front or back of the person.  It would just be a box --

Page 28

1        really smaller box on top of it.
2   Q.   Have you ever deployed your Taser in the line of duty
3        aside from this incident involving Mr. Kapuscinski?
4   A.   Yes.
5   Q.   How many times?
6   A.   This incident was the third time.
7   Q.   How about subsequent to this incident?
8   A.   I believe twice.
9   Q.   And what kind of Tasers do you use at the Rockwood PD?
10  A.   Currently the X2.
11  Q.   And then you used an X2 at the time of this incident?
12  A.   Yes.
13  Q.   Is that same Taser that was used in this incident with
14       Mr. Kapuscinski still being used?
15  A.   Yes.
16  Q.   The first time that you deployed your Taser in the line
17       of duty was approximately how long ago?
18  A.   If I could refer to my documents?
19  Q.   Sure.
20  A.   May of 2013.
21  Q.   And what were the circumstances leading up to the use
22       of your Taser?
23  A.   A individual who was harming himself in our jail cell,
24       in order to get him to stop harming himself, I deployed
25       a Taser on him.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                                    Pages 29–32

Page 29

1   Q.  And where did you hit him?  What target?
2   A.  If I could refer to my documents.  He was hit in the
3       right thigh.
4   Q.  And how was the suspect positioned when you deployed
5       your Taser?
6   A.  I don't recall.
7   Q.  How many times did you fire the Taser?
8   A.  Once.
9   Q.  And how do these things work in general?  You deploy
10      the cartridge, the two probes are supposed to make
11      contact and stick to the subject, correct?
12  A.  Yes.
13  Q.  And then does it automatically fire, or do you have to
14      press the Taser again or activate the trigger again?
15      Let me back up.  When you deploy the cartridge --
16  A.  Yes.
17  Q.  -- which shoots the two darts, how do you do that?
18  A.  You pull the trigger.
19  Q.  And then once the two darts hit the subject, does it
20      automatically fire, or do you have to pull the trigger
21      again?
22  A.  I'm not sure I understand.  I've already fired the
23      Taser.  How do I fire it?
24  Q.  Yeah.
25  A.  You pull the trigger, the probes come out, they stick

Page 30

1       into the subject, at which point he is then being
2       tased.
3   Q.  Okay.  So it's juiced.  As soon as those probes make
4       contact, they're full of juice, and how long does that
5       go on for?
6   A.  Five seconds.
7   Q.  All right.  And if you wanted to fire it again, do you
8       just hit the trigger again?
9   A.  It wouldn't fire, it would just recharge.  It would
10      just go a five-second cycle again.  On the Taser used
11      at this time during the first incident, you would pull
12      the trigger again and he would be tased again.
13  Q.  Okay.  When you say you pull the trigger again, that's
14      for which Taser?
15  A.  In 2013, my first Taser deployment, which I believe is
16      the one we were talking about --
17  Q.  Yes.
18  A.  -- we used the X26 Taser, which carried one cartridge.
19      So I would pull the trigger once, and he would be hit
20      with the Taser probes and be under power of the Taser.
21      If you wanted to tase him again, if he was getting up,
22      coming after you, you would pull it again and then pull
23      the trigger again and he would be tased again.
24  Q.  For another five-second cycle.
25  A.  Yes.

Page 31

1   Q.  Through the same darts that are already --
2   A.  Yes.
3   Q.  -- in the subject.
4   A.  Yes.
5   Q.  Okay.  All right.  That's for the X26 --
6   A.  Yes.
7   Q.  -- that you used in 2013.
8   A.  Yes.
9   Q.  Is it any different for the X2?
10  A.  Yes.
11  Q.  And how is the X2 different?
12  A.  The X2 has two cartridges.  I would pull the trigger, I
13      would tase somebody one time.  I could then pull the
14      trigger again and it would deploy a second cartridge,
15      or there is a switch on the side to use the same
16      cartridge again.
17  Q.  All right.  So if you wanted to do another five-second
18      cycle of the darts already in the subject after you did
19      the first tase --
20  A.  Yes.
21  Q.  -- do you -- can you do that on the X2 --
22  A.  The X2, yes.
23  Q.  -- or do you have to shoot the other cartridge if you
24      want to do another tase?
25  A.  No, you can use the same one.

Page 32

1   Q.  All right.  And to do that, you have to do it with a
2       mechanism on the side, is that what you said?
3   A.  Yes, a button on the side.
4   Q.  And what do they call that when you do it that way?
5   A.  That would be you press the ARC switch.
6   Q.  The ARC switch.  And once you hit the switch, does it
7       automatically go through a five-second cycle?
8   A.  When you use the switch, you have to hold it down for
9       the five seconds while watching the screen and release
10      at five.
11  Q.  Okay.  Can you release at two?
12  A.  Yes.
13  Q.  But the longest it will go is for five seconds.
14  A.  Unless you continue to hold that button down, it will
15      continue to go.
16  Q.  So you can fire it for 20 seconds if you want, right?
17  A.  Theoretically, yes.
18  Q.  Is that -- is that ever done?
19  A.  No.
20  Q.  Does the training say to do that?
21  A.  No.
22  Q.  What does the training say to do as to the duration of
23      the fire -- the firing?
24  A.  It's five-second cycles.
25  Q.  Is there any risk of harm presented to the suspect if

Page 33

1    you go longer than five seconds?
2  A.  The training I believe says that there is, yes.
3  Q.  Okay.  And what's the risk of harm?
4  A.  I believe it would be you could injure them by keeping
5      them under power, and I believe there would be any --
6      if I could refer to my documents.  I'm not seeing it
7      in the documents.  I'm not sure.
8  Q.  During your training, was it -- did they also caution
9      against using consecutive firings, if possible?
10 A.  The firing of a Taser should only be used the minimum
11     amount needed to control a situation.
12 Q.  Okay.  And ideally you hope that just one firing will
13     do it, correct?
14 A.  Ideally.
15 Q.  And they train you to, in conjunction with the Taser,
16     to also use other control techniques to take control of
17     the situation, correct?
18 A.  If feasible.
19 Q.  Yeah.  And one of the reasons for that is to hopefully
20     prevent having to cycle it more than one time, correct?
21 A.  I guess so, yes.
22 Q.  Okay.  Because each time that you do another Taser
23     cycle where you fire it for another two to five
24     seconds, that does present a further increase in the
25     risk of harm to the subject, true?

Page 34

1         MS. McGIFFERT:  Object as to foundation.  Go
2      ahead.
3         THE WITNESS:  I'm not sure if it would cause
4      any harm.  I wouldn't know.  I don't know.
5  BY MR. WEGLARZ:
6  Q.  The Taser in general is considered nonlethal force?
7  A.  I believe so, yes.
8  Q.  Nonetheless, it's still a use of force, true?
9  A.  Correct.
10 Q.  And you understand that working as a police officer,
11     even when you use what's typically referred to as
12     nonlethal force, you must use that force reasonably,
13     correct?
14 A.  Yes.
15 Q.  And you would agree that the use of a Taser, depending
16     on how it's used, can be excessive.
17 A.  Yes.
18 Q.  If you fire it more than you need to fire it, that
19     would be excessive force, correct?
20 A.  Yes.
21 Q.  And if you use it in the non-preferred areas, if you're
22     able to hit the preferred areas, that could be
23     excessive force?
24 A.  No.
25         MS. FORBUSH:  Object to form.

Page 35

1         MS. McGIFFERT:  Join.
2         MS. FORBUSH:  You said if you're able to hit
3      the preferred areas?
4  BY MR. WEGLARZ:
5  Q.  Yeah.  If you deploy the Taser and hit non-preferred
6      areas, the chest for example, when you could have hit
7      the abdomen or the back or the legs, would that be
8      excessive force?
9  A.  No.
10 Q.  And why not?
11 A.  It's only when feasible to hit the preferred target
12     areas.  It's not always feasible to hit those areas.
13 Q.  That's a fair point.  That's a fair point.  If it's
14     feasible to hit areas like the legs, the abdomen, the
15     back, if it's feasible, would it be excessive force if
16     you hit the chest?
17 A.  No.
18 Q.  When you deployed the Taser that first time back in May
19     of 2013, you hit the subject in the right thigh, and I
20     take it you only had to fire it once?
21 A.  If I can refer to my document.
22 Q.  Sure.
23 A.  The Taser was fired one time as there was only one
24     cartridge to fire.  There was two cycles applied, one
25     of them failed.  One of the cycles did not work.

Page 36

1  Q.  Do you know why?
2  A.  I do not know why.
3  Q.  And how do you know it didn't work?
4  A.  I deployed the Taser, I could hear the arcing, but the
5      probes did not deploy.
6  Q.  All right.  So the probes never left the Taser unit?
7  A.  Yes.
8  Q.  Okay.  And when the probes left the Taser unit the
9      second time, it worked, correct?
10 A.  Yes.
11 Q.  And it took control of the subject.
12 A.  Yes.
13 Q.  When was the second time you deployed the Taser in the
14     line of duty?
15 A.  Once again, referring to my document.  March 2nd, 2014.
16 Q.  And tell me the circumstances leading up to that.
17 A.  There was a violent domestic assault suspect that we
18     were -- myself and a Flat Rock officer were attempting
19     to take into custody.  He began fighting with the Flat
20     Rock officer, at which point I deployed the Taser.
21 Q.  By the way, to use the Taser reasonably, you can't use
22     the Taser for punitive measures, can you?
23 A.  By that you mean just as punishment?
24 Q.  Yes.
25 A.  No.

Page 37

1  Q.  There has to be some risk of harm to you or some
2      threatened risk of harm.
3  A.  Yes.
4  Q.  For example, you can't deploy a Taser on a subject
5      simply because the subject is not responding or
6      listening to you.
7  A.  Correct.
8  Q.  There would have to be some other threatened risk of
9      harm to you in conjunction with that for you to
10     lawfully use the Taser, do you agree?
11 A.  Yes.
12 Q.  And when you deployed the Taser in March of 2014, what
13     part of the body of the suspect did you hit?
14 A.  Referring to my documents.  He was hit in the lower
15     back.
16 Q.  By the way, is there one area that you always try to
17     target?
18 A.  You always try to target the preferred target areas.
19 Q.  Okay.  But is there one in particular you always have a
20     preference for?
21 A.  No.
22 Q.  Is there kind of like a hierarchy?  Go for the back.
23     If that's not available, then the legs?
24 A.  No.
25 Q.  Do you ever try to hit the arms?

Page 38

1  A.  I always aim for any of the preferred target areas.
2  Q.  Would the arms be a preferred target area?
3  A.  Yes.
4  Q.  And how many times did you fire the Taser the second
5      time?
6  A.  The second time --
7            MS. McGIFFERT:  Excuse me.  Just so the
8      record's clear, the second time?
9            MR. WEGLARZ:  Yeah, it's confusing.
10 BY MR. WEGLARZ:
11 Q.  The time you deployed it March of 2014 I think is much
12     better.
13 A.  Okay.  That was deployed twice at that time.  The
14     second time I deployed it, it was deployed immediately
15     while the subject was still being tased with the
16     other -- with the first cartridge.
17 Q.  I want to make sure I understand that.  So March of
18     2014 you deployed the Taser.  Did the two darts hit the
19     subject?
20 A.  Yes.
21 Q.  Do they stay in the subject?
22 A.  Yes.
23 Q.  Okay.  And then you fired it again, or did you deploy
24     the cartridge -- the second cartridge?
25 A.  The second cartridge was fired immediately upon firing

Page 39

1      with the first one.
2  Q.  And why?
3  A.  I'm not sure exactly why, what the circumstances were
4      behind it.  Just went off the second time.
5  Q.  Was that intentional?
6  A.  No, it was not intentional.
7  Q.  And the second cartridge that was deployed, did that
8      also take effect on the subject?
9  A.  Yes.
10 Q.  And where did you hit the subject when you deployed the
11     second cartridge?
12 A.  The subject was only hit once -- or it was only hit
13     with one of the Taser probes from that one, and it went
14     into his lower back.
15 Q.  All right.  So he had two probes stuck in him from the
16     first cartridge deployment and one probe from the
17     second cartridge deployment.
18 A.  Yes.
19 Q.  Did you fire it after the second cartridge was deployed
20     for a third time?
21 A.  No.
22 Q.  Now, even though only one probe hit the subject, was he
23     tased?  I mean, was he --
24 A.  He was --
25 Q.  -- did it take effect?  Was he shocked?

Page 40

1  A.  He was as the first cartridge was --
2  Q.  Because he has another two probes there, it's still
3      going to complete the circuit?
4  A.  Yes.  He was being tased from the first cartridge.
5  Q.  Was the subject injured in that incident?
6  A.  No, he was not.
7  Q.  What about in the first incident in May of 2013?
8  A.  He was not.
9  Q.  And did the Taser deployment seem to control the
10     situation during this domestic assault incident in
11     March of 2014?
12 A.  Yes.
13 Q.  And did it seem to control the situation even just from
14     the first cartridge deployment?
15 A.  Can you rephrase that question?
16 Q.  Sure.  In March of 2014 you deployed both cartridges,
17     correct?
18 A.  Yes.
19 Q.  One right after the other --
20 A.  Yes.
21 Q.  -- or was it at the same time?
22 A.  It was within a second when the second one went off.
23 Q.  And both would have fired.  He was receiving jolts from
24     both, correct?
25 A.  No, he was receiving it from one.  Only one of the

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 41

1   **cartridges went into him.**
2   Q.   Right.  For five seconds?
3   A.   **Yes.**
4   Q.   And that controlled the situation.
5   A.   **Yes.**
6   Q.   You were able to arrest him and take control.
7   A.   **Yes.**
8   Q.   And when you say this person was fighting with this
9        other officer, were they throwing punches?
10  A.   **He was grabbing him, trying to take him down to the**
11       **ground.**
12  Q.   Okay.  So it was a physical altercation between the
13       subject and the other police officer.
14  A.   **Yes.**
15  Q.   And then the next time you deployed a Taser would have
16       been with Mr. Kapuscinski?
17  A.   **Yes.**
18  Q.   Up until the point in time where you deployed the Taser
19       on Mr. Kapuscinski, did anyone from the department
20       review with you your prior two Taser deployments?
21  A.   **Do you mean go over them with me or review --**
22  Q.   Review your reports --
23  A.   **Yes.**
24  Q.   -- go over them with you --
25  A.   **Yes.**

Page 42

1   Q.   -- discuss it with you, anything?
2   A.   **My reports were reviewed, yes.**
3   Q.   And every time you use a Taser in the line of duty, you
4        fill out a Taser use report?
5   A.   **Yes.**
6   Q.   Any other documentation or reports you fill out when
7        you deploy a Taser?
8   A.   **We write our police report and the Taser use report.**
9   Q.   And what do you recall your supervisors or anyone else
10       at the department discussing with you about these other
11       two deployments that we just discussed?
12  A.   **I don't recall anything.**
13  Q.   Was anyone ever critical of the way that you used or
14       managed your Taser when deployed in the line of duty?
15  A.   **I don't recall if they were.**
16  Q.   Do you know if anyone commented or was critical of
17       deploying both cartridges in March of 2014?
18  A.   **If they were, I don't recall.**
19  Q.   Up until the time that you had your interaction with
20       Mr. Kapuscinski, are you aware of anyone being injured
21       from the use of a Taser from anyone at the Rockwood
22       Police Department?
23  A.   **No.**
24  Q.   Are you aware or did you hear of anyone complaining
25       that they were tased unnecessarily or excessively?

Page 43

1   A.   **No.**
2   Q.   Are you aware of any officer being accused of not
3        properly using their Taser?
4   A.   **No.**
5   Q.   All right.  Now, the Kapuscinski incident occurred in
6        April of 2015, correct?
7   A.   **Yes.**
8   Q.   I believe on April the 16th?
9   A.   **I believe so.**
10  Q.   Early morning hours?
11  A.   **I believe so.**
12  Q.   Okay.  Up until the time you first hear information
13       about this over the radio, which we'll talk about in a
14       second, did you know who David Kapuscinski was?
15  A.   **No, I did not.**
16  Q.   Did you ever see the guy before April the 16th of 2015?
17  A.   **Not that I know of.**
18  Q.   Did you ever even see the name listed anywhere prior to
19       April 16 of 2015?
20  A.   **Not that I'm aware of.**
21  Q.   All right.  And if Mr. Kapuscinski were to have any
22       type of criminal record, criminal background, you
23       wouldn't know about it because you didn't know that guy
24       on April the 16th of 2015 up until the time that you
25       interacted with him, fair?

Page 44

1   A.   **Correct.**
2   Q.   Okay.  And even after your interaction with him, you
3        had no idea or understanding as to what his background
4        was, fair to say?
5   A.   **Correct.**
6   Q.   Okay.  What shift were you working?
7   A.   **The night shift.**
8   Q.   Which is from when to when?
9   A.   **7:00 p.m. to 7:00 a.m.**
10  Q.   Is that your typical shift?
11  A.   **At the time, yes.**
12  Q.   And when you worked the night shift for the Rockwood
13       PD, is there anyone else working that night shift?
14  A.   **At that time, no.**
15  Q.   That changed at some time?
16  A.   **With our department, with the size that we are and our**
17       **turnover rate and bringing people in and training them,**
18       **most of the time we do not have a second officer on**
19       **night shift.  It's preferred that we do, but we most of**
20       **the time do not.**
21  Q.   And that's even the current practice?
22  A.   **Currently we do have somebody on the night shift -- or**
23       **a second car on the night shift.**
24  Q.   All right.  Back in 2015, how many officers were on the
25       day shift?

Page 45

1   A.   On the day shift at that time I believe one.
2   Q.   Okay.  So that was the usual staffing, one officer on
3        the day shift from 7a to 7p and one officer at night
4        from 7p to 7a.
5   A.   One uniformed officer on the day shift, yes.
6   Q.   So that implies there's non-uniformed officers.
7        Explain that, please.
8   A.   There is a detective and a chief who work during the
9        days.
10  Q.   And what is the -- what do they do during the day?
11  A.   The chief runs day-to-day operations of the police
12       department or is the head of day-to-day operations of
13       the PD.  The detective investigates crimes that were
14       reported.
15  Q.   All right.  And so what do you typically do during a
16       night shift for the Rockwood PD from 7p to 7a?
17  A.   We respond to calls and make traffic stops if needed.
18  Q.   And if you're not responding to a specific call, what
19       do you typically do?
20  A.   Patrol the city.
21  Q.   And before you got the call on Mr. Kapuscinski's
22       incident, where were you right before that?
23  A.   I believe I was at Carlson High School.
24  Q.   By the way, how tall are you?
25  A.   I believe I'm about five-eleven.

Page 46

1   Q.   How much do you weigh?
2   A.   At the time of this incident or now?
3   Q.   I'm going to have to put -- I'm going to have you put
4        this on the record.  How much do you weigh now?
5   A.   Currently, approximately 225 pounds.
6   Q.   And at the time of the incident?
7   A.   I was probably about 200 pounds.
8   Q.   Just means you're lifting a lot, right?
9   A.   Lifting a lot of donuts.
10  Q.   Okay.  You left- or right-handed?
11  A.   Right-handed.
12  Q.   And when you use a Taser, I take it you use your right
13       hand, correct?
14  A.   I -- the Tasers are on my left side.  I grab the Taser
15       with my left hand.
16  Q.   Do you deploy it with your left hand?
17  A.   I believe I would deploy it -- I would take my Taser
18       out with my left hand, put both hands on it, I would
19       pull the trigger with my right hand.
20  Q.   How long were you up at Carlson High School before you
21       heard about this call on the radio involving
22       Mr. Kapuscinski?
23  A.   I'm not sure.
24  Q.   Best estimate.
25  A.   I would have no idea.  A few minutes?

Page 47

1   Q.   And why were you at Carlson High School?
2   A.   I was speaking with Officer Robinson.
3   Q.   And Officer Robinson is who?
4   A.   He's a police officer for the city of Gibralter.
5   Q.   And why were you speaking with Officer Robinson at
6        Carlson High School as opposed to any other location
7        that night?
8   A.   It's just a centralized location between our cities.
9   Q.   I mean, is Carlson High School a usual spot for you to
10       locate yourself during your shift?
11  A.   Sometimes I would speak with Gibralter officers there,
12       yes.
13  Q.   Okay.  That's the spot you usually go to to speak to
14       other Gibralter officers.
15  A.   Sometimes, yes.
16  Q.   Any other reason why you would be at Carlson High
17       School while on duty other than to talk to Gibralter
18       officers?
19  A.   If I'm called to assist them there.
20  Q.   Okay.  If there happens to be a specific run there,
21       correct?
22  A.   Yes.
23  Q.   But that wasn't the case --
24  A.   No.
25  Q.   -- this evening.

Page 48

1   A.   No.
2   Q.   Okay.  Do you recall what day during the week this was?
3   A.   I do not.
4   Q.   Does Thursday morning ring a bell?
5   A.   I believe that's right.
6   Q.   And do you know why Officer Robinson was up at Carlson
7        High School?
8   A.   Just to talk to me.
9   Q.   Who got there first?
10  A.   I don't recall.
11  Q.   Was this a prearranged thing?
12  A.   I think it was just a spur of the moment meet-up.
13  Q.   And what was the purpose in meeting up?
14  A.   Just social.
15  Q.   And did you do the cop thing where you parked your cars
16       in opposite directions so you could be right next to
17       each other and talk to each other through your open
18       windows?
19            MS. McGIFFERT:  Place an objection as to
20       form.
21            MS. FORBUSH:  Join.
22            MS. McGIFFERT:  Go ahead.
23            THE WITNESS:  I believe so.
24  BY MR. WEGLARZ:
25  Q.   And do you recall what you were discussing?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 49

1  A.  No.

2  Q.  And then at some point you hear something over the
3      radio pertaining to an incident involving
4      Mr. Kapuscinski?

5  A.  I didn't know it was Mr. Kapuscinski at the time, but
6      yes.

7  Q.  Okay.  And tell me what you heard.

8  A.  The Gibraltar dispatcher put a call over the radio of a
9      domestic violence incident in progress in Gibraltar.

10  Q.  And did the dispatcher really say violence or just a
11      domestic issue going on?

12  A.  I don't recall.

13  Q.  Anything else you recall hearing over the radio?

14  A.  Not at this time, no.

15  Q.  And you were being requested to go out there and check
16      it out?

17  A.  Yes.  Officer Robinson requested me.

18  Q.  This was a call actually to Officer Robinson?  It was
19      through the Gibraltar dispatch?

20  A.  Yes.

21  Q.  And did you actually hear it over his radio?

22  A.  I heard it over both of our radios.

23  Q.  What channel was that on?

24  A.  I'm not sure.

25  Q.  Gibraltar and Rockwood have their own dispatchers,

Page 50

1      correct?

2  A.  Correct.

3  Q.  And if Gibraltar gets a call to go out and check out a
4      domestic incident, does Rockwood usually go out to
5      that?

6  A.  Sometimes, yes.

7  Q.  And can you tell me why sometimes and sometimes not?

8  A.  We would if they needed assistance, if they only had
9      one car on.  If they had multiple officers working and
10      were able to handle it themselves, then they would not
11      call us.

12  Q.  Did Gibraltar have just one officer on duty at that
13      time?

14  A.  I believe so.

15  Q.  And that was Officer Robinson?

16  A.  Yes.

17  Q.  Was he working the same type of shift as you, 7p to 7a?

18  A.  I believe so.

19  Q.  Did dispatch advise that the Trenton PD were also going
20      to be involved with the run?

21  A.  I believe so.

22  Q.  And did you hear that over the radio?

23  A.  Yes.

24  Q.  And so was that supposed to be the assistance being
25      provided, the Trenton PD assisting and backing up the

Page 51

1      Gibraltar PD?

2  A.  The Gibraltar dispatcher advised Officer Robinson that
3      she would be contacting Trenton.  Officer Robinson had
4      asked me to go over there while we were talking.  He
5      then advised their dispatcher that I was coming there
6      with him.

7  Q.  How many times have you assisted Officer Robinson on
8      calls or runs?

9  A.  A lot.

10  Q.  Best estimate as to how many times to the present date?

11  A.  I honestly don't know if I could give you an estimate.
12      It's been a lot.  We work with each other a lot.

13  Q.  Do you still work the night shift?

14  A.  Not currently.

15  Q.  And would you assist Officer Robinson -- like back in
16      2015, was this a nightly thing, a weekly thing, a
17      monthly thing?

18  A.  I would say we assist Gibraltar probably weekly, maybe
19      more.

20  Q.  Once or twice a week?

21  A.  That's probably a good estimate.

22  Q.  And if Officer Robinson gets a call during the midnight
23      shift, does he usually ask for your assistance if he
24      knows that you're on duty?

25  A.  Me specifically?

Page 52

1  Q.  Yeah.

2  A.  I don't think he would ask for me specifically.  Just a
3      Rockwood police officer or just a backup officer.

4  Q.  Okay.  That's the usual routine.

5  A.  Between us and Gibraltar, yes.

6  Q.  Okay.  All right.  So after getting that call, you then
7      go to the apartment complex?

8  A.  Yes.

9  Q.  And that was on Middle Gibraltar --

10  A.  Yes.

11  Q.  -- correct?  Did you have the lights and siren
12      activated?

13  A.  I do not believe so.

14  Q.  And there is an in-car video, correct?

15  A.  Yes.

16  Q.  With audio.

17  A.  Yes.

18  Q.  And the audio is captured through the microphone that
19      is on your person?

20  A.  Yes.

21  Q.  And is that in-car video always rolling?

22  A.  Yes.

23  Q.  As is the audio?

24  A.  The audio is not.

25  Q.  Okay.  And what determines when the audio goes on or

Page 53

1     goes off?
2 A.  The audio would go on if I'm making contact with a
3     person.
4 Q.  So the microphone only goes on if you're actively
5     speaking?
6 A.  No.  If I am out of the car making contact with a
7     person, I would turn my microphone on.
8 Q.  Okay.  Is the microphone on while you're in the car?
9 A.  It's not recording, no.
10 Q.  It only starts to record if you're outside of the car?
11 A.  It starts to record when I hit the button to.
12 Q.  So it's manually controlled by you?
13 A.  Yes.
14 Q.  And you -- when do you turn the microphone on?  What's
15     your routine or policy?
16 A.  The policy is to be recording any time that we're
17     making contact with somebody.  I usually turn it on as
18     soon as I step out of my patrol car.
19 Q.  Having conversations with anyone through dispatch or
20     radio communications, is that considered making
21     contact?
22 A.  Through radio communications, no.
23 Q.  Have you ever looked for the video of this incident
24     from the time you get the call at Carlson up until the
25     time that you arrive at the complex?

Page 54

1 A.  Have I ever watched it?
2 Q.  Yeah.
3 A.  Yes.
4 Q.  Is there any audio in it?
5 A.  No.
6 Q.  When was the last time you've watched that video?
7 A.  I've watched it over the past few days.
8 Q.  Okay.  How long did it take you to get from Carlson
9     High School to the apartment complex?
10 A.  I don't recall an exact time.
11 Q.  Ballpark.
12 A.  Couple minutes.
13 Q.  And you were behind Officer Robinson's vehicle?
14 A.  I believe so, yes.
15 Q.  Do you know if Officer Robinson's vehicle has a video,
16     in-car video?
17 A.  I do not know.
18 Q.  And was this really Officer Robinson's run?
19 A.  Yes.
20 Q.  He was the one taking charge, correct?
21 A.  Correct.
22 Q.  You were there to back up?
23 A.  Correct.
24 Q.  And once you get to the scene, tell me what happens.
25 A.  We arrived on scene.  I was in my patrol car as was

Page 55

1     Officer Robinson.  We walked towards the main entrance
2     to the apartment complex where we were met by a highly,
3     highly upset young child.  The young child let us in,
4     led us towards the stairs.  Officer Robinson asked him
5     which apartment it was, asked him if he could let us
6     in.  The child said that he was too scared, he was
7     going to wait downstairs.
8         We knocked on the door and were met by a
9     young juvenile female who was extremely, extremely
10     upset.  Officer Robinson asked where the individuals
11     were at.  She just kept screaming, was highly upset.
12     Could hear some sort of an altercation taking place in
13     a back room in the apartment where we then made entry
14     into the apartment.
15         Once we entered into the back bedroom where
16     they were located at, we saw a male who was completely
17     nude, and he had a female's head -- neck between his
18     thighs, was squeezing while yelling something along the
19     lines of "I'm going to kill her, I'm going to kill
20     you."  He was threatening to kill her.  Officer
21     Robinson --
22 Q.  I'll let you finish if you want.  I was going to stop
23     you there and maybe ask you some follow-up, but if you
24     want to get out the whole narrative right now too,
25     that's up to you.

Page 56

1         MS. McGIFFERT:  Well, you know, this endless
2     narrative I think is not the most appropriate way to
3     proceed, so if you want to do some follow-up questions
4     and then let him continue, as long as it's understood
5     he's not finished.
6         MR. WEGLARZ:  Of course.
7 BY MR. WEGLARZ:
8 Q.  All right.  Once you stop your vehicle and get out of
9     the car when you're at the complex, did you then
10     activate the microphone?
11 A.  Yes.  At some point while walking in -- I don't exactly
12     remember at which point I hit the button where I was
13     at, but I activated it.
14 Q.  Do you believe you activated the record button at least
15     at the time when you encountered the young boy outside?
16 A.  I couldn't recall if it was on while we were talking to
17     him outside or not.
18 Q.  All right.  And then what you have to do is first get
19     into the apartment building, right?  There's a main
20     door there into the building, correct?
21 A.  Yes.
22 Q.  And then from there you would have to enter the unit?
23 A.  Yes.
24 Q.  And that was Unit 16?
25 A.  I believe so, yes.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                        Pages 57—60

Page 57

1   Q.   And that was an upstairs unit?
2   A.   Yes.
3   Q.   So I take it you had to go upstairs to find Unit 16,
4        correct?
5   A.   Yes.
6   Q.   And was the door to Unit 16 open or closed?
7   A.   It was closed.
8   Q.   How did you know it was Unit 16, by the way?
9   A.   The boy that let us in, it's the one that he told us
10       to.
11  Q.   You guys didn't just barge into Unit 16.  I take it you
12       knocked, correct?
13  A.   Correct.
14  Q.   And if you listen to that video, slash, audio, you can
15       hear knocking, correct?
16  A.   Correct.
17  Q.   And you recall hearing that just very recently when you
18       were listening to it yourself?
19  A.   Correct.
20  Q.   Okay.  And in response to the knocking, is this when
21       this young girl opened the door?
22  A.   Yes.
23  Q.   And that girl was crying and upset?
24  A.   Yes.
25  Q.   And someone asked, "Where's mom and dad at?"  Was that

Page 58

1        you or Officer Robinson?
2   A.   I believe Officer Robinson asked that.
3   Q.   By the way, what are you wearing at this time?  I take
4        it you're in full uniform?
5   A.   Yes.
6   Q.   Are you armed?
7   A.   Yes.
8   Q.   And what do you have on you?
9   A.   Along the lines of a firearm you mean?
10  Q.   Yeah.
11  A.   I have a firearm, Glock 22, I have a Taser.
12  Q.   Do you have a Glock 22, is that what you said?
13  A.   Yes.
14  Q.   And where is that located on your person?
15  A.   On my right hip.
16  Q.   And that's visible --
17  A.   Yes.
18  Q.   -- correct?  And the Taser's on your left hip.
19  A.   Yes.
20  Q.   Any other weapons or accessories that you had on you?
21  A.   Accessories, I had two handcuffs, I had a -- on my back
22       was a pouch with rubber gloves.  I have on my front a
23       little pouch that holds keys, my car keys, and I
24       believe that's all I had on.
25  Q.   Did you have a baton?

Page 59

1   A.   No.
2   Q.   Did you have a secondary firearm?
3   A.   No.  I take that back.  I don't recall if I did at the
4        time or not.
5   Q.   Do you recall the young girl saying "please don't take
6        us away" at this initial meeting at the door?
7   A.   I don't know if she was saying "take us away."  I know
8        she was saying something.  I don't know if it was "take
9        us" or "take him."  I thought it was "please don't take
10       him away," but I don't recall the exact wording.
11  Q.   Do you recall either of the kids -- and there were two
12       kids that were living in this unit, correct?
13  A.   Correct.
14  Q.   The one that you met outside initially and the young
15       girl who answered the door, right?
16  A.   Yes.
17  Q.   Do you remember them ever mentioning something to the
18       effect of "don't take us away"?
19  A.   Take -- I don't recall if they said "take us away."  I
20       don't recall that.
21  Q.   All right.  Did the young child who answered the door
22       ever tell you where mom and dad were?
23  A.   He just said in the apartment, and then he was too
24       scared to go up there with us.
25  Q.   I'm talking about the girl who answered the door.

Page 60

1   A.   Oh, the girl who answered the door, I don't believe she
2        did, no.
3   Q.   In fact, the boy that you encountered outside, he never
4        went in.  He didn't follow you into the apartment.
5   A.   No.
6   Q.   He stayed outside.
7   A.   Yes.
8   Q.   And then when the girl answered the door, Robinson
9        asked, "Where's mom and dad at," but the girl doesn't
10       really tell you where, correct?
11  A.   Correct.
12  Q.   She's reluctant to tell you.
13  A.   Correct.
14            MS. McGIFFERT:  I'm just going to place an
15       objection as to foundation in terms of what her mindset
16       was.
17  BY MR. WEGLARZ:
18  Q.   All right.  And so then what happens at that point
19       after this brief interaction with the little girl?
20  A.   After we were speaking with the little girl -- or while
21       we were speaking with the little girl, we hear some
22       kind of a struggle going on in the back bedroom.
23       Officer Robinson and then made our way into the back
24       bedroom where we could then hear some screaming, a male
25       voice yelling "I'm going to kill you" or "I'm going to

Page 61

1    kill her," something along those lines.
2         And we then saw that the male had the
3    female's neck between his thighs.  He was squeezing her
4    neck while continuously yelling that he was going to
5    "kill her" or "kill you."  Officer Robinson then gave
6    multiple loud verbal commands for him to get off of
7    her, which he would not -- not comply with the
8    commands.
9  Q.  I'm going to stop you there.  Did you say you heard
10     screaming in the back bedroom?
11 A.  I heard -- we heard a -- some sort of an
12     altercation/commotion going on in the back bedroom.  As
13     we were getting closer and entering that room, we heard
14     a male voice yelling.
15 Q.  Is that what drew you into the apartment when you heard
16     this altercation, slash, commotion going on in the back
17     bedroom?
18 A.  Yes.
19 Q.  But you didn't hear any screaming from that room at
20     least at that point in time, right?
21 A.  Not originally that -- when we knocked on the door that
22     I can recall.
23 Q.  Okay.  When you knocked on the door or when Officer
24     Robinson knocked on the door -- was it Officer Robinson
25     who knocked on the door?

Page 62

1  A.  I believe so.
2  Q.  Did you have your firearm drawn?
3  A.  No.
4  Q.  Did you have your Taser drawn?
5  A.  No.
6  Q.  What about Officer Robinson?
7  A.  I don't believe so.
8  Q.  Neither firearm nor Taser was drawn at that time,
9      correct?
10 A.  When we were knocking on the door, no.
11 Q.  All right.  What about after the girl opens up the
12     door?  Either of those drawn?
13 A.  No.
14 Q.  Okay.  What about when you heard the altercation or
15     commotion coming from the back bedroom?
16 A.  At some point our Tasers were drawn.  I don't know what
17     point exactly that was at.
18 Q.  Did you ever draw your firearm?
19 A.  No.
20 Q.  Did Officer Robinson ever draw his firearm?
21 A.  No.
22 Q.  According to your training, when are you -- when are
23     you trained to brandish your firearm?
24 A.  To protect life, serious bodily injury.
25 Q.  If you feel someone else is being --

Page 63

1         MS. McGIFFERT:  Are you finished?
2         MR. WEGLARZ:  I'm sorry, I thought he was.
3         THE WITNESS:  Yes.
4  BY MR. WEGLARZ:
5  Q.  If you feel that someone else or yourself are being
6      physically threatened, then you're trained to draw your
7      firearm, correct?
8  A.  If I feel myself or someone else life's in danger, yes.
9  Q.  At some point you do draw your Taser?
10 A.  Yes.
11 Q.  Okay.  And do you recall physically where in the house
12     you were when you first drew your Taser?
13 A.  I don't recall.
14 Q.  Do you believe you drew your Taser before you arrived
15     in the back bedroom where the suspect and this other
16     person were?
17 A.  I don't recall the exact time that I drew my Taser.
18 Q.  And to get to the back bedroom, you walked across a
19     hallway, is that correct?
20 A.  I believe there was a front living room and then a
21     small hallway and then the back bedroom.
22 Q.  Where along the floor plan of that apartment were you
23     first able to see any occupants in that back bedroom?
24 A.  I don't recall when we first saw them.  I don't recall
25     where it was at.

Page 64

1  Q.  Was it -- did you see them -- did you see any part of
2      them prior to you getting into the back bedroom?
3  A.  While we were walking, Officer Robinson was walking in
4      front of me in the hallway.  I was just following
5      Officer Robinson.  And then looking at Officer
6      Robinson, I didn't see anybody -- couldn't see through
7      him to see where people were at.
8  Q.  All right.  And then I take it within a second or two
9      you're in the back bedroom.  It's not a long distance
10     there, right?
11 A.  A brief period of time, yes.
12 Q.  All right.  And tell me your first observation of the
13     occupants in that back bedroom.
14 A.  My first observation of them where a -- it was a nude
15     male with a female's neck in between his legs.
16 Q.  All right.  I'm going to stop you there.  Nude male.
17     Is that completely nude?
18 A.  Yes.
19 Q.  Buck naked.
20 A.  Yes.
21 Q.  Not even covered with a blanket or a sheet.
22 A.  Correct.
23 Q.  He obviously was an unarmed nude male?
24 A.  Yes.
25 Q.  How big did he appear to be?

Page 65

1  A.   He was appeared to be quite large.  About probably my
2       height but muscular.
3  Q.   The autopsy report and the medical records I believe
4       list him at five-nine, 150 pounds.  Does that sound
5       about right?
6             MS. FORBUSH:  Object to foundation.
7             MS. McGIFFERT:  Join.
8  BY MR. WEGLARZ:
9  Q.   Go ahead.
10            MS. FORBUSH:  If you know.
11            THE WITNESS:  I'm not sure.  I couldn't
12       estimate his weight.  I never saw him standing straight
13       up.  I couldn't estimate his height either.
14  BY MR. WEGLARZ:
15  Q.   Good point.  I'll keep this digression very brief.  I
16       take it you work out?
17  A.   Not as often as I should.
18  Q.   Of course.  Well, we all say that.  I don't want to act
19       like I'm in high school again, but I guess I have to
20       ask you, what do you bench?
21  A.   Honestly, I don't know.
22  Q.   Back then where were you?
23  A.   Honestly, I don't know.
24  Q.   I take it that's part of your workout routine?
25  A.   I do more of a cardio than weightlifting.

Page 66

1  Q.   You don't do any weightlifting?
2  A.   I do, but more of cardio.  I don't know what I would
3       bench honestly.
4  Q.   Can you bench 200?
5  A.   That's possible.
6  Q.   250?
7  A.   Probably not.  I'm not sure.
8  Q.   Do they have any workout requirements with the
9       department?
10  A.   No.
11  Q.   All right.  So you see this nude male in the back
12       bedroom, and you also see another person, correct?  A
13       female?
14  A.   Yes.
15  Q.   And she's wearing a shirt?
16  A.   She's wearing a shirt, yes.
17  Q.   And only a shirt?
18  A.   Yes.
19  Q.   And what kind of a shirt?
20  A.   I believe it was -- I would describe it as scrubs.
21  Q.   Scrub top?
22  A.   Yes.
23  Q.   Do you recall the color?
24  A.   I believe it was blue.
25  Q.   Does she have underwear on?

Page 67

1  A.   I do not believe so, no.
2  Q.   And how far down does the scrub top go?
3  A.   I don't recall.  I saw her laying on the bed before she
4       ran out of the room.
5  Q.   I'm not going to mark this yet.  I'm going to show you
6       that photo.  Is that a picture of the back bedroom
7       where you saw these two people?
8  A.   I believe so, yes.
9             MR. WEGLARZ:  So I will mark it.
10            (At 10:37 a.m., Exhibit 2 marked)
11  BY MR. WEGLARZ:
12  Q.   And we have marked as Exhibit 2 a photo of the back
13       bedroom that we have just referenced.  Where is the
14       nude male when you have your first observation of him?
15  A.   On the bed.
16  Q.   All right.
17            MS. FORBUSH:  Can I just see what photograph
18       you're looking at?
19            MR. WEGLARZ:  Sure.
20            MS. FORBUSH:  Okay.  Thank you.
21  BY MR. WEGLARZ:
22  Q.   So he's on top of the bed, and is the bed basically as
23       we see it here in Exhibit Number 2?  It looks like
24       there's a light-colored blanket or comforter underneath
25       an even lighter-colored or yellow-colored --

Page 68

1  A.   I don't recall what was on the bed.
2  Q.   All right.  So the nude male is on the bed, and how is
3       he positioned on the bed?
4  A.   He's positioned with the female's head between his
5       thighs.  I don't remember exactly which way he was
6       facing.
7  Q.   Okay.  Is he on his side, is he on his --
8  A.   I believe he was --
9  Q.   -- hands and knees, on his back?
10  A.   He was on I believe either his back or his side.  He
11       was not on his hands and knees.
12            MS. McGIFFERT:  You're saying he was not?
13            THE WITNESS:  Not on his hands and knees.
14  BY MR. WEGLARZ:
15  Q.   And is his head -- his head is where?  Is his head
16       closer to the back wall here where we see the window or
17       --
18  A.   I don't recall which way he was turned facing.
19  Q.   Okay.
20  A.   I do not recall.
21  Q.   All right.  And was he positioned length-wise --
22  A.   I believe --
23  Q.   -- in the bed or perpendicular to it?
24  A.   He would have been more perpendicular I do believe.  I
25       don't recall either of their exact positioning.  I was

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 69

1     focused more on -- I was observing her head and neck in
2     between his thighs.
3  Q.  Meaning his body was, if you had to describe it, more
4     parallel to the back wall that we see with the window
5     as opposed to the adjoining wall.
6  A.  I'm not for certain.
7  Q.  What parts of the nude male's body were in contact with
8     the bed?
9  A.  It was either his side or his back or his -- I do not
10    recall --
11  Q.  Sure.
12  A.  -- but I believe he was on one of his sides.
13  Q.  All right.  And tell me the position of the female with
14    respect to the bed.  Is she on her hands and knees?
15  A.  She was laying in the bed kind of laying
16    perpendicular with him with his -- her head in between
17    his neck.
18         MS. McGIFFERT:  His neck?
19         THE WITNESS:  I'm sorry.
20         MS. McGIFFERT:  Take your time.
21         THE WITNESS:  Her neck in between his thighs.
22    They're laying I believe -- if I can refer to one of
23    the reports how I described it.
24  BY MR. WEGLARZ:
25  Q.  Sure.

Page 70

1  A.  The only way I honestly know how to describe it, and
2    not to be as crude and immature about it, what you
3    would call the 69 sexual position, front up.
4  Q.  I was just going to say, it sounds like you're
5    describing the 69 position.
6  A.  Yes.  One of my statements with the state police,
7    that's exactly how I described the positioning.
8  Q.  If that's what you recall, that's what you recall.
9  A.  That's just how I recall them.  I don't remember if he
10    was on his back or side.  I just remember her neck
11    between his thighs.
12  Q.  Is she performing a sexual act?
13  A.  At that time I don't believe so, no.
14  Q.  Did you ever see her performing a sexual act on him?
15  A.  No.
16  Q.  When you first walked in, though, did it appear to be
17    that you were walking in on a sexual act?
18  A.  It appeared I was walking in on an assault.
19  Q.  And so her head and neck is between his thighs.
20  A.  Yes.
21  Q.  And are his thighs making contact with her head or
22    neck?
23  A.  Her neck, yes.
24  Q.  And how so?
25  A.  Her neck is between his thighs and he's squeezing her

Page 71

1     neck.
2  Q.  Is she trying to remove -- was it like a grip, like he
3    was applying pressure?
4  A.  It appeared so, yes.
5  Q.  Did she seem to be trying to remove her head or neck
6    out of this position or grip?
7  A.  I don't recall if she was actively trying to push off,
8    but he had his thighs around her neck squeezing.
9  Q.  Did the female say anything?
10  A.  At that time it appeared that she could not talk.
11  Q.  Okay.  Tell me, what did you see or observe to conclude
12    that?
13  A.  The male had his thighs wrapped around her neck
14    squeezing, making it difficult for her to breathe or
15    talk.
16  Q.  Did you think she was having difficulty breathing?
17  A.  Yes.
18  Q.  Okay.  Just from you seeing the thighs around her neck,
19    or did you hear something to suggest that as well?
20  A.  I do believe I heard some gasping noises, if I can
21    refer to my report.  If I can refer to the state police
22    interview report of me.  There were gasping noises
23    coming from when we entered the apartment -- or the
24    bedroom.  I could hear gasping noises coming from her.
25    It appeared that she was attempting to get air and

Page 72

1     having a difficult time.
2  Q.  When you walked into that back bedroom, was her face --
3    could you see any part of her face?
4  A.  Yes.
5  Q.  So her face was --
6  A.  Her face would have been looking at us I believe.
7  Q.  Could you see her mouth?
8  A.  I believe so.
9  Q.  And she didn't have anything on or in her mouth?
10  A.  Not that I recall, no.
11  Q.  And so then you wouldn't be able to see
12    Mr. Kapuscinski's face, correct, because he was facing
13    the opposite way?
14         MS. McGIFFERT:  Place an objection as to
15    foundation.
16         THE WITNESS:  I believe I was able to see his
17    face because he was turning to yell when we walked in
18    that he was going to "kill her" or "kill you," one of
19    the variations of that.
20  BY MR. WEGLARZ:
21  Q.  Do you believe Mr. Kapuscinski was aware that there
22    were two police officers in the bedroom --
23  A.  Yes.
24  Q.  -- when you first got there?
25  A.  Yes.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 73—76

Page 73

1   Q.  And how do you know that?
2   A.  Because Officer Robinson was giving very loud verbal
3       commands for him to get off of her.
4   Q.  Was Mr. Kapuscinski on top of this female?
5   A.  I don't recall if he was on top.  I believe that they
6       were kind of side to side.
7   Q.  He was in a submissive position --
8   A.  No.
9   Q.  -- correct?
10  A.  No.
11  Q.  All right.  So he wasn't on top of her, he was either
12      side to side or, like you said, you thought he was
13      either on his back or side, correct?
14  A.  Yes.  He was not on top of her, though.
15  Q.  And the command by Officer Robinson was to get off of
16      her?
17  A.  Yes.
18  Q.  Can you -- you know that I'm going to have you do?  On
19      Exhibit Number 2, can you diagram as best you can the
20      position of the male and female as you observed it
21      when you first went back there?
22          MS. McGIFFERT:  I'm just going to place an
23      objection as to foundation.  I think he's already told
24      you he was uncertain about their positions in
25      relationship to the bed.  I mean, I think that's

Page 74

1       already in the record, so --
2           MS. FORBUSH:  You're asking him to speculate.
3       He said he didn't recall.
4   BY MR. WEGLARZ:
5   Q.  Are you telling me that your memory of how they were
6       positioned in this back bedroom is such that you can't
7       even try to diagram it for me even with a stick figure?
8   A.  I wouldn't feel comfortable diagramming with my very,
9       very limited art skills where they were at.  I believe
10      that he was in the one position that I described.  I
11      don't know if I could draw it out and diagram for you.
12  Q.  Well, the one position that you believe he was in, can
13      you just do a stick diagram for me?
14          MS. McGIFFERT:  Same objection.
15          MS. FORBUSH:  Join.
16          THE WITNESS:  He was just on one side.
17          MS. McGIFFERT:  Counsel, you can't force him
18      to draw if he said that he's not comfortable doing it,
19      so putting the pen over next to him is -- I don't know
20      what that's supposed to accomplish.
21          MR. WEGLARZ:  I'm trying to assist him.  He
22      doesn't have a pen.
23          MS. McGIFFERT:  I don't think the problem is
24      him not having pen, based on his testimony.
25  BY MR. WEGLARZ:

Page 75

1   Q.  So you don't really recall the position enough even to
2       draw a stick figure to show us the general position of
3       him when you entered that bedroom?
4   A.  He was facing one direction.  She was facing one
5       direction with her --
6   Q.  Okay.
7   A.  -- neck between his legs.
8   Q.  Sure.  What direction was he facing?
9   A.  I'm not 100 percent for sure on that.
10  Q.  Well, what direction was she facing?
11  A.  The opposite direction, whichever that was.
12  Q.  But you can't tell me either way.
13  A.  I don't recall the exact positioning.
14          MS. FORBUSH:  Todd, when you're at a good
15      breaking point --
16          MR. WEGLARZ:  Yeah.  Just a minute.
17  BY MR. WEGLARZ:
18  Q.  And do you recall this male saying that he's going to
19      kill her?
20  A.  Yes.  A variation of -- it was either "I'm going to
21      kill her" or "I'm going to kill you."
22  Q.  Okay.  And did you hear this as soon as you got into
23      that back bedroom?
24  A.  Yes.
25  Q.  How many times did he say that?

Page 76

1   A.  Multiple times.
2   Q.  Where are you standing in that back bedroom when you
3       hear this?
4   A.  In the doorway.
5   Q.  And where you were standing, is that area depicted at
6       all in Exhibit Number 2 there?
7   A.  It does not show the doorway, no.
8   Q.  And when you say in the doorway, are you talking
9       literally right in the doorway, or are you a foot to
10      2 feet in, a foot to 2 feet out?
11  A.  I couldn't give you an exact measurement.  Somewhere in
12      the area that whoever took this picture was standing
13      in.
14  Q.  How many feet away were you approximately?
15  A.  I'm not sure.  I couldn't estimate that.
16  Q.  Was it 2 feet, 3 feet, 6 feet, 10, 20?
17  A.  Several feet.
18  Q.  Which would mean?
19  A.  Several feet.  Approximately 10 feet away at this
20      point.
21  Q.  Okay.  When you were listening to the audio, did you
22      hear Mr. Kapuscinski saying he's going to kill someone?
23  A.  In the audio you can hear him yelling.  However, it's
24      difficult to hear with the juvenile female screaming
25      and crying.

Page 77

1  Q.  Sure.  And I've listened to it a few times, and I'm not
2      trying to say I'm an expert on the audio, but I never
3      heard Mr. Kapuscinski saying anything about kill or
4      killing.  I'm just curious if you heard it at all in
5      the audio when you listened to it.
6  A.  **I hear him yelling, but you can't make out what he's**
7      **saying.**
8  Q.  You never hear the words kill or killing, at least in
9      the audio, correct?
10 A.  **In the audio, no.**
11         MR. WEGLARZ:  We can stop for a minute,
12     that's fine.
13         MS. FORBUSH:  Thank you.
14         (At 10:50 a.m., recess taken)
15         (At 11:02 a.m., back on the record)
16 BY MR. WEGLARZ:
17 Q.  When you go into this back bedroom, where is the little
18     girl?  Because you hear her screaming in the audio at
19     this time, right?
20 A.  **Yes.  I believe she's behind us.**
21 Q.  Okay.  And she's viewing what's going on, correct?
22 A.  **I believe so.**
23 Q.  And when you get into that room and you have this
24     initial observation that you just describe for us over
25     the last 10, 15 minutes, I take it you were concerned

Page 78

1      about the female on the bed, right?  That's what you
2      were telling me.
3  A.  **Yes.**
4  Q.  You did not feel physically threatened at that point,
5      correct?
6  A.  **I felt she was in danger at that point, though not**
7      **myself and Officer Robinson at that point.**
8  Q.  All right.  Is that the point where you take out the
9      Taser?
10 A.  **At one point we did deploy our Tasers or take our**
11     **Tasers -- draw our Tasers I should say.**
12 Q.  And do you both kind of draw the Tasers at the same
13     time, or does someone go first?
14 A.  **I couldn't recall who drew Tasers at what time or what**
15     **the timing was on that.**
16 Q.  And when the Tasers were drawn, did the child seem to
17     react to that?  Did she start screaming?
18         MS. McGIFFERT:  Place on objection as to
19     foundation and speculation.  I mean, you can talk about
20     what you saw, but not what she felt.
21         THE WITNESS:  **The female was screaming -- the**
22     **juvenile female was screaming the whole time that we**
23     **were in there.**
24 BY MR. WEGLARZ:
25 Q.  Did the screaming seem to get louder or did she seem to

Page 79

1      get more panicked when the Tasers were drawn?
2         MS. McGIFFERT:  Same objection.  Go ahead.
3         THE WITNESS:  **I'm not sure.  I don't know**
4      **what she was screaming at specifically.**
5  BY MR. WEGLARZ:
6  Q.  Okay.  And from what I can hear on the audio, it sounds
7      like the first tase was done fairly quickly after you
8      guys got in that back bedroom, do you agree?
9  A.  **No.  It was done after Officer Robinson gave him plenty**
10     **of time to comply with his orders to get off of her.**
11 Q.  And how many such warnings do you think were given
12     before that first tase?
13 A.  **Several.**
14 Q.  Three, seven, a dozen?
15 A.  **About seven.**
16 Q.  And what were those warnings?
17 A.  **Officer Robinson said, "Stop, get off of her,"**
18     **repeatedly.**
19 Q.  And while he's saying that, the Taser's drawn.
20 A.  **I believe so.**
21 Q.  And it's aimed where?
22 A.  **It would be aimed in the direction of where**
23     **Mr. Kapuscinski's at.  I couldn't speak for Officer**
24     **Robinson's Taser where he was aimed, but I believe mine**
25     **was aimed towards the -- what you would consider the**

Page 80

1      preferred target areas of Mr. Kapuscinski.
2  Q.  And where specifically did you have your Taser aimed?
3  A.  **I couldn't tell you where specifically.**
4  Q.  You can't tell me if it was the back or the legs or the
5      abdomen?
6  A.  **I couldn't tell you exactly specifically where it was**
7      **at.  I don't exactly recall the positioning that he was**
8      **in at the time.**
9         (At 11:06 a.m., Chief Lawyer enters the room)
10        MR. WEGLARZ:  Hey, someone tried calling you
11     a sergeant and I said, "No, it's chief."  I made sure.
12        CHIEF LAWYER:  Forget about it.
13        MR. WEGLARZ:  Thanks.
14        (At 11:06 a.m., Chief Lawyer leaves the room)
15 BY MR. WEGLARZ:
16 Q.  Sorry about that.  We were interrupted.  Is this the
17     usual routine or practice if you have two officers
18     going into a room like this, do you both draw the
19     Tasers, or is it supposed to be one?  How does that
20     work?
21 A.  **You can both draw them, yeah.**
22 Q.  Okay.  And we know at some point a Taser is deployed,
23     correct?
24 A.  **Correct.**
25 Q.  And whose Taser deployed first?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 81–84

**Page 81**

1 A. Officer Robinson's.
2 Q. How far away was Officer Robinson from the male and the
3 female at the time he deployed the Taser?
4 A. I was paying attention to the male and female on the
5 bed. I don't know where Officer Robinson was standing
6 in the room in relation to them.
7 Q. Do you have any idea as to where he was?
8 A. I do not.
9 Q. Did he seem to be pretty much right next to you?
10 A. Probably he was kind of in front of me I believe on
11 the -- towards my right I believe.
12 Q. And you're behind him to his left.
13 A. Yes.
14 Q. Okay. Can you point to me where on Exhibit Number 2
15 you would have been at the time that Robinson deployed
16 the Taser?
17 A. I cannot. It's not pictured because it was right where
18 this guy's taking the picture.
19 Q. And can you tell me where on there Officer Robinson was
20 when he deployed the Taser?
21 A. I couldn't speculate to exactly where he was at. I'm
22 not sure where he was.
23 Q. Can you tell me on what side of the bed he was
24 standing?
25 A. I believe it would be -- I believe towards the right

**Page 82**

1 side of the bed I believe.
2 Q. Okay. The right side as we're looking at it straight
3 at this picture, correct?
4 A. Correct. Not -- I don't mean on the very exact right
5 side, but in relation to the bed where he was at in
6 this picture to the right. I don't mean further up by
7 the bed.
8 Q. Do you believe that he was positioned somewhere outside
9 of the view of this picture here that we see as Exhibit
10 2?
11 A. It's possible.
12 Q. Do you think most likely that's where he was, outside
13 of that viewing area?
14 A. It's possible. This picture doesn't depict the entire
15 room.
16 Q. Right.
17 A. It's not a very informative picture for that. I would
18 need more on an aerial picture to see where the doors
19 are at. I don't recall where he was at looking at this
20 picture.
21 Q. Just give me a second. Maybe there's a better one. I
22 don't know if there is, though. When Officer Robinson
23 deploys his Taser, it makes an audible sound I take it?
24 A. Yes.
25 Q. What does it sound like?

**Page 83**

1 A. It's a sparking noise.
2 Q. Do you hear like a loud click as well?
3 A. Yes.
4 Q. And when you're listening to your police car video,
5 slash, audio, can you hear it on the audio?
6 A. I believe so, yes.
7 Q. It's the first loud click that we hear in the audio,
8 correct?
9 A. Correct.
10 Q. And I believe the Michigan State Police, they even
11 point out where in the video that the first tase is
12 heard. Do you remember seeing that in their records or
13 reports?
14 A. I would have to refer to the report here.
15 Q. I may have it.
16 A. Yes, on page 33.
17 Q. And it says 3 minutes, 55 seconds into the audio a
18 Taser deployment can be heard, correct?
19 A. Yes.
20 Q. And that's what you recall hearing as well on the audio
21 when you were listening to it, correct?
22 A. Yes.
23 Q. And that Taser deployment is from Officer Robinson,
24 correct?
25 A. Yes.

**Page 84**

1 Q. And what are you doing at that point?
2 A. At that point I am still standing kind of behind
3 Officer Robinson to cover him.
4 Q. Okay. Why didn't you -- why didn't you deploy your
5 Taser?
6 A. Officer Robinson deployed his Taser the first time.
7 Q. Why didn't you deploy your Taser before Officer
8 Robinson did?
9 A. Officer Robinson had a better vantage point. I mean,
10 he was in front of me.
11 Q. Okay. Would you have deployed your Taser if you felt
12 it was necessary?
13 A. If Officer Robinson did not deploy his Taser, then yes.
14 Q. And Officer Robinson's Taser is a little bit different
15 than your Taser, correct? Different model?
16 A. At this time, yes.
17 Q. Did he have the X26?
18 A. I believe so, yes.
19 Q. It's a yellow body?
20 A. I couldn't speculate to the color of it. I don't know
21 what color his Taser was.
22 Q. It just has one cartridge?
23 A. Yes.
24 Q. And did that deploy two darts?
25 A. Yes.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 85

1   Q.   And what happened to those two darts after they were
2        deployed by Officer Robinson?
3   A.   One of the darts went into Mr. Kapuscinski, and I do
4        not know where the other one went.
5   Q.   When you say the one dart hit Mr. Kapuscinski, where
6        specifically?
7   A.   I would have to refer to the reports.
8   Q.   Do you recall in general?
9   A.   I believe it was in an arm.  I'd have to refer to the
10       reports.
11  Q.   Do you believe it was the right arm?
12  A.   That's possible, yes.
13  Q.   Okay.  And where about on the arm?
14  A.   I believe possibly in the back of the arm.
15  Q.   Like the -- just above the elbow area?
16  A.   That would be possible, yeah.
17  Q.   And did that probe -- that dart, did it stick there?
18  A.   I believe so, yes.
19  Q.   Did the other probe or dart hit Mr. Kapuscinski at all?
20  A.   I do not know if it did or not.
21  Q.   Did you see that other dart or probe hit
22       Mr. Kapuscinski anywhere?
23  A.   I don't recall seeing it hit him at all.
24  Q.   Where do you recall seeing that other dart or probe go?
25  A.   I never found it.  I never saw it.  I don't know where

Page 86

1        the second one went.
2   Q.   Did it hit the female?
3   A.   It's possible that it did.  At the time I thought it
4        did.  However, reviewing any reports, there's no record
5        of anyone removing the Taser probe from her, her
6        complaining of being hit by a Taser, her complaining of
7        being shocked by a Taser, her needing assistance for a
8        Taser, no evidence ever of a Taser wound being on her,
9        and I don't believe the probe was recovered at the
10       time.
11  Q.   How about was it ever recovered?
12  A.   I'm not sure if it was or not.
13  Q.   Did the Taser -- I mean, did it work?  Did it affect
14       Mr. Kapuscinski at all?
15  A.   I don't know if it affected him in the way a Taser
16       normally would affect him as being as what you would
17       call shocked, but it affected him by separating him
18       from the female.
19  Q.   And how would it work like that other than by shocking
20       him?
21  A.   I couldn't speculate as to how it would affect him.  It
22       could be maybe he thought he was going to get shocked,
23       maybe he just felt it hit him so he separated, maybe it
24       did shock him and they were separated.  I don't know
25       exactly how it got them separated, but it got them

Page 87

1        separated.
2   Q.   Did it seem like Mr. Kapuscinski was shocked from that
3        first Taser deployment?
4   A.   I don't know if he was or not.
5   Q.   You've seen what happens to people when they are
6        shocked by a Taser deployment, correct?
7   A.   Correct.
8   Q.   Have you been tased, by the way?  Do they make you do
9        that through the training?
10  A.   Yes, I have been.
11  Q.   What does that feel like, by the way?
12  A.   It's a very -- kind of almost hard to explain.  You
13       lock up completely.  Can't move.  It does hurt.
14  Q.   I mean, is it like a pinch?  I've never been tased.
15       Maybe you guys can show me after, but --
16            MR. FORBUSH:  Happy to.
17            MS. McGIFFERT:  My pleasure.
18            MR. WEGLARZ:  Here I thought I'd get some
19       resistance.
20            MS. FORBUSH:  You want video?
21            MR. WEGLARZ:  Apparently not.
22  BY MR. WEGLARZ:
23  Q.   I mean, is it a God awful pain?
24  A.   It feels like a big muscle spasm.
25            MS. FORBUSH:  The cramp of all cramps.

Page 88

1            MR. WEGLARZ:  Like you're giving birth.
2            MS. FORBUSH:  Yeah.
3            MR. WEGLARZ:  Throughout your whole body.
4            MS. FORBUSH:  I doubt it.
5   BY MR. WEGLARZ:
6   Q.   And how long does it last?
7   A.   Four or five seconds.
8   Q.   And it does incapacitate the person.
9   A.   For the five seconds.
10  Q.   And so if someone is being shocked by a Taser, it's
11       pretty easy to see that, correct?
12  A.   Correct.
13  Q.   Okay.  Did you see that type of a response with
14       Mr. Kapuscinski after that first deployment?
15  A.   I don't recall the Taser shocking him.  However,
16       different people have different responses to it.
17  Q.   And you don't ever recall the other probe hitting the
18       female?
19  A.   I don't recall where it went.  I don't know where it
20       went I should say.
21  Q.   But do you recall it making contact with the female?  I
22       understand you may not know where it eventually went --
23  A.   I don't know if it made contact with the female.  At
24       the time I had thought because there was only one probe
25       in him that the other one went into the female.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 89

1    However, she never needed a probe removed from her,
2    never had any aid or requested aid for a Taser injury,
3    never said that she was under power of a Taser or
4    shocked or anything of that nature.
5  Q.  Did you ever tell anyone that the other probe went into
6    the female?
7  A.  Yes.
8  Q.  And who did you tell that to?
9  A.  I said that to Officer Robinson at the time I believe
10    that it went into her just because it wasn't in him. I
11    didn't know where it was.
12  Q.  Did you tell anyone else that?
13  A.  If I can refer to the state police report. I possibly
14    told the state police that that's where it went.
15  Q.  Did you listen to your audio interview with the state
16    police?
17  A.  I did not. The state police report does not indicate
18    that I said it went into the female. It just said that
19    it separated them and one of the probes was in his
20    right arm.
21  Q.  And you're correct, I recall that the written report
22    says that. In your audio, your recorded interview with
23    the state police, you told Sergeant Rhody that the
24    other probe went into her?
25  A.  I don't recall that. I have not listened to that

Page 90

1    interview.
2  Q.  Sure. And they were touching, so it completed the
3    circuit. Does that refresh your memory that you did
4    say that to Sergeant Rhody?
5  A.  I don't recall saying that. If I did, I don't know
6    that I did. I would have to listen to the interview.
7  Q.  Okay. Is that true what you told Sergeant Rhody?
8  A.  Is what true?
9  Q.  If you were to represent that the other probe went into
10    her and that they were touching, Mr. Kapuscinski and
11    the female, so it completed the circuit, is that true?
12  A.  You're saying if one probe went into her, one probe
13    went into him, they would both feel the effects? Is
14    that what you're saying?
15  Q.  Well, I'll take an answer to that I guess.
16  A.  If one probe went into her and him, then yes, it would
17    affect them both, which would separate them.
18  Q.  Now, if you represented to Sergeant Rhody that the
19    other probe actually went into the female, is that a
20    true statement?
21  A.  If I told him that? I don't recall if I told him that
22    or not. I might have. At the time of this incident I
23    believed that that's where the probe possibly went.
24  Q.  Okay. Do you believe that to be a true statement, the
25    other probe from Robinson's Taser went into her, the

Page 91

1    female?
2  A.  I don't know if it's a true statement. It's possible.
3    I don't know where the other probe went.
4  Q.  And if you were to represent that it completed the
5    circuit, would that be a true statement?
6  A.  If that probe had gone into her, it could compete the
7    circuit, but I don't know if that probe went into her.
8  Q.  So you may have provided a misrepresentation then to
9    Sergeant Rhody?
10        MS. FORBUSH: Object to the form and
11    foundation.
12        MS. McGIFFERT: Join.
13        THE WITNESS: No, I did not because at the
14    time I didn't know where that probe went. I believed
15    that it possibly went into her.
16  BY MR. WEGLARZ:
17  Q.  Do you recall Officer Robinson ever mentioning to you
18    that one prong went into Mr. Kapuscinski and the other
19    went into the female?
20  A.  No.
21  Q.  But you do remember telling him that at the scene
22    shortly after the incident while in that back bedroom?
23  A.  At the scene I did say that. At the time I believed
24    that that's possibly where it went.
25  Q.  Okay. And you hear yourself saying it on this audio.

Page 92

1  A.  Yes.
2  Q.  From your scout car.
3  A.  Yes.
4  Q.  And at the time that you made this comment to Mr. -- or
5    to Officer Robinson, you felt that's what happened,
6    correct, that the probe hit her. That's why you said
7    it to him.
8  A.  At that time, yes.
9  Q.  How come -- now, you don't mention that in your
10    complaint report or record with the Rockwood PD, do
11    you?
12  A.  I don't believe I do. I'd have to check that.
13  Q.  You can take my word for it, but I didn't see it in
14    there. In fact, when I first heard it being mentioned
15    was actually in the audio interview with the state
16    police.
17  A.  I say that the second probe missed.
18  Q.  Right. Would there be any reason as to why you would
19    put that in your report that the other probe hit the
20    female?
21  A.  I'm not sure where it went. It was just my belief at
22    the time that it was -- that it had hit the female. It
23    was just an opinion that wasn't a fact at the time. I
24    don't know where that second probe went.
25  Q.  And Officer Robinson also represented to the state

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                      Pages 93–96

Page 93

1    police, like I told you, that the other probe hit the
2    female.  Any reason why neither one of you mentioned
3    that in your official reports?
4  A.  I could not speak to what Officer Robinson talked to
5    with the state police about.
6  Q.  After that first Taser deployment, regardless of where
7    that second probe or dart went, I believe you already
8    told us that is was effective in at least separating
9    Mr. Kapuscinski and the female?
10       MS. McGIFFERT:  I'm just going to place an
11   objection.  Mischaracterizes his testimony.  But you
12   can answer the question.
13       MR. WEGLARZ:  Well, it may and it may not,
14   that's why I'm asking.
15       MS. McGIFFERT:  Well, you said that's what
16   his testimony was, and I'm objecting to that.  So if
17   you're asking the question again, you can ask him the
18   question as opposed to mischaracterizing his testimony.
19  BY MR. WEGLARZ:
20  Q.  You can still answer.
21       MS. McGIFFERT:  Do you know what the question
22   is?
23       THE WITNESS:  Can you --
24       MS. FORBUSH:  I don't.
25       MS. McGIFFERT:  She can read it back to you

Page 94

1    with my objection noted.
2  BY MR. WEGLARZ:
3  Q.  I'll just reask the question.  After the first Taser
4    deployment by Officer Robinson, did that have any
5    effect on the situation?
6  A.  It separated the two individuals on the bed.
7  Q.  Okay.  And explain, please.
8  A.  It separated them.  He -- after that, he was no longer
9    choking her.
10  Q.  Okay.  But they're still in the same positions, he just
11   stopped choking her.
12  A.  I believe he rolled or somehow got off the bed onto the
13   ground.
14  Q.  He fell on the ground, correct?
15  A.  Okay.  Yep.
16  Q.  That's what you recall, right?
17  A.  Yes, he went onto the ground from there.
18  Q.  And he was on his back on the ground?
19  A.  I don't recall exactly what position he was in.  I
20   think he was more flailing, moving around.
21  Q.  And where does the female go?
22  A.  She, I believe, ran out of the room.
23  Q.  And at this point in time you would agree after this
24   first tase by Officer Robinson, the female is no longer
25   at risk of being harmed by Mr. Kapuscinski.

Page 95

1  A.  Prior to the tasing, she was at risk of harm.  After
2    the tasing, she no longer was.  Officer Robinson and
3    myself were.
4  Q.  Well, we'll get to that.  I want to take it in
5    segments.  After that first tase, they're separated,
6    female is out of the room.  There's no second tase yet,
7    you agree?
8  A.  Correct.
9  Q.  And once that female's out of the room, we no longer
10   have the situation where she's now being threatened by
11   Mr. Kapuscinski.  That threat is gone at that moment,
12   correct?
13  A.  Her life is no longer being threatened.
14  Q.  And once she gets out of the room, is there a second
15   tase that is activated on Mr. Kapuscinski?  At that
16   moment, the moment she leaves the room, was the second
17   tase activated?
18  A.  I don't know the timing of -- I don't recall the timing
19   of when she left the room versus when the second Taser
20   was -- or the second tasing attempt was.
21  Q.  Now, after that dart or probe hit Mr. Kapuscinski, how
22   long did it take for him to fall off the bed?
23  A.  I don't recall the exact --
24  Q.  I mean, it seemed to be instantaneous, correct?
25  A.  Yes.

Page 96

1  Q.  And when he falls off the bed, they're separated,
2    right?
3  A.  Yes.
4  Q.  They don't fall off the bed together, right?
5  A.  No.
6  Q.  Did you deploy -- well, you eventually deploy your
7    Taser, correct?  And we're going to talk about that in
8    a second.
9  A.  Yes.
10  Q.  Did you deploy your Taser before the female left the
11   room?
12  A.  I don't recall what the timing was when she left versus
13   when I deployed my Taser.
14  Q.  When you did deploy your Taser, do you recall the
15   female being in the room?
16  A.  I don't recall her being in the room.
17  Q.  Now, when Officer Robinson deploys his Taser, do you
18   know how many times he actually fired the Taser?  I
19   know the darts and the probes are deployed, and so that
20   will generate one five-second cycle, correct?
21  A.  Correct.
22  Q.  Were there other cycles that were hit or activated?
23       MS. FORBUSH:  Well, I'm going to object to
24   the form of the question.  And you're referring to
25   cycles, and cycles would imply that we have two probes

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                    Pages 97—100

Page 97

1   and a completed cycle, and he's already indicated
2   there's one probe.  So when you use the word cycle, I
3   think that's improper.  Trigger pulls might be
4   something different.
5           MR. WEGLARZ:  I can understand that, but I
6   also think it's improper to have an objection like that
7   and then really just tell the witness how he responds
8   to the question so now I can't get a fair response, so
9   --
10          MS. FORBUSH:  That's a very misleading
11  question when you say cycle.
12          MR. WEGLARZ:  Well, he probably knows more
13  about Tasers than all the lawyers here combined, so
14  he's going to be the first one to tell me.
15          MS. FORBUSH:  Okay.
16  BY MR. WEGLARZ:
17  Q.   Okay.  Well, try to answer the question now, now that
18       you've been -- now that you got a sneak preview of the
19       response.
20  A.   Can you repeat the question?
21  Q.   Sure.
22          MR. WEGLARZ:  Can you repeat it?
23          (At 11:29 a.m., the court reporter read back:
24          "Question: Were there other cycles that were
25          hit or activated?")

Page 98

1           THE WITNESS:  There was a second attempt at
2   tasing Mr. Kapuscinski.
3   BY MR. WEGLARZ:
4   Q.   And how do you know that?  Second attempt by Officer
5        Robinson, correct?
6   A.   Correct.
7   Q.   Okay.  And how do you know that?
8   A.   I was able to hear the Taser being deployed.
9   Q.   And that's -- is that the same sound that we hear
10       initially, that loud click?
11  A.   Yes.
12  Q.   Okay.  All right.  So even though the cartridge has
13       already been fired, to fire it again, is that when we
14       do the ARC circuit thing?  I'm sorry, I'm thinking
15       about my DTE case.  Is that when you do the ARC button?
16  A.   No, not on that Taser.
17  Q.   Okay.  To fire it again, you just pull the trigger on
18       that model.
19          MS. FORBUSH:  Object to the form.
20          THE WITNESS:  Correct.
21  BY MR. WEGLARZ:
22  Q.   And that makes the same click that you hear when the
23       cartridge is deployed?
24  A.   It will be the same -- yeah, it's the same Taser, the
25       same noise.  It wouldn't be a different noise when

Page 99

1   you're being tased or deploying a Taser.  It only makes
2   one noise.
3   Q.   Did you deploy your Taser yet when you hear the second
4        deployment or the second firing by Officer Robinson?
5   A.   No.
6   Q.   And tell me what you observed after Robinson's second
7        firing.
8   A.   Officer Robinson's second attempt was unsuccessful.
9        Mr. Kapuscinski was still kicking, being very
10       aggressive towards us, not listening to verbal
11       commands.  He was attempting to get up to come after
12       us.  I then feared further assault on Officer Robinson
13       and myself from Mr. Kapuscinski.  I then deployed my
14       Taser.
15  Q.   Okay.  And, again, the deployment by Robinson happens
16       when the female's already out of the room?
17  A.   I don't know where she was at at the time.
18  Q.   The second deployment by Robinson, you would agree
19       Mr. Kapuscinski is no longer a threat to the female at
20       least, correct?
21          MS. FORBUSH:  Object to the form.
22          MS. McGIFFERT:  The question's been asked and
23       answered.
24  BY MR. WEGLARZ:
25  Q.   Go ahead.

Page 100

1   A.   He's a threat to myself and Officer Robinson.
2   Q.   All right.  But not the female at that point.
3   A.   At that point not the female anymore.
4   Q.   Okay.  And Mr. Robinson is still on the ground?
5           MS. FORBUSH:  Mr. Kapuscinski?
6   BY MR. WEGLARZ:
7   Q.   Yeah, sorry.
8   A.   At which point?
9   Q.   So I'll object to my own question.  When the second
10       Taser is deployed --
11          MS. FORBUSH:  Object to form.
12  BY MR. WEGLARZ:
13  Q.   -- by Robinson, the second firing.
14  A.   He is on the ground, he's kicking at us, and attempting
15       to get up.
16  Q.   When he's on the ground kicking at you, how is he
17       positioned on the ground?
18  A.   I'm not sure exactly how he was.  He was, I believe,
19       coming from his back, kicking, getting onto his knees
20       in an attempt to get up.
21  Q.   So he's initially on his back?
22  A.   I believe so.  At one point he was on his back I
23       believe.
24  Q.   All right.  Well, when he first fell to the ground,
25       wasn't he on his back?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                          Pages 101–104

Page 101

1   A.   Most likely would be on his back, yes.
2   Q.   All right.  And then does that position change at any
3        point in time up until the time that Robinson does the
4        second firing?
5   A.   Yes.
6   Q.   Okay.  And tell me what changes about the position of
7        Kapuscinski being on the back on the floor?
8   A.   He's kicking at us.  Officer Robinson is ordering him
9        to roll over so he can place him in handcuffs.  He's
10       not obeying Officer Robinson's orders while kicking at
11       us and then attempts to get up.
12   Q.  So Officer Robinson is trying to tell Kapuscinski to
13       roll over?
14   A.  Yes, on his stomach.
15   Q.  He wants him to go on his stomach.  He wants
16       Kapuscinski to go on his stomach, and then what's
17       significant about him going on his stomach?
18   A.  He can be placed in handcuffs.
19   Q.  Okay.  So I take it when he's yelling "roll over," he's
20       still on his back.
21   A.  I believe so.
22   Q.  Okay.  Is he kicking while he's lying on his back?
23   A.  I believe so.
24   Q.  Describe that.
25   A.  Just kicking.  He's just attempting to assault Officer

Page 102

1        Robinson.  He was resisting Officer Robinson's attempt
2        to put him in handcuffs.
3   Q.   So we have a full naked man lying on the floor on his
4        back trying to assault two officers by kicking in that
5        position.
6   A.   Yes.
7   Q.   Did he ever strike you?
8   A.   He did not strike me, no.
9   Q.   Did he ever strike Officer Robinson?
10   A.  I'm not sure.
11   Q.  Did you ever see him strike Officer Robinson?
12   A.  I don't recall if he hit him or not, no.
13   Q.  How many times did you observe -- was he kicking with
14       both legs?
15   A.  I don't recall.
16   Q.  Do you recall him kicking with one leg?
17   A.  He would at least have to be kicking with one leg if he
18       was kicking at us.  I don't recall if it was two legs
19       at once.
20   Q.  Can you tell me what leg that he kicked?
21   A.  I don't recall.
22   Q.  Can you tell me how many times you observed any leg in
23       a kicking motion by Mr. Kapuscinski?
24   A.  I don't recall.
25   Q.  Can you tell me for how long of a period he was in this

Page 103

1        kicking motion?
2   A.   It would have been a brief period of time before he
3        attempted to get up.
4   Q.   And describe what he did at the point where it looked
5        like he was trying to get up.
6   A.   He had gotten onto his hands and knees, and he had --
7        was attempting to stand up from kind of like a kneeling
8        position.
9   Q.   All right.  So he now goes from lying on his back, now
10       we've got him on his hands and knees on the floor.
11   A.  Yeah.
12   Q.  I take it while he's on his hands and knees, he's not
13       throwing punches or kicking anyone?
14   A.  I don't believe so at that point.
15   Q.  Okay.  And how long does he remain on his hands and
16       knees?
17   A.  He got up immediately.  He wasn't staying there.  He
18       was getting to a standing position, attempting to get
19       to a standing position.
20   Q.  Okay.  Because I thought you told me earlier you never
21       did see him in a standing position.
22   A.  I never saw him standing fully up, no.
23   Q.  All right.  Did you see him standing partially up?
24   A.  He was from getting from a kneeling position attempting
25       to get to a standing position.

Page 104

1   Q.   Okay.  And tell me -- tell me what you observed about
2        the change in his position to get to that point.
3   A.   He was just attempting to stand up.  I'm not sure what
4        you're --
5   Q.   Well, did he -- was he able to stand on just his --
6        just his two feet at any time?
7   A.   I don't know if he was on his -- he wasn't standing
8        straight up on two feet.  He was getting from a
9        kneeling position to attempting to stand up.
10   Q.  All right.  Did you ever see him take one knee off the
11       ground?
12   A.  I'm not sure if his knees were off the ground or what
13       exact position he was at.
14   Q.  Did you ever see him take one hand or elbow off the
15       ground?
16   A.  I would assume that he did.  He was attempting to stand
17       up, yes.
18   Q.  Sure.  And I assume that that has to be done too when
19       you go from the hands and knees position to a standing
20       position, but I'm interested in what you actually
21       recall seeing.
22   A.  He was attempting to get up from a kneeling position.
23       His hands would have been off the ground attempting to
24       stand up, but was not standing up.
25   Q.  Did he have both hands off the ground?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                                          Pages 105—108

Page 105

1   A.   I believe so.
2   Q.   So he had both hands off the ground, and did he have
3        either knee still on the ground?
4   A.   I don't believe he had one knee on the ground, so I
5        think he had possibly into a crouching position at this
6        time.  His knees were -- wouldn't have been on the
7        ground.  He was attempting to stand up.
8   Q.   So he would have had both knees off the ground, both
9        feet on the ground, and he had both hands off the
10       ground starting to stand up.
11  A.   In a crouching-type position I believe.  He was not
12       fully standing up.
13  Q.   And at what angle do you think he --
14  A.   I don't know.
15  Q.   What's the highest angle he got?
16  A.   I don't know what that angle would be.  It would not be
17       a full 90-degree angle.  Forty-five at the most angle.
18       He was not fully standing up.
19  Q.   When you talk about being crouched, you're talking
20       about the torso being bent forward?
21  A.   Yes.
22  Q.   45 degrees?
23  A.   Maybe 45 or less, yes.
24  Q.   Okay.  Facing you?
25  A.   Yes.

Page 106

1   Q.   And I take it while he's doing that he's not kicking
2        because he's using his legs to --
3   A.   At that point, no.
4   Q.   -- support his weight to try to stand up, correct?
5   A.   Correct.
6   Q.   And what's going on with his hands?
7   A.   His hands were I think kind of on his knees.  I don't
8        know where they were at.  They weren't on the ground,
9        they weren't coming at us, but I believe he had them
10       trying to stabilize himself.
11  Q.   So somewhere on his knees trying to stabilize himself?
12  A.   I believe so, yeah.
13  Q.   Okay.  So is he being tased at this point?
14  A.   No.
15  Q.   What are you doing while he's in this position?
16  A.   I'm standing in front of him, and Officer Robinson is
17       giving him verbal commands to stop and to get down, and
18       he's not listening to him while he's getting up.
19  Q.   Because before he was telling him to turn over or roll
20       over, correct?
21  A.   Yes.
22  Q.   And then those commands changed to "get on the ground"
23       because he's now partially standing up.
24  A.   I don't recall exactly what wording Officer Robinson
25       was using at the time.

Page 107

1   Q.   Do you ever recall him saying to get on the ground
2        after he gave the instruction to turn over and roll
3        over?
4   A.   I don't recall.  He could have.  I don't recall.  I
5        would refer to the audio.
6   Q.   Sure.  So when do you tase Mr. Kapuscinski?
7   A.   As he's getting up, while he's not listening to
8        commands, I then deploy my Taser.
9   Q.   And the commands that he wasn't listening to, that then
10       after which we hear -- or we have you deploying your
11       Taser, can you tell me those commands?
12  A.   Can you repeat that?
13  Q.   Sure.  What were the commands that he wasn't listening
14       to?
15  A.   Officer Robinson's commands of putting his hands behind
16       his back and, originally, roll over.  He wasn't rolling
17       over, and then he was attempting to get up.
18  Q.   Then he was told to get on the ground?
19  A.   I would have to refer to the audio.  I don't recall if
20       he said get on the ground or not.
21  Q.   Well, I'm just interested in what you recall hearing.
22  A.   If that's what Officer Robinson had said, then that was
23       the command that he was ignoring, to get on the ground.
24  Q.   Do you recall Officer Robinson also telling him to put
25       his hands behind his back?

Page 108

1   A.   Yes.
2   Q.   Okay.  And instead of putting his hands behind his
3        back, what was Mr. Kapuscinski doing?
4   A.   He was attempting to stand up.
5   Q.   And when he didn't listen to those commands to put his
6        hands behind his back, is that when you tased him?
7   A.   No.  I tased him as he was getting up, apparently
8        attempting to attack Officer Robinson and I.
9   Q.   Okay.  All right.  I need to cover that middle ground
10       there.  So we have him in a 45-degree angle in the
11       process of trying to get up, and then some point after
12       that, he then tries to attack you?
13  A.   It appeared that he was attempting to get up to come
14       after Officer Robinson and I.
15  Q.   Okay.  So tell me, what did he do to now be in this
16       position that looks like he's attacking you and/or
17       Officer Robinson?
18  A.   Are you asking how he got into that position, or are
19       you asking what he was doing to -- I'm not sure what
20       you're asking.
21  Q.   What about Mr. Kapuscinski led you to believe that he
22       was trying to attack you and Mr. Robinson?
23  A.   How he was not listening to our commands and just the
24       look on his face.  He had a deranged look on his face
25       that appeared that he was very aggressive and rage

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 109—112

Page 109

1     filled.
2  Q.  Okay.  Anything else other than not listening to
3     Robinson's commands and having a rage look on his face
4     that he did for you to believe and feel that he was
5     attacking either one of you?
6  A.  Getting up, coming towards us, attempting to get up to
7     come towards us.
8  Q.  Let's break that down.  You know he's unarmed, right?
9  A.  Correct.
10  Q.  He's bare naked still?
11  A.  Correct.
12  Q.  When you say attempting to get up and come toward us,
13     we already talked about attempting to get up, correct?
14  A.  Correct.
15  Q.  He's getting on both feet, he's roughly at a 45-degree
16     angle, he has both hands around his knee area trying to
17     stabilize himself trying to come up, correct?
18  A.  I believe so, yeah.
19  Q.  And then you said "come towards us."  I didn't hear
20     anything about that earlier, so tell me, what did he do
21     that you took as a gesture that he's coming toward you
22     in a threatening fashion?
23  A.  By attempting to get up and not listening to Officer
24     Robinson's commands, the look on his face, he would
25     have no reason to get up when Officer Robinson is

Page 110

1     telling him to stay down unless it was to attack us.
2  Q.  So I think I understand.  The way -- you interpreted
3     this as a threatening gesture only because you thought
4     he would have no other reason to try to stand up on his
5     own two feet, correct?
6        MS. FORBUSH:  Object to the form.
7        THE WITNESS:  His look of rage and aggression
8     on his face was a look that he was going to come attack
9     us.  He had no reason to stand up and ignore commands
10     unless he was going to attack us, and he already showed
11     that he was violent by attacking the female.
12  BY MR. WEGLARZ:
13  Q.  When he was trying to stand up, he appeared to be
14     struggling with that feat?
15  A.  I don't know if I would say he was struggling.  He was
16     doing a pretty good job at getting up.
17  Q.  He didn't seem to have difficulty doing that?
18  A.  Not that I recall.
19  Q.  He didn't seem to be under the effect or dazed by just
20     what happened?
21  A.  I don't remember him being under the effect or daze of
22     the Taser.
23  Q.  Okay.  Did he ever lunge towards you?
24  A.  No, he did not lunge at us.
25  Q.  Did he ever take a step toward you?

Page 111

1  A.  He was getting up towards us, yes.
2  Q.  When you say getting up, we already talked about that.
3     He's raising in that 45-degree position with his feet
4     on the ground, correct?
5  A.  Which would include, while getting up from that
6     kneeling position, taking a step towards you to move
7     towards you.
8  Q.  Okay.  When does he take a step towards you after that
9     kneeling position?
10  A.  It was just in the -- while in the process of him
11     getting up, his foot came down towards us.
12  Q.  How many steps does he take toward you?
13  A.  He didn't take any necessarily steps.  It was just the
14     step of getting up while he was coming towards us.
15  Q.  He just went from his knee to his feet to try to stand
16     up.
17  A.  While he appeared to be coming towards us, yes.
18  Q.  Okay.  But he didn't take any steps towards you.
19  A.  I'm not sure if -- I'm not sure.
20  Q.  He never took a swing at you?
21  A.  He never took a swing at me, no.
22  Q.  Never took a swing at Officer Robinson?
23  A.  Not that I recall.
24  Q.  And ever since he was on his hands and knees and even
25     while trying to stand up, he never engaged in any more

Page 112

1     kicking motions, agreed?
2  A.  After attempting to stand up, I don't believe he kicked
3     at all, no.
4  Q.  And that's when you deployed your Taser.
5  A.  Yes.
6  Q.  Okay.  Where did you aim?
7  A.  I was aiming, as I always do, in the preferred target
8     areas of Mr. Kapuscinski.
9  Q.  Well, there's several of those, correct?
10  A.  Correct.
11  Q.  Okay.  So where specifically on Mr. Kapuscinski's body
12     were you aiming that Taser?
13  A.  I don't know where specifically.
14  Q.  Where were you hoping to hit him?
15  A.  In the preferred target areas.
16  Q.  Which was?
17  A.  The preferred target areas that we've already gone
18     over, the arms, abdomen, legs, any of these areas.
19  Q.  Or back.
20  A.  Or back.  But he was facing me, which would not have
21     been feasible.
22  Q.  So we can agree you weren't aiming at the back.
23  A.  Correct.
24  Q.  And are you facing each other?
25  A.  Yes.

**Page 113**

1  Q.  And what's the distance between the two of you?
2  A.  **Several feet.**
3  Q.  Three feet, four feet?
4  A.  **Approximately maybe five to -- five, six, seven feet**
5     **approximately.**
6  Q.  And is his torso still bent forward in roughly a
7     45-degree angle when you deploy your Taser?
8  A.  **I believe so.**
9  Q.  Did you give him any commands or warnings?
10 A.  **I did not I don't believe.**
11 Q.  I didn't hear it in the audio, but you listened to the
12    audio as well.  You don't hear yourself giving any
13    warnings or commands, correct?
14 A.  **Correct.**
15 Q.  Were you aiming for the chest?
16 A.  **No.**
17 Q.  Were you trying to avoid the chest?
18 A.  **Yes.**
19 Q.  Why?
20 A.  **It's not a preferred target area.**
21 Q.  But you could see his chest from the positions the two
22    of you were, correct?
23 A.  **Correct.**
24 Q.  And when you -- when you were deploying your Taser, is
25    there -- what position were you in?  Do you have your

**Page 114**

1     knees bent slightly?  How do you do that?
2  A.  **Standing position.**
3  Q.  I'm assuming it's standing.  Perfectly straight, or are
4     your knees bent?
5  A.  **I don't recall if my knees were bent or not.**
6  Q.  How do you normally do it?
7  A.  **I guess there would be a slight bend in my knee.**
8  Q.  Keep your arms extended completely out --
9  A.  **I wouldn't say --**
10 Q.  -- parallel to the floor?
11 A.  **I wouldn't say completely out as you have it, but not**
12    **completely locked out, no.**
13 Q.  You can tell I don't shoot these a lot, right?
14       MS. FORBUSH:  Ever.
15       MR. WEGLARZ:  Only a few times a week.
16 BY MR. WEGLARZ:
17 Q.  Slightly bent.  Are you aiming -- do you think you were
18    parallel to the floor, were you aiming slightly
19    upward, slightly upward?
20 A.  **I believe slightly downward.  As he was coming from a**
21    **downward to an up position and I was up, I would have**
22    **had to have aimed downwards.**
23 Q.  And how far below was that Taser?  How far below your
24    shoulder --
25 A.  **I couldn't --**

**Page 115**

1     -- level were you?
2  A.  **I couldn't recall.  I don't know.**
3  Q.  What degree of angle downward do you think you had that
4     Taser pointed?
5  A.  **I don't know.**
6  Q.  Best estimate.
7  A.  **I couldn't give you an estimate.  I don't know.**
8  Q.  Twenty-three degrees?
9        MS. McGIFFERT:  I'm going to place an
10    objection.  The question's been asked and answered.
11    He's told you, "I can't give you an estimate."  Can't
12    force it.
13 BY MR. WEGLARZ:
14 Q.  Best estimate.
15       MS. McGIFFERT:  If he can't give you an
16    estimate, he can't give you a best estimate.
17       MR. WEGLARZ:  Sure he can.
18       MS. McGIFFERT:  And I'm definitely cautioning
19    the witness not to guess.
20       **THE WITNESS:  I don't know.**
21 BY MR. WEGLARZ:
22 Q.  Greater than 45 degrees or less than 45 degrees?
23 A.  **I don't know.**
24 Q.  Was Mr. Kapuscinski looking at you at the time you
25    deployed your Taser?

**Page 116**

1  A.  **Yes.**
2  Q.  Did he say anything?
3  A.  **I don't believe so, no.**
4  Q.  Did your darts hit Mr. Kapuscinski?
5  A.  **Yes.**
6  Q.  Where?
7  A.  **One hit him in the upper left chest, one hit him in the**
8     **lower right abdomen.**
9  Q.  And whereabouts in the upper left chest?
10 A.  **Probably maybe a couple inches below the clavicle.**
11 Q.  Did both darts -- do you believe the darts landed where
12    you were aiming?
13 A.  **I don't -- I wasn't necessarily aiming for the chest,**
14    **so no.  I was aiming for the preferred target zone.**
15    **With a moving target, it's almost impossible to -- or**
16    **not feasible to hit exactly where you're aiming in**
17    **those preferred target zones all the time.  I was not**
18    **aiming for the chest.**
19 Q.  But you were aiming for his torso, fair to say?
20 A.  **I was aiming for the preferred target zones.**
21 Q.  Come on.  Which were?  Were you trying to hit the leg,
22    were you trying to hit the abdomen, were you trying to
23    hit the arm?
24 A.  **I was trying to hit a preferred target zone.  It was**
25    **the arm, abdomen, legs.**

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 117

1  Q.  But you can't aim at all of those at the same time, can
2      you?
3  A.  Not at the same time, no.
4  Q.  Okay. So which one were you really trying to hit?
5  A.  I would probably be trying to hit the abdomen, but with
6      him moving, it's impossible to -- not feasible, I
7      should say, to hit where you're aiming.
8  Q.  And did he move from the moment you aimed and then
9      decided to press the trigger?
10 A.  He was moving the entire time, yes.
11 Q.  Well, what movement did he engage in?
12 A.  He was standing up.
13 Q.  So his movement during this process was that his torso
14     was going higher as he was trying to stand up, correct?
15     He was raising the torso up.
16 A.  I guess, yeah.
17 Q.  And the more he raised his torso, the higher up his
18     chest became.
19 A.  I guess so, yes.
20 Q.  Does that make sense?
21 A.  Yes, that makes sense.
22 Q.  Sure. And the more he's raising up, the easier it
23     should be to hit the abdomen because now the chest is
24     becoming further away, correct?
25 A.  Not necessarily on a moving target.

Page 118

1  Q.  Were you satisfied with where those darts landed?
2          MS. FORBUSH:  Object to form.
3          MS. McGIFFERT:  Join.
4          THE WITNESS:  What did you mean by satisfied?
5      Was I happy to tase him?
6  BY MR. WEGLARZ:
7  Q.  Were you happy they landed there as opposed to any
8      other location?
9  A.  I wouldn't say I was happy. I was aiming for the
10     preferred target areas. It wasn't always feasible at
11     the time to necessarily hit that specific area with a
12     moving target. I wouldn't say I was happy to have a
13     dart in his chest, no.
14 Q.  And, actually, the one dart went into a non-preferred
15     area, correct?
16 A.  Yes.
17 Q.  You can't aim both darts, can you?
18 A.  It's very difficult to aim the Taser. Even while
19     aiming, they're not going to always go right where you
20     want them to.
21 Q.  So how is it that when you're aiming at one location,
22     one goes in the abdomen and one goes further up?
23 A.  They spread out.
24 Q.  And do they spread out in a typical manner?
25 A.  There's a set angle that they would spread out at.

Page 119

1  Q.  And what's that set angle?
2  A.  I don't know.
3  Q.  Do you have any idea?
4  A.  I would have to refer you to the Taser training, which
5      I don't have on me. I don't know.
6  Q.  But you go through it every year, correct?
7  A.  Correct.
8  Q.  So you aim somewhere, but you know when you shoot it,
9      these wires and probes are going to spread --
10 A.  Correct.
11 Q.  -- a certain distance, correct?
12 A.  Yes.
13 Q.  And does one -- will one typically go higher than the
14     other in addition to the two spreading apart?
15 A.  One will stay on a level plane, while the bottom one
16     will drop down I believe.
17 Q.  Okay. And it's designed that way, correct, because you
18     need them spread apart for it to be effective.
19 A.  Correct.
20 Q.  So it's designed so that the bottom one goes lower than
21     the top one.
22 A.  I believe so, yes.
23 Q.  All right. And so when you're aiming, you're really
24     aiming the top probe, correct?
25 A.  I would guess so.

Page 120

1  Q.  Yeah. With the understanding that, all right, I'm
2      aiming the top probe for this targeted area. I know
3      the low probe typically goes a little bit lower, and
4      that's going to hit somewhere beneath that, correct?
5  A.  Okay.
6  Q.  Okay. So it sounds like where these -- so obviously
7      the top probe here is the one that landed in the chest
8      area, right?
9  A.  I guess so, yes.
10 Q.  Okay. So the way I look at it is it looks like you
11     were aiming for the chest, the top probe hit the chest
12     where you were aiming, and then that lower probe went
13     lower into the abdomen, correct?
14 A.  No. I was not aiming for his chest.
15 Q.  Okay. Did it work?
16 A.  Did the Taser work?
17 Q.  Yeah.
18 A.  Yes.
19 Q.  Did it fire?
20 A.  Yes.
21 Q.  Was he juiced?
22         MS. FORBUSH:  Object to the form.
23 BY MR. WEGLARZ:
24 Q.  It's an electrical term, forgive me.
25 A.  Do you mean was he under the influence of the Taser?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 121–124

Page 121

```
1    Q.   Yeah, I like that better.
2    A.   Yes.
3    Q.   How so?  What happened?
4    A.   He stopped doing the action that he was doing, went
5         down to the floor where Officer Robinson was able to
6         handcuff him.
7    Q.   And the action he was doing is he was trying to stand
8         up.
9    A.   Yes.
10   Q.   And he fell to the floor?
11   A.   Yes, he went down onto the ground.
12   Q.   And when he went to the ground, he was in what
13        position?
14   A.   Officer Robinson handcuffed him, so I believe he would
15        have been on his stomach at that point.
16   Q.   Did you fire the Taser again?
17   A.   No, I did not.
18   Q.   It worked as it was intended to work, correct?
19   A.   Correct.
20   Q.   This didn't seem like a guy who was somehow -- I know
21        you said, hey, you know what, whether Tasers are real
22        painful or not, it depends on the person.  Sometimes
23        people don't feel anything, sometimes they have this
24        super strength, whatever, it doesn't affect them,
25        correct?
```

Page 122

```
1              MS. McGIFFERT:  Well, I'm just going to place
2         an objection as to foundation.  Is that supposed to be
3         what his testimony was?
4              MR. WEGLARZ:  Yes.  I'm paraphrasing.
5              MS. McGIFFERT:  Objection to --
6              MR. WEGLARZ:  If I'm incorrect, he'll tell
7         me.
8              MS. McGIFFERT:  -- mischaracterizing his
9         testimony.
10             MR. WEGLARZ:  Sure, sure.
11             THE WITNESS:  I don't recall saying that
12        people don't feel it.
13   BY MR. WEGLARZ:
14   Q.   Well, they feel it to different degrees, correct?
15   A.   Okay.
16   Q.   Okay.  Did Mr. Kapuscinski seem to be someone who
17        wasn't affected by a tase?
18   A.   I don't know if how he was affected by it or how he
19        felt with it.
20   Q.   Well, based on your observation, he went down pretty
21        quick, right?
22   A.   Yeah.  The Taser, it worked on him, yes.
23   Q.   Sometimes you tase people just like you did
24        Mr. Kapuscinski and it doesn't take them down, does it?
25   A.   Correct.
```

Page 123

```
1    Q.   It took Mr. Kapuscinski down right away, agreed?
2    A.   Correct.
3    Q.   You didn't fire it again?
4    A.   No.
5    Q.   Did either you or Officer Robinson get any -- were you
6         under any tase?  Did you also get tased?  I know
7         sometimes officers are collateral damage in these
8         things.
9    A.   No.
10   Q.   Was a drive stun ever used?
11   A.   No.
12   Q.   Was it ever attempted?
13   A.   No.
14   Q.   And what is that, by the way?
15   A.   What is a drive stun?
16   Q.   Yes.
17   A.   That would be when you have the Taser, instead of
18        deploying the probes, you would hold it on the
19        individual and activate it just holding it up to them.
20   Q.   And do you have to activate a certain button?
21   A.   On the X2 model that I use, you would have to use the
22        ARC switch.
23   Q.   What about on the other model, the 26?
24   A.   On the X26 you would have to remove the cartridge and
25        then hold it up to the person.
```

Page 124

```
1    Q.   Did Robinson ever remove his cartridge?
2    A.   What are you asking?  Removed it when?
3    Q.   Let me back up.  When you say remove the cartridge and
4         hold it up to him, are you talking about the same
5         cartridge that you use to deploy the darts and the
6         probes?
7    A.   Yes.  To drive stun someone with the X26, you would
8         remove the probes -- the cartridge with the probes in
9         it and then hold it up to them.
10   Q.   Okay.  So once you deploy the probes, if you want, you
11        can just go up and drive stun them too, correct?
12   A.   Correct, but that would also -- if you had that
13        cartridge still on, it would also reactivate the probes
14        when you pulled the trigger.
15   Q.   Okay.  You don't recall the female ever removing a
16        probe from her, would you agree?
17   A.   I don't recall her doing so, no.
18   Q.   You don't recall the female ever -- you don't recall a
19        probe ever falling off of the female, agreed?
20   A.   I don't recall.  I don't know where the other probe
21        went.
22   Q.   Did you observe Mr. Kapuscinski being tased four times
23        in a row, four firings in a row --
24   A.   No.
25   Q.   -- for five to six seconds --
```

Page 125

```
1              MS. FORBUSH:  Object to the form.
2   BY MR. WEGLARZ:
3   Q.  -- each firing?
4              MS. FORBUSH:  Object to the form.
5              THE WITNESS:  No.
6   BY MR. WEGLARZ:
7   Q.  Okay.  And you're pretty sure that didn't happen,
8       correct?
9   A.  I am positive that that did not happen.
10  Q.  Okay.  One of the reasons why you know that didn't
11      happen is because there was no reason for that to
12      happen, correct?
13  A.  Correct.
14  Q.  You would agree that if you fired four times, five to
15      six seconds apiece consecutively, one after the other,
16      that would be excessive, correct?
17  A.  Correct.
18  Q.  And you would agree that, hypothetically, if
19      Mr. Kapuscinski was being tased in that manner four
20      consecutive times, five to six seconds each time, and
21      then you also tased him while that was going on, that
22      would obviously be excessive, correct?
23  A.  Correct.
24  Q.  And that could cause harm to him, correct?
25  A.  Correct.
```

Page 126

```
1   Q.  After you tased Mr. Kapuscinski, was he still
2       breathing?
3   A.  Yes.
4   Q.  What did you do after you deployed your Taser?
5   A.  After I deployed my Taser, I personally stood by while
6       Officer Robinson handcuffed Mr. Kapuscinski, then
7       watched as Officer Robinson got him into what they call
8       the recovery position, and then we both -- I should
9       backtrack one second.
10  Q.  Sure.
11  A.  Immediately after firing my Taser, I requested an
12      ambulance from the city of Gibraltar.  Then after that,
13      we -- Officer Robinson handcuffed him, got him in the
14      recovery position.  We monitored his vitals until the
15      ambulance could get there.
16  Q.  And is that routine?  Do you always call an ambulance
17      when someone gets tased?
18  A.  Yes.
19  Q.  Why not call an ambulance the first time Kapuscinski
20      was tased?
21  A.  The scene wasn't secure yet.  We still had a violent
22      suspect that we had to get into custody.  We call them
23      after he's in custody.
24  Q.  Okay.  So you do that after he's cuffed.
25  A.  After the scene is secure, whatever that may entail,
```

Page 127

```
1       yes.
2   Q.  When you deployed your Taser, does it make the same
3       sound as Robinson's Taser?
4   A.  A similar sound, yes.
5   Q.  And when you were listening to the video, slash, audio,
6       could you hear your Taser being deployed?
7   A.  I believe so, yes.
8   Q.  Would you agree that it would be excessive to tase
9       Mr. Kapuscinkli -- Mr. Kapuscinski simply because he
10      didn't turn over when instructed?
11  A.  If there was no other aggressive actions, just not
12      listening to a verbal command, then yes.
13  Q.  And you do recall when Mr. Kapuscinski was being told
14      to turn over, that was when he was on his back,
15      correct?
16  A.  I believe so, yes.
17  Q.  And he wasn't a threat to anyone when he was lying on
18      his back, we agree?
19  A.  No.
20  Q.  You disagree?
21  A.  Yes.
22  Q.  Okay.  Talking about the kicking motions?
23  A.  Yes.
24  Q.  Okay.  Have you ever tased anyone while they were lying
25      on their back before?
```

Page 128

```
1   A.  I don't believe so.
2   Q.  Have you ever heard of anyone tasing somebody while the
3       suspect was lying on their back?
4   A.  There's nothing that says that you can't.  I'm sure
5       that people have.
6   Q.  When you were listening to that audio, do you recall
7       Robinson yelling at Mr. Kapuscinski to "roll over now
8       or I'm going to tase you again"?
9   A.  Yes.
10  Q.  Do you recall in the audio either you or Officer
11      Robinson telling Mr. Kapuscinski to stop resisting or
12      stop being assaultive?
13  A.  I'm not sure if those are the exact words used, but
14      Officer Robinson was giving him loud verbal commands to
15      stop.
16  Q.  Did you hear three tase sounds on the audio?  I only
17      heard two.
18  A.  I was only able to hear two.
19  Q.  First one was Robinson's, the second one was yours, do
20      we agree on that?
21  A.  I believe so, yes.
22  Q.  And the time between the two was about 17 seconds from
23      a time we hear Robinson's Taser and the time we hear
24      your Taser.  Is that how you recall it?
25  A.  I'd have to refer to the MSP report.
```

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                                                                           Pages 129–132

Page 129

1   Q.   Sure.  You know which one I'm talking about, right?
2   A.   Yeah.  33.  Yes, about 17 seconds.
3   Q.   Okay.  And I think we've already established this
4        before.  Does that sound about right to you?  Is that
5        what you recall, deploying yours around 17 seconds
6        after the first deployment by Robinson?
7   A.   At the time of the incident I couldn't give you a exact
8        time.  Looking at this, though, 17 seconds, yes.
9   Q.   You don't disagree with that.
10  A.   Correct.
11  Q.   Okay.  And any time Robinson is going to be activating
12       to fire his Taser again, even though the darts already
13       deployed, you're going to be able to hear that because
14       it makes a loud noise, right?
15  A.   Correct.
16  Q.   And I take it if you were to hear Officer Robinson
17       firing four times consecutively one after the other in
18       five- to six-second bursts, you're not going to deploy
19       your Taser while that's going on, correct?
20  A.   Correct.
21  Q.   That would be excessive, correct?
22  A.   Correct.
23  Q.   Okay.  And do you recall just a few seconds after
24       Robinson -- well, let me back up.  You do recall
25       Robinson saying, "roll over now or I'm going to tase

Page 130

1        you," correct?
2   A.   Yes.
3   Q.   And do you recall him saying that just within a few
4        seconds, six to eight seconds, after you deployed your
5        Taser?
6   A.   After I deployed my Taser, no, I don't recall him
7        saying that.
8   Q.   And then do you recall maybe ten seconds after you
9        deployed your Taser you mentioning to Robinson that,
10       "you only got one barb in there"?
11  A.   I don't know if it was after I deployed mine or not.
12       At one point I did.
13  Q.   But you recall hearing yourself say that on the audio,
14       correct?
15  A.   Yeah.
16  Q.   And that's when you first noticed there's only one dart
17       or barb sticking in Mr. Kapuscinski.
18  A.   I had already noticed it.  It was the time I was
19       advising Officer Robinson that.
20  Q.   When you first noticed there was only one barb in
21       there, did you advise Officer Robinson of that right
22       away?
23  A.   Right away when I noticed it, no.  I did at the time
24       that I said after what you said.
25  Q.   Why did you think you needed to notify him at this

Page 131

1        particular point in time that we hear it on the audio?
2   A.   In case Mr. Kapuscinski started becoming violent again,
3        if Officer Robinson would have deployed his Taser, then
4        it would not have worked.  I was just letting him know
5        that his Taser was not going to be effective.
6   Q.   Did it look like Robinson wanted to deploy his Taser
7        again --
8   A.   No.
9   Q.   -- shortly before you verbally warned him of that?
10            MS. FORBUSH:  Object to the form.
11            THE WITNESS:  I don't --
12  BY MR. WEGLARZ:
13  Q.   Maybe that's why you said -- you told him about it?
14            MS. FORBUSH:  Object to the form.
15            THE WITNESS:  I don't know what you're -- I
16       don't understand the question that you're asking me.
17  BY MR. WEGLARZ:
18  Q.   Sure.  I hear you on the audio saying, "you only got
19       one barb in him."  Is the reason why you said that
20       because you thought he was about to tase him again?
21  A.   I don't know.  I was just advising him in case the
22       subject gets violent again and Officer Robinson
23       attempts to pull his Taser that it's not going to work.
24  Q.   All right.  Then, now, up until the point in time that
25       you tased Mr. Kapuscinski, you don't remember seeing

Page 132

1        any fecal matter on the floor, do you?
2   A.   I don't recall what time I noticed that.
3   Q.   Do you recall hearing on the audio it sounded like
4        Robinson saying, "Did he shit himself?"  Do you
5        remember that?
6   A.   I recall hearing that, yes.
7   Q.   Okay.  And then right after that, he says, "He shit
8        himself there."  Do you remember him saying that to
9        you?
10  A.   I remember him saying that, yes.
11  Q.   And then he pointed out to you where the fecal matter
12       was?
13  A.   I don't recall if he pointed it out.
14  Q.   Did you see it?
15  A.   Yes.
16  Q.   Where did you see it?
17  A.   It was in various parts of the room.
18  Q.   Did you see it on Mr. Kapuscinski?
19  A.   Not that I recall.
20  Q.   But you understood -- when Officer Robinson said this
21       to you, you understood that he was trying to tell you
22       that Mr. Kapuscinski defecated on himself, correct?
23            MS. FORBUSH:  Object to the form, foundation.
24            THE WITNESS:  I think he was just pointing
25       out that there was fecal matter in the room.

Page 133

BY MR. WEGLARZ:

Q. And you didn't notice that before he pointed that out to you, fair to say?

A. **I don't recall.**

Q. Can you -- I'm going to ask you if you can diagram for me very simply a diagram of the room, your location, and Mr. Kapuscinski's location when you tased him.

A. **I don't know if I'd be able to give you exact specific areas.**

Q. Just do the best you can.

MS. McGIFFERT: Well, when you talk about location, I mean, unless he can draw it by scale, I'm not sure what you're asking him to do.

MR. WEGLARZ: Just -- I'm just asking for a simple diagram, that's all.

MS. McGIFFERT: Well, counsel, when you say a simple diagram, I mean, he's already -- I don't know if he knows what you're asking him to do. But a simple diagram, you said your location and his location. I mean, unless he's drawing it to scale, I don't know what the purpose of this diagram is.

MR. WEGLARZ: Well, we do that all the time.

MS. McGIFFERT: What are you asking him to do?

MR. WEGLARZ: I want to know where he was and

Page 134

where Mr. Kapuscinski was within that room, that's all. It's no different than a auto case. Where was the car and what lane were you in?

MS. FORBUSH: Well, you have a picture of the room. Can't we look at the picture and ask questions based on the picture? Seems like it would be more accurate than having him draw stick figures.

MR. WEGLARZ: Well, there is no picture that shows the full room, so I think that's part of the problem.

MS. McGIFFERT: Well, I'm just going to object for the record that you're asking him apparently to draw the full room, to draw where he was in relationship to Mr. Kapuscinski on a piece of 8-and-a-half-by-11 paper that, unless he's more of an artist than I know about, will not be to scale and, therefore, will be inaccurate and later, I'm sure, misinterpreted in terms of distances, so I'm not quite sure --

MR. WEGLARZ: And I think --

MS. McGIFFERT: -- this can be done.

MR. WEGLARZ: -- we can all agree that it will not be a to-scale rendering. Of course it's not.

MS. McGIFFERT: Well, then, I guess, counsel, that's what I'm questioning. If it's you're telling

Page 135

him to draw where he was and where Mr. Kapuscinski was, and if it's not to scale, which of course it will not be, what is -- it's not going to be an accurate rendition of anything.

MR. WEGLARZ: No, but it gives us a general idea, and judges allow us all the time, so your objection's noted. And I get it, you have to make that part of the record, but I'm still going to ask that he do that.

MS. McGIFFERT: Okay. I'm going to tell the witness that that's up to you. You can answer this. You're not required to make a diagram, so it's up to you if you think you can do what he's asking you to do.

THE WITNESS: **I don't feel at this time I could depict a fair, accurate diagram.**

BY MR. WEGLARZ:

Q. You can't even tell us in general where you were or Mr. Kapuscinski was.

A. **I believe I have already explained in general where we were at.**

Q. All right. But you can't even do a general diagram and pinpoint where within a rectangle that represents the bedroom where the two of you were when you tased him, fair?

A. **I don't think I could come up with an accurate drawing.**

Page 136

Q. Or something even close to being accurate. It would be sheer speculation.

MS. McGIFFERT: I'm most certainly going to instruct him not to come up with anything that would be sheer speculation.

MR. WEGLARZ: Well, that's what I'm trying to establish so I can move on. If that's what it is, then okay. Then you may have something. But I'm telling you, I've taken this issue to the judges before, and they said of course they're going to do a diagram, okay?

MS. McGIFFERT: Okay. And I'm going to say in all my years of experience, I've never seen or heard of a judge forcing someone to do a diagram, especially when they say they don't feel they can do it accurately, so I don't know what your experience is, but that's been my --

MR. WEGLARZ: Codimer and Jim Ferrell.

MS. McGIFFERT: Okay. So I'm telling the witness that unless the judge instructs him to do it, it's his choice. And I've never heard of a judge instructing a witness to do something that they say they cannot accurately do.

BY MR. WEGLARZ:

Q. Okay. So you're not going to do it?

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                                    Pages 137–140

Page 137

1   A.   Correct.
2   Q.   Okay.  Takes care of that.  At some point
3        Mr. Kapuscinski becomes unresponsive?
4   A.   Correct.
5   Q.   Where is the Trenton PD, by the way, at the time that
6        you're -- that you tase Mr. Kapuscinski?
7             MS. FORBUSH:  Object to foundation.
8   BY MR. WEGLARZ:
9   Q.   Go ahead.
10  A.   I would have no idea where they're at.
11  Q.   Were they at the scene yet?
12  A.   No.
13  Q.   They do arrive at the scene, right?
14  A.   Yes.
15  Q.   And at what point in time do you recall them arriving?
16  A.   I don't recall when the first officer arrived.  I
17       believe when I went out to my car to get a CPR mask,
18       one of them was walking in, and I believe the second
19       one pulled up as I was walking back into the apartment.
20  Q.   Did you look at the Trenton PD records?
21  A.   No, I did not.
22  Q.   Oh.  After Kapuscinski was cuffed by Robinson, what
23       position was Robinson in -- I mean Kapuscinski, I'm
24       sorry.
25  A.   He was placed into what was called the recovery

Page 138

1        position.
2   Q.   And he did that right after cuffing him?
3   A.   I believe so, yes.
4   Q.   And why would you want to put him in the recovery
5        position?
6   A.   It's a safe position for the individual, opens up
7        airways so they can get oxygen and breathe better.  Or
8        breathe good.
9   Q.   And you mention that you went outside and that's when
10       you noticed the Trenton PD walking in while you were
11       walking out?
12  A.   I believe when I was walking out of the apartment one
13       was walking in.  I'm not sure the exact time we walked
14       past each other.
15  Q.   Sure, sure.  And the reason why you were walking out of
16       the apartment at that time?
17  A.   Was to get a CPR mask out in the car.
18  Q.   Okay.  And Mr. Kapuscinski was already cuffed and
19       placed in the recovery position by this time?
20  A.   Prior to that, yes.
21  Q.   Okay.  Now, if the Trenton Police Department -- if
22       their reports mention -- do you know who Patrolperson
23       Arnoczki is?
24  A.   I know him by name.
25  Q.   Did I say it correctly?

Page 139

1   A.   I'm not sure.  I've -- outside of this call, I don't
2        think I've ever actually met him, and I don't think I
3        met him on this call.
4   Q.   All right.  His report mentions that he walks in the
5        apartment, he walked to the back bedroom, met with
6        Officer Robinson and Officer Mitchell.  He says, "I
7        observed a naked male lying on his back in the bedroom
8        between the two officers.  He was unresponsive.  His
9        arms were behind his back and it appeared that two
10       barbs from a Taser were in the center chest region of
11       his body."  Does that refresh your recollection?  Do
12       you recall that?
13  A.   That sounds familiar, yeah.
14  Q.   Okay.  So you -- that does sound familiar, Trenton PD
15       arrives, and at that time you've got Kapuscinski
16       cuffed, laying on his back, unresponsive, two barbs in
17       the center chest region.
18  A.   One, he's unresponsive at this point.  He is still
19       breathing with a pulse I do believe, just not
20       responding to our questions.
21  Q.   And you believe he's breathing and has a pulse?
22  A.   Yes.
23  Q.   Did you check?
24  A.   Officer Robinson I believe checked.
25  Q.   Do you recall what the pulse was?

Page 140

1   A.   I don't think Officer Robinson took a reading.
2   Q.   And it says the barbs already had their wires detached
3        and were lying next to him.  Who would have detached
4        the wires?
5   A.   My wires were not detached.  I believe my cartridge was
6        removed and on the ground, and I can't speak for
7        Officer Robinson's Taser wires, but my wires were kept
8        intact.
9   Q.   Okay.  Both.
10  A.   Yes.
11  Q.   You believe one was in the abdomen, one was in the
12       chest, right?
13  A.   Yes.
14  Q.   And then he says, "Officer Robinson stated that the man
15       had no pulse and wasn't breathing.  Officer Robinson
16       checked for a pulse and then requested for Officer
17       Mitchell to get his CPR mask from his patrol car."  Is
18       that how you recall what happened at the scene?
19  A.   No.
20  Q.   Okay.  What's incorrect about that?
21  A.   Officer Robinson -- or Mr. Kapuscinski still had a
22       pulse.  We observed that it appeared that he stopped
23       breathing.  I then went out to my car to get the CPR
24       mask.  When I came back -- while I was gone, I believe
25       his pulse stopped and CPR had started.

Page 141

1   Q.  Okay.  When you realized that Mr. Kapuscinski had a
2       dart probe in the chest area, I take it you wanted to
3       make sure he was okay because that was a non-preferred
4       target area, correct?
5   A.  Correct.
6   Q.  And you know that if you get hit in that area, that
7       could cause a problem.  It's low probability, but it
8       could cause a problem, correct?
9   A.  Low probability and very rare in circumstances.
10  Q.  And if indeed Mr. Kapuscinski has no pulse and wasn't
11      breathing, he needs medical attention immediately, fair
12      to say?
13  A.  Correct.
14  Q.  And that medical attention would consist of what at a
15      bare minimum?
16  A.  Bare minimum would be CPR.
17  Q.  Which would mean what?
18  A.  Chest compressions.
19  Q.  And rescue breaths?
20  A.  Yes.
21  Q.  And you know that someone who's been tased in the chest
22      who has no pulse and isn't breathing, if they don't get
23      CPR within the next few minutes, they could really be
24      in trouble.
25          MS. FORBUSH:  Object to form and foundation.

Page 142

1           MS. McGIFFERT:  Join.
2   BY MR. WEGLARZ:
3   Q.  You can still answer.
4   A.  I believe so.
5   Q.  Now, throughout the video, slash, audio, sometimes your
6       mic is shut off?
7   A.  Yes.
8   Q.  And why -- why was that done?
9   A.  The reason that I shut my microphone off was to save
10      the battery.  It is a battery-operated microphone.  The
11      battery does not last very long.  When I was outside of
12      the room away from any of the people inside the
13      apartment, I turned my microphone off for brief periods
14      of time just to save the battery on it.
15  Q.  Is that pursuant to policy?
16  A.  Our policy would be to have it on when we're in contact
17      with people.  If I'm away from people by myself, it
18      would be okay to turn it off.
19  Q.  You made some phone calls on your cell phone at the
20      scene, true?
21  A.  Correct.
22  Q.  And who did you call?
23  A.  I made a call to, now at this time, Lieutenant Krause
24      to advise him of the issue.
25  Q.  And when did you call Lieutenant Krause?

Page 143

1   A.  I'm not sure exactly what time it was at.  It was at --
2       while we were on scene.
3   Q.  I'm assuming that.  Where in our sequence?  This is
4       after you deployed your Taser obviously.
5   A.  Yes.
6   Q.  Is this before you went out to get the CPR mask?
7   A.  I'm sorry?
8   Q.  Was this before you went out to your car to get the
9       mask?
10  A.  No, after.
11  Q.  After.  And when you brought in the mask, did you
12      assist with CPR?
13  A.  Yes, I did.
14  Q.  And how did you do that?
15  A.  At first Officer Robinson performed the chest
16      compressions while I did the rescue breaths portion of
17      CPR.  After a few minutes, Officer Robinson and I
18      switched and I did the chest compressions.
19  Q.  Okay.  And how long did you do that?
20  A.  I'm not sure the exact time frame of --
21  Q.  Did you continue to do that up until the time EMS
22      arrived?
23  A.  Yes.
24  Q.  And it was after that point in time that you then
25      called Lieutenant Krause?

Page 144

1   A.  It was a while after that still, yes.
2   Q.  And that was the first person you called that day after
3       this incident from your cell phone?
4   A.  Yes.
5   Q.  Did you receive any calls on your cell phone that
6       evening?
7   A.  That evening?
8   Q.  Yeah.  Or early morning while you were at the scene.
9   A.  While I was on the phone with Lieutenant Krause,
10      Detective Sergeant Mercure had called me, and then when
11      I got off the phone with Lieutenant Krause, I called
12      him back.
13  Q.  Okay.  And what do you recall Lieutenant Krause saying
14      to you?
15  A.  I don't recall what he said.  I just informed him of
16      the situation, and I believe that he was going to come
17      in and assist at some point.
18  Q.  And what would be the reason for you calling Lieutenant
19      Krause?
20  A.  Per our department policy -- if I can refer to that,
21      I'll give you the exact specific wording and
22      notification of supervisors.
23  Q.  Well, is it a policy that requires you to notify your
24      supervisor?
25  A.  Yes.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Page 145

1  Q.  And then what did you discuss with -- is it Mercure?
2  A.  Yes.  He is also a supervisor.  I just advised him of
3      what the situation was.
4  Q.  Okay.  And what did the two of you discuss?
5  A.  That he was going to come in and -- I'm sorry, I'm
6      looking through this for the supervisor notification.
7  Q.  Do what you have to do.
8  A.  Any discharge other than the function test, either
9      intentional or accidental, shall necitate (sic) the
10     immediate notification of the officer's supervisor.
11     Sergeant Mercure advised me that he was going to come
12     in to cover any road calls, and then to come back to
13     the station after I completed that assist with
14     Gibraltar.
15 Q.  Did you talk about what happened?
16 A.  I very briefly advised him of what happened.
17 Q.  And what did you tell him?
18 A.  I don't recall exactly.
19 Q.  And what was his response to after you telling him what
20     happened?
21 A.  That he would come in to cover the road calls if we had
22     any other future calls until the end of my shift and
23     then to come to the station afterwards.
24 Q.  Now, was it decided that you were going to go home to
25     change your clothes?

Page 146

1  A.  Yes.
2  Q.  What led up to that?
3  A.  While performing CPR, I had fecal matter on my pants,
4      on my boots, and I needed to get changed out of that.
5  Q.  Did Robinson get fecal matter on his uniform?
6  A.  I don't know.
7  Q.  And who did you discuss this with?
8  A.  The fecal matter?
9  Q.  Wanting to change your clothes because of the fecal
10     matter.
11 A.  The lieutenant at the time, Krause, and Sergeant
12     Mercure.
13 Q.  Okay.  Wasn't it first decided that, yeah, you can go
14     home and change, and then, well, you know what, why
15     don't you meet me at the station instead?
16 A.  I'm not sure what the sequence of events was.  I went
17     to the station first before I went home.
18 Q.  And why did you go to the station first?
19 A.  To turn my uniform over to Sergeant Mercure.
20 Q.  He met you up there?
21 A.  Yes.
22 Q.  And do you recall what you discussed with Sergeant
23     Mercure at the station?
24 A.  I don't recall what we discussed, no.
25 Q.  Did they give you a breathalyzer?

Page 147

1  A.  Yes.
2  Q.  Who gave that to you?
3  A.  Sergeant Mercure.
4  Q.  And why?
5  A.  I think that was just a precaution on his part and on
6      the department's part.
7  Q.  Has your employer ever given you a breathalyzer before
8      while on duty?
9  A.  No.
10 Q.  Did you think it was odd that you were giving a
11     breathalyzer for your supervisor while on the job in
12     the middle of this incident?
13 A.  No.
14 Q.  Did anyone accuse you of having consumed alcohol that
15     day?
16 A.  No.
17 Q.  Did anyone suspect that perhaps you were under the
18     influence or you were consuming alcohol that day?
19 A.  No.
20 Q.  Have you heard of any other police officers from
21     Rockwood ever having to give a breathalyzer while on
22     duty?
23 A.  Not that I recall, no.
24 Q.  Can you think of any reason as to why you were being
25     asked to give a breathalyzer?

Page 148

1  A.  Just as a precaution.
2  Q.  Precaution for what?
3  A.  Just proof that I wasn't intoxicated.
4  Q.  All right.  Was someone worried that someone may try to
5      allege you were intoxicated?
6          MS. McGIFFERT:  Object as to foundation and
7      speculation.  He can't tell you what -- anyhow, that's
8      my objection.
9          THE WITNESS:  Can you repeat your question?
10     I'm sorry.
11 BY MR. WEGLARZ:
12 Q.  Sure.  Did anyone tell you that they were worried that
13     you would be accused of drinking or being intoxicated?
14 A.  No.
15 Q.  Do you know if Officer Robinson had to give a
16     breathalyzer?
17 A.  I don't know.
18 Q.  Have you heard that he did?
19 A.  I have not heard.
20 Q.  Okay.  Do you think it's unusual that you gave a
21     breathalyzer but not the other officer involved in the
22     incident?
23 A.  No.
24 Q.  Are you aware of any policy or procedure at the
25     department that says we're going to be giving

Page 149

1    breathalyzers to our officers involved in incidents
2    similar to this --
3    A.   No.
4    Q.   -- or for any reason?
5    A.   Not that I'm aware of.
6    Q.   You would agree this is a very unusual thing.
7    A.   No.
8    Q.   It's not?
9    A.   No.
10   Q.   And where was the breathalyzer done?
11   A.   In the garage of the police department.
12   Q.   And it was videotaped?
13   A.   It was in front of the security camera.
14   Q.   Have you seen that video footage?
15   A.   I have not.
16   Q.   Do you know what the results were?
17   A.   Yes.
18   Q.   And what were they?
19   A.   Point 0000.
20   Q.   And how -- I've never given a breathalyzer.  How do
21        they do a breathalyzer?  Is there a kit?
22   A.   It's a box about the size of a cell phone with a straw.
23        You just blow into it.
24   Q.   And then it gives a value?
25   A.   Yes.

Page 150

1    Q.   And what does that value come up on?
2    A.   It comes up on a screen.
3    Q.   The screen of?
4    A.   The PBT, the pulmonary breath test.
5    Q.   Okay.  And is that recorded or documented anywhere?
6    A.   I believe it's documented in Sergeant Mercure's report.
7    Q.   But that test was recorded on video, right?
8    A.   On the security camera in the garage, yes.
9    Q.   Okay.  Have any coworkers ever made any complaints
10        about you, your activities, your conduct or behavior at
11        the department?
12   A.   Not that I'm aware of.
13   Q.   Has anyone ever accused you of drinking alcohol or
14        being under the influence --
15   A.   No.
16   Q.   -- either on the job or to a point or at a time where
17        it may interfere with you carrying out your job?
18   A.   No.
19   Q.   When did you draft your original complaint report?
20   A.   I'm not sure exactly what date and time it was written
21        at.
22   Q.   Well, did you do it that night?
23   A.   No.
24   Q.   The following day?
25   A.   I believe it was the following day.

Page 151

1    Q.   Following day meaning April the 16th?
2    A.   No.
3    Q.   17th?
4    A.   I believe it was the 17th.
5             MR. WEGLARZ:  We're going to mark this as
6        Number 3.
7             (At 12:35 p.m., Exhibit 3 marked)
8    BY MR. WEGLARZ:
9    Q.   Exhibit Number 3 represents your case report that you
10        drafted on this case, correct?
11   A.   Yes.
12   Q.   And you drafted it for your employer, correct?
13   A.   Correct.
14   Q.   And can you tell me where you were when you drafted
15        that?
16            MS. FORBUSH:  What did you mark as Exhibit 3?
17            MR. WEGLARZ:  His report.
18            MS. FORBUSH:  It's highlighted.  Obviously
19        you're not suggesting that it was highlighted in the
20        original, correct?
21            MR. WEGLARZ:  No.  Yeah, I'm suggesting that.
22        No.
23            MS. McGIFFERT:  Let me just put that on the
24        record.  I pose an objection to him utilizing --
25        because I have a clean copy if you really want him to

Page 152

1        use it.
2             MR. WEGLARZ:  I don't care.
3             MS. McGIFFERT:  I object to utilizing a
4        highlighted copy as an exhibit in this deposition when
5        you've done the highlighting.  If you'd like a clean
6        copy, we can provide one.
7             MR. WEGLARZ:  Okay.  We can copy it after.
8        Laurel, I'm here to help you, make this easier for you,
9        so whatever you want.
10            MS. McGIFFERT:  No, you're not.  What I want
11        is, if you're going to use his report as an exhibit --
12        can I see yours, Todd?  What I want is that you use a
13        clean copy, and I'm sure Ms. Court Reporter won't mind
14        marking this clean copy --
15            MR. WEGLARZ:  Or we can just copy this after,
16        but it's fine.
17            MS. McGIFFERT:  -- as Exhibit 3.
18            MR. WEGLARZ:  Just mark it again.  It's fine.
19            MS. McGIFFERT:  I need to make a call soon.
20            MR. WEGLARZ:  Sure.  Want to do it now?
21            MS. McGIFFERT:  Well, how much longer do you
22        estimate?  Because maybe we can just finish him up.
23            MR. WEGLARZ:  Twenty minutes.
24            MS. McGIFFERT:  That will work for me.
25   BY MR. WEGLARZ:

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                          Pages 153–156

Page 153

1   Q.   Okay.  All right.  We've marked your report as Exhibit
2        Number 3, correct?
3   A.   Correct.
4   Q.   Okay.  Where were you when you drafted that report?
5   A.   I was at the Rockwood Police Department.
6   Q.   And you typed it yourself?
7   A.   I typed it with a union attorney in the room.
8   Q.   Okay.  In fact, you didn't fill out any reports or
9        statements until you first discussed this with an
10       attorney, fair to say?
11  A.   Correct.
12  Q.   And you didn't want to fill out a report like this
13       until you had the input and assistance from an
14       attorney, fair to say?
15  A.   Correct.
16            MS. FORBUSH:  Object to form.
17  BY MR. WEGLARZ:
18  Q.   And as you typed up this three-page statement --
19       objection, four-page statement, your attorney was
20       present the entire time, correct?
21  A.   Correct.
22  Q.   He was right next to you as you typed it up, correct?
23  A.   He was in the room with me, yes.
24  Q.   And I don't want to know what you discussed, but I take
25       it as you were drafting this four-page document while

Page 154

1        he was in the room, the two of you also had
2        discussions, correct?
3   A.   I don't recall what, if anything, was said.
4   Q.   Anyone else in the room?
5   A.   No.
6   Q.   How long did it take you to type this up?
7   A.   I don't recall.
8   Q.   Couple hours, couple minutes?
9   A.   I don't recall the exact time frame that it took.
10  Q.   You finished it, though, during that same sitting?
11  A.   Yes.
12  Q.   Okay.  And what did you do after you finished it?  Did
13       you print it out?
14  A.   Yeah, it would have been printed.
15  Q.   Okay.  Do you typically sign reports like this?
16  A.   I sign them after they are reviewed by a supervisor.
17  Q.   Was this report ever reviewed by a supervisor?
18  A.   Yes.
19  Q.   Okay.  And did you sign off on it?
20  A.   Yes.
21  Q.   Have you seen the signed-off version?
22  A.   Yes.
23  Q.   Oh.  When's the last time you saw that version?
24  A.   It's been a while.  Our reports are signed and then
25       they are filed away, and the -- there is a computerized

Page 155

1        copy, which is this copy, which doesn't get a signature
2        on it or have a signature on it, but the signature copy
3        is on file with the Rockwood Police Department.
4   Q.   Is there any difference between this computerized
5        version marked as Exhibit 3 and the version that you
6        signed?
7   A.   No.
8   Q.   Did you make any other notes or reports besides Exhibit
9        Number 3 regarding this incident?
10  A.   No.
11  Q.   Any of your supervisors or coworkers or colleagues ever
12       discuss this incident with you?
13  A.   Outside of like a training purpose, no.
14  Q.   How about for a training purpose?
15  A.   Yes.
16  Q.   Explain.
17  A.   In a Taser training class it was discussed one time.
18  Q.   Okay.  And when was that discussed?
19  A.   I couldn't give you the exact time.  I don't know.
20  Q.   Within a few days of this incident, couple months, a
21       year?
22  A.   Within a couple years after.
23  Q.   Okay.  And tell me what was -- tell me how it was
24       discussed.
25  A.   I don't recall.  It would just have been the

Page 156

1        walk-through from start to finish.
2   Q.   Okay.  And who did the training where they presented
3        this?
4   A.   Lieutenant Krause would have been doing the Taser
5        training, and just me in the class talked about it --
6   Q.   Okay.
7   A.   -- the story of it.
8   Q.   And did Lieutenant Krause have you walk everybody
9        through this incident step by step?
10  A.   I don't recall.
11  Q.   Do you know if there are any written materials or
12       summaries of this incident that were used or referenced
13       as part of this training?
14  A.   There are not.
15  Q.   And was the purpose of this to show everyone how to
16       best handle a situation like this and how to best use a
17       Taser?
18  A.   I am not sure what the objective of it necessarily was,
19       other than just informative of a Taser scenario.
20  Q.   Okay.  What parts of this scenario were used or
21       referenced as the informative parts?
22  A.   Just the story from front to beginning.
23  Q.   So you're saying everything.
24  A.   Yes.
25  Q.   Anything -- what specific topics or subjects do you

Page 157

1    recall them mentioning?
2  A.  I don't recall anything specifically.
3  Q.  Do you recall any subjects, topics, or facts that were
4      brought up where they said, you know, maybe from
5      hindsight this should have been done differently?
6  A.  No.
7  Q.  Okay.  So how this situation was handled sounds like
8      it's being used as an exemplar as how to handle all
9      such situations similar to this.
10 A.  I can't really agree or disagree with that.  It's just
11     a scenario.  Every scenario is different.  This is just
12     one thing that happened.
13 Q.  Okay.  Other than you and Lieutenant Krause, anyone
14     else who participated in the presentation of that
15     training?
16 A.  Not that I recall.
17 Q.  Okay.  Anywhere else where this incident was
18     discussed --
19 A.  No.
20 Q.  -- by your employers or colleagues other than the
21     training scenario?
22 A.  No.
23 Q.  In your complaint record you provided the statement to
24     the state police.  Any other statements you provided to
25     anyone else?

Page 158

1  A.  No.
2  Q.  Did you ever meet with a prosecutor?
3  A.  No.
4  Q.  Did anyone criticize anything about you or about how
5      you handled or reacted to this situation?
6  A.  Not that I know of.
7  Q.  Would you agree with me that at the time you deployed
8      your Taser, Mr. Kapuscinski's chest area was not the
9      only area that was available to hit with the probes?
10     MS. McGIFFERT:  Object as to form.
11     MS. FORBUSH:  Join.
12 BY MR. WEGLARZ:
13 Q.  Go ahead.
14 A.  I -- his whole body was an area.  I was attempting to
15     aim for the non-preferred areas on his body.  He was a
16     moving target.
17 Q.  Right.  This wasn't a situation --
18     MS. McGIFFERT:  I'm sorry, can I hear that
19     question and answer again, please?
20     (At 12:46 p.m., the court reporter read back:
21     "Question: Would you agree with me that at
22     the time you deployed your Taser,
23     Mr. Kapuscinski's chest area was not the only
24     area that was available to hit with the
25     probes?

Page 159

1      "Answer: I -- his whole body was an area.  I
2      was attempting to aim for the non-preferred
3      areas on his body.  He was a moving target.")
4      MS. McGIFFERT:  Okay.
5      MR. WEGLARZ:  I'm fine with it.
6      MS. McGIFFERT:  I just needed the question
7      and answer.
8      MR. WEGLARZ:  Sure.
9  BY MR. WEGLARZ:
10 Q.  Let me throw something out there.  Because of his
11     position right before you deployed the Taser, this is
12     when he was in the process of trying to stand up,
13     correct?
14 A.  Correct.
15 Q.  His legs were available to hit if you wanted to hit
16     them, correct?
17 A.  I guess so, yes.
18 Q.  His arms would have been exposed, correct?
19 A.  I guess so, yes.
20 Q.  His lower abdomen was exposed, correct?
21 A.  I guess so, yes.
22 Q.  When did you fill out the Taser report?
23 A.  I believe that would have been done with my complaint
24     report as that's part of my complaint report.
25 Q.  Same date, same sitting?

Page 160

1  A.  I believe so.
2      MR. WEGLARZ:  Okay.  And I'm going to mark it
3      as the next exhibit, but it's going to have highlights
4      on it, so I'm warning you right now if you want to
5      attach yours, Laurel, that's fine.
6      MS. McGIFFERT:  I'm sorry, say it again?
7      MR. WEGLARZ:  His Taser use report.  I want
8      to attach it.
9      MS. McGIFFERT:  You may use mine.  Let me
10     find it first.  Because you're saying yours is
11     highlighted?
12     MR. WEGLARZ:  Yes.
13     MS. McGIFFERT:  I'll find you one.
14     MR. WEGLARZ:  Thank you.
15     MS. McGIFFERT:  Let's find yours.  Page 23.
16     You can give those to her.
17     (At 12:50 p.m., Exhibit 4 marked)
18 BY MR. WEGLARZ:
19 Q.  All right.  We marked as Exhibit Number 4 your Taser
20     use report, is that correct?
21 A.  Yes.
22 Q.  That's a report you filled out in connection with the
23     use of your Taser in this incident involving
24     Mr. Kapuscinski?
25 A.  Yes.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 161–164

Page 161

1  Q.  All right.  And on that report you indicate where the
2      probes from your Taser struck Mr. Kapuscinski, is that
3      correct?
4  A.  **Yes.**
5  Q.  Okay.  And you do show one up by the left chest area,
6      correct?
7  A.  **This is not exactly to scale, but yes.**
8  Q.  Yeah.  And you also indicate the other location is
9      where?
10 A.  **The lower right abdomen.**
11 Q.  Is that to scale?
12 A.  **Neither of them are exact locations.  They're**
13     **estimates.**
14 Q.  Right.  But you still do the diagram for informative
15     purposes, correct?
16 A.  **Yes.**
17 Q.  Now, have you seen the photos of Mr. Kapuscinski that
18     were taken at the hospital?
19 A.  **At the hospital, no, I have not.**
20 Q.  What photos of Kapuscinski have you seen?
21 A.  **I have seen the medical examiner's photos.**
22 Q.  Oh, okay.  I think they're the same thing.  I'm going
23     to show you this photo, and I apologize for maybe some
24     insensitive imagery, but --
25          MS. FORBUSH:  Do you have a number on it or

Page 162

1          --
2          MR. WEGLARZ:  Yeah.  It's from -- the number
3      is -- must be a case number, but it's 15, dash, 4606F,
4      dash, 20.
5          MS. McGIFFERT:  15, dash, 46 --
6      MS. WEGLARZ:  06F, dash, 20.  And I believe
7      that was in the Michigan State Police file, which I
8      think they got from Gibraltar.
9  BY MR. WEGLARZ:
10 Q.  So I'm going to show you this photo of Mr. Kapuscinski.
11     Can you tell me where on his body the probes were?  Do
12     they correlate to any of the wounds that we see here?
13          MS. McGIFFERT:  You mean the probes from --
14          MR. WEGLARZ:  His Taser.
15          MS. McGIFFERT:  -- Officer Mitchell's
16     deployment.
17          MR. WEGLARZ:  Yes.
18 BY MR. WEGLARZ:
19 Q.  If that helps you.
20 A.  **One of them would be right here.**
21 Q.  All right.  And you're pointing to a wound, and it
22     looks like it's an area of a tattoo that he has on the
23     left chest, right?
24 A.  **Yes.**
25 Q.  Do you see that?

Page 163

1  A.  **Yes.**
2  Q.  Do you know what that's from?
3  A.  **I do not.**
4  Q.  Okay.  So one of these -- this one you believe, the one
5      right in the middle of this space here you believe is
6      from your probe, right?
7  A.  **Yes.**
8          MS. FORBUSH:  Object to foundation.
9          MS. McGIFFERT:  I join.
10         MS. FORBUSH:  Maybe you should ask him how
11     many probe wounds he's looked at to establish if he has
12     a foundation for an opinion.
13 BY MR. WEGLARZ:
14 Q.  All right.  And where do you think the other probe
15     landed?
16 A.  **Looking at this picture I believe, but I'm not**
17     **100 percent certain, it's that one right there.**
18 Q.  Okay.  And that's on the right side of the abdomen
19     where we see two wounds next to each other, correct?
20 A.  **Yes.**
21 Q.  Okay.  Just above the naval but on the right side,
22     correct?
23 A.  **Yes.**
24 Q.  There's also a wound it looks like in the midsternum
25     here.  Do you have any idea what that is?

Page 164

1          MS. FORBUSH:  Object to the form.
2          **THE WITNESS:  I would have no idea.**
3  BY MR. WEGLARZ:
4  Q.  Do you know what a sternal rub is?
5  A.  **Yes.**
6  Q.  Could that be from a sternal rub?
7  A.  **I have no idea.**
8          MS. FORBUSH:  Object to foundation.
9  BY MR. WEGLARZ:
10 Q.  Just give me a minute.  Did you have any discussions
11     with the girlfriend?
12 A.  **I do not believe that I talked to her at all.  I was**
13     **standing by Officer Robinson as he talked to her about**
14     **the incident.**
15 Q.  Okay.  Did you overhear Officer Robinson's discussions
16     with the girlfriend?
17 A.  **Yes.**
18 Q.  Okay.  And tell me what you recall hearing.
19 A.  **I would have to refer to my report on exactly what was**
20     **said.**
21 Q.  You're talking about your report that we've already
22     marked as an exhibit?
23 A.  **Yes.**
24 Q.  Exhibit Number 3?
25 A.  **Yes.**

Page 165

1  Q.  And if you're going to tell me that anything that you
2      overheard about that would be reflected in your report,
3      that's all you need to tell me, but if you think you
4      need to look at it to refresh your memory to see if
5      there's something else, then feel free to do so.
6  A.  **Everything would have been reflected here in the**
7      **report.**
8  Q.  Okay. In your audio statement to the Michigan State
9      Police, you mentioned to them that you didn't see any
10     injuries on the girlfriend. Is that your recollection?
11 A.  **I don't recall what I spoke with the state police**
12     **about.**
13 Q.  Do you recall seeing any injuries on the girlfriend?
14 A.  **I do not recall seeing any physical injuries that were**
15     **apparent there immediately.**
16 Q.  And then you also told the state police that when you
17     guys walked in, it just looked like a weird sex act was
18     going on.
19           MS. McGIFFERT: Well, you know what? Let me
20     pose an objection because it sounds to me like you're
21     paraphrasing. If you want to ask him if he said or
22     recalls saying X, Y, and Z to the state police, that's
23     fine.
24           MR. WEGLARZ: That's kind of what I'm getting
25     at.

Page 166

1            MS. McGIFFERT: Well, okay. That was a
2      statement, not a question. You told him what he
3      allegedly said to the state police in a
4      paraphrased-type manner.
5            MR. WEGLARZ: Yes. I'm about to ask the
6      question now.
7            MS. McGIFFERT: Okay.
8  BY MR. WEGLARZ:
9  Q.  Do you recall saying something like that to that effect
10     to the state police?
11 A.  **I did not tell them that it was a -- that we walked in**
12     **on a sex act. They asked me to describe their**
13     **positioning, at which time I told them that the only**
14     **way I could describe it would be the 69 position**
15     **because that's where their bodies were at.**
16 Q.  But you don't recall saying, "It looked like a weird
17     sex act when we walked in."
18 A.  **I don't recall that. I don't recall what I said with**
19     **the state police.**
20 Q.  And you also mentioned to the state police that the
21     girlfriend was very calm throughout, do you remember
22     that?
23 A.  **Yes.**
24 Q.  She never yelled or complained that she felt threatened
25     or was -- or she was about to be harmed, did she?

Page 167

1  A.  **I don't know how she was feeling.**
2  Q.  You didn't hear her say anything like that.
3  A.  **She didn't verbalize to us that she -- no.**
4  Q.  I mean, she seemed to be pretty comfortable with the
5      whole thing, correct?
6            MS. FORBUSH: Well, I'm going to object to
7      the form. Are you suggesting she was comfortable when
8      she was being choked and he said she couldn't talk and
9      was gasping for breath?
10           MR. WEGLARZ: Save the closing argument for
11     the closing argument.
12           MS. FORBUSH: Come on. Let's ask a fair
13     question.
14           MR. WEGLARZ: Well, it is a fair question
15     because it's what he said to the state police.
16 BY MR. WEGLARZ:
17 Q.  You thought it was kind of strange that she was so calm
18     throughout this entire thing, do you agree?
19           MS. McGIFFERT: I will place an objection as
20     to form and foundation. Go ahead if you want to answer
21     the question.
22           THE WITNESS: **If I could hear back what you**
23     **said, I think you kind of asked two different**
24     **questions.**
25 BY MR. WEGLARZ:

Page 168

1  Q.  I may have. Do you recall the girlfriend being very
2      calm at the scene?
3  A.  **Yes.**
4  Q.  Okay. And that's what you explained to the state
5      police, correct?
6  A.  **I haven't listened to the recording of me from the**
7      **state police. I don't recall exactly what I told them.**
8  Q.  Fair enough. Do you recall telling the state police
9      that the girlfriend kept saying that she was giving a
10     good blow job to him?
11 A.  **I don't recall saying that to the state police. I do**
12     **recall her saying that.**
13 Q.  And when you recall her saying that, where in this
14     sequence?
15 A.  **I should rephrase that. She did not say that she was**
16     **giving him a good blow job. She said that she gives a**
17     **good blow job. She was not giving one at the time I**
18     **don't think is what she was getting at.**
19 Q.  All right. Well, I know Laurel doesn't want me to
20     finish the dep until I get that out, and I did, so we
21     can stop your deposition now. I have no further
22     questions.
23           MS. FORBUSH: I'm going to have a few
24     questions. Laurel, make your call, and I'm going to
25     use the restroom.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018

Pages 169–172

Page 169

```
1                 (At 1:00 p.m., recess taken)
2                 (At 1:22 p.m., back on the record)
3                      CROSS-EXAMINATION
4    BY MS. FORBUSH:
5    Q.   I just have a couple questions, if that's okay.
6         Officer Mitchell, at one point I thought you testified
7         that when you aimed your Taser at Mr. Kapuscinski, you
8         were aiming at a non-preferred target area.  Did you
9         misspeak?
10   A.   If I said non-preferred target area, then yes, I
11        misspoke.  At all times I was aiming for preferred
12        target areas.
13   Q.   Okay.  And I assume that with a Taser, much like a
14        handgun, when the target is moving, you don't always
15        hit the area that you're aiming for, is that true?
16   A.   That's true, correct.
17   Q.   Okay.  And Mr. Kapuscinski I think you said was moving
18        the entire time.
19   A.   Yes.
20   Q.   All right.  Going back prior to your use of the Taser,
21        when Officer Robinson had tased Mr. Kapuscinski, you
22        had indicated he had rolled or landed onto the floor
23        and was kicking, resisting, not following commands, and
24        was being actively aggressive, correct?
25   A.   Yes.
```

Page 170

```
1    Q.   And was it at that point when Officer Robinson
2         attempted to taser him a second time?
3    A.   After giving loud verbal commands to stop, yes.
4    Q.   All right.  And when Officer Robinson pulled the
5         trigger on his Taser, what happened?
6    A.   When Officer Robinson pulled it for the second time,
7         nothing happened due to only having one probe in it --
8         or in Mr. Kapuscinski.  He was not under any affect of
9         the Taser.
10   Q.   So help me understand.  When the -- in order for the
11        Taser to be effective, both probes have to be in the
12        subject.
13   A.   Yes.
14   Q.   And you had already testified that you believed Officer
15        Robinson had hit him once in the back of the right arm
16        near the elbow and that you never saw the other probe.
17   A.   Correct.
18   Q.   And you never saw the other probe at any time anywhere
19        on Mr. Kapuscinski's body.
20   A.   Correct.
21   Q.   So when he attempted to activate his Taser the second
22        time, was it effective?
23   A.   No, it was not.
24   Q.   And that's because there was no circuit completed and
25        Mr. Kapuscinski didn't get shocked, right?
```

Page 171

```
1    A.   Correct.
2    Q.   Okay.  And do you know if he attempted more than once
3         to try to taser Mr. Kapuscinski?
4    A.   I don't know how many times he attempted.
5    Q.   Okay.  Other than the first time, which caused
6         Mr. Kapuscinski and his victim to separate physically,
7         did you see any effect of any Taser applications by
8         Officer Robinson?
9    A.   No.
10   Q.   You never saw Mr. Kapuscinski get shocked after the
11        first attempt.
12   A.   No.
13   Q.   And was it because Officer Robinson's attempts to taser
14        Mr. Kapuscinski were ineffective that you had to deploy
15        your Taser to stop the threat of Mr. Kapuscinski?
16   A.   Yes.
17   Q.   Do you have to wait until the subject is actually upon
18        you and lunging and touching you to stop the threat?
19   A.   No.
20   Q.   Okay.  I would assume that this happened rather
21        quickly.
22   A.   Yes.
23   Q.   I think Mr. Weglarz suggested that from the time
24        Officer Robinson deployed his Taser the first time and
25        the time you deployed your Taser the only time you
```

Page 172

```
1         deployed it was a total of 17 seconds.
2    A.   I believe that's what he said, yes.
3    Q.   All right.  And you're familiar with the term
4         reactionary gap I assume?
5    A.   Yes.
6    Q.   All right.  Were you trying to maintain some type of
7         distance or reactionary gap between yourself and
8         Mr. Kapuscinski?
9    A.   Yes.
10   Q.   And you were asked about what you observed when you
11        first walked into that bedroom.  Would it be fair to
12        state that you saw Mr. Kapuscinski trying to kill this
13        woman by choking her to death?
14   A.   Yes, he was.
15   Q.   All right.  And did this woman appear to be cool, calm,
16        and collected as she was being choked and was gasping
17        for a breath?
18   A.   No, she did not.
19   Q.   All right.  And she fled the room as fast as she was
20        able to, is that correct?
21   A.   Yes.
22   Q.   And afterwards, after Mr. Kapuscinski had been
23        handcuffed and subdued, is that when you had some
24        limited interaction with this woman where she seemed to
25        be very calm?
```

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                            Pages 173–176

Page 173

1   A.   Yes.
2   Q.   Okay.  Do you know what drugs, if any, she was under
3        the influence of?
4   A.   I do not know what drugs, if any, she was on.
5   Q.   At any time did you punch, hit, strike, or kick
6        Mr. Kapuscinski?
7   A.   No.
8   Q.   At any time did you see Officer Robinson punch, hit,
9        strike, or kick Mr. Kapuscinski?
10  A.   No.
11  Q.   And, in fact, once Mr. Kapuscinski was subdued and
12       handcuffed behind his back, both of you immediately
13       ensured that he was in a recovery position so that his
14       breathing could be monitored, is that correct?
15  A.   Correct.
16  Q.   I don't think I have any other questions.  Thank you.
17                    CROSS-EXAMINATION
18  BY MS. McGIFFERT:
19  Q.   I have just a few.  Officer Mitchell, you were asked
20       questions about your initial Taser training, which I
21       think you testified was in 2012.
22  A.   Yes.
23  Q.   And according to the certificates that we have in front
24       of us that we have provided to Mr. Weglarz, am I
25       correct that you had additional Taser conductor

Page 174

1        electrical weapon training in July 2013?
2   A.   Yes.
3   Q.   And then thereafter did you have additional updated
4        training on the Taser conducted electrical weapon in
5        January 2014?
6   A.   Yes.
7   Q.   And am I correct that you also had additional training
8        on the conducted electrical weapon, or what we've been
9        referring to as a Taser, both the X2 and the X26, on
10       February 25th, 2015?
11  A.   Yes.
12  Q.   So you had been trained on the use of the weapon that
13       you were carrying on April 16th, 2015, as recently as
14       less than two months before.
15  A.   Yes.
16  Q.   Even though there was some reference to you thinking at
17       the time that one of Officer Robinson's probes may have
18       entered into, for lack of a better word, the
19       girlfriend, did you ever see any probe in her?
20  A.   I did not.
21  Q.   Okay.  When you first entered the room and shortly
22       thereafter, meaning the back bedroom, and Officer
23       Robinson was giving loud verbal commands for
24       Mr. Kapuscinski to get off of the female, did you form
25       any belief that her life was in danger?

Page 175

1   A.   Yes, I did.
2   Q.   You were asked some questions about drafting your
3        report of this incident, and you testified that your --
4        that there was a union attorney present when you
5        drafted it.
6   A.   Yes.
7   Q.   Even though he was present, who drafted the report?
8   A.   I did.
9   Q.   And is everything in that report true and accurate
10       based on your recollection and your observation of the
11       events at the time?
12  A.   Yes, it is.
13  Q.   I don't have anything further.  Thank you.
14                    - - -
15                    REDIRECT EXAMINATION
16  BY MR. WEGLARZ:
17  Q.   Was there anything about the Taser that did not
18       function properly, your Taser?
19  A.   No, there was not.
20  Q.   Prior to the first tase on Mr. Kapuscinski, do you
21       recall hearing any warnings that "if you don't stop,
22       you're going to be tased"?
23  A.   No, I do not.
24  Q.   That's the policy, isn't it, at the department?
25  A.   When feasible.

Page 176

1   Q.   And you also did not give any type of warning or
2        instruction, would you agree?
3   A.   Correct.
4   Q.   Did you see the photos showing the marks on
5        Mr. Kapuscinski's hand?
6   A.   I did not.
7   Q.   Pull it up real quick.  That's not a good copy.  Just
8        give me a second.
9             (At 1:33 p.m., Exhibit 5 marked)
10  BY MR. WEGLARZ:
11  Q.   Let me show you what we marked Exhibit Number 5, photos
12       of Mr. Kapuscinski's right extremity.  Do you see those
13       marks around his wrist area?
14            MS. McGIFFERT:  Let me check, counsel.
15            MR. WEGLARZ:  Sure.
16            MS. FORBUSH:  Which -- if you tell me which
17       number we're on?
18            MR. WEGLARZ:  I don't know the number.  It's
19       my hard copy.
20            MS. FORBUSH:  It should have the number --
21            MR. WEGLARZ:  Maybe on the back?  On the back
22       it may be.
23            MS. FORBUSH:  Oh, wait.  These are the ones
24       from -- those aren't the autopsy photos.  I think I
25       have these.

MITCHELL, OFFICER NICHOLAS BILL
06/28/2018                                                        Pages 177–179

Page 177

1          MS. McGIFFERT:  What is this, Exhibit 5?
2          MR. WEGLARZ:  Yes.
3          MS. McGIFFERT:  Okay.
4          MR. WEGLARZ:  There's a number on the back of
5     it from the -- I think it's from Gibraltar PD.
6          MS. FORBUSH:  It just says 15, dash, 217,
7     which I think is the case number.
8          MR. WEGLARZ:  Yeah, you're right.  Sorry.
9          MS. FORBUSH:  I've got it.  And that's Number
10    5?
11         MR. WEGLARZ:  Yes.
12 BY MR. WEGLARZ:
13 Q.   All right.  The marks that we see around his wrist
14      there in Exhibit 5, do you have any idea or
15      understanding as to what caused those?
16 A.   I do not.
17 Q.   Do those appear to be marks consistent with handcuffs?
18         MS. FORBUSH:  Object to foundation.
19         MS. McGIFFERT:  Join.
20         THE WITNESS:  I couldn't tell you.
21 BY MR. WEGLARZ:
22 Q.   You never saw those marks before he was cuffed, agreed?
23 A.   I was not paying attention to his wrist and specific
24      injuries.
25 Q.   So fair to say you don't recall ever seeing those marks

Page 178

1      or injuries at any time before the cuffs were applied.
2 A.   Correct.
3          MR. WEGLARZ:  Okay.  That's all I have.
4          MS. McGIFFERT:  I just have one question.
5              RECROSS-EXAMINATION
6 BY MS. McGIFFERT:
7 Q.   Officer Mitchell, based on your observations of
8      Mr. Kapuscinski's behavior and his demeanor that day,
9      do you believe it is likely that he would have complied
10     if he was warned in advance that he was going to be
11     tased?
12 A.   No.
13         MS. McGIFFERT:  I have nothing further.
14         MS. FORBUSH:  No questions.
15         MR. WEGLARZ:  Nothing.
16         (At 1:36 p.m., proceedings concluded)
17              - - -
18
19
20
21
22
23
24
25

Page 179

1              C E R T I F I C A T E
2  STATE OF MICHIGAN )
                     ) SS.
3  COUNTY OF WAYNE   )
4          I certify that this transcript, consisting of
5     pages, is a complete, true, and correct record of
6     the testimony of OFFICER NICHOLAS BILL MITCHELL held in
7     this case on Thursday, June 28, 2018.
8          I also certify that prior to taking this
9     deposition, OFFICER NICHOLAS BILL MITCHELL was duly
10    sworn to tell the truth.
11         IN WITNESS WHEREOF, I have hereunto set my hand
12    on this 11th day of July, 2018.
13
14
15
                    _____
                    LEAH M. WITT, CSR-8825
16
My Commission expires        Notary Public, County of Wayne
17 December 27, 2023              State of Michigan
18                             U.S. Legal Support
                               30800 Telegraph Road
19                          Bingham Farms, Michigan 48025
20
21
22
23
24
25

 **TASER** Protect Life

**TASER® Handheld CEW Warnings, Instructions, and Information: Law Enforcement**



## IMPORTANT SAFETY AND HEALTH INFORMATION



**Conducted Electrical Weapon**
- Can temporarily incapacitate targets
- Can cause death or serious injury
- Obey warnings, instructions and all laws
- Comply with current training materials and requirements
- See www.TASER.com

This document presents important safety warnings, instructions, and information intended to minimize hazards associated with the use of TASER International, Inc. (TASER) Conducted Electrical Weapons (CEWs). These instructions and warnings are for your protection as well as the safety of others. Read the entire document before using a CEW.

When used as directed in probe-deployment mode, CEWs are designed to temporarily incapacitate a person from a safer distance than some other force options, while reducing the likelihood of death or serious injury. However, any use of force, including the use of a CEW, involves risks that a person may get hurt or die due to the effects of the CEW, physical incapacitation, physical exertion, unforeseen circumstances, or individual susceptibilities. Following the instructions and warnings in this document will reduce the likelihood that CEW use will cause death or serious injury.

These warnings and instructions are effective March 1, 2013, and supersede all prior revisions and relevant Training Bulletins. Immediately distribute this document to all TASER CEW users. The most current warnings are also available online at www.TASER.com.

1. **Complete training first.** Significant differences exist between different TASER CEW models. Do not use or attempt to use any CEW model unless you have been trained by a Certified TASER Instructor on that particular model.[1]

2. **Read and obey.** Read, understand, and follow all current instructions, warnings, and relevant TASER training materials before using TASER CEWs. Failure to do so could increase the risk of death or serious injury to the user, force recipient, or others.

3. **Obey applicable laws, regulations, and agency Guidance.** Use of CEWs must be legally justified and comply with applicable federal, state, and local laws and regulations. The decision to use a CEW in a particular manner or circumstance must follow applicable law enforcement agency Guidance.[2]

Always follow all current instructions, warnings, and TASER training materials to minimize CEW risks.

This document uses a signal word panel to mark specific warnings:

 This signal word panel indicates a potentially hazardous situation which if not avoided could result in death or serious injury.

Warnings may be followed by instructions and information to help avoid the hazard and improve CEW safety.

[1] A Certified TASER Instructor is not a TASER agent, but maintains a current TASER instructor certification and complies with TASER's most current training requirements, materials and license agreement. Representations inconsistent with this document made by any Certified TASER Instructor are expressly disclaimed.

[2] Law enforcement agencies are force experts and are solely responsible for their own Guidance. "Guidance" includes policy, custom, procedure, rule, order, directive, training, continuum, and standard. TASER has no authority to mandate Guidance, set policy, require training, or establish standards of care or conduct.

## SAFETY INFORMATION: CEW RISKS AND RISK AVOIDANCE

**WARNING** **Cumulative Effects.** CEW exposure causes certain effects, including physiological and metabolic changes, stress, and pain. In some individuals, the risk of death or serious injury may increase with cumulative CEW exposure. Repeated, prolonged, or continuous CEW applications may contribute to cumulative exhaustion, stress, cardiac, physiologic, metabolic, respiratory, and associated medical risks which could increase the risk of death or serious injury. Minimize repeated, continuous, or simultaneous exposure.

**Physiologic and Metabolic Effects.** CEW use causes physiologic and/or metabolic effects that may increase the risk of death or serious injury. These effects include changes in blood chemistry, blood pressure, respiration, heart rate and rhythm, and adrenaline and stress hormones, among others. In human studies of electrical discharge from a single CEW of up to 15 seconds, the effects on acid-base balance, creatine kinase, electrolytes, stress hormones, and vital signs were comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques.

Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include the elderly, those with heart conditions, asthma or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle. In a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death.

**Stress and Pain.** CEW use, anticipation of use, or response to use can cause startle, panic, fear, anger, rage, temporary discomfort, pain, or stress which may be injurious or fatal to some people.

To reduce the risk from CEW exposure:

1. **Minimize the number and duration of CEW exposures.** Most human CEW lab testing has not exceeded 15 seconds of CEW application, and none has exceeded 45 seconds. Use the shortest duration of CEW exposure objectively reasonable to accomplish lawful objectives, and reassess the subject's behavior, reaction, and resistance before initiating or continuing the exposure. If a CEW deployment is ineffective in incapacitating a subject or achieving compliance consider alternative control measures in conjunction with or separate from the CEW.

2. **Avoid simultaneous CEW exposures.** Do not use multiple CEWs or multiple completed circuits at the same time without justification. Multiple CEWs or multiple completed circuits at the same time could have cumulative effects and result in increased risks.

3. **Control and restrain immediately.** Begin control and restraint procedures, including during CEW exposure ("cuffing under power"), as soon as reasonably safe and practical to minimize CEW cumulative effects and the total duration of exertion and stress experienced by the subject.

4. **Avoid touching probes/wires during CEW discharge.** Controlling and restraining a subject during CEW exposure may put the CEW user and those assisting at risk of accidental or unintended shock. Avoid touching the probes and wires and the areas between the probes during the electrical discharge.

**WARNING** **Cardiac Capture.** CEW exposure in the chest area near the heart has a small probability of inducing extra heart beats (cardiac capture). In rare circumstances, cardiac capture could lead to cardiac arrest. When possible, avoid targeting the frontal chest area near the heart to reduce the risk of potential serious injury or death.

Cardiac capture may be more likely in children and thin adults because the heart is usually closer to the CEW-delivered discharge (the dart-to-heart distance). Serious complications could also arise in those with impaired heart function or in those with an implanted cardiac pacemaker or defibrillator.

March 1, 2013       MPC0014 Rev. Y       Page 1 of 4
M26™, TASER CAM™, Smart™, X2™, X26™, X26P™ and 'Protect Life' are trademarks of TASER International, Inc. and TASER®, X2® and ⊘ are registered trademarks of TASER International, Inc., registered in the U.S. © 2013 TASER International, Inc. All rights reserved.



EXHIBIT
MITCHELL
1
ZW 6-28-18

PENGAD 800-631-6989

 **TASER**  Protect Life

**TASER® Handheld CEW Warnings, Instructions, and Information: Law Enforcement**



To reduce the risk of injury:

1. Use preferred target areas. The preferred target areas (blue) are below the neck area for back shots and the lower center mass (below chest) for front shots. The preferred target areas increase dart-to-heart distance and reduce cardiac risks. Back shots are preferable to front shots when practicable.

2. Avoid sensitive areas. When practicable, avoid intentionally targeting the CEW on sensitive areas of the body such as the face, eyes, head, throat, chest area (area of the heart), breast, groin, genitals, or known pre-existing injury areas.



**⚠ WARNING**  Muscle Contraction or Strain-Related Injury. CEWs in probe-deployment mode can cause muscle contractions that may result in injury, including bone fractures.

**⚠ WARNING**  Higher Risk Populations. CEW use on a pregnant, infirm, elderly, or low body-mass index person or on a small child could increase the risk of death or serious injury. As with any force option, CEW use has not been scientifically tested on these populations. Use a CEW on such persons only if the situation justifies an increased risk.

CEWs in probe-deployment mode can cause muscle contractions resulting in injuries similar to those from physical exertion, athletics, or sports, including hernia rupture, dislocation, tear, or other injury to soft tissue, organ, muscle, tendon, ligament, cartilage, disc, nerve, bone, or joint; or injury or damage associated with or to orthopedic or other hardware. Fractures to bone, including compression fracture to vertebrae, may occur.

These injuries may be more serious and more likely to occur in people with pre-existing injuries, orthopedic hardware, conditions or special susceptibilities, including pregnancy; low bone density; spinal injury; or previous muscle, disc, ligament, joint, bone, or tendon damage or surgery. Such injuries may also occur in drive-stun applications or when a person reacts to the CEW deployment by making a rapid or unexpected movement.

**⚠ WARNING**  Secondary Injury. The loss of control resulting from a CEW exposure may result in injuries due to a fall or other uncontrolled movement. When possible, avoid using a CEW when secondary injuries are likely.

Loss of control associated with CEW use can have several causes:

• Seizure. Repetitive stimuli (e.g., flashing light or electrical stimuli) can induce seizure in some people, which may result in death or serious injury. This risk may be increased in a person with epilepsy, a seizure history, or if electrical stimuli pass through the head. Emotional stress and physical exertion, both likely in incidents involving CEW and other uses of force, are reported as seizure-precipitating factors.

• Fainting. A person may experience an exaggerated response to a CEW exposure, or threatened exposure, which may result in fainting or falling.

• Muscle contraction, incapacitation, or startle response. CEW use may cause loss of control from muscle contraction, incapacitation, or startle response.

To reduce these risks, consider the person's location before using a CEW. When practicable, avoid using a CEW on a person in the following

circumstances unless the situation justifies a higher risk.

When practicable, avoid using a CEW on a person who:

• is on an elevated or unstable surface (e.g., tree, roof, ladder, ledge, balcony, porch, bridge, or stair);
• could fall and suffer impact injury to the head or other area;
• could fall on a sharp object or surface (e.g., holding a knife, falling on glass);
• is less able to catch or protect self in a fall (e.g., restrained, handcuffed, incapacitated, or immobilized);
• has impaired reflexes (e.g., from alcohol, drugs or certain medications);
• is running, in motion, or moving under momentum;
• is operating or riding any mode of transportation (e.g., vehicle, bus, bicycle, motorcycle, or train), conveyance (e.g., escalator, moving walkway, elevator, skateboard, rollerblades), or machinery; or
• is located in water, mud, or marsh environment if the ability to move is restricted.

**SAFETY INFORMATION: INJURY OR INFECTION**

A CEW may cause injury as a result of the probe or electrical discharge. The nature and severity of these effects depends on numerous factors including the area of exposure, method of application, individual susceptibility, and other circumstances surrounding CEW use, exposure, and after care. Medical care may be required.

**⚠ WARNING**  Eye Injury Hazard. A TASER probe, electrode, or electrical discharge that contacts or comes close to an eye can result in serious injury, including permanent vision loss. DO NOT intentionally aim a CEW, including the LASER, at the eye of a person or animal without justification.

**⚠ LASER Light Hazard.** CEWs use a LASER targeting aid. LASERs can cause serious eye injury, including permanent vision loss. NEVER aim a LASER at an aircraft or the operator of an aircraft or moving vehicle.

**⚠ WARNING**  Probe or Electrode Injury, Puncture, Scarring, or Infection Hazard. CEW use may cause a permanent mark, burn, scar, puncture, or other skin or tissue damage. Infection could result in death or serious injury. Scarring risk may be increased when using a CEW in drive-stun mode. Increased skin irritation, abrasion, mark, burning, or scarring may occur with a CEW with multiple cartridge bays when used in drive-stun or three-point deployment modes.

**⚠ WARNING**  Penetration Injury. The TASER probe has a small dart point which may cause a penetration injury to a blood vessel or internal organ, including lung, bone, or nerve. The probe or dart point (which may detach or break) can puncture or become embedded into a bone, organ, or tissue, which may require immediate medical care, surgical removal, or may result in scarring, infection, or other serious injury.

To reduce the risk of serious or permanent injury:

1. Provide medical care as needed. Injury due to penetration of a probe or dart point into a blood vessel, organ, nerve, or bone may require medical care. A probe, dart point, or barb embedded in a sensitive area such as the eye, genitals, breast, neck, throat, or vascular structure may cause serious injury and require medical care. CEW use may cause skin irritation, puncture wound, abrasion, mark, rash, burn, or other scar or infection, which may require medical care and may be permanent. As with any injury of this type, infection or tetanus and resulting complications may occur. In accordance with your agency's Guidance, ensure access to medical care if needed.

M26™, TASER CAM™, Smart™, X2™, X26™, X26P™ and 'Protect Life' are trademarks of TASER International, Inc. and TASER®, X2® and ⊘ are registered trademarks of TASER International, Inc., registered in the U.S. © 2013 TASER International, Inc. All rights reserved.

RW0002

 TASER

**TASER® Handheld CEW Warnings, Instructions, and Information: Law Enforcement**



2. Follow agency Guidance for removing probes. Probe removal may cause injury. Leaving a probe in the body may result in pain or injury. Follow your agency's Guidance and biohazard protocols for probe removal. In the case of embedment, organ or bone penetration, or probe, dart point, or barb detachment, immediate medical care and possible surgical removal may be required.

3. Follow biohazard protocols. Use appropriate biohazard protocols including isolation procedures and protective equipment (e.g., gloves, masks, and washing of hands and exposed areas as necessary). Follow your agency's Guidance and appropriate biohazard, waste, and evidence protocols when dealing with biohazards.

### SAFETY INFORMATION: CEW DEPLOYMENT AND USE

**⚠ WARNING** CEWs and cartridges are weapons and as with any weapon follow safe weapon-handling practices and store your CEW securely. Follow practices herein and additional requirements in your agency's Guidance. Failure to follow these warnings may result in death or serious injury to the user or others.

**⚠ WARNING** Confusing Handgun with CEW. Confusing a handgun with a CEW could result in death or serious injury. Learn the differences in the physical feel and holstering characteristics between your CEW and your handgun to help avoid confusion. Always follow your agency's Guidance and training.

**⚠ WARNING** Trigger Hold-Back Model Differences. If the trigger is held back, most CEWs will continue to discharge until the trigger is released or the power source is expended. With an APPM installed, the X2 and X26P can be programmed to stop a CEW discharge at 5 seconds even if the user continues to hold back the trigger, requiring a deliberate action to re-energize the deployed cartridge. Know your model and how it works. Avoid repeated, prolonged, or continuous CEW applications when practicable.

**⚠ WARNING** In stressful or noisy circumstances, the APPM's audible warning may not be heard.

1. Use properly. Use a CEW only for its intended purpose, in legally justifiable situations, and in accordance with your agency's Guidance. Do not use for torture.

2. Store in a secure location. Store CEWs, cartridges, and accessories in secure locations inaccessible to children and other unauthorized persons to prevent inappropriate access or use.

3. Use the safety switch. Place the CEW safety switch in the down (SAFE) position when the CEW is not in use. Remember to place the CEW safety switch in the up (ARMED) position when you intend to use the CEW.

4. Assume CEW is loaded. Always assume that a CEW is loaded and capable of discharging. To help avoid unexpected discharge, ensure that no live cartridge is in the CEW when inserting a battery pack; TASER CAM™ or TASER CAM HD recorder; or while performing spark tests (except when function testing the X2 or X3), maintenance, data downloading, or battery charging.

5. Be aware of CEW trigger. Keep your finger off the trigger until it is legally justifiable to use the CEW and you are ready to deploy.

6. Know how the CEW works. Significant differences exist between different TASER CEW models. Before using any CEW, including a multi-shot CEW, ensure you understand the functioning and effects of that model.

7. Be aware of X2 and X3 deployment mode. Be aware of which deployment mode (manual or semi-automatic) is set on the X2 and X3 before use.

8. Be aware of X2 Static (Fixed) LASER Sight Mode. The X2 has static dual LASERs. One LASER is intended to approximately align with the top dart and the other with the bottom dart, both of which are set-up for 15' (4.6 meters (m)) and 25' (7.62 m) cartridges at a 15° distance from the target. The trajectory of the 35' (10.7 m) long range cartridge will not line up with the bottom LASER when placed in the X2.

9. Use simulation (training) cartridges ONLY for training or practice. DO NOT use a CEW loaded with a simulation training cartridge for field use or self-defense. Simulation cartridges are intended for practice only and will have no incapacitating effect on a subject. Simulation cartridges use non-conductive wires and will not transmit electrical pulses to the probes.

### SAFETY INFORMATION: CEW EFFECTIVENESS

A CEW, like any weapon or force option, does not always function as intended and is not effective on every subject. As with any use of force, if a particular option is not effective, consider using other force options, disengaging, or using other alternatives per agency Guidance. Always have a back-up plan.

**⚠ WARNING** Subject Not Incapacitated. An ineffective CEW application could increase the risk of death or serious injury to the user, the subject, or others. If a CEW does not operate as intended or if subject is not incapacitated, disengage, redeploy the CEW, or use other force options in accordance with agency Guidance.

A CEW's effects may be limited by many factors, including absence of delivered electrical charge due to misses, clothing disconnect, intermittent connection, or wire breakage; probe locations or spread; subject's muscle mass; or movement. Some of the factors that may influence the effectiveness of CEW use in affecting or achieving control of a subject include:

- **Subject may not be fully incapacitated.** Even though a subject may be affected by a CEW in one part of his body, the subject may maintain full muscle control of other portions of his body. Control and restrain a subject as soon as possible, and be prepared in case the subject is not fully incapacitated.

- **Subject may recover immediately.** A subject receiving a CEW discharge may immediately regain physical or cognitive abilities upon cessation of the delivered CEW discharge. Control and restrain a subject as soon as possible, and be prepared in case the subject immediately recovers.

- **Drive-stun mode is for pain compliance only.** The use of a handheld CEW in drive-stun mode is painful, but generally does not cause incapacitation. Drive-stun use may not be effective on emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect. Avoid using repeated drive-stuns on such individuals if compliance is not achieved.

- **Probes may deviate.** CEWs are not precision-aimed weapons. Probe discharge, flight trajectory, and impact location can be affected by numerous factors, including cartridge or probe accuracy; failure of cartridge to properly deploy; strong air movements; user and subject movements; or probe striking subject, clothing, or object with insufficient force or trajectory to penetrate or adhere to subject. Deviations can result in limited or lack of effectiveness due to misses, failure to complete or maintain the electrical circuit, a small probe spread, or failure to deliver a sufficient charge to the subject.

- **CEW or cartridge may fail to fire or operate.** No weapon system, force option, or CEW is always operational or effective. If a CEW, cartridge, or accessory is inoperable or fails to function, consider reloading and redeploying, using other force options, disengaging, or using other alternatives per agency Guidance.

### SAFETY INFORMATION: OTHER HAZARDS

**⚠ WARNING** Probe Recoil or Ricochet. If your target is farther away than the length of the probe wire, or if one or more probes miss the target, the probe can recoil and bounce back to strike the user or a

March 1, 2013      MPC0014 Rev. Y      Page 3 of 4
M26™, TASER CAM™, Smart™, X2™, X26™, X26P™ and 'Protect Life' are trademarks of TASER International, Inc., and TASER®, X3® and ⊘ are registered trademarks of TASER International, Inc., registered in the U.S. © 2013 TASER International, Inc. All rights reserved.

RW0003

 **TASER**
Protect Life

**TASER® Handheld CEW Warnings, Instructions, and Information: Law Enforcement**



bystander, causing injury. Probe recoil is more likely with simulation cartridges because of the nylon probe wire used.

Always be sure your target is within range. Wear protective eyewear when deploying any CEW in training or for practice. Be sure practice targets have a firm backing that will allow the probes to stick and not bounce off and strike an unintended person, animal, or object, or continue through the backing and strike objects behind the target.

⚠️ **WARNING** Untethered Discharged Probe. A discharged probe that does not impact a subject or target may become untethered from the wire and travel a significant distance causing serious injury. Always be sure your target is within range.

⚠️ **WARNING** Fire and Explosion Hazard. CEW use can result in a fire or explosion when flammable gases, fumes, vapors, liquids, or materials are present. Use of a CEW in presence of fire or explosion hazard could result in death or serious injury. When possible, avoid using a CEW in known flammable hazard conditions.

A CEW can ignite explosive or flammable clothing or materials, liquids, fumes, gases, or vapors (e.g., gasoline, vapor or gas found in sewer lines or methamphetamine labs, butane-type lighters, flammable hair gels or some self-defense sprays). Do not knowingly use a CEW in the presence of any explosive or flammable substance unless the situation justifies the increased risk.

**SAFETY INFORMATION: GENERAL PRECAUTIONS**

⚠️ **WARNING** Unintentional CEW Deployment or Discharge Hazard. Unintentional CEW activation or unexpected cartridge discharge could result in death or serious injury to the user, subject, or others.

To reduce the risk of unintentional deployment or discharge:

1. Avoid static electricity. Keep cartridge away from sources of static electricity. Static electricity can cause a CEW or X26, X26P, or M26 cartridge to discharge unexpectedly, possibly resulting in serious injury.

2. Keep body parts away from front of CEW or cartridge. Always keep your hands and body parts away from the front of the CEW and cartridge. If the CEW discharges unexpectedly you could be injured.

3. Avoid electronic equipment interferences. Electronic transmission equipment close to a CEW could interfere with the proper CEW operation and cause the CEW to deploy or discharge. Keep the CEW at least several inches away from other electronic equipment. Place the CEW safety switch in the down (SAFE) position whenever it is near electronic equipment, including transmitting radios and cell phones. Remember to place the CEW safety switch in the up (ARMED) position before use.

4. Avoid dropping CEW or cartridge. If a CEW or cartridge is dropped or damaged it may unintentionally deploy or discharge, become inoperable, or fail to function, making it unsafe for continued use. If a CEW or cartridge has been dropped or damaged refer to the procedure recommended in the current version of the TASER Training materials.

**SAFETY INFORMATION: MAINTENANCE**

⚠️ **WARNING** Failure to maintain a CEW as instructed may cause the CEW to malfunction or fail to function optimally, increasing the risk of death or serious injury. Follow recommended maintenance procedures.

To reduce these risks:

1. Safely perform spark (function) test before each shift. Testing helps verify that the CEW is functioning properly. See the current version of the TASER Training materials for further information on testing.

2. Avoid using a damaged CEW or cartridge. Do not use a cartridge with a missing blast door unless facing an immediate threat. CEW repair or modification by an unauthorized person may cause the CEW to fire or malfunction, will void the warranty, and may put the user or other person at risk of death or serious injury. Cartridges with blast doors that have been repaired should only be used for training and not for field use.

3. Update CEW software. Some CEWs have updateable software. Current CEW software may be obtained by contacting TASER's Customer Service Department or following instructions at www.evidence.com or www.TASER.com.

4. Use only TASER-approved components, batteries, accessories, and cartridges. The CEW is a sophisticated electronic system. For proper function, use only TASER-approved components, batteries, accessories, and cartridges with your CEW. Use of anything other than TASER-approved components, batteries, accessories, and cartridges will void the warranty, may cause malfunction, and may put the user or other person at risk of death or serious injury.

5. Avoid exposure to wet conditions. If the CEW is drenched or immersed in water or other liquid, DO NOT use or attempt to use the CEW until completing the procedure recommended by the manufacturer.

6. Keep Smart™ cartridge contacts clean. If the contacts on the Smart cartridge or inside the Smart cartridge bay of the X2 or X3 are not kept clean the CEW may fail to deploy the Smart cartridge.

7. Know CEW and cartridge expected useful life. Under normal storage, handling, and operating conditions, a CEW and cartridges have a 5-year expected useful life. Use or attempted use of a CEW or cartridge after its expected useful life may result in malfunctions and lack of effectiveness. Failure to properly care for and maintain a CEW or cartridge may substantially reduce or eliminate the expected useful life of the product.

**SAFETY INFORMATION: HAZARDOUS SUBSTANCES**

⚠️ **WARNING** Hazardous Substances. The CEW (including the cartridge) has components that contain chemicals known to the State of California and others to cause cancer and birth defects or other reproductive harm. Do not disassemble. Refer to your agency's Guidance for proper handling and disposal.

March 1, 2013    MPC0014 Rev: Y    Page: 4 of 4
M26™, TASER CAM™, Smart™, X2™, X26™, X26P™ and 'Protect Life' are trademarks of TASER International, Inc. and TASER®, X3® and Ⓣ are registered trademarks of TASER International, Inc., registered in the U.S. © 2013 TASER International, Inc. All rights reserved.

Redacted Image

Of Victim



EXHIBIT

MITCHELL

2

LW 6.28.18



### ROCKWOOD POLICE DEPARTMENT
### ORIGINAL COMPLAINT



| Complaint # | 15-1378 | Officer | N. Mitchell | Date/Time | 04/16/15@0328 |

**Information:**

On 04/16/15 at approximately 0328 hours, Officer Gary Robinson of the Gibraltar Police Department and I were talking in the parking lot of Carlson High School when he was dispatched to 14680 Middle Gibraltar Road in regards to a domestic violence in progress. Officer Robinson asked me if I would assist him and I agreed to. This is standard practice of both departments. Gibraltar's Dispatcher requested the Trenton Police Department to assist as well and Officer Robinson told her over the radio that I was going to the scene to assist.

**Investigation:**

Upon arrival, we met with a juvenile male who was holding the door open to the apartment building. The juvenile appeared highly upset and was crying. He led us to the apartment upstairs and then went back downstairs and said he would wait down there because he was scared.

Officer Robinson knocked on the door to the apartment, and a juvenile female answered the door. Officer Robinson asked her where the fight was occurring. The juvenile female also appeared highly upset and was crying.

Officer Robinson and I entered the apartment, which was in disarray. There were clothes thrown all over apartment and various objects thrown on to the floor. After entering the apartment, we could hear what sounded like someone gasping for air. We then heard a male voice telling someone that he was going to kill them. The voice stated this multiple times. I am unsure if he stated "I am going to kill her" or "I will kill you", it was a variation of that.

The voice was coming from the back bed room. Officer Robinson and I entered the back bedroom of the apartment. We observed a fully nude male and a female nude from the waist down on the bed. The male had the female's neck between his legs and was squeezing her neck choking the female. At this point, I feared that if the male continued this action, the female would lose her life. Through my training and experience, it appeared to me that the male was under the influence of an unknown substance. The male was highly aggressive and had a look on his face that I can only describe as complete rage and aggression.



RW0017

Signature _____   Reviewed by _____



*ROCKWOOD POLICE DEPARTMENT*
*ORIGINAL COMPLAINT*



Officer Robinson gave the male several verbal commands to get off of the female. The male ignored all verbal commands. At this point, Officer Robinson deployed his TASER. Officer Robinson struck the male with one probe from his TASER and the second probe missed. This was enough to get the male and the female to separate, however the male was not under any power from the TASER. The female was able to break loose and fled the room. The male was then on the floor and kicking and being aggressive towards us. The verbal commands from Officer Robinson to put his hands behind his back were not followed. The male attempted to get up. Fearing further physical confrontation I deployed my TASER. I was able to hit the male with my TASER successfully. One probe went into the male's chest and the other went into is lower abdomen. During the course of this incident, I applied only one-five second cycle from my TASER.

At this point, Officer Robinson was able to handcuff the male, while I immediately advised Gibraltar's Dispatch to send an ambulance per Department procedure. At this point, the male was still moving and breathing.

**After TASER actions:**

After deploying the TASER, Officer Robinson and I monitored the male while waiting for rescue. The male was turned onto his right side in the recovery position. While in this position, the male was still breathing and Officer Robinson found a pulse on him, but he was not responding to us.

Officer Robinson asked his Dispatcher to request the Fire Department to move a little bit quicker and then requested Brownstown Township Fire to respond with a paramedic unit.

Shortly after, we observed that the male had stopped breathing, but still had a pulse. Officer Robinson stated that he needed a CPR mask to start rescue breaths. I told him that I would go to my car and get one. At this time, one Trenton Police Officer arrived on scene. As I was walking back in to the building, a second Trenton Police Officer arrived on scene.

I went to my car and got a CPR mask and went back into the apartment. Upon arrival back at the apartment, I observed Officer Robinson performing CPR chest compressions on the male. Officer Robinson continued to do chest compressions while I readied the CPR mask. I performed rescue breaths on the male while Officer Robinson performed the chest compressions. While kneeling next the male, I observed that I had knelt down in fecal matter and that there was fecal matter in various parts of the apartment.

RW0018

Signature _____   Reviewed by _____




### ROCKWOOD POLICE DEPARTMENT
### ORIGINAL COMPLAINT

Officer Robinson performed chest compressions for several cycles until getting tired. At this point, Officer Robinson requested that I take over the chest compressions. I performed chest compressions for a few minutes until the Gibraltar Fire Department arrived on scene and continued to perform chest compressions while they readied their AED. Once their AED was ready, I stopped performing chest compressions and turned the male over to the Fire Department. I observed as the Fire Department placed the AED pads on the male and provided him with a shock.

I collected both my TASER wire and probes and Officer Robinson's TASER wire. I secured them into evidence bags. I turned Officer Robinson's TASER wire over to him and I later turned my TASER wire and probes over to Det/Sgt. Mercure who then turned it over to the Michigan State Police.

The male was then taken outside and placed in Brownstown's ambulance. He was transported to Oakwood South Shore Hospital.

**Interviews:**

Officer Robinson spoke with the female and the two young children about this incident.

**Notification of Supervisors:**

Officer Robinson requested that I stay and secure the scene while he notified his supervisor. While Officer Robinson was outside speaking with his supervisor, I heard the female tell the juvenile male to go to bed and she cleaned all the paramedic's stuff out of his room.

After returning to the apartment, I went to my patrol car and called Lt. Krause and also Det/Sgt. Mercure.

**Written Statements/ Further Interviews:**

Officer Robinson attempted to get a written statement from the female and juvenile male. Both written statements were approximately one sentence each. Officer Robinson requested that both parties provide a little more detail. The female seemed very uncooperative and at one pointed told us that she did not want the male to get in trouble.

Officer Robinson talked with the female who then told him that the male had assaulted the juvenile male and held him (juvenile) down with his (adult male) foot on the juvenile's neck.

RW0019

Signature _____   Reviewed by _____



*ROCKWOOD POLICE DEPARTMENT*
*ORIGINAL COMPLAINT*



The female also stated that the male was attempting to force her into performing oral sex on him. At this time, the female stated he did not attempt any penetration.

We noticed that there were several pill bottles and multiple different loose pills all over the apartment. The female told us that the male takes Seroquel for Bi-polar disorder.

**Interview with Neighbor:**

I spoke with the neighbor in apartment 12, Patricia Dawn Hust. Hust told me that she had heard fighting going on in the apartment upstairs. Hust told me that she could hear "bodies being thrown around" and a lot of yelling, but could not make out any of the words. Hust stated that this had been going on for approximately the last hour.

**Change of Clothes:**

Due to kneeling in fecal matter while perming CPR, I requested permission from Lt. Krause to go home and get a change of clothes. I went to the Rockwood Police Department, where I took off my full uniform and immediately turned everything over to Det/Sgt. Mercure. Det/Sgt. Mercure provided me coveralls to wear to go home and get a change of clothes.

At the time Det/Sgt. Mercure provided me with a change of clothes, he requested that I take a Preliminary Breath Test just as a precaution. I advised him that I had not consumed any alcohol and would submit to the test. Det/Sgt. Mercure obtained a PBT reading of .000% from me. This was done in front of the camera in the Police Department garage.

**Disposition:**

This report is written for informational purposes. For further information on this case, see Gibraltar Police Department case number 15-1378. The scene and case were turned over to the Gibraltar Police Department.

**Status:**

Closed.

RW0020

Signature _____   Reviewed by _____

### TASER® USE REPORT
Rockwood Police Department

Date: 4/16/15   Time: 0328   Case Number: 15-1378

TASER Officer's Name: Mitchell   Officer(s) Involved: Mitchell, Robinson

Dept Address: 32409 Fort Street Rockwood, MI. 48173   Phone: 734-379-5323

On Scene Supervisor: Robinson

Department TASER Number #1 _____ #2 ✓ #3 _____ #4 _____ (check one)

Air Cartridge Serial Number(s): _____

Air Cartridge Type(s): ___ 15-ft ___ 21-ft ___ 21-ft XP ✓ 25-ft XP(Green)

TASER Serial #: X2900012   Medical Facility: Southshore   Doctor: _____

Nature of the Call or Incident: Domestic   Charges: N/A   Booked: Y (N)

Type of Subject: ✓ Human   ___ Animal   ___Accidental Firing (no injury or damage)

Location of Incident: (X) Indoor ( ) Outdoor ( ) Jail ( ) Hospital ( ) Vehicle

Type of Force Used (Check all that apply): ( ) Physical (X) Less-lethal ( ) Firearm ( ) Chemical

Nature of the Injuries and Medical Treatment Required: Became unresponsive

Admitted to Hospital for Injuries: (Y) N      Admitted to Hospital for Psychiatric: Y (N)

Medical Exam: (Y) N   Suspect Under the influence: Alcohol / Drugs (specify): unknown

Was an Officer, Police Employee, Volunteer or Citizen Injured other than by TASER? Y / (N)

Incident Type (circle appropriate response(s) below):

Civil Disturbance   Suicidal   Suicide by Cop   (Violent Suspect)   Barricaded   Warrant   Other

Age: 39   Sex: Male   Height: 509   Race: White   Weight: 155

TASER use (circle one): (Success) / Failure      Suspect wearing heaving clothes: Y / (N)

Number of Air Cartridges fired: 1      Number of cycles applied: 1

Usage (check one): ( ) Arc Display Only   ( ) Laser Display Only   (X) TASER Application

TASER:  Is this a dart probe contact: (Y) / N      Is this a drive stun contact: Y / (N)

Approximate target distance at the time of the dart launch: 4 feet

Distance between the two probes: 15 inches      Need for an additional shot? Y / (N)

Did dart contacts penetrate the subject's skin? (Y) / N      Probes removed on scene: (N) / N

Did TASER application cause injury? (N) / N      If yes, was the subject treated for the injury: (Y) / N

DESCRIPTION OF INJURY:
Became unresponsive and later pronounced deceased

*TASER® USE REPORT*

EXHIBIT
MITCHELL
4
SW 4-23-18

**APPLICATION AREAS**
(Place "X's" where probes hit suspect <u>AND</u> *"O's" where stunned*)



SYNOPSIS:

_Subject was violently assaulting female. Gibraltar officer_
_Robinson attempted TASER and missed with one probe. Subject_
_came towards us and I used my TASER._

Need for additional applications? Y /(N)    Did the device respond satisfactorily?(Y) / N

If the TASER firing was unsuccessful was a DRIVE STUN follow-up used? Y /(N)

Describe the subject's demeanor after the device was used or displayed?

_Became unresponsive, But when checked, had a pulse and was breathing_

Chemical Spray: Y (N)          Baton or Blunt Instrument: Y (N)

Authorized control holds: Y (N)     If yes, what types: _____

Describe other means attempted to control the subject: _____

Photographs Taken: Y (N)        Report Completed by: _Nicholas Mitchell_

*ADDITIONAL INFORMATION*

Report Reviewed by: _____     Date: _04/10/15_

RW0024

EXHIBIT

MITCHELL
5

SN 6·27·18

PENGAD 800-631-6989