# EXHIBIT J

**Page 1**

```
1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION
3
4   RICHARD KAPUSCINSKI, Personal
    Representative of the Estate of
5   DAVID KAPUSCINSKI, Deceased,
6        Plaintiff,
                              Case No. 2:17-cv-11281
7        vs.                  Hon. Arthur J. Tarnow
                              Mag. Judge Anthony P. Patti
8   OFFICER NICHOLAS B. MITCHELL,
    OFFICER GARY ROBINSON, CITY OF
9   ROCKWOOD, and CITY OF GIBRALTAR,
    Jointly and Severally,
10
          Defendants.
11  _____/
12       DEPOSITION OF OFFICER GARY KEITH ROBINSON
13  Taken by the Plaintiff on the 18th of July, 2018, at the
14  offices of the Gibraltar Police Department, 29450 Munro
15  Street, Gibraltar, Michigan, at 10:04 a.m.
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
1   APPEARANCES:
2   For the Plaintiff:
3        MR. TODD J. WEGLARZ (P48035)
         Fieger Fieger Kenney & Harrington PC
4        19390 West 10 Mile Road
         Southfield, Michigan 48075
5        (248)355-5555
6
7   For Defendants Robinson and City of Gibraltar:
8        MS. AUDREY J. FORBUSH (P41744)
         Plunkett Cooney
9        111 East Court Street, Suite 1B
         Flint, Michigan 48502
10       (810)342-7014
11
12  For Defendants Mitchell and City of Rockwood:
13       MS. LAUREL F. MCGIFFERT (P31667)
         Plunkett Cooney
14       150 West Jefferson, Suite 800
         Detroit, Michigan 48226
15       (313)983-4751
16
17  Also Present:
18       Chief Krause
         Officer Nicholas Mitchell
19
20
    REPORTED BY:
21
         Ms. Leah M. Witt, CSR-8825
22       Certified Shorthand Reporter
         (248)644-8888
23
24
25
```

**Page 3**

```
1                 TABLE OF CONTENTS
2   WITNESS:                                       PAGE
3   OFFICER GARY KEITH ROBINSON
4      Direct Examination by Mr. Weglarz            4
       Cross-Examination by Ms. McGiffert          125
5      Redirect Examination by Mr. Weglarz         128
6
7
8   EXHIBITS:                                     MARKED
9   Exhibit 1    Gibraltar Taser Policy             7
10  Exhibit 2    Gibraltar Use of Force             7
11  Exhibit 3    Robinson Report                   33
12  Exhibit 4    Bedroom Photograph                63
13  Exhibit 5    Post Mortem Report                72
14  Exhibit 6    Kapuscinski Photograph            72
15  Exhibit 7    Kapuscinski Photograph            72
16  Exhibit 8    Kapuscinski Photograph            72
17  Exhibit 9    Kapuscinski Photograph            72
18  Exhibit 10   Taser Data Log                    85
19
20
21
22
23
24
25
```

**Page 4**

```
1   Gibraltar, Michigan
2   Wednesday, July 18, 2018 - 10:04 a.m.
3            OFFICER GARY KEITH ROBINSON
4        HAVING BEEN CALLED BY THE PLAINTIFF AND SWORN:
5            MR. WEGLARZ:  Okay.  We're here for the
6   deposition of Doctor -- Doctor --
7            MS. FORBUSH:  Whoa.
8            MR. WEGLARZ:  -- Officer Gary Robinson.  I
9   know everyone calls you doctor.
10           THE WITNESS:  Yeah.
11           MR. WEGLARZ:  Taken pursuant to notice and
12  agreement of counsel.  Officer Robinson, my name's Todd
13  Weglarz.  I'm going to ask you some questions today
14  about yourself and, of course, about this incident
15  involving Mr. Kapuscinski.  If you do not understand a
16  question, let me know.  I will rephrase.  If you want
17  to take a break, just say so.  That won't be a problem.
18  Fair enough?
19           THE WITNESS:  Fair.
20              DIRECT EXAMINATION
21  BY MR. WEGLARZ:
22  Q.  For the record, full and complete name, please.
23  A.  Gary Keith Robinson.
24  Q.  Date of birth?
25  A.  11/3/83.
```

Page 5

1  Q.  Did you review anything to prepare yourself for your
2      deposition?
3  A.  Yes, I did.
4  Q.  And what did you review?
5  A.  My police report, the Michigan State Police report,
6      written statements from the three people on-scene
7      there, and I have my Taser -- Gibraltar Police
8      Department Taser policy.
9  Q.  Can I see the Taser policy?
10 A.  Sure.
11 Q.  And while you're doing that, anything else that you
12     reviewed?
13 A.  I think we listened to a couple audio things with my
14     attorney here.
15 Q.  Okay.  And when did you listen to the audio?
16 A.  A few weeks ago?  Was it two or three weeks ago when we
17     were first here?  And then some more today.
18 Q.  Did you listen to those audios before we took
19     Mitchell's deposition, or was it after?
20 A.  I think we listened to before.
21 Q.  Okay.
22             (At 10:06 a.m., Chief Krause and Officer
23             Mitchell enter the deposition)
24             CHIEF KRAUSE:  I apologize for our tardiness,
25     but unfortunately we had things come up.  Where's your

Page 6

1      newbie?
2             MS. McGIFFERT:  Oh, she had to go somewhere
3      else today.  I'll tell her you missed her, though.
4             CHIEF KRAUSE:  I didn't say that.
5  BY MR. WEGLARZ:
6  Q.  All right.  The audios were pertaining to what?
7  A.  The incident, the Taser incident.
8  Q.  And audios of what specifically?
9  A.  Partial I guess it's body -- body mic from Rockwood PD
10     and today the Michigan State Police interview.
11 Q.  Okay.
12 A.  Just my interview.
13 Q.  That was my next question.
14 A.  Yeah.
15 Q.  Audios from state police regarding your interview,
16     correct?
17 A.  Yep.
18 Q.  Any others?
19 A.  No.
20 Q.  Okay.  Anything else that you reviewed?
21 A.  I don't believe so.
22 Q.  Okay.  Did you review the other policies from the
23     Gibraltar PD in addition to the Taser policy?
24 A.  No.
25 Q.  All right.  The Gibraltar PD has use of force policies?

Page 7

1  A.  Yes.
2  Q.  Okay.  And I take it you've reviewed those before,
3      correct?
4  A.  I have before.  Not in preparation for today, though.
5  Q.  Fair enough.  Just give me a sec.
6             MR. WEGLARZ:  Mark this 1, and this is going
7      to be 2.
8             (At 10:08 a.m., Exhibits 1 and 2 marked)
9  BY MR. WEGLARZ:
10 Q.  Officer Robinson, I've handed to you Exhibits 1 and 2.
11     I believe Exhibit Number 1 is the Taser policy that we
12     just identified, correct?
13 A.  Correct.
14 Q.  And that Taser policy was in effect at the time of the
15     incident involving Mr. Kapuscinski?
16 A.  Correct.
17 Q.  And you are aware of all the contents of that policy
18     prior to the Kapuscinski incident, true?
19 A.  Yes.
20 Q.  Okay.  And that Taser policy was the policy promulgated
21     by the Gibraltar PD?
22 A.  Correct.
23 Q.  Okay.  And what I've marked as Exhibit Number 2 are the
24     use of force policies that were provided to me by the
25     Gibraltar PD.  Have you ever seen those policies before

Page 8

1      marked as Exhibit Number 2?
2  A.  I'm sure I have.
3  Q.  Okay.  And would you have been aware of all of the
4      content of the policies that we've marked as Exhibit
5      Number 2?
6  A.  Yes.
7  Q.  Okay.  And you're aware of the content of those
8      policies prior to this Kapuscinski incident.
9  A.  Correct.
10 Q.  Okay.  Tell me a little bit about your educational
11     background.  I take it you graduated from high school?
12 A.  I graduated from high school in 2002.  I went to Monroe
13     Community College, graduated in 2004.  Went to the
14     Washtenaw Police Academy in 2006, and I went to Delta
15     Correctional Academy in 20 -- maybe '08 or '09.  I
16     don't remember.
17 Q.  All right.  When you completed the police academy in
18     2006, do you recall your class standing, your rank?
19 A.  I think I was two or three.
20 Q.  Out of how many?
21 A.  Twelve I believe.
22 Q.  And why did you go to the corrections academy?
23 A.  I was working at the time I was working at the
24     sheriff's department.  I started with the sheriff's
25     department -- the Monroe County Sheriff's Department in

Page 9

1        2007.
2    Q.  And when did you finish that -- the academy?
3    A.  Oh, it's only -- it's a month-long program.  They send
4        you to Bay City.  I don't know if I took it in '08 or
5        '09, so I wouldn't be able to tell.
6    Q.  2008 or 2009?
7    A.  Yeah.  That's my guess, yeah.
8    Q.  All right.  Any other education?
9    A.  I went to EMT school.  That was through Gibraltar PD,
10       and that would have been in 2013.
11   Q.  And why did you go through that?
12   A.  All the police officers in Gibraltar are EMTs.
13   Q.  When did they start that?  Is that a requirement?
14   A.  Yeah.  I think that's been forever.
15   Q.  Okay.  Any other education?
16   A.  I don't think so.
17   Q.  Okay.  You obviously are currently employed, right?
18   A.  Yes.
19   Q.  Gibraltar PD?
20   A.  Yes.
21   Q.  And how long have you been with the Gibraltar Police
22       Department?
23   A.  Since January of '13.
24   Q.  And job title, job responsibilities have been the same
25       since January of 2013?

Page 10

1    A.  Yes.
2    Q.  Are you employed anywhere else currently?
3    A.  No.
4    Q.  Okay.  I take it this is a full-time position?
5    A.  Yes.
6    Q.  Forty hours a week?
7    A.  Plus, yes.
8    Q.  Where were you working prior to the Gibraltar Police
9        Department?
10   A.  Rockwood Police Department.
11   Q.  And when did you first start working for the Rockwood
12       PD?
13   A.  June or July of 2010.
14   Q.  And when did you stop working for them?
15   A.  January of '13.
16   Q.  And what was your job title?
17   A.  Patrolman, officer.
18   Q.  Doing the same thing that you do at the Gibraltar PD.
19   A.  Yes.
20   Q.  And why did you leave Rockwood?
21   A.  Pension, better pay.
22   Q.  What was better?
23   A.  You can -- you make more money per hour and you can
24       earn a better pension, more money for a pension.
25   Q.  Were you ever disciplined or reprimanded while with the

Page 11

1        Rockwood PD?
2    A.  No.
3    Q.  How about while with Gibraltar?
4    A.  No.
5    Q.  While you were employed at Rockwood PD, were you
6        employed anywhere else?
7    A.  No.
8    Q.  Where were you working prior to Rockwood?
9    A.  Prior to there I had two jobs at the same time.  I was
10       Monroe County Sheriff's and the Carleton Police
11       Department.
12   Q.  And when did you first start working with the Monroe
13       County Sheriff Department?
14   A.  April of 2007.
15   Q.  And how about with Carleton?
16   A.  Probably -- it was later on in 2007.  Five, six months
17       later.  I don't know.
18   Q.  While you were at Rockwood, that was a full-time
19       position?
20   A.  Yes.
21   Q.  Okay.  How about with the Monroe County Sheriff
22       Department?
23   A.  Full-time position also.
24   Q.  Okay.  How about with Carleton?
25   A.  That was part time.

Page 12

1    Q.  And how many hours at Carleton?
2    A.  Per month maybe 20 hours is kind of my guess.
3    Q.  And what were you doing there?
4    A.  Patrolman.
5    Q.  How about for the sheriff's department with Monroe?
6    A.  Correctional officer.
7    Q.  Always corrections with Monroe?
8    A.  Yeah.  I started as a deputy and then did corrections
9        for -- I guess was that three years?
10   Q.  And when did you stop working for the Monroe County
11       Sheriff Department?
12   A.  Right when I went to Rockwood, which was that 2010?
13       June or July of 2010?
14   Q.  Okay.  And why did you leave Monroe?
15   A.  Again, looking -- better pension than Monroe County had
16       and more money.
17   Q.  And why did you leave Carleton?
18   A.  I had a full time, and I was making enough money in
19       Rockwood at that point.
20   Q.  Were you ever disciplined or reprimanded by either
21       Monroe County or Carleton?
22   A.  No.
23   Q.  Any other places where you've worked?
24   A.  Before then I was in college, but I worked for Kroger
25       loss prevention.  I believe that was the time frame was

Page 13

1       2004, 2005 to probably 2006.
2   Q.  Okay. Anywhere else?
3   A.  Before then would have been probably high school, which
4       would have been like Wendy's or Red Lobster. I don't
5       remember the years on those.
6   Q.  Ever been disciplined while working at Kroger?
7   A.  No.
8   Q.  Have you ever been arrested?
9   A.  No.
10  Q.  Ever been charged with a crime?
11  A.  No.
12  Q.  Have you ever been part of a lawsuit where you sued
13      somebody?
14  A.  I've never sued anybody, no.
15  Q.  Have you ever been named in a lawsuit?
16  A.  Yes.
17  Q.  How many times?
18  A.  I think just one.
19  Q.  Would it be this suit or one other?
20  A.  One other besides this one.
21  Q.  How long ago was that?
22  A.  It's ongoing.
23  Q.  Okay. And that lawsuit pertains to an incident that
24      occurred when?
25  A.  Oh, 2016 maybe when I was working here. Yeah, my guess

Page 14

1       is '16.
2   Q.  Did you have your deposition taken in that case?
3   A.  I did, yes.
4   Q.  And how long ago was that?
5   A.  Within the last couple months.
6   Q.  Who was the lawyer who asked you all these questions?
7   A.  My attorney was there, and I don't recall the other
8       attorney's name.
9   Q.  Can you give me a 45-second overview as to the incident
10      that involved that case?
11  A.  Sure. I responded to a bar where someone didn't pay
12      their bill. The officer in charge instructed them to
13      pay their bill. They said they couldn't or they
14      weren't going to. He arrested all three people, and I
15      think she's suing for -- she was deaf, she didn't have
16      an interpreter, something like that.
17  Q.  So what's the claim?
18  A.  I guess she --
19          MS. FORBUSH: To the extent you understand
20      it.
21          THE WITNESS: That she didn't have an
22      interpreter, you know, on-scene.
23  BY MR. WEGLARZ:
24  Q.  No claims of excessive force?
25  A.  No, I don't think so.

Page 15

1   Q.  Has anyone ever accused you of excessive force?
2   A.  No.
3   Q.  That includes maybe coworkers, citizen complaints,
4       anything.
5   A.  No.
6   Q.  How long have you been using a Taser or carrying a
7       Taser?
8   A.  2007.
9   Q.  And when did you receive your first training on a
10      Taser?
11  A.  Right when I started at the sheriff's department,
12      probably April of 2007.
13  Q.  That was with the Monroe County Sheriff's Department?
14  A.  Yes.
15  Q.  Okay. And what kind of Tasers were you using with
16      Monroe County?
17  A.  The X26.
18  Q.  Have you ever used a Taser other than the X26?
19  A.  Now we carry the X2s.
20  Q.  And when did that start?
21  A.  2016.
22  Q.  After this incident?
23  A.  After this incident.
24  Q.  Okay. Do you know why they went from the X26 to the
25      X2?

Page 16

1   A.  I don't know specifically.
2   Q.  Do you have any idea or understanding?
3   A.  I would assume just end of shelf life or end of life of
4       the X26. I don't think they make them anymore.
5   Q.  What type of training did you receive on the X26? We
6       can start with Monroe.
7   A.  Classroom, practicals.
8   Q.  And how long does that last?
9   A.  It's been a long time. I wouldn't -- I wouldn't be
10      able to guess at that.
11  Q.  Is this a couple hours, couple days?
12  A.  Not days, hours. Some sort of hours.
13  Q.  Any training beyond that, the initial classroom and
14      practical?
15  A.  The first time I got trained, any additional training?
16  Q.  Yes.
17  A.  We trained I think a couple times I was there, a couple
18      times in Rockwood, Gibraltar.
19  Q.  What type of training did they provide to you on the
20      Taser at Gibraltar?
21  A.  Probably similar to the 2007 one or the 2010 and '11
22      that I had in Rockwood, classroom and deploying I think
23      two cartridges. Taser recommends two cartridges a
24      year.
25  Q.  And during this training, do they instruct you on

ROBINSON, OFFICER GARY KEITH
07/18/2018

Pages 17—20

Page 17

1    preferred target areas?
2  A.  I'm sure they did.
3  Q.  Okay.  And what is your understanding as to what those
4    preferred target areas are based upon that training?
5  A.  Nothing to the head or face, nothing to the chest,
6    nothing to the groin.  Preferred would be back, arms,
7    legs.  In the front would be splitting the belt line,
8    you know, maybe stomach to legs.
9  Q.  And what is your understanding as to why they teach you
10   to avoid shooting at the head?
11  A.  So you don't put a prong through someone's eye or nose
12   or sort of injuries.
13  Q.  And what is your understanding as to why they train you
14   to avoid or at least try to avoid shooting at the face?
15  A.  The same thing I just said.  You know, so you're not
16   shooting someone in the eye or nose or mouth.
17  Q.  Those can cause more serious injuries?
18  A.  Cause damage I would assume.
19  Q.  And what is your understanding as to why you're trained
20   to try avoiding shooting at the groin?
21  A.  Not shooting at the groin.
22  Q.  Right.  Why are you trained to avoid that area?
23  A.  Oh, okay.  Again, damage.  Causing damage.
24  Q.  Okay.  And what is your understanding as to why you are
25   trained to avoid the chest area?

Page 18

1  A.  I would assume heart, cardiac.  I think they call it
2    dart to heart in the training.
3  Q.  And tell me what that means, dart to heart.
4  A.  Increasing the distance from dart to heart.
5  Q.  So try to maintain some distance between the heart and
6    the dart when you're deploying a Taser at somebody,
7    correct?
8  A.  Correct.
9  Q.  Okay.  The closer the dart is to the heart, that could
10   cause injury?
11        MS. McGIFFERT:  Object as to foundation.
12        THE WITNESS:  I assume.
13        MS. FORBUSH:  Join.
14  BY MR. WEGLARZ:
15  Q.  Cardiac injury?
16        MS. McGIFFERT:  Same objection.
17        THE WITNESS:  I assume that's why they put
18   that there.  I don't know.
19  BY MR. WEGLARZ:
20  Q.  Have you ever heard that tasing someone in the chest
21   area or near the heart area can cause cardiac problems?
22  A.  Never had firsthand someone shoot somebody in the chest
23   and have issues.
24  Q.  Right.  I'm not asking firsthand.  I'm just asking in
25   general have you heard that anywhere that if you tase

Page 19

1    someone in the chest area near the heart, that could
2    cause a cardiac problem?
3  A.  I believe that's probably in the training somewhere.
4  Q.  Okay.  And who puts on the training for the Tasers at
5    the Gibraltar PD?
6  A.  I do now.  I'm a Taser instructor.
7  Q.  Who's the instructor?
8  A.  I'm the Taser instructor now.
9  Q.  You're the instructor.
10        MS. FORBUSH:  Now.
11  BY MR. WEGLARZ:
12  Q.  Who was it before you?
13  A.  Sergeant Trush.
14        MS. FORBUSH:  Is that T-R-U-S-H?
15        THE WITNESS:  T-R-U-S-H, yep.
16  BY MR. WEGLARZ:
17  Q.  Is he still with the department?
18  A.  He is.
19  Q.  And how come you're now doing it?
20  A.  Training just came up.  It came up in 2016, and the
21   chief at the time asked if I wanted to go to it.  He
22   sent three instructors, myself, now the chief -- the
23   new chief, he's certified instructor.  And the third
24   person -- actually, I think they had to leave early, so
25   I think there's just two of us that were certified

Page 20

1    then.
2  Q.  All right.  So you're certified?
3  A.  My -- I'm certified user.  My instructor expired in
4    January, and I'm already signed up for next January to
5    go back to instructor school.
6  Q.  And you've been a certified user since when, 2007?
7  A.  2007.
8  Q.  And that certification is, what, annual, every two
9    years?  How long does it last?
10  A.  Taser recommends that you go to X amount of hours.
11   It's more what the department, I guess, can put you
12   through or afford, but I think it's pretty much every
13   year, year and a half.
14  Q.  And when you say Taser recommends, you're talking about
15   Taser International?
16  A.  Taser International.
17  Q.  The manufacturer of the Tasers.
18  A.  Correct.
19  Q.  And the certification that you receive is through Taser
20   International, or is it through the department or
21   somewhere else?
22  A.  One of the officers, prior to me doing it, would put us
23   through, and it's just I'm teaching what the Taser, you
24   know, PowerPoint puts on.
25  Q.  Okay.  And are there a certain number of hours that you

ROBINSON, OFFICER GARY KEITH
07/18/2018                                                          Pages 21–24

Page 21

1     have to complete for the training to get a
2     certification?
3  A. Well, I can tell you --
4          MS. FORBUSH:  As an instructor or as a user?
5  BY MR. WEGLARZ:
6  Q. We'll start out as a user.
7  A. Our department does four hours right now per year.
8  Q. What does Taser recommend?
9  A. I don't know off the top of my head.
10 Q. Is it more than four hours?
11 A. I would assume it probably is.
12 Q. Your best estimate as to what Taser recommends, the
13    number of hours for a user.
14 A. Probably six to eight.
15 Q. How many times have you deployed your Taser while on
16    duty?
17 A. Three total.
18 Q. And you're talking about total of all the places you've
19    worked or just while with Gibraltar?
20 A. No, three total.  One of them was a -- during a
21    training.
22 Q. When was the last time you've deployed your Taser while
23    on duty?
24 A. Training last -- last year sometime.  Or maybe it might
25    have been January.  It was either December or January

Page 22

1     this year.
2  Q. And what would the circumstances be on that?
3  A. Training a new scenario or a new hire, you know, to
4     take a voluntary exposure during our training.
5  Q. And is that what you did, deployed it on a volunteer?
6  A. Yes.
7  Q. Okay.  And where did you -- where did you shoot the
8     probes, the darts?
9  A. We were upstairs in the back.
10 Q. Okay.  And where did those probes land on the
11    volunteer?
12 A. Low back and I think in the top of the thigh.
13 Q. And how many times have you deployed a Taser on a
14    person during training?
15 A. Just the one.
16 Q. That one time?
17 A. Just the one, yep.
18 Q. Last December or January.
19 A. Yeah, I think it was this January.
20 Q. Have you ever had to -- have you ever been tased?
21 A. Yes, two times.
22 Q. Why twice?
23 A. I did it in '07, and I raised my hand again in 2016.
24 Q. You didn't learn.
25 A. So I got a much better video of it that time.

Page 23

1  Q. When they -- when you were tased in 2007, where did the
2     darts land?
3  A. Back.  Somewhere in the back.
4  Q. How about in 2016?
5  A. Back again.  It was like back and belt.
6  Q. Okay.  All right.  So when was the last time you
7     deployed your Taser while on duty prior to this
8     training in December or January?
9  A. The Kapuscinski.
10 Q. And then when did you deploy your Taser prior to the
11    Kapuscinski incident?
12 A. I was in Rockwood.  I don't remember the date.  It
13    was -- I couldn't guess on the date.
14 Q. Best estimate.  I mean, we're talking --
15 A. Yeah.
16 Q. -- how many years ago?
17 A. '11.  2011 maybe.
18 Q. Okay.
19 A. I have no idea on the month or anything, though.  '11
20    or '12.
21 Q. Sure.  And tell me the circumstances that led up to you
22    deploying your Taser.
23 A. That one was a inmate.  The inmate has just
24    assaulted -- or attempted to assault an officer on the
25    road.  Took him back into the jail.  He was trying

Page 24

1     to -- he was destroying the cell, kicking the windows
2     out of the cells, said he was going to fight us too.
3     We opened the door and tasered him, and then that was
4     it.
5  Q. Was this an inmate that's being transported?
6  A. No.  He was in a jail cell.
7  Q. At what jail?
8  A. We were in Rockwood.  More of a holding cell, but --
9  Q. Yeah.  And did you deploy the darts?
10 A. Yes.
11 Q. And did they strike the victim?
12 A. Yes.
13 Q. Where?
14 A. Somewhere on his like legs or stomach.  I don't recall.
15 Q. So that would be the front?
16 A. Yeah.
17 Q. And how many times did you have to activate the Taser?
18 A. Just once.
19 Q. For five seconds?
20 A. I would guess, yeah.
21 Q. Did it work?
22 A. Yes.
23 Q. Did anyone else tase this person?
24 A. No.
25 Q. And did you have to fill out a report pertaining to the

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 25

1    use of that Taser?
2  A.  I would assume so, yes.
3  Q.  Okay.  And what report would you have filled out?  What
4      do they call those reports?
5  A.  I know we did an incident report.  I don't know if we
6      had a use of force Taser report there at the time.
7  Q.  And this is when you were with Rockwood, right?
8  A.  Yes.
9  Q.  Now, with the Gibraltar PD, do you have to fill out a
10     use of force or an incident report when you deploy a
11     Taser?
12 A.  An incident report.  Now we have a incident report and
13     a actual Taser use of force report.
14 Q.  When did that start?
15 A.  Sometime in '16.
16 Q.  So before that, the Gibraltar PD never required the
17     filling out of a specific Taser use of force report,
18     correct?
19         MS. FORBUSH:  Object to foundation.  To the
20     extent you know.
21 BY MR. WEGLARZ:
22 Q.  You can answer.
23 A.  We had an incident report, basically like a narrative.
24     I don't recall if we had a use of force.  I can double
25     check this policy here and see if it says it right on

Page 26

1      there.  It shows report required department incident
2      report.
3  Q.  And the incident report is really just a report that
4      you would fill out for any incident you're involved
5      with, correct?
6  A.  Correct.
7  Q.  An arrest, a run to a place, you have to make out an
8      incident report, correct?
9  A.  Correct.
10 Q.  Okay.  You've seen Mitchell's Taser use report that he
11     filled out regarding this incident, right?
12 A.  I don't believe so.
13 Q.  Really?
14 A.  I don't think so.  I don't know if it was in the state
15     police one.
16 Q.  You can see my copy.  It's got some highlights on it,
17     so forgive that.  But have you ever seen a report like
18     that before?
19 A.  The Rockwood Police Department --
20         MS. FORBUSH:  The one filled out by Mitchell?
21 BY MR. WEGLARZ:
22 Q.  I'm just talking in general.  Have you ever seen Taser
23     use reports before?
24 A.  Similar.  We have a similar one that's -- I think it's
25     this -- like the Axon or Taser International across the

Page 27

1      top of it, but --
2  Q.  Have you ever seen that specific Taser use report
3      before today?
4  A.  I don't think I've seen this, unless it's in this -- I
5      don't remember seeing it in this state police one.
6  Q.  Did you ever fill out a report like that, the Taser
7      report, for your actions the night that you were
8      involved with Mr. Kapuscinski?
9  A.  I did not.
10 Q.  I'll take it back.  We'll talk about it some more
11     later.  Were you wearing a mic the night of this
12     incident?
13 A.  I was not.
14 Q.  Did you have a video camera in your car or on your
15     person?
16 A.  No.
17 Q.  Did you have any audio recording in your car or on your
18     person the night of the incident?
19 A.  No.
20 Q.  And was that routine for the Gibraltar PD?
21 A.  Yep.
22 Q.  Is that the same situation currently?
23 A.  Yes, it is.
24 Q.  Okay.  So they have no video, no audio.
25 A.  Correct.

Page 28

1  Q.  How tall are you?
2  A.  Six-two.
3  Q.  How much do you weigh?
4  A.  240.
5  Q.  Did you weigh 240 back in April of 2015?
6  A.  Probably 220.
7  Q.  I take it you work out regularly?
8  A.  I do not.
9  Q.  Okay.
10 A.  That's why I gained 20 pounds.
11 Q.  Were you working out back in 2015?
12 A.  Just cardio.
13 Q.  You didn't have a weightlifting routine?
14 A.  I did not.
15 Q.  You couldn't tell me how much you bench?
16 A.  Could not.
17 Q.  Can you tell me the most you've ever benched?
18 A.  Most I've -- I can remember was 185 in high school that
19     I recall.
20 Q.  Was there any internal review or investigation
21     regarding this incident?
22 A.  I don't think so.
23 Q.  Does the Gibraltar PD have an internal affairs
24     department?
25 A.  No.

Page 29

1   Q.   Do they have any department or unit or group of
2        officers or individuals who will review incidents after
3        the fact to see if policies and procedures were
4        complied with?
5   A.   No.
6   Q.   Do you know if this incident was reviewed from a
7        retrospective analysis by anyone at the Gibralter PD?
8   A.   I would assume the chief, but I don't know.
9   Q.   The chief is who?
10  A.   The chief at the time was Larry Williams.
11  Q.   Who is it now?
12  A.   Chief Matt Lawyer.
13  Q.   And where is Chief Larry Williams today?
14          MS. FORBUSH:  Object to foundation.  If you
15       know.
16          THE WITNESS:  He works for the school now,
17       Carlson or Gibralter district.
18  BY MR. WEGLARZ:
19  Q.   All right.  And when was there a change in the chiefs?
20  A.   July of '17.
21  Q.   Did either Chief Williams or Chief Lawyer ever discuss
22       with you this incident about how you handled it, what
23       you did well, what you could have done better next
24       time, anything like that?
25  A.   I don't recall anything like that.

Page 30

1   Q.   Okay.  Do you recall either of them talking to you
2        about the incident?
3   A.   Chief Williams, I know he read me Garrity and ordered
4        me to type my report.
5   Q.   Other than that, has anyone from the Gibralter PD
6        discussed this incident with you?
7   A.   I think everyone pretty much knows what happened.  They
8        read the report.  I don't remember anyone specific
9        sitting down with me to discuss it.
10  Q.   Do you know if anyone from the Gibralter PD was
11       critical of anything that you did or did not do in this
12       incident?
13  A.   No.
14  Q.   Was this incident ever discussed or brought up during
15       any type of training for the Gibralter PD?
16  A.   I don't recall.
17  Q.   When you think about and look back at this incident
18       from hindsight, is there anything that you believe you,
19       you know, shouldn't have done or could have done
20       better?
21  A.   No.
22  Q.   If this incident were to unfold tomorrow, you would
23       do -- you would approach it the exact same way and
24       would have done the exact same things.
25  A.   Correct.

Page 31

1   Q.   Did you know David Kapuscinski before your interaction
2        with him on April 16 of 2015?
3   A.   I did not.
4   Q.   Never even heard his name before that, fair to say?
5   A.   Never, yep.
6   Q.   And the first time you even heard anything that
7        involved him was when you heard something over dispatch
8        regarding this incident, correct?
9   A.   Yep.  At the time I didn't know -- obviously I still
10       didn't know it was him, though.
11  Q.   Understood.  And what was it that you heard over the
12       radio that related to this incident?
13  A.   Dispatch relayed that there was a domestic violence
14       occurring where a young -- I think he was a
15       ten-year-old was calling 911.
16  Q.   Any other information that you received about this
17       incident other than that before your interaction with
18       Mr. Kapuscinski?
19  A.   If I could refer to my report real quick.
20  Q.   If you need to, go right ahead.
21  A.   Thank you.
22          MS. FORBUSH:  And just to clarify, when you
23       ask whether he had any other information before he had
24       contact with Mr. Kapuscinski, are you asking him to
25       recount what the boy told him, what the girl told him,

Page 32

1        and then the contact with Mr. Kapuscinski, or
2        contact -- information before he gets to the scene?
3          MR. WEGLARZ:  Just any information he had
4        before his interaction with Mr. Kapuscinski --
5          MS. FORBUSH:  Okay.
6          MR. WEGLARZ:  -- whether by radio or any
7        other source.
8          THE WITNESS:  Would you like me to relay some
9        information from my report to you then?
10  BY MR. WEGLARZ:
11  Q.   If you think you need to, sure.
12  A.   Okay.  Like I said, dispatch advised the caller was a
13       ten-year-old boy calling on a domestic.  He was going
14       to wait outside and let us in.  We arrived on-scene,
15       discovered a juvenile male standing outside the
16       apartment complex, later identified as Angelo Beneteau.
17       Angelo advised his mother and her boyfriend were
18       fighting upstairs.  I asked if it was physical or
19       verbal.  He stated it was both.
20          I then walked to the second floor of the
21       apartment complex, knocked on the door, and a female
22       opened the door -- juvenile female opened the door.
23       She was crying.  Later identified as Alice Beneteau.  I
24       asked where they were fighting.  She pointed me to the
25       back room.  Alice was screaming, asked if he was going

Page 33

1      to go to jail.  We started to make our way to the
2      bedroom.  I could hear groaning or moaning, and that's
3      kind of where I meet --
4   Q. Okay.
5   A. -- or see --
6   Q. And you're reading from your report, and we're going to
7      mark that as Exhibit Number 3 since you're reading from
8      it.
9   A. That was -- that was a little bit more of a summary,
10     but I was kind of off of there, though.
11  Q. That's okay.
12  A. Okay.
13  Q. You're fine.
14           MS. McGIFFERT:  How many pages is that?
15           THE WITNESS:  This is -- let's see.  One,
16     two, three, four, five, six -- seven full pages.  My
17     portion of the report is two pages.
18           MS. McGIFFERT:  Thank you.
19           THE WITNESS:  Yep.
20           (At 10:43 a.m., Exhibit 3 marked)
21  BY MR. WEGLARZ:
22  Q. So fair to say at the time that you first saw
23     Mr. Kapuscinski, you did not know anything about any
24     prior criminal record he may have had or did not have,
25     true?

Page 34

1   A. I didn't know anything of him.
2   Q. Okay.  You didn't know about anything that occurred
3      between Mr. Kapuscinski and the children in or near
4      that apartment or the female in the apartment, other
5      than that there was a domestic violence, they were
6      arguing and fighting, fair to say?
7   A. Correct.
8   Q. You did not see a weapon on Mr. Kapuscinski at any
9      time, fair to say?
10  A. Just his hands and legs.  He didn't have any knives or
11     guns or anything.
12  Q. Okay.  And you never had reason to believe that he was
13     armed at any point in time with a weapon other than his
14     hands and legs, correct?
15  A. Correct.
16  Q. Okay.  And about what time did you hear this call from
17     dispatch coming in?
18  A. It was close to 3:30, 3:20, or something like that.
19  Q. And where were you when the call came in?
20  A. Carlson High School with Officer Mitchell.
21  Q. And why were you at Carlson High School?
22  A. Just talking with Officer Mitchell.
23  Q. And why were you talking with Officer Mitchell there as
24     opposed to anywhere else?
25  A. Kind of in the middle of our cities.

Page 35

1   Q. Is it kind of a place where you go --
2   A. Yeah.  Yep.
3   Q. -- to talk to other officers and listen to the radio?
4   A. Yep.  Either meet there or, you know, somewhere just
5      inside of his city.
6   Q. Do you recall what you were doing the 60 minutes before
7      you heard that call?
8   A. Sixty minutes before?
9   Q. Yeah.
10  A. I'm sure just patrolling the streets.
11  Q. But you have no specific memory or recollection of
12     that?
13  A. No.
14  Q. How long do you think you were at Carlson High School
15     before you heard the call come in?
16  A. Probably minutes, but I don't know.
17  Q. When you went to Carlson High School, was Officer
18     Mitchell already there?
19  A. I don't remember.
20  Q. When you went there, was it your understanding Officer
21     Mitchell would be there?
22  A. Yes, or he would be -- either be there waiting or
23     showing up after me.
24  Q. But is this something that the two of you arranged --
25  A. We set up --

Page 36

1   Q. -- in advance?
2   A. Yes, we set it up.  Yep.
3   Q. Okay.  And when do you think you set that up?
4   A. I'm sure just before we met there.
5   Q. Over the radio?
6   A. Probably text or called or something like that.
7   Q. Sure.  From your personal cell phone?
8   A. Correct.
9   Q. And this wouldn't be the first time that you and
10     Officer Mitchell would have met at Carlson High School
11     or somewhere else while on duty during your patrol
12     responsibilities, fair to say?
13  A. Correct.
14  Q. And when you would do that, you would arrange it
15     through your cell phones, usually through a text
16     message?
17  A. Yeah.  There's like messaging through the computers or
18     your phone, so one of the two.  I don't really know
19     which one we used, though.
20  Q. Fair enough.  If you do a message through the computer,
21     that's through the police computers, correct?
22  A. Yeah.
23  Q. And if you do it through the phone, that's through your
24     personal phones?
25  A. Correct.

ROBINSON, OFFICER GARY KEITH
07/18/2018                                                                      Pages 37–40

Page 37

1   Q.   What carrier do you use?
2   A.   Verizon.
3   Q.   And what's your cell phone number?
4   A.   (734)497-1948.
5   Q.   And do you recall what you and Officer Mitchell were
6        talking about while you were there before this call
7        comes through?
8   A.   I do not.
9   Q.   Do you have any recollection as to what the two of you
10       discussed?  Anything?
11  A.   No.
12  Q.   Do you know if there are audios -- recorded audios that
13       cover what the two of you discussed?
14  A.   I'm sure there isn't.
15  Q.   Why are you sure?
16  A.   I would never meet up to record a conversation.
17  Q.   And is this a Gibraltar PD run?
18  A.   The Kapuscinski?  Yes.
19  Q.   Okay.  And Mitchell is with Rockwood.
20  A.   Correct.
21  Q.   But he accompanied you on the run, right?
22  A.   Yes.
23  Q.   And tell me about that arrangement.
24  A.   Mutual aid between the cities.
25  Q.   And was Trenton also involved?

Page 38

1   A.   I believe they were called too.  Our dispatcher called
2        them.
3   Q.   Okay.  And is there a similar agreement with Trenton
4        that you have with Rockwood, this mutual aid agreement?
5   A.   I think we all do have mutual aid.  We typically just
6        use Rockwood, but I'd say there's a percentage that we
7        definitely use Trenton too.
8   Q.   Were there any other officers from the Gibraltar PD on
9        duty at this time?
10  A.   No.
11  Q.   You're the only one.
12  A.   Correct.
13  Q.   When did you start your shift?
14  A.   I was probably 7p to 7a.
15  Q.   Any other officers from Gibraltar PD working during
16       that shift?
17  A.   I would assume there was somebody that got off at 3:00.
18       I don't remember who.
19  Q.   At 3:00 a.m.?
20  A.   Yes.
21  Q.   And this call would have come in shortly after that?
22  A.   A little bit after that, yeah.
23  Q.   You don't recall who that officer was.
24  A.   I do not.
25  Q.   Do you have a general idea as to who it may be?

Page 39

1   A.   No, not a clue.
2   Q.   Is there someone who usually worked that shift during
3        that time?
4   A.   I couldn't guess back then.  It changes quite a bit.
5   Q.   So there would be two officers on duty from 7p to 3a,
6        and then from 3a to 7a it's just you.
7   A.   Correct.
8   Q.   For this evening.
9   A.   Yep.
10  Q.   What about during the day shift?
11  A.   Day shift there's --
12  Q.   How is it usually staffed?
13  A.   -- usually a 7a to 7p, and there's a detective on from
14       8:00 to 4:00, and the chief is in from 8:00 to 4:00.
15  Q.   And how many Rockwood officers are on duty from 7p to
16       7a?
17            MS. McGIFFERT:  Object as to foundation.
18            MS. FORBUSH:  Join.
19            THE WITNESS:  Definitely one, but I don't
20       know.
21  BY MR. WEGLARZ:
22  Q.   Fair to say that you were the lead officer to handle
23       this run.
24  A.   Correct.
25  Q.   So it's a Gibraltar PD run, you're the Gibraltar

Page 40

1        officer, you're basically the guy in charge.
2   A.   Correct.
3   Q.   And what is Officer Mitchell's role and responsibility
4        on this run?
5   A.   I guess backup or support.
6   Q.   And what does it mean -- well, strike that.  What does
7        an officer typically do serving as the backup or
8        support person?
9   A.   When you're going to a domestic, you don't want to show
10       up by yourself.  Generally they would -- you know, if
11       we can try to separate parties, talk to parties
12       separately, whoever's handling the -- you know, the
13       complaint would talk to the victim, talk to the
14       suspect, and just having an extra body on scene.
15       That's usually what it is.
16  Q.   Is the backup really just supposed to be there with
17       their presence in case they're needed?
18  A.   Oh, yeah, definitely if they're needed and, you know,
19       if there's a fight or whatever it is they need to
20       assist.
21  Q.   Does a backup person basically appear and await
22       direction or instruction from you?
23  A.   They could, yeah.
24  Q.   For the most part -- I mean, I know I'm describing in
25       general, but is that really the role of the backup

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 41

1   support person?
2   **A.   In general, right.**
3   Q.   And when you drove to the location, you led the way,
4        right?
5   **A.   I would assume.**
6   Q.   Okay.  You watched the video from Mitchell's unit,
7        correct?
8   **A.   I did.  I don't remember, though.  That's the one I**
9   **watched three weeks ago.  I've only seen it the one**
10  **time.**
11  Q.   What kind of vehicle were you in that night?
12  **A.   A Tahoe.**
13  Q.   And is that a fully marked police car?
14  **A.   Yes.**
15  Q.   With lights and siren?
16  **A.   Yes.**
17  Q.   Did you activate lights and siren on the way to the
18       location of this incident?
19  **A.   I don't think so.**
20  Q.   Did you activate either/or?
21  **A.   I don't think so.**
22  Q.   Do you know if Mitchell did?
23  **A.   I don't think he did either.**
24  Q.   And can you tell me the uniform you were wearing and
25       any accessories, equipment, weapons that you had on

Page 42

1        you?
2   **A.   I was probably wearing this uniform.  I had a vest on**
3   **similar to what Officer Mitchell's wearing.  It has**
4   **magazines which carry your bullets in it, a radio, had**
5   **a pouch, handcuffs all on a vest.  I don't know if I**
6   **had a Taser on my vest or if I had it on my belt at**
7   **that time.**
8   Q.   And you would have carried the Taser X26?
9   **A.   Correct.**
10  Q.   The yellow Taser?
11  **A.   Yes.**
12  Q.   What kind of firearm did you have on you?
13  **A.   It was a Glock .40 caliber.**
14  Q.   And where would that be on your person?
15  **A.   That is on my right hip.**
16  Q.   I take it you're right-handed?
17  **A.   Yes.**
18  Q.   And if you had the Glock on your right hip, where
19       usually do you keep the Taser?
20  **A.   I may have had the Taser on a vest at that time.  Now I**
21  **carry it on my left hip.**
22  Q.   And it would just be one Taser?
23  **A.   Yes.**
24  Q.   Did you have anything else like a separate stun gun?
25  **A.   No.**

Page 43

1   Q.   Do you sometimes carry a stun gun that's different than
2        the X26 Taser?
3   **A.   No.  I've never handled any sort of stun gun.**
4   Q.   So one firearm, the .40 caliber Glock, is that what you
5        said?
6   **A.   Yep.**
7   Q.   And the Taser.  Any other weapons that you had on you?
8   **A.   I don't believe so.  Handcuffs, I probably had two sets**
9   **of handcuffs, radio, magazines, pocket knife.**
10  Q.   What about a baton?
11  **A.   No.**
12  Q.   All right.  So you pull up to the location here, and
13       this is an apartment complex, correct?
14  **A.   Yes.**
15  Q.   You pull in and tell me what happens.
16  **We pull in, see the juvenile outside.  Tells us they're**
17  **upstairs fighting, mom and her boyfriend, physically**
18  **and verbally.  We walk up the steps.  I think the boy**
19  **walked halfway up the step.  Me and Officer Mitchell**
20  **made it to the front door.  Knock, knock, knock.**
21  **Screaming girl opens the door, points us to the back.**
22  **I'm talking to her very briefly, "What's going on?"**
23  Q.   Can I stop you there?
24  **A.   Sure.**
25  Q.   You see the ten-year-old kid outside?

Page 44

1   **A.   The boy?**
2   Q.   Yeah.
3   **A.   Yep.**
4   Q.   And the info he gives you specifically is what?
5   **A.   I'll refer to my report right here.  Angelo advised his**
6   **mother and -- his mother and her boyfriend were**
7   **fighting upstairs, and I asked if it was physical or**
8   **verbal.  Angelo stated it was both and then walked to**
9   **the second floor.**
10  Q.   And to get to the second floor, do you just go up a
11       stairway, or do you have to go through a main entrance
12       first before you can get to the second floor?
13  **A.   He has to -- he let us in the building.  There's a**
14  **glass door.  I don't know if it's straight up the**
15  **stairs.  I think we have to go down a corridor and then**
16  **turn and go back on top of ourself.**
17  Q.   When you say he let us in, you're talking about the
18       child?
19  **A.   The boy, yeah.**
20  Q.   The boy?  And Mitchell is right behind you?
21  **A.   Correct.**
22  Q.   So you go upstairs and you knock on the door.
23  **A.   Yes.**
24  Q.   And this is the main entrance door to this apartment
25       unit for Mr. Kapuscinski?

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 45

```
 1   A.  Yes.
 2   Q.  Are there any other doors up there to other units?
 3   A.  I think it's four per floor.
 4   Q.  And how did you know that that particular door that you
 5       knocked on was the one for Kapuscinski?
 6   A.  I believe he pointed us and told us the number.  I got
 7       the number in here I think.  Apartment 16.
 8   Q.  And you knocked on the door?
 9   A.  Correct.
10   Q.  And who answered?
11   A.  Juvenile female.
12   Q.  And how old did the girl appear to be?
13   A.  I think she was like seven or eight maybe.
14   Q.  And she was upset at that time.
15   A.  Yes.
16   Q.  She was crying?
17   A.  Yep.
18   Q.  And do you recall what you said to this little girl?
19   A.  Again I asked if they were fighting, and she pointed me
20       to the back room.  She was screaming, asked if he was
21       going to go to jail, and I proceeded to the back room.
22   Q.  When was the last time that you listened to the audio
23       from the police video?
24   A.  I've only listened to it the one time partial, and that
25       was whenever we did Officer Mitchell's -- three weeks
```

Page 46

```
 1       ago maybe?
 2   Q.  On that video you can -- you can hear knocking and
 3       someone says shortly after that, "How you doing?
 4       Police department."  Do you remember that being in the
 5       audio?
 6   A.  No, I don't.
 7   Q.  And then you hear a child crying, and then you hear an
 8       officer ask, "Where's mom and dad at?"  Do you remember
 9       that being asked?
10   A.  I don't, no.
11   Q.  Is that most likely you?
12   A.  I would assume it was.
13   Q.  Okay.  Do you recall asking this young girl where mom
14       and dad were?
15   A.  You know, "Where are they fighting at?"  I think she
16       just pointed.
17   Q.  And she pointed where?
18   A.  Towards the back bedrooms or towards the bedroom areas.
19   Q.  And did you then walk toward the bedroom areas?
20   A.  Yes.
21   Q.  Officer Mitchell was right behind you?
22   A.  Yes.
23   Q.  And the little girl also followed you, correct?
24   A.  I don't remember if she followed us or stood there or
25       stayed in the living room.
```

Page 47

```
 1   Q.  Do you recall telling the state police that the little
 2       girl was there the entire time?
 3   A.  I don't.
 4   Q.  Do you recall the little girl being there the entire
 5       time?
 6   A.  I do not.
 7   Q.  To get to the bedroom -- there's two bedrooms, right?
 8   A.  Correct.
 9   Q.  And they're located off of a hallway?
10   A.  Yes.
11   Q.  You walked down the hallway to get to one of the two
12       bedrooms and you see Mr. Kapuscinski and a female in
13       the bedroom, correct?
14   A.  Once we go in the room, yes.
15   Q.  Okay.  And is that the first time you're able to see
16       anything going on?  That's the first time you see
17       Mr. Kapuscinski is when you enter that bedroom,
18       correct?
19   A.  Correct.
20   Q.  Okay.  Did you hear anything before you enter the
21       bedroom?
22   A.  Moaning or groaning.
23   Q.  And is that moaning or groaning from a male or female?
24   A.  I couldn't tell.
25   Q.  And in what bedroom were Kapuscinski and the female?
```

Page 48

```
 1   A.  In which bedroom were they?
 2   Q.  Yes.
 3   A.  The south -- southeast.  It would have been the one on
 4       the left as I was walking down the hallway.
 5   Q.  Would you have passed the other bedroom before going
 6       into the bedroom occupied by Mr. Kapuscinski?
 7   A.  I believe it was right to the right.  I think they're
 8       door to door there.
 9   Q.  And tell me your first observation.  What did you see
10       going on in that bedroom?
11   A.  As soon as we opened the door, I see them laying on the
12       bed.  He's completely nude.  Looks like he's choking
13       her, attempting to kill her.  He's screaming, "I'm
14       going to kill her, I'm going to kill her."  She --
15   Q.  Can I stop you there?
16   A.  Sure.
17   Q.  When you enter the bedroom, do you have your firearm
18       drawn?
19   A.  I do not.
20   Q.  Do you have your Taser drawn?
21   A.  I do not.
22   Q.  You see a completely nude male on the bed?
23   A.  Correct.
24   Q.  And how is he positioned on the bed?
25   A.  He's laying on his left side facing me, and she's
```

ROBINSON, OFFICER GARY KEITH
07/18/2018                                                                      Pages 49—52

1   partially nude.  She had just a shirt on on her left
2   side facing -- like her left side/back facing kind of
3   away from us.
4   Q.  Is she also on her side?
5   A.  She's like her side/back, kind of a little bit back and
6   forth.
7   Q.  And she's on her left side or right side going back and
8   forth?
9   A.  Left.  Left side.  They both have their left shoulder
10  more down towards the bed.  His head would be facing
11  west and hers would be facing east.
12  Q.  Were they in a sexual act when you walked in?
13  A.  No.
14  Q.  Was there any sexual activity going on when you walked
15  in?
16  A.  No.  It looked like he was trying to kill her.
17  Q.  And what did you observe for you to think that he was
18  trying to kill her?
19  A.  He was choking her with his thighs yelling, "I'm going
20  to kill her," and she was rocking back and forth.  It
21  didn't look like she was breathing properly.  I think
22  she was trying to say something, but, you know, she
23  couldn't because he was choking her with the thighs.
24  Q.  So he has both thighs wrapped around her neck?
25  A.  Her neck, yep.

1   Q.  And where are Mr. Kapuscinski's hands?
2   A.  His arms are wrapped around her legs holding her legs
3   close to him, and he kept pointing with his right arm
4   at me, "I'm going to kill her, I'm going to kill her,
5   I'm going to kill her."  I think I kept telling him,
6   you know, "Get off her, get off her, let go, let go."
7   Q.  All right.  So Mr. Kapuscinski I think you said had his
8   arms wrapped around her legs, but he was also pointing
9   his right hand toward you?
10  A.  Yep.  So he, you know, kept holding onto her legs
11  wrapped around, but then he kept pointing his hand
12  pointing at me, "I'm going to kill her, I'm going to
13  kill her."  At the same time he'd point and then bring
14  his arms back, point, bring his arms back.  You know,
15  it's all within a few seconds, so it's, you know, back
16  and forth.
17  Q.  And how did you interpret that gesture by
18  Mr. Kapuscinski when he's pointing and extending his
19  right arm toward you saying, "I'm going to kill her"?
20  A.  I would interpret that he was -- wanted to make sure I
21  knew he was going to kill her, pointing at me, "I'm
22  going to kill her."
23  Q.  Was he actually pointing his finger at you with his
24  index finger?
25  A.  Kind of like -- I remember just the hand coming at me

1   or fingers.  I don't know if it was fingers or the
2   whole hand.
3   Q.  But a gesture with his hand and arm going back and
4   forth as if he's talking directly to you.
5   A.  To me.
6   Q.  Correct?
7   A.  Correct.
8   Q.  Do you describe that in your report that we marked as
9   Exhibit Number 3?  I don't remember --
10  A.  Let me check here.
11  Q.  I don't remember reading that.
12  A.  The descriptions I have here was man was covered in
13  sweat and he had a crazed look on his face.  His eyes
14  were opened very wide, and the whites of his eyes are
15  very -- or were red.  I don't have the holding onto her
16  legs pointing at me.
17  Q.  All right.  And even in your audio statement to the
18  state police I don't -- I did not recall you describing
19  that to the state police.  Do you agree you did not
20  tell the state police about this particular --
21  A.  Yeah, I gave the --
22  Q.  -- part of the incident?
23  A.  I don't recall telling them that.  I think I just gave
24  them like a summary and kind of assuming they were
25  going to ask me more questions, kind of like how you're

1   breaking down everything down, and they were basically,
2   "Hey, give me a summary."  I gave them a summary and
3   then they -- I think that was pretty much it.  I don't
4   think they asked very many questions afterwards.  They
5   asked if I wanted to hurt him.
6   Q.  All right.  You never interpreted those hand or arm
7   gestures to be like he was armed or pointing a gun at
8   you.
9   A.  No.
10  Q.  Just that he was talking to you.
11  A.  That he was talking, yeah.
12  Q.  And was he making eye contact with you?
13  A.  I described his eyes as crazed, very wide, all the
14  whites are completely red.  It was almost like he
15  was -- he was pointing at -- in my direction, but it
16  was almost like he was looking through me, past me.
17  Q.  And what about the female?  Is she completely nude?
18  A.  She has a -- I described it as like a scrub top, like a
19  nurse's scrub top, but it was like a papery kind of
20  material, disposable maybe.
21  Q.  Like she was a patient?
22  A.  Yes.
23  Q.  So she had that scrub top on but no bottoms, correct?
24  A.  Correct.
25  Q.  Completely nude from the waist down?

ROBINSON, OFFICER GARY KEITH
07/18/2018
Pages 53–56

Page 53

1 A. Correct.
2 Q. And where are her arms and hands?
3 A. I don't really -- can't really recall her arms and
4    hands. I remember her legs and her head squished
5    between his thighs and then her trying to turn to me.
6 Q. Is her back to you?
7 A. It was to me, and then it was down to the bed, to me,
8    down to the bed. It was kind of like -- I mean, they
9    were kind of rocking a little bit. It looked like she
10   was struggling to try to get out of there, but, you
11   know, this all happened just within, you know, seconds.
12 Q. Were you able to see her face?
13 A. Partially.
14 Q. And describe that.
15 A. It would have been her right side of her face. She was
16   trying to like look over his thigh at us. You know,
17   she didn't have like normal color skin on her face. It
18   looked like she was oxygen deprived. Like I said, she
19   was rocking towards us as we came in.
20 Q. I'm going to show you a Mitchell Exhibit Number 2.
21   You've probably seen this before. It's a photo of one
22   of the bedrooms. Is that the bedroom where this
23   incident took place?
24 A. I think so. I don't see the -- well, that was cleaned
25   up, so -- I would assume this is the picture here.

Page 54

1 Q. Yes. That appears to be the bedroom where this took
2    place, right?
3 A. Correct.
4 Q. Can you tell me where in the bedroom you were standing
5    when you were making this observation?
6 A. Somewhere in this area, this area here.
7 Q. All right. I may have you put an X there shortly. How
8    many feet away from the bed would you say you were?
9 A. I don't know.
10 Q. 3 feet, 4 feet?
11 A. If I had to guess, maybe 6 feet. I don't know what
12   that distance is.
13 Q. All right. And where is Officer Mitchell?
14 A. The door should be in this corner here. He's probably
15   somewhere over here. I don't know. I would assume
16   somewhere in this length of the room.
17 Q. Is he within a foot or two away from you?
18 A. I don't know. I just know he's kind of behind me to
19   the side.
20 Q. And when Mr. Kapuscinski is saying, "I'm going to kill
21   her," how is he saying it?
22 A. He's screaming, "I'm going to kill her, I'm going to
23   kill her." Kind of has like a weird growl.
24 Q. So it wasn't something that he was whispering and you
25   could barely hear?

Page 55

1 A. No.
2 Q. It was he was screaming it.
3 A. Screaming it.
4 Q. No doubt in your mind. You could hear it because he
5    was screaming it.
6 A. He was screaming it.
7 Q. Did you say anything to him?
8 A. I think I just kept saying, "Get off her, get off her,
9    get off her," or let go or something like that.
10   Obviously he wasn't listening.
11 Q. And are you saying, "Get off of her, get off of her"
12   while he's also saying, "I'm going to kill her"?
13 A. The same exact time?
14 Q. Yeah.
15 A. I don't know. We're probably just -- I wouldn't know.
16 Q. And are you saying, "Get off of her" just as loud as
17   he's saying, "I'm going to kill her"?
18      MS. FORBUSH: If you know.
19      THE WITNESS: Yeah, I don't know. I mean,
20   I'm not whispering to him to, hey, please get off of
21   her. I'm yelling.
22 BY MR. WEGLARZ:
23 Q. He's screaming and you're screaming.
24 A. I'm yelling to get off of her, yeah.
25 Q. So it's probably equal decibels.

Page 56

1 A. Yeah.
2      MS. FORBUSH: Object to foundation.
3      THE WITNESS: I mean, we were both -- I'm
4    assuming we were both pretty loud.
5 BY MR. WEGLARZ:
6 Q. Okay. And how many times do you think Mr. Kapuscinski
7    screamed "I'm gonna kill her" or "I'm going to kill
8    her"?
9 A. I don't remember. I listened to the audio, but I don't
10   remember, though.
11 Q. Can you hear Mr. Kapuscinski saying that on the audio?
12 A. I don't remember either.
13 Q. Okay. I don't recall hearing anyone saying "I'm going
14   to kill her" or anything close to that. As you sit
15   here today, do you recall hearing on the audio -- do
16   you hear Kapuscinski saying he's going to kill her?
17 A. Like I said, I don't remember. I've only listened to
18   it the one time. I don't remember if it's on there or
19   not.
20 Q. When you say you don't remember, meaning as you sit
21   here today, you can't tell me where -- or you can't say
22   "Hey, yeah, I listened to it and I remember I can hear
23   this guy saying 'I'm going to kill her.'"
24 A. I remember him saying it while I was in the room. I
25   just don't remember what the audio has on it.

ROBINSON, OFFICER GARY KEITH
07/18/2018

1  Q.  You've never heard it on the audio, fair to say?
2        MS. FORBUSH:  He just said he doesn't
3     remember if he --
4        THE WITNESS:  I don't remember what the audio
5     has.  I've only heard it the one time partially.
6  BY MR. WEGLARZ:
7  Q.  Right, right.  And as you sit here today, you don't
8     recall ever hearing it on the audio, correct?
9        MS. FORBUSH:  No, he's saying, "I don't
10     recall if I heard it.  I don't recall what the audio
11     has."
12        THE WITNESS:  I don't remember what the audio
13     has.
14  BY MR. WEGLARZ:
15  Q.  All right.  Did you ever change your positioning in the
16     room from the time that you're making this observation
17     until the time that you deploy your Taser, which we're
18     going to talk about shortly?
19  A.  Probably not a whole lot.  I know I stayed on that
20     right side when I came in --
21  Q.  Okay.
22  A.  -- but I don't know.
23  Q.  But you were basically in the same location throughout,
24     correct?
25  A.  Same area kind of.

1  Q.  Okay.  All right.  When do you deploy your Taser?  Or
2     when do you pull out your Taser?
3  A.  I know there was a lot of commands "get off her, get
4     off her, get off her," or "let her go."  I started to
5     draw my Taser.  I saw Officer Mitchell's -- I guess his
6     red light, his laser, the same time I was drawing mine.
7     I may have even said, "get off her, get off her" again,
8     and then that's when I deployed the Taser.
9  Q.  Okay.  Mitchell's Taser has a laser?
10  A.  Both of them.
11  Q.  Okay.
12  A.  His has two, mine only has one.
13  Q.  And do you recall seeing Mitchell's laser before you
14     even pulled out your Taser?
15  A.  I recall seeing his as I was pulling mine out, so it
16     might have been just split seconds.
17  Q.  Both of you seem to pull out your Tasers at about the
18     same time is what you're telling me?
19  A.  Probably, yeah.
20  Q.  And did you pull out your Taser, aim, and shoot pretty
21     much in one motion, or was there some delay or pause --
22  A.  I don't --
23  Q.  -- from when you pulled it out initially and then
24     deployed it?
25  A.  I don't recall if it was pulled it straight out and

1     then deployed or pulled it out and was still giving
2     commands.
3  Q.  You did deploy your Taser, right?
4  A.  Correct.
5  Q.  And Officer Mitchell deployed his as well?
6  A.  Eventually he did.
7  Q.  Okay.  You tased first, fair to say?
8  A.  I deployed first.
9  Q.  All right.  And when you deployed, was Officer
10     Mitchell's laser also being aimed at Mr. Kapuscinski?
11  A.  I don't recall seeing his when I deployed mine.
12  Q.  Do you recall Mitchell ever having his laser directed
13     at Mr. Kapuscinski at any point in time before you
14     deployed your Taser?
15  A.  I remember seeing his, but I don't know where I
16     remember seeing it.  I just remember seeing the red,
17     you know, kind of going across the room.
18  Q.  Okay.  And when you pull out your Taser, does the laser
19     go on automatically?
20  A.  Once you turn it on.
21  Q.  And on the X26, how do you turn it on?
22  A.  Just a switch similar to the X2.  Switch on the back,
23     thumb switch.
24  Q.  And you have to put that thumb switch in what position?
25  A.  You have to push it up.

1  Q.  And what options do you have for that thumb switch
2     other than pushing it up?
3  A.  Just up or down, on or off.
4  Q.  Are there any other levers or switches on that Taser
5     besides the on/off switch?
6  A.  There's a button on the top that you could turn the
7     flashlight off or turn the laser off or do kinds of
8     stuff, but nobody ever -- that was something like the
9     instructor would set them up once they got the
10     shipment, so the only thing we would do is on and off.
11  Q.  So fair to say you didn't use that button that you just
12     described.
13  A.  Didn't use that button.
14  Q.  Any other levers or buttons on that X26?
15  A.  No.
16  Q.  You have one cartridge, right?
17  A.  Yes.
18  Q.  The X2 has two cartridges, correct?
19  A.  Correct.
20  Q.  When you deployed your Taser, how many feet away were
21     you from Mr. Kapuscinski?
22  A.  Like we just said, a guess, maybe six.  I was standing
23     towards the wall, he was on the bed.
24  Q.  And is that your best estimate, about 6 feet away?
25  A.  It's just a guess there.

Page 61

1  Q.  When you fill out these Taser use reports, they
2      actually ask for the distance, correct?  How far away
3      you were from the person that you tased, right?
4  A.  Correct.
5  Q.  That's usually information that your supervisors --
6      that's information they want to know on any tasing
7      incident usually.
8              MS. FORBUSH:  Object to foundation.
9              THE WITNESS:  We didn't have a Taser use of
10     force report at the time, but --
11 BY MR. WEGLARZ:
12 Q.  I understand that, but that's the information that they
13     usually want when you're documenting your use of the
14     Taser, correct?
15 A.  I think the one you showed me did have it listed on
16     there.
17 Q.  So you're about 6 feet away.  How far -- when you
18     deployed your Taser, two darts come out of it, correct?
19 A.  Correct.
20 Q.  And to do that you have to press the trigger?
21 A.  Correct.
22 Q.  And those two darts are in the cartridge that's loaded
23     into the Taser, correct?
24 A.  Correct.
25 Q.  And the darts or the probes -- they call them probes as

Page 62

1      well?
2  A.  Probes, yes.
3  Q.  What's the distance between the two when they're in the
4      cartridge?
5  A.  Maybe an inch or so I would assume.  I think they come
6      off at some sort of an angle.
7  Q.  You would have directed the laser to where you wanted
8      to shoot the probes, correct?
9  A.  That's approximate for the top, the top probe.
10 Q.  What's the purpose of the laser, by the way?
11 A.  To give you the appropriate -- or approximate area
12     where you're going to deploy.
13 Q.  Right.  It's so you can aim the gun and figure out
14     where you're going to send those darts, correct?
15 A.  Correct.
16 Q.  Right before you press the trigger, where was your
17     laser pointed at on Mr. Kapuscinski?
18 A.  I don't recall.  I don't remember.
19 Q.  Do you recall where the laser was at any point in time
20     before you deployed the Taser?
21 A.  Somewhere on his right side to arm area.
22 Q.  And why were you aiming it there?
23 A.  That was really the only portion I could -- I could see
24     his face, down his whole side, his right thigh, so I
25     assumed my best area was kind of the side/back as he

Page 63

1      was leaning forward pointing at me.
2  Q.  Okay.  I think now is a good time.  I think I'm going
3      to have you diagram now on the Mitchell Exhibit 2, and
4      we're going to call it whatever the next exhibit is.
5              (At 11:21 a.m., Exhibit 4 marked)
6  BY MR. WEGLARZ:
7  Q.  If you need to use my pen -- that you actually gave to
8      me by the way, thank you -- if you could show me where
9      you were standing, first of all, when you deployed the
10     Taser.
11 A.  I'm going to do it right on this picture here.
12 Q.  Do it right on that picture.
13 A.  I'm just going to draw a circle.
14 Q.  A circle is fine.
15 A.  Okay.  I'm assuming the door's over here somewhere, so
16     I'm somewhere in here.
17 Q.  That's the best you can do for me?
18 A.  Yeah.
19 Q.  All right.  So you're standing somewhere in that circle
20     at the time you deployed that Taser, correct?
21 A.  Correct.
22 Q.  Okay.  And you were also standing in that circle when
23     you've been telling us about your observations of what
24     you saw in that bedroom so far, correct?
25 A.  Correct.

Page 64

1  Q.  Same area.
2  A.  Yep.
3  Q.  Okay.  And where is Officer Mitchell at this time?
4  A.  Somewhere on this I would assume -- I know he walked in
5      right behind me, but somewhere in this area.
6  Q.  Okay.  Can you draw a circle as well?
7              MS. McGIFFERT:  And I'm just going to place
8      an objection as to foundation.
9              MR. WEGLARZ:  Sure.
10             THE WITNESS:  Go ahead a draw and circle
11     here?
12 BY MR. WEGLARZ:
13 Q.  Yeah, you can.
14 A.  I'm assuming somewhere in this area.
15 Q.  All right.  So the circle on the left approximates
16     Mitchell's location during the time of the Taser
17     deployment and the events leading up to it, correct?
18             MS. McGIFFERT:  Let me place an objection as
19     to foundation.  He did say assuming, so I think you're
20     misstating or mischaracterization of his testimony.
21             MR. WEGLARZ:  I'll give you every objection
22     known to mankind that you can preserve in this
23     deposition.
24 BY MR. WEGLARZ:
25 Q.  Is that correct?

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 65

```
 1  A.   What was the question again?
 2  Q.   Sure.  On our exhibit here, the circle that you've
 3       diagrammed for us on the left, that represents
 4       Mitchell's approximate location during the Taser
 5       deployment, correct?
 6  A.   Correct.
 7  Q.   And it also represents his location during the events
 8       in that bedroom leading up to the Taser deployment.
 9  A.   Correct.
10  Q.   Okay.  And the circle that you drew in to the right
11       represents your location for Taser deployment and the
12       events leading up to it, correct?
13  A.   Correct.
14  Q.   All right.  Now, you mentioned that you were aiming for
15       the right side of Mr. Kapuscinski.  Can you -- can you
16       show me -- can you put like a stick figure --
17  A.   I'll do -- I'm not going to do a stick figure.
18  Q.   -- of Mr. Kapuscinski in that bed?
19  A.   I'll give you this.  His feet was here, his head was
20       facing this way --
21            MS. FORBUSH:  You drew an arrow in the
22       direction his head was facing?
23            THE WITNESS:  His head's facing this way,
24       legs are this way.  Her head is facing that way.
25            MS. FORBUSH:  Toward the wall.
```

Page 66

```
 1            MS. McGIFFERT:  You're probably going to have
 2       to label those arrows so we know who is who.
 3            THE WITNESS:  I don't know how to spell his
 4       last name.
 5            MS. FORBUSH:  Just put K.
 6  BY MR. WEGLARZ:
 7  Q.   K is good.  All right.
 8  A.   Hers is B.
 9            MS. FORBUSH:  Beneteau, yeah.
10  BY MR. WEGLARZ:
11  Q.   So the arrows represent where the head was pointed.
12  A.   Arrow is the head.
13  Q.   Gotcha.  And are they -- are they kind of in the middle
14       of the bed?
15  A.   No, they're more -- more towards this edge here.
16  Q.   All right.  Towards the foot of the bed, correct?
17       They're closer to the foot of the bed?
18  A.   Yes.
19  Q.   The end of it.
20  A.   Yep.
21  Q.   Where the head of the bed, at least for the context of
22       this picture, is up against the wall underneath the
23       window, correct?
24  A.   Correct.
25  Q.   And they're kind of -- they're side to side, right?
```

Page 67

```
 1  A.   They're more face to face.  Like he's on his left side
 2       facing this direction.  She's more on her left side
 3       kind of back a little bit facing that way.
 4  Q.   Okay.  So she's actually in front of him, correct?  If
 5       you're looking at it --
 6            MS. FORBUSH:  Object to form.
 7  BY MR. WEGLARZ:
 8  Q.   -- if you're looking at it from the doorway into the
 9       bedroom, right?
10  A.   She's closer to the door.
11  Q.   Okay.
12  A.   Her back would be.
13  Q.   Where's north, by the way?  If you can put that in
14       there, that would help.
15  A.   North should be this way.
16  Q.   Can you do an arrow --
17  A.   To north?
18  Q.   -- with a capital N?
19  A.   Yeah.  Should be more like this, but -- kind of.
20  Q.   That's fine.  That works.  That's a Russian N, so it
21       works out.
22  A.   Yeah.
23  Q.   All right.  So how are you able to see his right side
24       if she is closer to the doorway?
25  A.   It's just her legs down here, and his chest is taller
```

Page 68

```
 1       than her two legs stacked up.
 2  Q.   And you have no idea where that laser was on
 3       Mr. Kapuscinski right before you deployed it.
 4  A.   No.
 5  Q.   And the last -- can you tell me where you last saw that
 6       laser on Mr. Kapuscinski before you deployed it?
 7  A.   I could not.  It would just be a guess.  You know, and
 8       like I said, they're both moving at -- you know, she's
 9       kind of like struggling back and forth trying to roll
10       from her side to her back, and he's, you know, pulling
11       the legs, pointing at me, pulling the legs.
12  Q.   And how far away would you say she was from the edge of
13       the bed?  A couple inches, a couple feet?
14  A.   No, closer to the edge than -- closer to the feet area
15       than the head area that we discussed.
16  Q.   Okay.  Well, that can mean a lot of different things.
17       I'm just trying to figure out were they just inches
18       from the edge of the bed, or did they have a couple
19       feet?
20  A.   Well, they were pretty close to this edge.  I --
21  Q.   When we talk about the edge, we're talking about the
22       northernmost edge.
23  A.   Yeah.
24  Q.   Edge parallel to the wall that would have the
25       entranceway to it.
```

Page 69

1   A.   The door on it.
2   Q.   Okay.  Now, this circle area that you drew, it's pretty
3        big.  Part of it -- for where you're standing, by the
4        way.  Do you know if you were at least even with the
5        edge of the bed that would be the foot of the bed
6        here --
7   A.   I don't know.
8   Q.   -- or do you think you were north of the foot of the
9        bed when you deployed your Taser?
10  A.   I don't know.
11  Q.   So you could have been anywhere as far north as the
12       very edge of this right circle here when you deployed
13       that Taser or as far south to this other edge here of
14       the circle where you're more than midway at the bed,
15       right?
16            MS. FORBUSH:  Object to the form.
17            THE WITNESS:  Yeah, I don't really know
18       specifically where I was standing.
19  BY MR. WEGLARZ:
20  Q.   Did the probes hit Mr. Kapuscinski?
21  A.   I believe one probe hit him in the arm.
22  Q.   Okay.  In which arm?
23  A.   Pointing --
24  Q.   Can I have that --
25  A.   Yeah, absolutely.

Page 70

1   Q.   -- pen back that you gave me?
2   A.   He was pointing at me with his right arm, so I think it
3        was his right arm I hit him.  I don't know if I hit him
4        when he was pointing or if he was grabbing her legs to
5        hold her down.
6   Q.   All right.  And where in the right arm?  Did you hit
7        him like in the back by the elbow?
8   A.   I remember seeing it on here.  I think it was the elbow
9        area.
10  Q.   Did you see the medical examiner's report?
11  A.   I did.  I haven't seen it in quite a while I think,
12       though.
13  Q.   Do you recall the medical examiner describing a wound
14       or stun gun wounds to the back of the right arm?
15  A.   Do you have a copy of that there?
16  Q.   I do, I do.
17  A.   I don't know if it's in the state police one here.
18       Okay.  I think I might have something here.  Probably
19       the same one you have.  Wayne County medical examiner
20       post mortem report.
21  Q.   Yes.  Do you have it?  You can look through mine.
22            MR. WEGLARZ:  We'll go off the record for a
23       second.
24            (At 11:30 a.m., discussion held off the
25            record)

Page 71

1            (At 11:31 a.m., back on the record)
2   BY MR. WEGLARZ:
3   Q.   All right.  We're looking at the medical examiner's
4        report, and do you see where he's describing wounds to
5        the back of the right arm?
6   A.   Possibly striking the decedent in the right arm.  Then
7        the picture of it shows one on the back of the right
8        arm.
9   Q.   Right.  And we're going to mark this as Exhibit Number
10       5, by the way, in a second, but the diagram here that
11       the medical examiner has, do you see where he has this
12       diagram --
13  A.   Yeah.
14  Q.   -- with the circle to the back of the right arm by the
15       elbow?
16  A.   Yep.
17  Q.   Is that where the probe hit that you deployed?
18  A.   I would assume that's probably what they're circling
19       there.
20  Q.   Okay.  But do you recall that being the area where the
21       dart hit?
22  A.   Oh, yeah.  I think it was in the arm, yeah.
23  Q.   That seems to be about correct to you.
24  A.   Probably right.
25  Q.   That looks like where your dart hit him, correct?

Page 72

1   A.   Yeah.
2            MS. FORBUSH:  One dart.
3            THE WITNESS:  One dart, yeah.  They keep
4        saying stun gun.  I've never used a stun gun, I've
5        never seen a stun gun.  I don't know why they keep
6        saying stun gun.  It's different than the Taser.
7            MR. WEGLARZ:  Let's mark that.  This will be
8        6 and that will be 7.  And 8 and 9.
9            (At 11:34 a.m., Exhibits 5 through 9 marked)
10  BY MR. WEGLARZ:
11  Q.   Okay.  And, Officer Robinson, I'm also going to show
12       you Exhibit 6, which is a photo of Mr. Kapuscinski's
13       right arm taken by the medical examiner.  And you see
14       the wound on the right elbow there?
15  A.   Probably this thing here you're thinking?
16  Q.   There's two wounds -- they look like two wounds to
17       me -- and so my question is, I'm just interested in the
18       general area of these two wounds below the right elbow.
19       Is that your understanding as to where in general your
20       dart landed after you deployed the Taser?
21  A.   Yes.
22  Q.   Okay.  Can you tell me which of these two wound marks
23       would be from your dart?
24  A.   I cannot.
25  Q.   Okay.  Do you believe both of those wound marks were

Page 73

1    caused by the dart?
2  A. No.
3  Q. Okay. Do you think both of those wound marks were
4     caused by both darts?
5  A. Were both -- no. I only had one dart in him throughout
6     his whole body.
7  Q. Okay. Did the other dart strike Mr. Kapuscinski at
8     all?
9  A. I don't think so. I don't believe I ever had a
10    completed circuit on him. I think I had just one dart
11    in him.
12 Q. Where did the other dart go?
13 A. I have no idea.
14 Q. Did it hit the female?
15 A. I think that's what Mitchell told me on scene, it might
16    have hit him or I only had one dart in.
17 Q. Did Mr. Kapuscinski react at all to being hit with the
18    dart in the Taser?
19 A. Once I deployed, there was some sort of reaction
20    between both of them and they separated, and then my
21    Taser was completely useless the second after they
22    separated.
23 Q. And why do you think -- strike that. When the dart
24    struck Mr. Kapuscinski at that time, did you think that
25    you hit him with only one dart, or did you think you

Page 74

1     hit him with both?
2  A. I thought I had a good connection. I thought I had two
3     darts.
4  Q. Sure.
5  A. They separated, and then I knew, you know, he's still
6     moving, there's no connection.
7  Q. Okay.
8  A. I've been tasered, and you can't just start moving and
9     standing, doing anything.
10 Q. Okay. And how you're trained to deploy these Tasers,
11    you line the laser up to where you want it to go, and
12    while looking at that target, you then deploy it, and
13    you watch the darts deploy and hit the target or
14    hopefully hit the target, correct?
15 A. Well, the training's a lot different than something
16    like this where we walk in and he's killing her, and I
17    didn't really have a, hey, I'm going to slow down and
18    point it at a target. It was a split second, I need to
19    do something here, pulled the Taser out, deployed.
20    Training is just, hey, here's a guy, take
21    your time and shoot at it.
22 Q. But you never took your eyes off of him.
23 A. No.
24 Q. Based upon what you saw, you -- you were under the
25    belief and understanding that both darts did hit

Page 75

1     Mr. Kapuscinski, correct?
2  A. Originally, yes.
3  Q. And once you fire that Taser, that's -- it's already
4     activated, correct?
5  A. Correct.
6  Q. There's going to be an electrical charge going through
7     those wires, correct?
8  A. Yes.
9  Q. And how long does that charge go on for?
10 A. Five seconds with one trigger pull.
11 Q. And then if you want to activate it again, you have to
12    do another trigger pull.
13 A. Correct.
14 Q. And that will also go for five seconds?
15 A. Correct.
16 Q. Do you have to keep your finger on the trigger the
17    entire five seconds, or just one pull and you get five
18    seconds automatically?
19 A. Just one pull is five seconds. If you keep your finger
20    on it, it will continuously go until the battery dies.
21 Q. Okay. And based upon what you saw, you see the darts
22    being deployed, you thought both darts hit him, you did
23    see the two of them split apart, right, right after you
24    hit him with the darts?
25 A. I -- when I deployed the Taser, I thought I had a

Page 76

1     connection. Within that first second or so, I knew
2     there was no connection because it wasn't working.
3  Q. How did you know that?
4  A. Because he -- he wasn't just laying still. He started
5     to move, progressed towards us, the officers. When I
6     say us, me and Mitchell.
7  Q. Sure. But they split apart how soon after you hit
8     Mr. Kapuscinski with the dart?
9  A. Very quickly.
10 Q. Split second, fair to say?
11 A. Probably.
12 Q. And why do you think that happened?
13 A. Either -- either I got one in him and one in her and
14    they completed the circuit and then they broke apart
15    for a second and and then the circuit stopped, or I
16    have one in him and it scared him and he let go and she
17    was able to get free and run to safety.
18 Q. Did you ever figure out if you actually hit her or if
19    she was tased herself?
20 A. No.
21 Q. Did anyone ever ask her that?
22 A. I don't know.
23 Q. Officer Mitchell thought you hit her, right?
24 A. I think he said that, yeah.
25 Q. He said that to you while at the scene.

ROBINSON, OFFICER GARY KEITH
07/18/2018                                                                    Pages 77–80

1  A.  I think so.  I remember him saying, "You only have one
2      dart in him."
3  Q.  So you even knew after the first firing within that
4      first five seconds, you knew that you didn't have an
5      effective hit, correct?
6  A.  I knew something wasn't working, yeah.
7  Q.  But you pressed the trigger again, correct?
8  A.  Correct.
9  Q.  And so why would you do that if you knew you didn't
10     have the circuit complete?
11  A.  I just don't know.  I just -- probably the stress, pull
12      again, not working, pull again, not working.
13  Q.  All right.
14  A.  I remember pulling two more times at least.
15  Q.  But they split apart during the first five seconds of
16     that tase.
17  A.  It wasn't five seconds.  It was the first second and a
18      half, two seconds, something like that.
19  Q.  Okay.  And when you saw that, you thought, wow, this is
20     a successful tase, right?
21  A.  Yeah, I thought it was working good.
22  Q.  Okay.
23  A.  Very briefly.
24  Q.  So they split apart.  She -- what does she do, jump off
25     the bed and run out of the room?  What does she do?

1  A.  Yeah, she -- I'm assuming --
2           MS. FORBUSH:  Don't assume.
3           THE WITNESS:  Somehow she gets away, gets off
4      the bed, and then leaves the room.
5  BY MR. WEGLARZ:
6  Q.  Okay.  And how soon is she out of the room?
7  A.  Within seconds.
8  Q.  Okay.  So she's out of the room even before that first
9      five-second activation is done.
10  A.  I don't know on that.
11  Q.  Within seconds of them splitting apart, she's out of
12     the room.
13  A.  Yeah.  She doesn't stick around.
14  Q.  And what happens to Mr. Kapuscinski when they split
15     apart?
16  A.  He starts coming towards us, falls off the bed.  I
17      think I'm telling him to turn over or turn over, turn
18      over, turn over.
19  Q.  Let me stop you there, if it's okay.
20  A.  Sure.
21  Q.  You said, "He starts coming at us, he falls off the
22     bed."  How soon after he's hit with the dart does he
23     fall off the bed?
24  A.  I don't know.
25  Q.  Is it instantaneous?

1  A.  No.  Again, seconds.  I don't know, though.
2  Q.  And he falls off the bed and lands on the floor?
3  A.  Yes.
4  Q.  And what is his position while on the floor?
5  A.  I believe I was telling him to turn over, turn over,
6      turn over, so my guess is --
7           MS. FORBUSH:  Don't guess.
8  BY MR. WEGLARZ:
9  Q.  What's your understanding as to how he was positioned
10     on the floor?
11  A.  I'm going to refer to my report here real quick.
12  Q.  If that helps you.
13  A.  Yeah, I don't have it listed here as how he fell, but I
14      think I was telling him to turn over.
15  Q.  Do you recall Officer Mitchell saying that when he
16     fell, he fell on his back, he landed on his back?
17  A.  I don't recall that.
18  Q.  Do you have any reason to disagree with that?
19  A.  No.  That probably goes with why I'm telling him to
20      turn over.
21  Q.  And why would you be telling him to turn over if he's
22     on his back?
23  A.  So I can put him on his face, handcuff him.
24  Q.  You can't cuff him if he's lying on his back?
25  A.  We prefer to cuff facedown so you're not attacked.

1  Q.  But if he's unable to move or for whatever reason he
2      can't reposition himself, can you cuff him while he's
3      on his back?
4  A.  If someone's unable, yeah.
5  Q.  And you start telling him to turn over, and you say
6      that to him repeatedly, right, turn over, turn over?
7  A.  I think so, yeah.
8  Q.  And when you're telling him to turn over, he's on his
9      back.  He's not threatening you at that point, correct?
10          MS. FORBUSH:  Object to the form.
11          THE WITNESS:  I think he was like thrashing,
12     moving around.
13  BY MR. WEGLARZ:
14  Q.  Is he thrashing because he was under the effect of the
15     tase?
16  A.  No.  You don't really thrash when you get tasered.  You
17      basically go stiff.
18  Q.  You've listened to the audio from the police video,
19     right?
20  A.  Only partial.
21  Q.  And do you recall hearing the tase -- the Tasers being
22     deployed on the audio?
23  A.  I don't remember.
24  Q.  You don't recall hearing two tase sounds on that audio?
25  A.  I don't recall, no.

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 81

1  Q.  Do you recall hearing yourself yelling, "Turn over now,
2       turn over now," and then hearing the second tasing
3       sound?
4  A.  I just remember, "Turn over, turn over, turn over."
5  Q.  Okay.  Did he ever listen to you?
6  A.  No.
7  Q.  While you were telling him to turn over, what was he
8       doing?
9  A.  He wasn't turning over.
10 Q.  Was he still alive?
11 A.  Yes.
12 Q.  Was he still breathing?
13 A.  Yes.
14 Q.  He wasn't dead at this point because he -- you hit him
15      with the Taser dart in the back of the right arm,
16      correct?
17 A.  Correct.
18 Q.  He's on his back.  You're telling him to turn over and
19      he's not turning over, correct?
20 A.  Correct.
21 Q.  And how are you -- where are you positioned at this
22      time?
23 A.  In that circle that I drew.
24 Q.  Okay.  You're not over him trying to cuff him?
25 A.  I stayed in that circle.

Page 82

1  Q.  Do you still have the Taser in your hand?
2  A.  I'm sure I do.
3  Q.  Do you ever get closer to him than the position you've
4       described for us earlier in the diagram?
5  A.  I stayed on that wall, and he fell onto the ground and
6       then got back up and then went back down again.  I
7       didn't get close enough to put handcuffs on him.
8  Q.  You didn't put away your Taser until after Mitchell
9       tased him, fair to say?
10 A.  Yeah.
11 Q.  So Mr. Kapuscinski is hit by at least one dart.
12      Kapuscinski and the female split apart.  The female
13      leaves the room.  Mr. Kapuscinski falls on the ground
14      and is on his back, correct?
15 A.  Correct.
16 Q.  You then tell him, "Turn over now, turn over now,"
17      correct?
18 A.  Correct.
19 Q.  When does Mr. Kapuscinski get back up?  Does he get
20      back up after you tell him to turn over?
21 A.  Yes.
22 Q.  Tell me about that.
23 A.  He just stood back up.  I told him to turn over so I
24      could handcuff him.  He didn't listen to those commands
25      either and then stood back up.

Page 83

1           MS. FORBUSH:  It's freezing in here.  69
2       degrees?  No wonder why we're freezing.
3           MR. WEGLARZ:  That's a cold 69 too.  I don't
4       think that's just the regular 69.  I think that's 67.
5  BY MR. WEGLARZ:
6  Q.  How much time goes by from the time that he falls on
7       the ground and is on his back until the time that he's
8       now standing up?
9  A.  I don't know.
10 Q.  A second, 20 seconds, a minute?
11 A.  Definitely less than a minute.
12 Q.  Can you give me anything better than that or anything
13      more approximate than that?
14 A.  I cannot.
15 Q.  Do you recall telling Mr. Kapuscinski, "Roll over now
16      or I'm going to tase you again"?
17 A.  I think that was on the audio.
18 Q.  And that's your voice, right?
19 A.  Yeah.
20 Q.  When you told Mr. Kapuscinski to "roll over now or I'm
21      going to tase you again," was this before he got back
22      up or after?
23 A.  It would have been before he got up.
24 Q.  Do you know how soon after you give him that
25      instruction does he get back up?

Page 84

1  A.  I don't know.
2  Q.  When he's lying on his back, are his eyes open?
3  A.  I don't recall specifically looking at his eyes at that
4       point.
5  Q.  Where do you think you would have been looking?
6  A.  I think he was moving, so his arms and legs.
7  Q.  And do you recall where on the floor in the room he's
8       positioned?
9  A.  I do not.
10 Q.  Let's pull out that Exhibit Number 4.
11 A.  Somewhere -- somewhere in this area.
12 Q.  Why don't you --
13 A.  If I could use your pen.
14 Q.  Why don't you put an X to show where Mr. Kapuscinski is
15      lying on the floor on his back.
16 A.  Somewhere in this circle there.
17 Q.  You put an X with a circle around it.  And where would
18      his head be?  Where is his head facing?
19 A.  I don't know on that.  I'd be guessing.
20          MS. FORBUSH:  Don't guess.
21 BY MR. WEGLARZ:
22 Q.  All right.  You can't tell me if it was -- if his head
23      was closer to the bed there or if his head was --
24 A.  I couldn't guess.  He was moving.  These ones I was
25      very certain.  These ones he is moving, so I don't

Page 85

1    know.
2         MS. McGIFFERT:  And, I'm sorry, Officer
3    Robinson.  You're saying these ones where you put the K
4    and the B --
5         THE WITNESS:  Yes.
6         MS. McGIFFERT:  -- you were more certain.
7         THE WITNESS:  I was certain with those.
8    These ones I couldn't say.
9         MS. FORBUSH:  Can we take a short restroom
10   break, please?
11        MR. WEGLARZ:  Yeah, give me one second.
12        MS. FORBUSH:  It's been almost two hours.
13        MR. WEGLARZ:  Okay.  That's fine.
14        (At 11:52 a.m., recess taken)
15        (At 12:06 p.m., Exhibit 10 marked and back on
16        the record)
17   BY MR. WEGLARZ:
18   Q.   Now, Officer Robinson, I'm going to show you Exhibit
19        Number 10.  This is a page from the data report taken
20        from your Taser.  I'm assuming you've seen this before.
21   A.   I have not seen this.
22   Q.   Well, there's a lot of firsts in this deposition.
23        You're seeing it now for the first time.
24        MS. FORBUSH:  Well, maybe you should ask him
25        if he's ever seen a Taser data download before.  Not

Page 86

1        just that one, but any one.
2    BY MR. WEGLARZ:
3    Q.   Well, based upon my understanding of this report and my
4        understanding of the sync that was done that you'll see
5        at the end of the entries there, this data is telling
6        us that your Taser was fired four consecutive times for
7        periods of five, six, five, and five seconds.  Would
8        you have any reason to disagree with that?
9         MS. FORBUSH:  Object to foundation.
10        MS. McGIFFERT:  I join.
11        THE WITNESS:  I don't know.  I don't know
12   anything about this.  I don't know how to read it or
13   anything.
14   BY MR. WEGLARZ:
15   Q.   Sure.  If that document is telling us that you fired
16        your Taser four separate times during your interaction
17        with Mr. Kapuscinski, does that -- do you agree or
18        disagree with that?
19   A.   That's probably not wrong.  I know I fired once when I
20        got the one probe on him, and I recall two more.  But
21        maybe a third, an extra one then.
22   Q.   Okay.  You wouldn't disagree with that if the data's
23        showing that there were four firings total.
24   A.   I would not disagree.
25   Q.   Okay.  And when you were pressing the trigger, each

Page 87

1    time that you pressed the trigger on your Taser, you
2    were -- you intended to charge Mr. Kapuscinski with
3    another tase, correct?
4         MS. FORBUSH:  Well, I'm going to object to
5    the form.
6         MR. WEGLARZ:  Noted.
7         THE WITNESS:  When I was pulling the trigger
8    the additional times, it wasn't connected, so I know it
9    wasn't working, so that's probably why I kept pulling
10   it.
11   BY MR. WEGLARZ:
12   Q.   So you kept pulling it knowing it wasn't connected,
13        right?
14   A.   Correct.
15   Q.   And why would you do that?
16   A.   I would assume just the stress of the situation.
17   Q.   What were you hoping would happen by pulling that
18        trigger?
19   A.   Don't know.  I was hoping something would change, it
20        would work.
21   Q.   Are you familiar with a drive stun?
22   A.   Yes.
23   Q.   What's a drive stun?
24   A.   It's where you take it and you make -- take the Taser
25        and make contact with that person.

Page 88

1    Q.   That's where you can still give them a charge, right,
2        and you can give them a stun by physically placing the
3        Taser up against the person's skin, right?
4    A.   Correct.
5    Q.   And if you wanted to do that, even though you didn't
6        have the two darts connected, you could still do a stun
7        drive, correct?
8    A.   Correct.
9    Q.   And what probes on your Taser would actually be
10        delivering the stun?  What part of your Taser would be
11        delivering that?
12        MS. FORBUSH:  Object to form.  Go ahead.
13        THE WITNESS:  If there was one barb in, that
14   one would get -- that one would get it, and then the
15   additional two from the front of the Taser would get it
16   too.
17   BY MR. WEGLARZ:
18   Q.   And when you say the two from the front of the Taser,
19        you're talking about -- what do they call those --
20        electrodes?
21   A.   I don't remember what they call them, but there's like
22        two pieces of metal off the front.
23   Q.   And do you know the distance between those two pieces
24        of metal?
25   A.   An inch or so, 2 inches maybe.

Page 89

1  Q.  And so what you can do is you can still fire and do
2      drive stuns even if you don't have the other probes --
3  A.  You could.
4  Q.  -- inserted.  Okay.  In fact, if you have one probe
5      inserted and you do a drive stun, you're really doing
6      another tase, right, because that completes the
7      circuit?
8  A.  It would complete the circuit, yep.
9  Q.  Have you ever been taught that you can also deploy the
10     darts real close range and then do a drive stun further
11     away from the dart deployment?
12 A.  Yes.
13 Q.  Okay.  Have you ever done that before?
14 A.  I have not.
15 Q.  When you deployed the darts on Mr. Kapuscinski, did you
16     do a real close range deployment?
17 A.  No.  I was standing at the distance we discussed
18     earlier.
19 Q.  Do you believe you drive-stunned Mr. Kapuscinski?
20 A.  I did not.
21 Q.  And you never took your Taser and applied it to him to
22     try to stun him?
23 A.  I did not.
24 Q.  Did your Taser ever touch Mr. Kapuscinski other than
25     the dart making contact as you testified?

Page 90

1  A.  I don't think so.
2  Q.  Did anyone drive stun Mr. Kapuscinski?
3  A.  No.
4  Q.  Did Officer Mitchell?
5  A.  He did not.
6  Q.  How soon after you deploy your Taser does Officer
7      Mitchell deploy his Taser?
8  A.  I don't know.
9  Q.  Seconds, minutes?
10 A.  Less -- I would assume -- I don't know.  Less than a
11     minute.
12 Q.  And do you recall hearing Officer Mitchell's Taser
13     being deployed on the audio from the police video?
14 A.  I don't recall hearing that.
15 Q.  You understand, though, that -- I think even the state
16     police, they made a timeline from that audio.  Are you
17     aware of that?
18 A.  Yes.
19 Q.  And do you know they have a time entry for the first
20     tase sound and the second tase sound?
21 A.  Yes, there is.
22 Q.  Okay.
23 A.  I don't know what it is, though.
24 Q.  Is it your understanding that the second tase sound
25     reflects the time -- or reflects the Taser from Officer

Page 91

1      Mitchell?
2  A.  Could you say the question again?
3          MS. FORBUSH:  If you need to look at the
4      report, look at the report.
5          THE WITNESS:  Okay.  I'm on the timeline now.
6      What was your question on the timeline?
7  BY MR. WEGLARZ:
8  Q.  My question was with respect to the second Taser, the
9      second tasing sound that's in that timeline, that
10     that's referring to Officer Mitchell's Taser.
11 A.  I don't know if they're referring.  It is listed at 4
12     minutes, 12 seconds in the audio, second Taser
13     deployment.
14 Q.  Are we going to hear more than one Taser deployment
15     from your Taser?
16         MS. FORBUSH:  Object to foundation.
17 BY MR. WEGLARZ:
18 Q.  Go ahead.
19 A.  I did pull the trigger.  Like myself, I recall three
20     times.  This report shows four.  I don't know what the
21     audio has.
22 Q.  Okay.  But even after you shoot the darts, if you pull
23     the trigger subsequent to that, you're going to hear
24     the exact same sound that you hear --
25 A.  No.  They're -- maybe you're referring to that first

Page 92

1      like that blast maybe?
2  Q.  Yes.
3  A.  Okay.  Yeah, mine would only make one blast.
4  Q.  And that's all you recall hearing during this
5      interaction, a blast from your Taser and then one blast
6      from Mitchell's Taser, correct?
7  A.  I don't ever recall hearing the blast.
8  Q.  Would it be dangerous to drive stun someone in the
9      chest area?
10         MS. FORBUSH:  Object to form, foundation.
11         THE WITNESS:  That would probably not be the
12     preferred target zone.
13 BY MR. WEGLARZ:
14 Q.  And why not?
15         MS. McGIFFERT:  Object as to foundation.
16         THE WITNESS:  Dart to heart, which we've
17     discussed at the beginning.
18 BY MR. WEGLARZ:
19 Q.  When Officer Mitchell deployed his Taser, did you see
20     where his laser was pointed?
21 A.  I did not.
22 Q.  Did Officer Mitchell's Taser hit Mr. Kapuscinski?
23 A.  It did.
24 Q.  Where?
25 A.  Left -- upper left chest and lower right abdomen.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**ROBINSON, OFFICER GARY KEITH**
07/18/2018                                                                Pages 93–96

Page 93

1  Q.  And when Officer Mitchell deployed his Taser, did it
2      seem to take effect?
3  A.  Yeah, he went down.  Straight down.  He was attempting
4      to stand, he got tasered.
5  Q.  And was he standing when he was tased by Officer
6      Mitchell?
7  A.  I don't think he was all the way up.  He was attempting
8      to stand up and --
9  Q.  So describe the position that Kapuscinski is in when
10     he's hit by Mitchell's Taser.
11 A.  I don't really have a memory of how close he was to the
12     ground or standing up completely.
13 Q.  He was in the process of standing up?
14 A.  Yes.
15 Q.  He was at least midway to the floor, if not higher?
16 A.  I don't know.
17 Q.  Were his knees bent?
18 A.  I don't recall.
19 Q.  Were you still pressing the trigger on your Taser when
20     Mitchell tased him?
21 A.  I don't recall.
22 Q.  Do you think that most likely happened?
23 A.  I have no idea.
24 Q.  And what would happen if you only have one barb in
25     Mr. Kapuscinski, but now we have Mitchell with two

Page 94

1      barbs in him?  If you press the trigger, will
2      Mr. Kapuscinski feel your tase?
3  A.  I would assume he wouldn't get anything.  There's no
4      circuit completed.
5  Q.  What if your barb or the wire to your barb is in
6      contact with either of Mitchell's barbs or wires?
7      Would that complete the circuit?
8          MS. FORBUSH:  Object to foundation.
9          MS. McGIFFERT:  Join.
10         THE WITNESS:  I don't know.
11 BY MR. WEGLARZ:
12 Q.  I'm going to show you Exhibit Number 8.  It's a photo
13     of Mr. Kapuscinski, post-incident of course.  Now, you
14     observed Mitchell's barbs -- when you said the upper
15     left chest, are you talking this area here?
16 A.  Yep.
17 Q.  These wounds that we see by this tattoo?
18         MS. FORBUSH:  Object to the form.
19         THE WITNESS:  It would only be one.  It looks
20     like maybe two or three --
21 BY MR. WEGLARZ:
22 Q.  Sure.
23 A.  -- so it would be something up here.
24 Q.  All right.  And then we also see a wound or set of
25     wounds on the lower right abdominal area there.  Is

Page 95

1      this the general area where you saw the other barb hit
2      from Officer Mitchell?
3  A.  I didn't see it hit there, but I remember when I was
4      doing CPR, my hands were here.  I remember --
5          MS. FORBUSH:  You're gesturing.  Can you say
6      where you're --
7          THE WITNESS:  I'm pointing right in the
8      middle of his chest at his sternum.
9  BY MR. WEGLARZ:
10 Q.  Yes.
11 A.  So I was doing CPR.  There was a probe above and a
12     probe below.
13 Q.  Okay.  And the probe above was in the area of the
14     tattoo that we just described, correct?
15 A.  Yes.
16 Q.  And the probe below is in the area of these wounds that
17     we see on the lower right abdominal.
18 A.  Correct.
19 Q.  And when you were doing CPR, was there a third probe?
20 A.  I think that's when Officer Mitchell told me I only had
21     one in him, but I don't remember seeing it.
22 Q.  Looking at Exhibit 8 again, you see a wound in the
23     middle of the chest there just below the sternum?
24 A.  Yep.
25 Q.  And then you see that faint wound --

Page 96

1  A.  Yep.
2  Q.  -- underneath it?  Any idea what that is?
3  A.  I have no idea.
4  Q.  Would that be consistent with a drive stun?
5  A.  No, I don't think so.  Nobody had given a drive stun,
6      so I don't know how he would get one.
7  Q.  Is it possible the two darts landed in the upper left
8      chest and then he was drive-stunned?
9  A.  Is it possible my darts or --
10 Q.  Mitchell's.
11 A.  -- Officer Mitchell's?
12 Q.  Yeah.
13 A.  No.
14 Q.  How far away was Mitchell when he deployed his Taser?
15 A.  I don't know.  I mean, you see how big the room was.
16     He was somewhere off to my left.
17 Q.  Was he just a couple feet away, 6 feet away, 8 feet
18     away?
19         MS. FORBUSH:  Lack of foundation.  He said he
20     didn't know.
21         THE WITNESS:  I don't know.
22 BY MR. WEGLARZ:
23 Q.  Was he still in that circle that you diagrammed for us?
24 A.  I don't know where he was when he -- he was somewhere
25     to my left, but I don't know where he was.

Page 97

1 Q.  So he could have been outside of that circle.
2 A.  Could have been, yeah.
3 Q.  Was he closer to Mr. Kapuscinski than he was before
4      when he deployed the Taser?
5           MS. FORBUSH:  Object to form, foundation.
6           THE WITNESS:  He only deployed it once.
7 BY MR. WEGLARZ:
8 Q.  Right.
9 A.  I don't know if he -- actually, can you go ahead and do
10     the question again?
11 Q.  Sure.  Did he actually get closer to Mr. Kapuscinski
12     when he deployed his Taser, closer than he was before?
13 A.  Oh, I don't know.
14 Q.  Were you surprised that Officer Mitchell tased
15     Mr. Kapuscinski?
16 A.  No.
17 Q.  Did you ask him to?
18 A.  I did not.  I didn't have to.
19 Q.  Is it an appropriate use of force to tase someone for
20     not rolling over for you?
21           MS. FORBUSH:  Object to form.
22           THE WITNESS:  Strictly just not rolling over?
23 BY MR. WEGLARZ:
24 Q.  Yes.
25 A.  Probably not.

Page 98

1 Q.  That would be excessive, correct?
2 A.  Could be, yeah.
3 Q.  And when you listened to the audio to the scout video,
4      did you hear you or Officer Mitchell ever say that
5      Mr. Kapuscinski was threatening you?
6           MS. FORBUSH:  Object to form.
7           THE WITNESS:  I don't recall that.
8 BY MR. WEGLARZ:
9 Q.  Would you agree with me that Mr. Kapuscinski never
10     threatened you?
11          MS. FORBUSH:  Verbally?  I'm just trying to
12     clarify.
13          MR. WEGLARZ:  Yeah.  No, you're trying to
14     testify, but that's all right.  Clarify and testify.
15 BY MR. WEGLARZ:
16 Q.  You agree with me Mr. Kapuscinski never threatened you.
17 A.  Verbally he did not.
18 Q.  Well, how did you know to say verbally?  I'm just
19     curious.
20 A.  Well, he wasn't listening to my commands, he was still
21     progressing towards us.  We told him to stay down or
22     get off of her, which he didn't do, roll over, which he
23     didn't do, so he never listened to any commands.
24 Q.  Yeah.  After he was hit with your dart, he never said
25     anything again after that, did he?

Page 99

1 A.  I don't recall.
2 Q.  Did he ever threaten you physically nonverbally?
3 A.  He was getting back up.  I would assume he was trying
4      to kill his girlfriend.  Now she's gone, he's still
5      coming towards us.  I take that as a threat.
6 Q.  And is that the reason why you continued to press the
7      trigger on your Taser?
8 A.  I continued to press it under stress and knowing it
9      wasn't working and just being in stress.  Pull, pull,
10     pull, nothing's happening at all.
11 Q.  But each time that you pulled, you pulled because you
12     were hoping to tase him with it, right?
13 A.  Correct, and it didn't work any of the times.
14 Q.  If your Taser was working during those times, would you
15     agree that it would be excessive force to have
16     Mitchell's Taser get involved?
17 A.  If I would have -- if mine would have been working, he
18     wouldn't have had to.  He would have been down on the
19     ground.
20 Q.  And if -- if Mr. Kapuscinski was being drive-stunned,
21     it would be excessive force to get Mitchell's Taser
22     involved, would you agree?
23 A.  If he was drive force?
24 Q.  Drive-stunned.
25          MS. FORBUSH:  Do you mean if Robinson was

Page 100

1      drive-stunning him?
2           MR. WEGLARZ:  Yes.
3           MS. FORBUSH:  Okay.
4           THE WITNESS:  If mine was working and then he
5      got involved?
6 BY MR. WEGLARZ:
7 Q.  Yes.
8 A.  That would have been probably -- there would be no
9      reason to do that.
10 Q.  And if you would have drive-stunned, it would have
11     tased him because you still had one probe in him,
12     correct?
13 A.  Correct.
14 Q.  It would have worked like a regular tase.
15 A.  Correct.  I just didn't want to get that close to him.
16 Q.  And the reason why tasing went on beyond your initial
17     deployment was because he started to get back up and
18     you guys felt threatened.
19          MS. McGIFFERT:  Object as to form,
20     foundation.
21          MS. FORBUSH:  Join.
22          THE WITNESS:  Well, he wasn't getting
23     tasered.  I was pulling the trigger, but he wasn't --
24     no charge was delivered to him with just one probe.
25 BY MR. WEGLARZ:

ROBINSON, OFFICER GARY KEITH
07/18/2018

Pages 101–104

Page 101

1 Q. But he was tased by Officer Mitchell.
2 A. He was.
3 Q. And the reason for that was because he tried to get
4    back up and --
5 A. I assume to assault us.
6 Q. Why didn't you drive stun him if your Taser wasn't
7    working?
8 A. I didn't want to get close to him.
9 Q. And why?
10 A. Well, I seen that he was trying to kill the girlfriend.
11 Q. Yeah.
12 A. I would assume that he wasn't going to shake my hand.
13    He was going assault me, you know, maybe choke me or
14    take my weapon, my firearm, so try to keep some sort of
15    distance if I can.
16 Q. Why not draw your firearm?
17 A. I just didn't.
18 Q. Right.  Because the Taser wasn't working --
19 A. Yep.
20 Q. -- so why not use the firearm, especially when you
21    thought he was now going to physically harm you?
22 A. I don't have an answer.
23 Q. Did anyone ask you about these other wounds on
24    Mr. Kapuscinski's body and question you about where you
25    deployed your Taser?

Page 102

1 A. I don't think so.
2 Q. Did anyone ask you how far away you were from
3    Mr. Kapuscinski or where did the probes land?
4 A. No.
5 Q. Did you ever find the other probe?
6 A. No.
7 Q. Did you look for it?
8 A. I don't think so.
9 Q. In the audio someone is telling Dispatch 15, "We're
10    secure now."  What does that mean?
11 A. Our station is Station 15, so I don't know if that was
12    me or Officer Mitchell saying 15 -- "Station 15, we're
13    secure."
14 Q. And 15 represents what?
15 A. Gibraltar Police Department.
16 Q. And what is a trained police officer like yourself
17    supposed to do if after someone is tased they are no
18    longer breathing?
19 A. Provide assistance, medical assistance.
20 Q. Which would be what?
21 A. If they're not breathing, CPR.
22 Q. And how would you carry that out?
23 A. I would like to have a rescue mask or a -- it's called
24    a BVM, some sort of device to give breaths, and then
25    compressions on the chest.

Page 103

1 Q. And did you do that?
2 A. Officer Mitchell left the apartment to go get his mask,
3    and I started chest compressions.  I think that was
4    right when a Trenton police officer walked in.
5 Q. Did you check his vitals after he was tased?
6 A. We were monitoring him.  He went down, he wasn't
7    responding to his name.  I had to figure out what his
8    name was.  He wasn't responding.  I put him like into
9    like a recovery on a side position.  Rubbed his sternum
10    to try to, you know, wake him or see if he was, you
11    know, faking.  He didn't respond to either of those.
12        I checked his pulse.  I think Officer
13    Mitchell said, "Hey, I don't think he's breathing," and
14    I think then I checked his pulse.  He had a pulse.
15    Probably shortly after then, Officer Mitchell went and
16    got a mask.  Checked -- I'm sure I checked his pulse
17    again because then I started CPR.
18 Q. When did you first check for a pulse or his
19    respirations?
20 A. You want me to look at the timeline for the state
21    police or just --
22 Q. I don't know if the timeline from the state police
23    gives it, but --
24 A. I think it had something on there.
25 Q. Would you have checked it right after he was tased?

Page 104

1 A. No.
2 Q. And why not?
3 A. You wouldn't suspect that.  You'd have to check that.
4    You wouldn't --
5 Q. When Mr. Kapuscinski was tased by Officer Mitchell, he
6    was hit with, what, a five-second charge?
7 A. I don't know how long.  I would assume he got five
8    seconds, but I don't know.  I haven't seen their data
9    either.
10 Q. Was he hit -- do you know if the trigger was pressed
11    more than once?
12 A. I think it was just once.
13 Q. And it took immediate effect, right?
14 A. Yes.
15 Q. And he didn't respond after that, did he?
16 A. No.
17 Q. Did you ever check his breathing to see if he was even
18    breathing?
19 A. Yeah.  Officer Mitchell -- well, he was breathing.  We
20    didn't see anything originally.  I put him onto his
21    side, like I said, just trying to make sure that he's
22    awake.  I didn't know if he was trying to play possum.
23    Did the sternum rub.  That wasn't working, and that's
24    when we turned him over and Officer Mitchell said,
25    "Hey, I don't think he's breathing."  That's when I

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 105

1   checked his pulse.
2   Q.   Officer Mitchell mentioned that he didn't think he was
3        breathing in conjunction with what?  What event?  What,
4        if anything, happened?  You turned him over?
5   A.   I must have, yeah.
6   Q.   Turned him over from what to what?
7   A.   He was laying on his side.  I don't know which side.
8        But I had him in like a recovery where you put him on
9        his side, put a leg out so they're not facedown.  I
10       think they call it positional asphyxiation.  I just
11       made sure he wasn't resting on his chest completely.
12  Q.   Before you put him in the recovery position, I take it
13       you handcuffed him?
14  A.   I did.
15  Q.   Did you cuff him right after Mitchell tased him?
16  A.   Yes.
17  Q.   All right.  And what position was Mr. Kapuscinski in
18       before you went to go cuff him?
19  A.   I think he was on -- I think he was on his back and I
20       had to roll him.  I started to handcuff and then roll
21       him.
22  Q.   And you rolled him onto his stomach?
23  A.   Yes.
24  Q.   And then you cuffed him?
25  A.   It was kind of all in the same motion.

Page 106

1   Q.   And then once you cuffed him, what position did you
2        leave him in?
3   A.   I think that's right when I put him -- I think he was
4        probably chest down, and then I moved him into the
5        recovery at that point after that.
6   Q.   Okay.  How long did you leave him in the chest-down
7        position?
8   A.   Oh, I don't know.
9   Q.   He was still in the chest-down position when the
10       Trenton PD arrived?
11  A.   No.  I was already doing CPR I believe.
12  Q.   Did you look at any of the Trenton PD records?
13  A.   Pardon?
14  Q.   Did you look at any of the Trenton PD records?
15  A.   No.  I think there is a report around here.  I haven't
16       read it, though.
17  Q.   Do you remember us talking about it the last deposition
18       that one of them thought that Mr. Kapuscinski was on
19       his back and wasn't breathing when he walked in?
20  A.   I do remember you talking about it.  I don't remember,
21       you know, specifics on it.
22  Q.   So is it likely that CPR really wasn't started until
23       after the Trenton PD arrived?
24  A.   No, I think I was doing it.  As the officer walked in,
25       I was doing CPR I think already.

Page 107

1   Q.   So after you cuffed him, you basically left him in the
2        chest-down position for a period of time before you
3        came back to put him in the recovery position, right?
4            MS. FORBUSH:  Object to form.
5            THE WITNESS:  I never left him.  I was
6        standing --
7   BY MR. WEGLARZ:
8   Q.   Right.  You were next to him, but he remained in the
9        chest-down position.
10  A.   Yes, briefly.  I don't know how long that would have
11       been, though.
12  Q.   And after you cuffed him, did you check his
13       respirations or pulse?
14  A.   I do remember Mitchell just saying, "Hey, I don't think
15       he's breathing," after I had him.
16  Q.   That was a while later, right?
17  A.   Yeah, I don't know what the timeline was on that.
18  Q.   I'm talking about right after you cuffed him, did you
19       check for respirations or a pulse?
20  A.   No.
21  Q.   And you know how to check for that, right?
22  A.   Correct.
23  Q.   You were an EMT back then?
24  A.   Correct.
25  Q.   When was the first time you checked his respirations or

Page 108

1        pulse?
2   A.   Whenever Officer Mitchell said, "Hey, I don't think
3        he's breathing."
4   Q.   And that was?
5   A.   That's the first time I physically, but as he was
6        laying there, originally he was facedown, I didn't see
7        any issues.  Everything looked normal.  It looked like,
8        you know, his chest was -- or his chest wouldn't have
9        been moving, but his back was coming up and down.
10  Q.   And where do you see that?  What report is that in?
11  A.   No, that's just what I remember from my head.
12  Q.   Oh.  Are you looking at a report?  Because I thought
13       you were reading it.
14  A.   Nope.  This is the state police one and this one's --
15  Q.   Sure.
16  A.   -- Exhibit 3, Robinson.
17  Q.   But eventually you did check his pulse and
18       respirations, right?
19  A.   Yes.
20  Q.   Okay.  And that was when Mitchell said, "Hey, I don't
21       think he's breathing."
22  A.   Correct.
23  Q.   And that was right after you rolled him from the
24       chest-down position.
25           MS. FORBUSH:  Object to form.

Page 109

1        THE WITNESS:  I don't know if it was right
2     after.
3  BY MR. WEGLARZ:
4  Q.  Around that time.
5  A.  It was after, yep.
6  Q.  Well after?  Minutes?
7  A.  Oh, I don't know.
8  Q.  And when you checked his respirations, were they zero?
9  A.  I don't recall.  I just remember him saying, "Hey, it
10    doesn't look like he's breathing," so I immediately
11    just went for a pulse.  I think it was on the right
12    side of his neck.
13 Q.  And what was his pulse?
14 A.  It felt like a normal pulse.
15 Q.  And a normal pulse is what?
16 A.  Maybe 60 to 80 beats --
17 Q.  And he had a 60 to 80 beat pulse at that time?
18 A.  Yeah.  It didn't feel like it was crazy at that point.
19 Q.  Did it ever get crazy?
20 A.  That's the only time, you know, I checked it.  It felt
21    normal.  I didn't check it before when he was screaming
22    or anything.
23 Q.  Do you guys have an AED?
24 A.  I have one in my car.
25 Q.  So if he needed to use that, you could have -- well, do

Page 110

1     you even know how to use an AED?
2  A.  Yes.
3  Q.  And when are you supposed to use an AED?
4  A.  Probably heart arrhythmia.
5  Q.  Well, how would you know if someone's walking around
6     with a heart arrhythmia?
7  A.  I guess you wouldn't.
8  Q.  If someone has a respiratory arrest, then you apply it
9     to see if it tells you to use it, correct?
10 A.  Well, you could, yeah.
11 Q.  And don't they tell you in these tasing trainings that
12    you have that once you tase someone you should check
13    them to make sure that they're still okay?
14 A.  I believe they say monitor, yeah.
15 Q.  Look for their vital signs, check their vital signs,
16    correct?
17 A.  I don't know if it says check vitals.  I think it says
18    monitor.  I know when we do voluntary exposures, you
19    know, keep a buddy with you to monitor them.  It seems
20    like monitor keeps coming up.
21 Q.  As an EMT if you have someone who's been tased and is
22    not responsive, one of the first things you're going to
23    do is check the vital signs, right?
24 A.  You would eventually.  You know, my primary position is
25    a police officer, so once I'm making sure that I'm

Page 111

1     safe, my partner's safe, the girl he was trying to kill
2     is safe, then maybe some of those things start coming
3     along.
4  Q.  Sure, sure.  And, of course, your primary position is
5     being a police officer, but the department requires you
6     to be a licensed EMT.
7  A.  Yeah.
8  Q.  Because they know you're going to use those skills out
9     in the field, correct?
10 A.  Correct.
11 Q.  And I take it in the Taser trainings they teach you
12    that if you use this Taser on people, sometimes you may
13    have to give some first aid, correct?
14 A.  You could.
15 Q.  Right.  And so you better be ready to do it because
16    when you tase someone, they may require first aid after
17    that, correct?
18 A.  The first aid I think they believe is just, you know,
19    CPR.
20 Q.  Yep.  And CPR being the very first thing that you can
21    do for somebody, correct?
22 A.  Correct.
23 Q.  And if you see someone who's not responsive after being
24    tased, that's one of the things you have to be thinking
25    about, maybe you have to start giving CPR.

Page 112

1  A.  Which we did.
2  Q.  Did Officer Mitchell appear under the influence of
3     alcohol?
4  A.  He did not.
5  Q.  Do you know why they give him a breathalyzer?
6  A.  I do not.
7  Q.  What were the results of your breathalyzer?
8  A.  I did not take one.
9  Q.  Did you refuse?
10 A.  I was not offered one.
11 Q.  Do you feel kind of slighted that they only offered him
12    the breathalyzer but not you?
13 A.  Not at all.
14 Q.  Have you ever heard of that, where they're giving
15    breathalyzers to officers right after a run?
16 A.  I've heard of critical incidents people getting, you
17    know, tested, make sure they're not -- usually they're
18    driving, but I don't know.
19 Q.  Would this be a first for you hearing that that
20    happened in this case?
21 A.  I heard about it last -- a couple three weeks ago.
22 Q.  That's the first time you heard of that.
23 A.  I think so.
24 Q.  Do you know if Officer Mitchell was consuming alcohol
25    within the 24 hours before this incident?

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 113

1  A.  I have no idea.
2  Q.  When you were at this scene, you believed that
3      Mr. Kapuscinski defecated on himself, true?
4  A.  Originally I did.  Or not on himself.  Just I saw the
5      pile, I thought maybe something --
6  Q.  You thought it was him.
7  A.  Yeah.
8  Q.  After he was tased.
9  A.  No, I thought -- I thought he did that before we got
10     there, like used the room as a bathroom.
11  Q.  Do you recall the audio from the video where it's
12     either you or Mitchell you can hear, "Did he shit
13     himself?"
14  A.  Probably because maybe he fell into it or something, so
15     I don't know.
16  Q.  But do you recall that being said?
17  A.  Yes.
18  Q.  Was that you?
19  A.  Yes.
20  Q.  And then right after, you say, "He fucking shit himself
21     there."  Do you remember that?
22  A.  Yes, but I think I was referring to -- it was there
23     before we came in.  The feces was in the room before we
24     came in, so I don't know if that was something that
25     they were doing before we were even called.

Page 114

1  Q.  But at the scene, you thought the feces were from him.
2  A.  I did originally.  Later on I talked to the girl and
3     found out it was from her while still at the scene.
4     This was after I think they took him.
5  Q.  According to the scout car video, it's not until right
6     after the Trenton PD come on the scene that there's now
7     a mention that he's not breathing.
8  A.  Okay.
9  Q.  Does that seem to jive with your recollection?
10  A.  When they were on scene or --
11  Q.  Yep.
12  A.  -- when they were in the apartment? I don't know.
13     Because I would assume once they got there, it would
14     take them --
15  Q.  It's a few seconds to get in.
16  A.  I don't know if the door was open or someone had to let
17     them in or --
18  Q.  But do you recall no one's really even mentioning or
19     discussing or even thinking that he's not able to
20     breathe until after the Trenton PD arrive?
21  A.  No, I think that was before.  The Trenton PD wasn't in
22     the room when Officer Mitchell mentioned that, and at
23     that point I think we'd already called for -- or he
24     called for our fire department, and then I may have
25     called for Brownstown somewhere in there.

Page 115

1  Q.  Now, I want you to assume that the audio shows that
2     about 4 minutes and 12 seconds into the video we hear
3     the second Taser sound.
4  A.  Okay.
5  Q.  And then eight seconds later we hear you saying, "Roll
6     over now" or "I'm going to tase you again."  Do you
7     have any idea as to what you're referring to there?
8  A.  Officer Mitchell tasered him, he went down.  He must
9     have been on his back.  Then I started handcuffing
10     because he wasn't thrashing like he was before.
11  Q.  Well, did he roll over for you?
12  A.  No.
13  Q.  So how did you get him?
14  A.  I just grabbed an arm.
15  Q.  You just rolled him over?
16  A.  Yeah.
17  Q.  Wasn't that hard, was it?
18  A.  I don't know.
19  Q.  You were able to do it without having to tase him,
20     right?
21  A.  Correct.
22  Q.  When did you first talk to the mom?
23  A.  The mom?  I don't know if I talked to anyone's mom.
24        MS. FORBUSH:  Are you talking about
25     Ms. Beneteau?

Page 116

1  BY MR. WEGLARZ:
2  Q.  Yeah, sorry.
3  A.  Oh, I don't know if it's on this audio here.  You want
4     me to look at this?  It would have been after -- it
5     would have probably been after the fire department took
6     Kapuscinski.  Or maybe during going, "Hey, what's his
7     name?"  I think I was yelling, "Hey, what's his name,
8     what's his name?"  So somebody told me his name.  I
9     guess it was David.
10  Q.  Did she appear injured at all to you?
11  A.  She had a couple bruises.  I think there was bruises on
12     her face, but I remember asking her if she was okay.
13     "Yeah, I'm okay."  She was very calm, which was very
14     odd.  She minimized any sort of injuries that she did
15     have.
16  Q.  Okay.  Now, someone mentioned that she had to be taken
17     to the hospital for something to get a surgery or to
18     get something done?
19  A.  Yep.
20  Q.  What was that?
21  A.  I'm kind of just going off what I heard.  I don't know
22     if this is in here at all, but apparently she was, you
23     know, like ripped from her anus up from when he was
24     taking the feces out of her anus with his -- both his
25     hands, so I believe she needed some stitches.  And they

ROBINSON, OFFICER GARY KEITH
07/18/2018

Page 117

1 took her to the hospital, and as I recall, she just
2 left the hospital. She didn't want to have the surgery
3 done.
4 Q. Who took her to the hospital for that?
5 A. I don't know.
6 Q. It was a police officer, right?
7 A. I have no idea.
8 Q. How did you hear about this?
9 A. I was secluded, but I could just -- you know, I could
10 hear people, "All right, we're taking her, she's doing
11 this."
12 Q. You talked to her about what happened, right?
13 A. Yes.
14 Q. Did she tell you that --
15 A. She did not.
16 Q. -- that happened to her?
17 A. She told me that he took both his hands or fists, put
18 them in her anus, took the feces out and threw it on
19 the ground, but she never mentioned that she was -- had
20 anal tearing or ripping.
21 Q. All right. And, of course, when you are at the scene
22 before the tasing, you didn't know about this, right?
23 A. I didn't know that he had brutally raped her or any of
24 that stuff before I tasered.
25 Q. Okay. And you didn't know that he had his hands or

Page 118

1 fingers in her anus, correct?
2 A. Did not know that.
3 Q. You never observed him doing that, correct?
4 A. Correct.
5 Q. You just observed him with his legs around her neck,
6 right?
7 A. Choking her to death, yep.
8 Q. And I'm not trying to minimize that, I'm not.
9 A. Just the legs around the neck.
10    MS. McGIFFERT: Just.
11 BY MR. WEGLARZ:
12 Q. I probably shouldn't have said just. And before you
13 did the tasing, you didn't know or you didn't hear
14 about him assaulting or making physical contact with
15 either of the kids, fair to say?
16 A. I did not know that either at the time.
17 Q. Do you have any idea as to what would cause that wound
18 there in Exhibit 8 right in the middle?
19 A. Not a clue. I think he had a lot of wounds on him.
20 Q. From?
21 A. I have no idea.
22 Q. Other than the wounds you described for me or showed
23 for me that appeared to be from the Tasers, any other
24 wounds in the photos that I showed you on
25 Mr. Kapuscinski that you think could be from anything

Page 119

1 else? Anything, whether it's a Taser, whether it's
2 something from CPR, whatever. Whatever the cause of
3 the source.
4 A. I don't know -- I mean, I'm looking at some of these
5 pictures here. I have no clue.
6 Q. Okay.
7 A. No guess.
8 Q. Would you agree that when you arrived on the scene, it
9 caused the little girl to really become frightened and
10 panicky?
11 A. I don't know what caused her. I assume listening to
12 mom and boyfriend go at it probably worked her up.
13 Q. You didn't hear her screaming before you knocked on the
14 door, did you?
15 A. I don't think so.
16 Q. And do you recall -- I think it's the little girl --
17 did the boy ever come inside during this interaction?
18 A. I don't know. I don't know where he was at.
19 Q. Do you recall the little girl asking for the police not
20 to kill him?
21 A. I do not.
22 Q. Do you recall the child asking how long she'll be taken
23 away for?
24 A. I do not.
25 Q. Did you think Mr. Kapuscinski was high?

Page 120

1 A. He appeared that he was high on something. I kind of
2 felt with the female's reaction, Beneteau, she was high
3 on something too.
4 Q. And do they give you any training on tasing people who
5 appear to be high or under the influence of drugs?
6 A. I don't know if there's a specialized training in that.
7 Q. Do you have any understanding that certain drugs can
8 make tasing more dangerous to people?
9 A. I don't know which certain drugs they would be, though.
10 Q. Have you heard that that could be true?
11 A. I think that's listed as one of the warnings.
12 Q. One of the warnings in the --
13 A. Taser --
14 Q. In the warnings provided by the manufacturer?
15 A. Yes. I'll have to double check those.
16 Q. While you're doing that, I want to make sure we're on
17 the same page. I'm going to show you Mitchell Number
18 1. This was the Taser International warning or
19 instructional sheet. Have you seen that document
20 before?
21 A. Yes.
22 Q. And you are aware of that document and the warnings
23 cited in that document even before the incident
24 involving Mr. Kapuscinski?
25 A. Yes.

Page 121

1    Q.   Other than talking to the female, the girlfriend and
2         the little girl's mother, that all being one person,
3         did you talk to any other witnesses at the scene?
4    A.   I talked to the daughter and the son of Ms. Beneteau.
5    Q.   And it was during those discussions that they gave you
6         those written statements?
7    A.   Probably right afterwards.
8    Q.   And can you tell me anything that they told you that is
9         not reflected in their written statements?
10   A.   I'd have to refer to the report real quick and their
11        statement.
12   Q.   If that's what you need to do.
13   A.   Actually, I think you might -- there we go.  In
14        reference to Angelo -- well, in reference to all three
15        of them actually, I mean, they were all pretty
16        reluctant to answer any questions.  In my report he
17        woke up, heard yelling, went out to see what was
18        happening, saw David naked but went back in his room.
19             After being on scene, I spoke with him again.
20        Angelo stated David punched him at least once, and I
21        asked if David stepped on his neck, and he was unsure.
22        I think the mom, Christina Beneteau, said, you know, he
23        knelt on his neck.  David knelt on Angelo's neck.  In a
24        statement that he wrote, "He was mad about something.
25        He hit me."  He was saying he was breaking stuff.  "He

Page 122

1         stepped on my neck and punched me in the head."
2              So Alice, she was reluctant also, like I
3         said.  She wanted to know if he was going to jail.
4         Said she saw David swinging his arm at her mother and
5         kept calling her the B word.  And in her written
6         statement, "I woke up, seen hands moving, called my
7         Tina" -- must be mom -- "the B word.  That's what I
8         heard the commotion" or the -- I don't know what that
9         is.  "Started throwing things.  Angelo came in, then
10        went into Angelo's room," and then I came.  So neither
11        of them had a whole lot to add.
12   Q.   Mr. Kapuscinski never hit you, correct?
13   A.   Correct.
14   Q.   Mr. Kapuscinski never hit or struck Officer Mitchell,
15        correct?
16   A.   Correct.
17   Q.   Officer Mitchell's Taser did hit him in a non-preferred
18        target, fair to say?
19   A.   Correct.
20   Q.   And when he deployed his Taser, Kapuscinski was
21        actually standing up.  I mean, preferred targets were
22        available, correct?
23        MS. FORBUSH:  Object to form.
24        THE WITNESS:  He was attempting to stand.  He
25        was defying all of our orders to stay down, get off.

Page 123

1         He wasn't listening to any of our commands.
2    BY MR. WEGLARZ:
3    Q.   But he was struck with a Taser while he was standing
4         up, correct?
5    A.   Attempting to stand, yep.  He was a moving target too.
6    Q.   Well, he was on his feet by this time, correct?
7    A.   Yeah, I don't know what degree of standing he was in,
8         but he was attempting to stand.
9    Q.   But he was at least on his feet?
10   A.   Yes.
11   Q.   And he had preferred targets available, correct?
12   A.   I don't know what the angle was, if he would have had
13        something preferred or -- I don't know.
14   Q.   Well, if someone's on their feet, you would they think
15        their legs are exposed, correct?
16   A.   Could be.  I don't know where his arms were, though.  I
17        just don't recall.
18   Q.   But the legs are one of the preferred targets, right?
19   A.   Correct.
20   Q.   And we know, obviously, the lower abdomen was available
21        because that's where one of the probes hit, correct?
22   A.   I don't know if it was available, or he was just moving
23        and ended up getting there, so --
24   Q.   Do you recall Mr. Kapuscinski moving at all just prior
25        to that Taser being deployed?

Page 124

1    A.   Yes.  He was attempting to stand.
2    Q.   Okay.  Tell me the difference in movements that you
3         observed.
4    A.   I don't really recall.  You know, just him coming off
5         the ground to try to stand up.  I couldn't say which
6         foot or which hand or where his knee was or none of
7         that.
8    Q.   Okay.  But both feet were on the ground.
9    A.   I believe so.  That's all I have from memory on that.
10   Q.   Were both hands off the ground?
11   A.   I don't know.
12   Q.   And he was already starting to raise up?
13   A.   Starting to stand up, yep.
14   Q.   And his torso would have been parallel to the floor or
15        --
16   A.   Somewhere bent, but I don't know.
17   Q.   Do you think it was somewhere between being parallel to
18        the floor and being bent over like that --
19   A.   Bent down?
20   Q.   -- at less than 90 degrees?
21   A.   Bent down?
22   Q.   Yeah, over.
23   A.   No, that doesn't make sense if he got hit in the front.
24        I don't recall, but just by looking at if he got hit,
25        he definitely wasn't bending down.

ROBINSON, OFFICER GARY KEITH
07/18/2018                                                              Pages 125–128

Page 125

1   Q.   So he's likely somewhere between 90 and 180 degrees,
2        his upper torso.
3   A.   **Yeah, it would have to be.**
4   Q.   With both feet on the ground?
5   A.   **I think so.**
6   Q.   And you can't tell me what angle his legs would be, his
7        knees?
8   A.   **I don't remember any of that.**
9   Q.   Do you know if Officer Mitchell was -- had to point
10       somewhat downward with the Taser?
11  A.   **I do not know.**
12  Q.   Are you trained to try to shoot it perfectly level?
13  A.   **No.  You shoot from different angles.**
14  Q.   All right.  That's all I have.  Thanks for your time.
15            MS. McGIFFERT:  I need to take a quick
16       two-minute break.  I know you have a time restriction,
17       counsel --
18            MR. WEGLARZ:  Sure.
19            MS. McGIFFERT:  -- so I'm going to take just
20       a quick two-minute break, and I may have a few
21       questions.
22            (At 12:59 p.m., recess taken)
23            (At 1:02 p.m., back on the record)
24                 CROSS-EXAMINATION
25  BY MS. McGIFFERT:

Page 126

1   Q.   Officer Robinson, I have just a few questions for you.
2        I know that during your previous testimony you had made
3        circles on that diagram, that photograph that was
4        presented to you --
5   A.   Correct.
6   Q.   -- indicating that you were somewhere in the circle and
7        that there was another circle that you know that
8        Officer Mitchell was somewhere in that circle.
9   A.   Yes.
10  Q.   Is it fair to say that with regard to where Officer
11       Mitchell was in the room when you initially entered and
12       even when he deployed his Taser, is it fair to say that
13       you were primarily focused on Mr. Kapuscinski and in,
14       fact, his victim when she was in the room more so than
15       on exactly where Officer Mitchell was in the room?
16  A.   Definitely.
17  Q.   Okay.  And you made a point earlier, and I just want to
18       make sure that I understand it, about I think you said
19       that this event was different than a practice exercise,
20       is that true?
21  A.   Yes.
22  Q.   And so at a practice exercise you may have a target,
23       whether it's a live one or not live one, correct, in
24       terms of aiming?
25  A.   Yes.  This was rapidly evolving life and death, whereas

Page 127

1        the other one's just a picture of somebody on a piece
2        of cardboard --
3   Q.   Okay.
4   A.   -- that doesn't move.
5   Q.   Okay.  And this particular instance when you deployed
6        your -- well, let's talk about when Officer Mitchell
7        deployed his weapon.  Was, in fact, the target, meaning
8        Mr. Kapuscinski, moving?
9   A.   Yes.
10  Q.   Was it what you would consider to be a stressful
11       situation?
12  A.   Absolutely.
13  Q.   Was it a situation that was changing second by second?
14  A.   Even faster.
15  Q.   Okay.  And as opposed to a target or even a
16       volunteer -- a police officer volunteer who's agreed to
17       take a tase, in this particular instance were you
18       dealing with an individual who had visibly shown to you
19       that he was assaultive?
20  A.   Oh, yeah.  He was trying to kill his girlfriend.
21  Q.   Okay.  Did you consider him to be potentially
22       dangerous?
23  A.   Highly dangerous.
24  Q.   Okay.  I don't have anything further.  Thank you.
25  A.   Thank you.

Page 128

1                 REDIRECT EXAMINATION
2   BY MR. WEGLARZ:
3   Q.   If you're involved in a situation that you believe was
4        a matter of life and death, aren't you trained to use
5        lethal force?
6   A.   You can.
7   Q.   Well, what does the training tell you to do?
8   A.   You can elevate to lethal force if you need to.
9   Q.   Well, don't they tell you to do that?  Hey, if now
10       someone's life is on the line, it's time to bring out
11       lethal force.
12  A.   You don't have to enter at lethal force.
13  Q.   Well, you don't have to, but what are you trained to
14       do?
15  A.   Stop the threat, which we did with the use of Tasers.
16  Q.   But if you believe your life is in danger or
17       someone's -- someone else's life is in danger, you're
18       supposed to meet that force, such as you're supposed to
19       use lethal force to counter that, correct?
20  A.   I don't know if you're supposed to.  You can.
21  Q.   How many times have you encountered an unarmed person
22       who was uncooperative with an arrest?
23  A.   Several.
24  Q.   And how many times have you had to tase that person?
25  A.   None, except for --

**ROBINSON, OFFICER GARY KEITH**
07/18/2018

Pages 129–130

Page 129

1  Q.  Right.

2  A.  -- Kapuscinski.

3  Q.  And how come you didn't tase those other individuals if

4      they were being uncooperative with your arrest?

5  A.  I was able to -- maybe I was already too close.  I

6      mean, there's all kinds of scenarios.  But if I'm maybe

7      doing an arrest, I'm handcuffing them, I'm already

8      close, they start to pull away and struggle, I'm not

9      going to disengage and then Taser.  I'm just going to,

10     you know, latch right on them.

11 Q.  And your diagram showing the approximate location of

12     Officer Mitchell, that is based upon what you recall,

13     correct?

14 A.  Correct.

15 Q.  All right.  And you do recall -- you do recall him

16     being there, you do recall his laser coming out of his

17     Taser and being directed at Mr. Kapuscinski and other

18     things, correct?

19 A.  I recall just seeing it.  I don't know what it was -- I

20     just remember seeing it.

21 Q.  All right.  That's all I have.  Thanks.

22 A.  Thanks.

23          MS. McGIFFERT:  Nothing from me.

24          MS. FORBUSH:  You're all done.

25          (At 1:07 p.m., proceedings concluded)

Page 130

1              C E R T I F I C A T E

2  STATE OF MICHIGAN )
                     ) SS.
3  COUNTY OF WAYNE   )

4          I certify that this transcript, consisting of

5      pages, is a complete, true, and correct record of

6      the testimony of OFFICER GARY KEITH ROBINSON held in

7      this case on Wednesday, July 18, 2018.

8          I also certify that prior to taking this

9      deposition, OFFICER GARY KEITH ROBINSON was duly sworn

10     to tell the truth.

11         IN WITNESS WHEREOF, I have hereunto set my hand

12     on this 26th day of July, 2018.

13

14

15

                    LEAH M. WITT, CSR-8825

16

   My Commission expires     Notary Public, County of Wayne
17 December 27, 2023            State of Michigan
18                            U.S. Legal Support
                              30800 Telegraph Road
19                         Bingham Farms, Michigan 48025
20
21
22
23
24
25              130

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

# GIBRALTAR POLICE DEPARTMENT
## Taser Policy
### Section #28

### Section 28.1- Purpose

The purpose of this policy is to provide guidelines for the appropriate use of a Sharpe Pulse Generator weapon referred to as the X26 Taser. This policy establishes guidelines for the use of force and ensures proper training for all personnel of the Department as it relates to the use of the taser.

### Section 28.2- Definitions

1. **Taser-** is a Shape Pulse generator weapon that is categorized as non-deadly force or less lethal force weapon. It transmits electrical pulse that causes an uncontrollable contraction of the muscle tissue, which cause temporary physical debilitation to a person.

2. **Less Lethal Force-** is defined force that is less likely to result in death or serious physical injury. The force is used when deadly force is not justified and/or necessary, but when empty hand control techniques have been or will likely be ineffective in the situation.

3. **X26 Shaped Pulse Generator-** is a Muscular Disruption Unit (MDU) device that transmits electrical pulse that causes an uncontrollable contraction of the muscle tissue, which cause temporary physical debilitation to a person.

4. **Anti-Felony Identification Device (A.F.I.D.) -** are small Identification tags that are like confetti, when they are ejected as the weapon is discharged.

5. **Air Cartridge-** is a small container that contains compressed nitrogen, A.F.I.D. tags, two darts and insulation wires.

6. **Data Port-** is an outlet that allows information to be uploaded to a computer.

### Section 28.3- Taser is an Additional Tool

1. The taser is an additional law enforcement tool and is not intended to replace firearms, or replace other tools or techniques. The taser should be used only when it is appropriate for the situation present. The use of a
2. taser is considered as Use of Force and shall comply with the Use of Force guidelines.



EXHIBIT
ROBINSON
1
ΣN   7·18·18
PENGAD 800-631-6989

**Section 28.4- Taser Training**

1.    No Officer of the Department shall carry a taser unless he/she has successfully completed a Department approved training course. The training shall consist of a minimum of four hours to be certified and training once a year to maintain certification.

**Section 28.5- Department Tasers and Carrying Procedures**

1.    Only a Department issued taser shall be carried on duty or used.

2.    Officers shall inspect the taser prior to carrying the taser during his/her tour of duty. Only properly functioning and charged taser shall be carried on duty.

3.    At the beginning of each shift, the officer shall spark test the unit by removing the cartridge from the device, and test the X26 Taser to ensure that it is properly charged, and by turning the unit on and verifying the unit has a power supply on the CID. The officer shall make a log entry on his/her daily log that a test was performed.

4.    The officer shall record on their daily log the quick reference number of the taser unit carried on his/her tour of duty.

5.    Spare cartridges and X26 tasers will be stored in the police gun locker. Additional cartridges shall be available from the Chief of Police or his designee.

6.    Officers can remove the spare cartridge from the extended magazine while carrying the taser. The cartridge shall be placed back in the magazine at the end of the officer's shift and appropriate log entries made.

7.    The officer shall carry the taser in a department-approved holster.

**Section 28.6- Taser Uses**

1.    Officers may use an approved taser when they are required to use physical force to take a person into custody, to protect himself/herself from physical assault, to protect a subject from injuring himself/herself or others, and against animals who pose a serious threat towards others.

2.    Any subject that is tased, shall be placed under arrest for a criminal offense or transported to a medical facility for mental health evaluation.

3. If a Gibraltar police officer is assisting another agency and tases a subject, that subject, shall be turned over to the agency requesting the assistance of the Gibraltar Police Department.

## Section 28.7- Taser Prohibited Uses

1. Officers should avoid any of the following situations:

   A. Aiming at a person's head, neck or groin area

   B. Using a taser if subject is a known pregnant female

   C. Using a taser if the subject is saturated with or is in the presence of highly flammable material or liquid

## Section 28.8- Prior to Using a Taser on a Subject

1. Prior to the use of a taser, the officer, if tactically possible, shall give the subject verbal persuasion and commands. The officer shall inform the suspect that if he/she does not comply he/she will be shocked. Officers may also inform others of his/her intentions to discharge the taser weapon.

## Section 28.9- Accidental Discharge

1. An Officer that discharges a taser other than the test function prior to deploying the taser for his/her tour of duty, either intentional or accidental shall notify the Sergeant as soon as possible. If the Sergeant is not available then the officer shall notify the Chief of Police or his designee as so as possible.

## Section 28.10- After Using a Taser on a Subject

1. The officer shall handcuff the subject as soon as it is tactically practical to minimize the threat of injury to the subject and/or his/her self.

2. If the taser's air cartridge was deployed, the officer shall at the earliest opportunity remove the taser darts from the subject. The officer shall wear protective latex gloves when removing and handling the discharged probes. Only a taser certified officer should remove the taser darts (probes). If the probes are stuck in the facial area, soft tissue around the neck, genital area or the breasts of a female, hands or feet only qualified medical personnel shall remove them.

3. Unless a subject is hit with an accidental taser discharge, all tased subjects will be treated as a police prisoner.

4. The officer shall visually examine the areas struck by the probes to determine if an injury was sustained. The officer may provide first aid to the subject following the removal of the probes, the officer may apply alcohol wipes, and a Band-Aid to the probe sites as needed. The officer may provide the tased subject with medical attention, at any time during or after the arrest, if the officer feels that the subject is in need of medical attention (i.e. Gibraltar fire rescue and or transport to a medical facility).

5. Officers shall inspect the probes after removing them from the subject to ensure that a probe, or probe barb has not broken off and is still embedded in the subject's skin. If the probe or the probe barb has broken off in the subject's skin, the officer shall make sure the subject is provided appropriate medical attention to remove the object.

## Section 28.11- Collection of Evidence

1. The officer that discharges the weapon shall be responsible to collect a minimum of three of the A.F.I.D. tags, the spent cartridge, and the darts and shall place them into evidence. The taser probes removed from the subject's body shall be considered a biological hazard and handled in accordance with Department's Bloodborne Pathogens policy.

## Section 28.12- Report Required

1. When an officer either intentionally or accidentally uses the taser, even if the subject was not struck, he/she shall prepare a departmental incident report.

## Section 28.13- Storage

1. The X26 Taser shall not be stored near flammable liquids or fumes and the air cartridges shall not be stored near any source of static electricity.

2. When department tasers are not being carried, the taser shall be stored in the department police equipment room gun locker.

## Section 28.14- Maintenance and Care

1. Only the Chief of Police or his designee shall maintain and replace air cartridges by their expiration date. The expired air cartridges shall be used for training purposes only.

2. The Chief of Police or his designee shall be responsible for the following:

    A. Receiving, inspect and ensure the maintenance and replacement of the X26 Taser devices assigned to department personnel.

B. Establish and maintain systems to record issuance of the X26 Taser and cartridges.  Serial numbers shall be recorded.

C. Maintain an adequate supply of batteries and air cartridges.

D. Return defective or damaged X26 Taser devices and cartridges to Michigan Taser Distributing.

E. Obtain service and/or replacement for defective or damaged X26 Taser components from Michigan Taser Distributing.

F. Provide re-certification training to certified users.

G. Review copies of the "Taser X26 Deployment Report" for completeness, and forward copy to Michigan Taser Distributing.

H. Maintain training updates from Michigan Taser Distributing.

I. Investigate each incident and ensure the proper forms are submitted.

**Section 28.15- Excessive Force**

1. Officers shall use the X26 Taser in accordance with Departmental Use of Force Policies.  Use of excessive force may subject an officer to disciplinary action including termination of employment and/or prosecution.



**City of Gibraltar**
Public Safety Department

GIBRALTAR POLICE DEPARTMENT GENERAL ORDER

| SUBJECT | | | |
|---|---|---|---|
| POLICE USE OF FORCE/FIREARMS | | | |
| DATE OF ISSUE | EFFECTIVE DATE | | NUMBER |
| 10/20/95 | IMMEDIATELY | | 95-7 |
| RESCINDS | AMENDS | EXPIRATION DATE | TOTAL PAGES |
| | | | 14 |

I.      PURPOSE

The purpose of this order is to establish policy and procedure regarding the appropriate and acceptable use of force, to provide for a high degree of officer safety, and to provide for the treatment of any injury or complaint of injury arising from the use of force.

II.     DEFINITIONS

A.    "Control" is the method/methods an officer uses to neutralize the unlawful actions of a subject, or to protect the subject from injuring himself or others.

B.    "Resistance" is defined as the subject's attempt to evade an officer's attempts to establish control.

C.    "Force" is the attempt to establish control through physical means, in the presence of resistance. all force is a means of control, however, control can at times be achieved without the use of physical force.

D.    "Non-lethal Force" is that amount of force that will not likely result in death or serious physical injury.

E.    "Lethal Force" is that amount of force that could result in death or serious physical injury.

F.    "Minimum Amount of force" is that amount of force that is reasonably necessary to overcome the resistance offered and to effect the lawful performance of duty.

G.    "Reasonableness" means within reason, moderate action suitable to the situation, consistent with department approved training and policies. The final decision as to the reasonableness of a police action will be determined on a case by case basis by those members of the department called upon to review the appropriateness of those tactics or actions, based on what a "reasonable" officer would have done under like circumstances.

H.    "Last Resort" situations are those wherein certain immediate and drastic measures must be undertaken by an officer in order to protect human life. Force used in these situations may involve the use of techniques or

EXHIBIT
ROBINSON
2
XW 7·18·18
PENGAD 800-631-6989

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
|---|---|
| SUBJECT: POLICE USE OF FORCE/FIREARMS | |
| DATED: 10/20/95 | PAGE 2 OF 14 |

weapons not covered by policy, however, they remain to
be tested by "reasonable" and "necessary" use of force
standards.

### III.   POLICY

It shall be the Policy of this Department to employ the
minimum amount of force, reasonable and necessary, to
overcome the resistance offered, effect a lawful arrest,
and/or accomplish the lawful performance of duty while
protecting the public.

The use of unreasonable, unnecessary force, and/or the
failure to provide proper medical treatment following the
use of force, shall, in every case, result in certain and
severe disciplinary action against those who use or allow
the use of such force, or fail to provide for the care of
persons in custody.

### IV.   AUTHORIZATION FOR THE USE OF FORCE

A.   Michigan statutes deal with the legal levels of force
that law enforcement officers may use in the normal
performance of their duties. It should be emphasized that
when consent or an emergency is not present, and there is
not probable cause to make an arrest, the non-consensual
touching by a police officer may constitute a crime, as well
as result in civil liability. When probable cause exists,
criminal and civil liability may still occur if the limits
of the law are exceeded.

B.   During an officer's tour of duty it may be necessary to
use some level of control to effect an arrest or to protect
others. In many situations control may be achieved without
the use of physical force. In other instances, based on the
resistance offered, the officer may find it necessary to use
varying levels of physical force to control the subject's
actions. That amount of force may be as low as placing a
hand on a subjects shoulder or arm and directing that
subject to place their hands in an appropriate position in
order to apply handcuffs. The amount of force would be
considered "mere physical contact".

However, depending on the level of resistance offered, the
officer may use techniques that may rise to a level of
physical force that is intended to influence behavior



| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
|---|---|
| SUBJECT: POLICE USE OF FORCE/FIREARMS | |
| DATED: 10/20/95    PAGE 3 OF 14 | |

through pain compliance, in order to establish control. These techniques would consist of touch pressure, leg/hand strikes, impact weapons, or even the use of firearms if justified by the resistance offered.

V.      LEVELS OF CONTROL

A.   For purposes of this policy, the use of force will be examined from two (2) perspectives; resistance and control. Both resistance and control can be in the form of verbal responses (subject) or directives (officer), or physical actions.

B.   Resistance is defined as the subject's attempt to evade an officer's attempt to control. The amount and type of resistance will vary based on a variety of factors. For purposes of this policy, the department recognizes the following levels of subject resistance and their definitions:

Psychological Intimidation--Non-verbal cues indicating a subject's unwillingness to comply with control, through apparent resistive attitude, appearance, and physical readiness to resist.

Verbal Non-Compliance--Verbal cues indicating a subject's unwillingness to comply with control, through resistive statements, threatening statements, or other "fighting words".

Passive Resistance--Physical actions that do not prevent an officer's attempt at control, but fail to assist, in that control. An example is "dead weight".

Defensive Resistance--Physical actions which attempt to prevent an officer's attempts at control, but do not attempt to harm the officer. Examples include pulling away or locking the body in a fetal posture.

Active aggression--Unarmed physical actions which attempt to harm the officer. Examples include punches and kicks.

Aggravated Active Aggression--Armed assault upon the officer.
C.   Control is the method an officer uses to neutralize the

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
|---|---|
| SUBJECT:   POLICE USE OF FORCE/FIREARMS | |
| DATED:   10/20/95 | PAGE   4   OF   14 |

unlawful actions  of a subject, or to protect a subject from
injuring themselves or others.  The type od  control methods
used  will  vary  based  on  a  variety of factors.  For the
purposes  of  this  policy,  the  department  recognizes the
following levels of control and their definitions.

Officer Presence--The  control manifested by the presence of
an officer, whether uniformed or not, on the scene.

Verbal Direction--The control  manifested  by  the officer's
use of spoken commands and directions.

Soft Empty  Hand Control--The  use of  empty hand techniques
that are unlikely to  result in  physical injury.   Examples
include control holds and pressure point touch pressure.

Hard Empty  Hand Control--the  use of  empty hand techniques
that have an increased  likelihood of  resulting in physical
injury.  Examples include punches, strikes and kicks.

Soft Intermediate Weapon Control--The use of an implement to
effect control, in a  manner that  is unlikely  to result in
physical  injury.   Examples  include handcuffs and aerosol
subject restraints.

Hard Intermediate Weapon Control--The use of an implement to
effect  control,  in  a  manner  that manifests an increased
likelihood  of  physical  injury.   Examples  include baton
strikes.

Lethal  Force--The  use  of  an implement or technique, in a
manner that is  reasonably  likely  to  result  in death or
serious  bodily  harm.   Examples  include  firearms, motor
vehicles and impact weapon strikes to the head or throat.

VI.        USE OF FORCE PROCEDURES

A.   Officers  should  assess  the  incident  in   order  to
determine the  level of  control that  would be appropriate.
When possible,  officers should  attempt to  gain control by
means of verbal directives or commands.

B.   If  verbal  directives  or commands are ineffective, or
not feasible given the  circumstances of  the situation, the
officer may find it necessary to escalate to control methods
that involve  the  use  of  physical  force.   If  force is

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
|---|---|
| SUBJECT: POLICE USE OF FORCE//FIREARMS | |
| DATED:  10/20/95        PAGE   5   OF   14 | |

necessary, the officer must decide which technique(s) or
authorized equipment will best de-escalate the incident and
bring it under control in a safe manner.

C. Officers are authorized to use department approved
control techniques and authorized equipment for resolution
of incidents as follows:

    1. To stop potentially dangerous and unlawful
       behavior.
    2. To protect the officer or another from injury or
       death.
    3. To protect subjects from injuring themselves.
    4. And, in the process of effecting a lawful arrest
       when subject offers resistance.

VII.     LETHAL FORCE PROCEDURES

    A.   AUTHORIZED USE OF LETHAL FORCE

The use of lethal force is considered a measure of "Last
Resort" as defined under Section II. H., and is limited to
the following situations:

    1. to protect the officer or another person from what
    is reasonably believed to be an immediate threat of
    death or serious physical injury;
    2. to prevent the escape of a subject who is fleeing
    from an inherently violent felony crime, and the
    officer has probable cause to believe that the subject
    poses a significant threat of death or serious physical
    injury to the officer or others.

Whenever any one of the two conditions described above
are present, where feasible, officers shall identify
themselves and provide a warning before the force is
applied.

    B.   USE OF LETHAL FORCE PROHIBITED

Lethal force may not be used in the following situations,
except as a "Last Resort", as defined under Section II., H.
of this policy:

    1. when it appears likely that an innocent person may
    be injured;
    2. to shoot at or from a moving vehicle. This tactic

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER:  95-7 |
|---|
| SUBJECT:  POLICE USE OF FORCE/FIREARMS |
| DATED:  10/20/95                    PAGE  6  OF  14 |

                    seldom, if ever proves effective and poses a
                    significant risk to innocents;

3.     solely because a subject fails to stop for a
        blockade or roadblock, or fails to obey a command
        to stop;

4.     to fire "warning" shots, or shots to attract
        attention.

## VIII.   LETHAL FORCE CONSIDERATIONS

A.   Court cases addressing the use of force by police officers.

1. Tennessee vs. Garner  471 US  1 (1985).  A U.S. Supreme Court decision which stated that deadly force is not constitutionally reasonable to prevent the escape of all felony suspects, especially where they pose no immediate threat to the officer and no threat to others.  A police officer may not "seize" an unarmed, non-dangerous felony suspect by shooting him dead.  However, when an officer has "probable cause" to believe that the suspect is armed with a weapon or poses a threat of serious physical harm, either to the officer or to others, deadly force may be used if necessary to prevent the escape of the suspect.

2.  Delude vs. Raasakka 391 Mich (1974).  This Michigan case concluded that the police have the right to use the force reasonable under the circumstances to effect a lawful arrest. The police may also take what action is reasonable to protect themselves in the course of an arrest or an attempted arrest.

3.  Alexander vs. Riccinto, 192  Mich App  69 (1991).  This Michigan Court of Appeals case stated that a police officer making a lawful arrest may use that force that is reasonable in self-defense circumstances and is not required to retreat before a display of force by an adversary.  The officer must have a reasonable belief of great danger before responding with the appropriate amount of force to foreclose the threat.

4.  Graham vs. Connor 490 US 386 (1989).  This U.S. Supreme Court case analyzed police conduct in a force situation.  The court said that police conduct must be examined to determine whether the officers actions are objectively reasonable in light of the facts and circumstances confronting the officer, without regard to their intent or motivation.  This is to be judged from the perspective of the officer on the scene.  The analysis of

| | | | |
|---|---|---|---|
| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | | | 95-7 |
| SUBJECT: POLICE USE OF FORCE/FIREARMS | | | |
| DATED:   10/20/95 | PAGE 7 | OF | 14 |

reasonableness takes into consideration the facts and circumstances including:

     A.   Severity of the crime at issue

     B.   Whether the suspect poses an immediate threat to the safety of the officer and others

     C.   Whether he is actively resisting arrest or attempting to evade arrest by fleeing the scene.

In this case, the U.S. Supreme Court stated that if there is a right to make an arrest, there is a right to use some physical force. Also, that the reasonableness standard must make an allowance for the fact that police officers are often forced to make split second judgements in circumstances that are tense, uncertain, and rapidly evolving.

**IX.**     ESCALATION AND DE-ESCALATION OF FORCE

     A.   Escalation of force may be justified when the officer is convinced that the level of force being used is insufficient to stop or control the resistance.

     B.   Officers may escalate to the level of force that is "reasonable" and "necessary" to control the situation, based on the level of resistance encountered. As the subject begins to de-escalate or lessen the resistance offered, the officer must de-escalate in a similar manner, for example:

     1.   to control a passive subject, the officer wuld use a strength technique (mere physical contact) first. If unsuccessful, the officer will escalate one step higher to a pain compliance technique such as a pressure point or a joint lock, with consideration given to the potential for injury when escalating to each greater level.

     2.   as the passive rersister begins to comply with verbal commands, the officer would reduce the amount of pressure applied at the pressure points or joints.

     C.   This is not meant to imply the officer must ease all control. Control must be maintained, but the level of force used to maintain control must de-escalate to a level commensurate to the level of resistance currently offered by the subject.

GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: 95-7

SUBJECT: POLICE USE OF FORCE/FIREARMS

DATED: 10/20/95                    PAGE 8 OF 14

X.      VARIABLES THAT EFFECT THE FORCE CONTINUUM

The officer should consider the following variables when making a decision to escalate or when to de-escalate the level of control:

A.   Officer/Subject: size, physical abilities;

B.   Environmental Conditions: such as close or confined areas;

C.   Nature: of contact;

D.   Exigent Conditions: number of officers, number of subject involved, availability of back-up;

E.   Reaction Time: the officer must consider that action is faster than reaction; thus the officer must pay attention to the above factors when preparing for a course of action.

F.   Reactionary Gap: officers should be cognizant of, and utilize, a reactionary gap during all police contacts. The reactionary gap is defined as a safety zone between the officer and subject which affords the officer more time to react to aggression:
1. the average distance is six feet or more;
2. varies with type of weapon the subject may possess;
3. the officer always has two "Reactionary Options" available:
   a. penetrate the gap to attempt control;
   b. disengage to create distance.

XI.     MOTOR VEHICLES AS FORCE

A.   Officers must be aware, and acknowledge, that in many instances the motor vehicle can be viewed as an instrument of force.   Intentional collisions, partial or complete roadblocks, or other similar methods, techniques, or actions have been ruled to be the use of force.

B.   "Boxing in" maneuvers and so called "rolling roadblocks", create a high probability of contact between the officer's and subject's vehicle.   As a result, these techniques may also be considered a use of force.

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER:  95-7 |
| SUBJECT: POLICE USE OF FORCE/FIREARMS |
| DATED:   10/20/95                          PAGE   9   OF   14 |

C.  The use of any such methods, techniques or actions must be justifiable and in accordance with departmental guidelines.

D.  The use of any such methods, techniques or actions have a high probability of causing death or serious physical injury.  The use of any such methods, techniques or actions are therefore classified, in most situations, as the use of lethal force as defined in this order.

XII.     MEDICAL CONSIDERATIONS

A.  Officers using any degree of force on a subject shall make medical treatment available to that subject when:

1.  the subject requests medical treatment, or
2.  the subject complains of injury or continued pain, or
3.  any officer observes or suspects injury to the subject, or
4.  when directed by a supervisor or acting supervisor:

*   A second officer, preferable one not involved in the confrontation, should be designated to convey and monitor the subject at the hospital.

*   Any subject upon whom force is used should be monitored closely.

*   Persons exhibiting signs of unusual distress should be transported to a medical facility for treatment.

B.  Officers that provide a subject with medical treatment shall document same, along with the nature of the injury or complaint of injury, in the incident report and the Use of Force report form.

C.  Medical treatment will be provided at a licensed, accredited medical facility by a licensed, accredited physician.

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER:   95-7 |
|---|
| SUBJECT:  POLICE USE OF FORCE/FIREARMS |
| DATED:  10/20/95                    PAGE  10   OF   14 |

D.    Officers who provide a subject with medical treatment shall, prior to removing the subject from the medical facility, receive written authorization from the attending physician to do so.

E.    Officers involved in a use of force incident shall apprise the desk supervisor of the circumstances and nature of injuries.

XIII.    INVESTIGATION OF USE OF FORCE

A.    The desk supervisor will thoroughly review every incident in which an officer uses force.

B.    After reviewing the circumstances surrounding the use of force, the supervisor shall submit a written report to the Chief of Police. The report shall contain the observations and conclusions of the supervising officer as to whether the use of force was justified and in accordance with departmental policy.

XIV.    DISPLAY OF FIREARMS

Firearms may be displayed and held in the "ready position" in the following situations:

A.    Where the use of firearms is authorized pursuant to this policy.

B.    Where the person to be apprehended has committed, or there is probable cause to believe the person to be apprehended has committed, a felony offense and the possibility of confrontation with deadly force exists, based on the:

1.    Severity of the charge;
2.    Individual or number of individuals to be apprehended;
3.    Credible information received concerning weapons and/or propensity for violence;
4.    Other circumstances under which the felony arrest may occur which renders the drawing or display of a firearm a reasonable precaution.

      PROVIDED, in either case that:
      Conditions are such that drawing or displaying a firearm can be accomplished without reasonable

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
|---|---|
| SUBJECT: POLICE USE OF FORCE/FIREARMS | |
| DATED:   10/20/95   PAGE  11   OF   14 | |

risk of accidental discharge. Firearms shall not be displayed or drawn in any misdemeanor or civil arrest.

C.   This policy does not prohibit an officer from placing his hand on the grip portion of his weapon during the initial stages of a traffic stop or when confronting individuals at a crime scene while determining their threat level to the officer.

D.   Officers in plain clothes, whether on duty or off duty, shall make every effort to conceal their weapon from public view when away from the confines of the police station and not involved in any authorized weapon display situation.

XV.        DEADLY FORCE, OTHER THAN FIREARMS, PROHIBITED

Deadly force may consist of the use of items, articles, instruments, or equipment other than firearms which are designed, intended and routinely utilized for other legitimate, police-fire purposes, such as vehicles, batons, flashlights, etc. Deliberate use of any such item, article, instrument or equipment for any purpose other than for which it is designed and intended, or in a potentially deadly manner (i.e. as a club), is prohibited except in cases where the use of deadly force is specifically authorized in this order.

XVI.        SURRENDERING OF FIREARMS

A.   No officer shall display or provide any weapon to a citizen to inspect, examine or otherwise handle.

B.   No officer shall furnish their firearm to any citizen or civilian enlisting their assistance in any way.

C.   Due to the fact that the individual officer must make the ultimate decision as to the safety of others and their own personal safety, any decision to surrender the weapon shall be solely in the discretion of the officer.   Most officer safety studies show that the officer has a better chance of survival if he does not surrender his weapon.

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
|---|---|
| SUBJECT: POLICE USE OF FORCE/FIREARMS | |
| DATED: 10/20/95 | PAGE 12 OF 14 |

### XVII.  OFF-DUTY USE OF FIREARMS

It shall be the policy that sworn officers are not required to be armed while off duty. However, the department administration realizes that most officers will in fact, carry a firearm while off duty.

All officers that do carry a firearm off duty, will only carry a department issued duty weapon, department issued off duty weapon, or a personally owned weapon approved by the Firearms Instructor. All officers wishing to carry a gun off duty must first qualify with a passing score at least once in a calender year in the presence of the Department Firearms Instructor. If armed and off duty, officers are still governed by all department policies regarding use of force, lethal force, and subject to discipline for any violations of the policies. Officers are reminded that outside the City of Gibraltar, officers cannot arrest for misdemeanors committed in their presence. Best course of action is for the officer to be a "good witness" for the jurisdiction in which the incident occurred.

### XVIII.  DESTRUCTION OF ANIMALS

Officers may use firearms to destroy severely injured, vicious or rabid animals, which are menacing persons or other domestic animals provided other reasonable means of apprehension are not available or feasible. Such destruction requires that it can be accomplished in complete safety with regard to other persons and property. Domestic animals are, in reality, personal property and in instances where feasible, a written request and/or waiver for the destruction of the animal should be obtained and maintained as part of the incident report.

### XIX.  REPORTING THE DISCHARGE OF FIREARMS

A. Any officer who discharges his weapon or uses deadly force for whatever reason shall prepare a department "Firearms Discharge Report", in addition to a complaint report. This department report is for administrative use only. A copy will be maintained in the officers permanent personnel file. The desk supervisor is responsible for assuring the report is completed and turned over to the Chief of Police prior to being relieved of duty.

| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: 95-7 |
| SUBJECT: POLICE USE OF FORCE/FIREARMS |
| DATED: 10/20/95      PAGE 13 OF 14 |

B. In all cases, except involving animals, where an officers weapon is discharged on duty or off duty and a person is struck with a department weapon or projectile, the Chief of Police will be notified immediately.

XX. PROCEDURES

A. Should an officer be personally involved in using deadly force, the desk supervisor is responsible for calling in another officer to relieve the involved officer on road patrol duties. The department detective will be called in also to initiate an investigation and interview witnesses.

B. Officer(s) involved will be afforded the opportunity to confer with a police union representative and/or an attorney prior to completing the required police reports. Refusal to complete required department reports will subject an officer to immediate suspension without pay.

Should the required reports be completed, the officer will automatically be placed on what will be called "administrative leave", (sent home with pay pending determination of status by the Wayne County Prosecutors Office and/or the Chief of Police).

Officers charged by the Wayne County Prosecutor for alleged crimes involving the use of force shall be suspended without pay, upon issuance of a warrant and until the outcome of the case has been determined.

Officers charged with a crime will be required to turn in the department issued equipment, weapon, handcuffs, radio and identification, for safekeeping until the case has been adjudicated by the appropriate court.

XXI. OFFICERS ASSIGNED TO OTHER AGENCIES

Officers of this department assigned to or assisting other law enforcement agencies/mutual aid teams will be guided by this policy.

XXII. APPLICATION

This order constitutes department policy, and is not intended to enlarge the employee's civil or criminal liability in any way. It shall not be construed as the

| | |
|---|---|
| GIBRALTAR POLICE DEPARTMENT GENERAL ORDER NUMBER: | 95-7 |
| SUBJECT: POLICE USE OF FORCE/FIREARMS | |
| DATED: 10/20/95          PAGE 14 OF 14 | |

creation of a higher legal standard or safety or care in an evidentiary sense with respect to third party claims insofar as the employee's legal duty as imposed by law.

XXIII.   COMPLIANCE

Any officer who violates any section of this General Order regarding Police Use of Force, subjects himself to department discipline, up to, and including termination.

*Chief Paul A. Lehr*

Chief Paul A. Lehr

**15-1217 – 04/16/2015 – OFC. ROBINSON:**

**INFORMATION:**

On 4-16-2015 at approximately 0322 hours I was dispatched to 14680 Middle Gibraltar Road for a domestic in progress. Dispatch advised the caller was a 10 year old boy and he would be waiting outside to let me in. At the time of the call I was speaking with Officer Mitchell from the Rockwood Police Department at Carlson High School and I requested that he assist me.

**INVESTIGATION:**

I arrived at the scene within minutes and discovered a juvenile male standing outside the apartment complex, he would later be identified as Angelo Beneteau. Angelo advised his mother and her boyfriend were fighting upstairs and I asked if it was verbal or physical. Angelo stated it was both. I then walked to the second floor of the apartment complex and knocked on the door of apartment 16. A juvenile female answered the door and she was crying, she would later be identified as Alice Beneteau. I asked where they were fighting and she pointed to a back bedroom. Alice was screaming and asking if he was going to jail as I proceeded to the bedroom. While making my way to the bedroom I could hear groaning coming from the bedroom. I was unsure if the groans were from a male or female.

I opened the bedroom door and discovered a completely nude male and a female wearing only a shirt on the bed, they would later be identified as David Kapuscinski and Christina Beneteau. The two were lying facing each other but his head was at her feet and her head and neck were between his thighs. The man was squeezing the female's neck and she was not breathing normally. She was making a gasping noise. The room was very messy with clothing and garbage on the floor. Near the bed I observed two piles of what appeared to be feces. The man was making an odd growling noise and I gave him verbal commands to let the woman go. The man was covered in sweat and he had a crazed look on his face. His eyes were open very wide and the whites of his eyes were red. The man kept yelling, "I'm going to kill her!". After multiple commands to let her go and him yelling "I'm going to kill her!" I deployed my Taser. The man and woman immediately began to separate after deployment. The woman was able to get free from the man's grasp and get out of the bedroom. The man fell to the floor briefly but attempted to get up. The man's aggressive actions showed he continued to be a physical threat to myself and anyone in the apartment. I attempted to Taser the man again but it was not affecting the subject. I tried again but discovered the Taser probes were no longer attached to the man. Officer Mitchell then deployed his Taser as the man was attempting to stand up. The Taser was effective and I was able to start handcuffing the man. I handcuffed the man behind his back as the man laid on his stomach. Officer Mitchell requested medical response at this time.

After several seconds of the man not responding to officers calling him by name I began placing the man in a recovery position, on his side and with his left leg bent at 90 degrees. The man was still not responding and I rolled him completely on his back. I then attempted a sternum rub and the man did not react. It now appeared the man was not breathing but I was able to feel a pulse in his neck. I advised dispatch to request Brownstown Fire as they are an advanced life support unit. Officer Mitchell proceeded to his vehicle to get a breathing mask for CPR and I started chest compressions. After several cycles of chest compressions and rescue breaths the Gibraltar Fire Department arrived and took over medical care. An AED was applied in the bedroom and a shock was delivered. At this time medical responders carried the man out of the apartment on a stretcher. Brownstown Fire was now on scene.



15-1217
PAGE 2

**INTERVIEW:** Christina Beneteau – Victim

Christina stated she has been in a dating relationship with David since October 17th 2014. Christina stated she was sleeping in the living room with David and she could hear him breathing very loud so she attempted to wake him up.  She said he woke up very sexually violent and he forced his penis in to her mouth very hard.  Christina said it was against her will and he forced his penis into her mouth so hard that she threw up several times.  Christina said she was able to go into the bathroom away from David but he followed and began crying and hugging her.  Christina then said David dragged her into the bedroom where her son sleeps.  David then punched Angelo at least one time on the top of the head and kneeled on his throat.  Angelo was able to get free and left the room.  I asked about the feces that I saw on the floor and Christina said it was hers.  Christina said David put both his hands up her anus and pulled the feces out.  Christina also stated that was against her will.  I asked what was happening when I entered the room and she replied, "He was choking me."  Christina believes the entire incident lasted approximately 30-45 minutes prior to officers arriving.

**INTERVIEW:** Angelo Beneteau – Witness

Angelo was reluctant to answer any questions.  Angelo stated he woke up and heard yelling and went out to see what was happening.  Angelo said he saw David naked but went back into his room.

After being on scene longer I again spoke with Angelo.  Angelo stated David punched him at least once.  I then asked if David stepped on his neck at one point and he was unsure.  Angelo said he called 911 and went outside to wait for police.

**INTERVIEW:** Alice Beneteau – Witness

Alice was also reluctant to answer my questions and wanted to know if David was going to jail.  Alice said she saw David swinging his arms at her mother and kept calling her "The B word."

**WRITTEN STATEMENTS:**

I requested to have Christina, Angelo and Alice fill out written statements.  See attached statements.

**DISPOSITION:**

I contacted D/Sgt Hammar while on scene and he responded to the station.  See his supplement.

**SUPPLEMENT – 04/16/2015 – D/SGT HAMMAR**

At 4:05am I was requested by Officer Robinson to respond to his location to investigate an incident.  I arrived at 14680 M Gibraltar Rd Apt. #16 at approximately 4:30am and was advised of the events leading up to this incident.

15-1217
PAGE 3

I spoke with Christina Beneteau, the victim of what appears to be an unwanted sexual assault by her boyfriend David Kapuscinski. Chistina stated that she went to bed at approximately 10:00pm last evening, before her boyfriend went to bed. Christina stated that she woke up in the middle of the night (unknown time) and was listening to David who appeared to be having a nightmare.

Christina stated that at some point David began to force her to perform fellatio on him and had struck her in the face several times stating "Bitch you better do this" and "Bitch you better suck it right". Christina stated that she had to be soft trying not to hurt him and that she had vomited several times because he had pushed his penis so far into her throat. Christina pointed to her hair stating she still had vomit in her hair. Christina stated that this went on for 30 to 45 minutes before David allowed her to go to the bathroom.

Christina stated that while she was sitting on the toilet seat David came into the bathroom, got down on his knees and hugged her stating "Baby I'm sorry, I'm so sorry".

Christina stated that at some point David had "Grabbed my anus and ripped it open". Christina began to tell me how David (age 14) allegedly claims to have been sexually molested by a Southgate police officer who was kicked off the force. Christina stated she thought David might have ripped her anus because David was thinking about that incident.

Christina stated that she had met David at the Sav-Mor pharmacy located at 29255 W Jefferson in the city of Gibralter on August 17, 2014. Christina stated that David had been taking care of her children recently because she had been at a mental ward. Christina stated that she had just come home on Monday 4/13/15. Christina stated that David was good to her children, did not do drugs and was only on one current prescription.

Christina handed me a bottle of Omeprazole 20mg, that states "take 2 capsules (40mg) twice daily before a meal". The bottle states "May cause Dizziness". The bottle appeared to have been filled on 4/3/15 and was almost full.

Christina stated "I knew this was going to be the last time I was going to see him". I asked her what she meant by that statement. Christina stated "Well if he does this to me once, then there won't be a second time".

I then spoke with Christina's son Angelo. Angelo stated that he heard yelling and screaming coming from his mom and her boyfriend, stating that his mom and David would sleep in the living room. Angelo stated after approximately 30 minutes he walked outside where he could see the address on their apartment building and called 911 to ask for help. Angelo pointed to a hole in his bedroom wall and stated he had hit the wall in frustration at some point during the incident.

The hole in the plaster was about the size of Angelo's fist. Angelo pointed to (2) other holes in the plaster, stating that both were new holes caused by things that were being thrown around the

15-1217
PAGE 4

room when his mom and David had gone into his room after he left to call police. Angelo showed me a tablet that was lying near the bed plugged into a charging cord, and pointed out that the smallest hole in the plaster appeared to be caused by the corner of the tablet. I picked up the tablet and laid it on the bed observing one of the corners had been damaged.

Angelo stated that he stayed outside until the police arrived and did not go back into the apartment until they were taking David out the door on his way to the hospital. I spoke with Alice, Christina's daughter. Alice stated she heard yelling and screaming but never left her bedroom. Alice stated that she did not observe anything, she stayed in her bedroom.

Officer Robinson was still on scene while I was taking several photographs, he advised me that what appeared to be human feces was on the floor next to the bed in Angelo's bedroom. I located a spot on the wood floor next to Angelo's bed that appeared to possibly be smeared human feces. I took photographs of the suspected feces, the holes in the same bedroom wall and the other rooms around the apartment.

I advised Christina that I needed to go to Southshore Hospital to follow up with the condition of David; I was preparing to leave the apartment when Officer Robinson stated that he had called our department union president (Officer Steve McInchak) to advise him of the incident, stating that our dispatcher had confirmed that David had been pronounced dead at Southshore Hospital. We walked outside into the parking lot, and then Officer Robinson left the scene. I made contact with Officer McInchak by radio who advised that we needed to contact the police chief and turn this investigation over to the Michigan State Police. I returned to the apartment, waiting for Officer McInchak to arrive.

**5:40am** I advised Christina that David had died at Southshore Hospital, she yelled "What". I asked Christina to remain calm as Alice came running into the living room asking what was wrong. Christina told Alice that David was going to be at the hospital for a while just like mommy was; she then said David may never come back after what he did to me tonight.

I went into the bedroom to attempt to have the children get dressed because we were going to have Christina and her children leave the apartment. I observed Christina on her knees trying to clean up the area in Angelo's bedroom where the suspected human feces was observed, I asked her to stop, but she had already wiped most of the stain away.

**5:45am** Officer McInchak arrived on scene and assisted me with getting shoes and coats on the kids. **5:48am** I called Chief Larry Williams and advised him of the incident, he agreed that MSP should handle the investigation and he stated that he was on his way in.

**5:59am** I transported Christina and her children to our police station. Officer McInchak was going to secure the apartment and stand by until MSP arrived. At the station, I tried to make Christina and her children comfortable, advising her that MSP will probably want to speak with her about this incident.

15-1217
PAGE 5

**6:38am** I contacted Charge nurse Tim Renner by phone, asking him to secure David's body because we were treating it as a crime scene. Tim advised that the shift change was coming up at 7:00am, so if I wanted to speak with the midnight staff they would be leaving soon.

**6:55am** Out at Southshore Hospital and met with Charge Nurse Tim inside the trauma room. David was still lying on the gurney covered up with a blanket.

I pulled the blanket down and took photos of David's body and then pulled the blanket back over him. I advised Chief Williams that I would be standing by waiting for instructions from MSP investigators.

The following is a list of the staff who had worked on David when he arrived at Southshore:

ER Staff

Doctor Melanie Aaberg
Charge Nurse Tim Renner (RN) personal cellular number - (734) 752-2278
Linda Gergely (RN)
Pete Zammit (Paramedic)

**7:20am** I met with David's mother, Carolyn Kapuscinski, (734) 771-9623 in the ER lobby. Carolyn stated that she had been called by Christina and informed about the incident. Carolyn had come to the hospital with her daughter in law and her daughter in laws mother. I tried to comfort her with the small amount of information I could release, but informed her that MSP was handling the entire investigation and she would need to get the answers to her questions from them.

The ER staff comforted David's family, but advised them there was nothing the hospital could do to assist them any further, the family left the hospital at 8:05am.

I spoke with the hospital chaplain who requested information should more family arrive at their facility with questions. While I was speaking with the chaplain, I was advised by dispatch that Christina had requested an ambulance and may be brought to Southshore Hospital for treatment, along with her two children. The Chaplin advised that she would assist the staff with the children, as she went to prepare for their arrival.

**9:07am** I was relieved from the hospital by Sgt Lawyer, on my way out I briefly spoke with MSP detectives who were arriving at the ER. I left the hospital and returned to the scene at 14680 M Gibraltar and waited with Officer Trush and Officer McInchak until MSP detectives arrived on scene. Shortly after MSP arrived they requested that I write my report and would like a copy for their investigation, I returned to the station and completed this report.

15-1217
PAGE 6

**SUPPLEMENT – 04/16/2015 – CHIEF WILLIAMS:**

On 04/16/2015 at 5:47 a.m. I was notified by D/Sgt. David Hammar that Officer Robinson had tasered a male subject (later identified as David Kapuscinski) who had been assaulting his girlfriend (later identified as Christina Beneteau) at the Gibraltar Shores Apartment complex at 14680 Middle Gibraltar Road, Apt. #16. D/Sgt. Hammar said the male (Kapuscinski) had developed a medial issue and was transported to Southshore Medical Hospital where he died.

D/Sgt. Hammar advised he would be transporting the female (Beneteau) and her two children to the police station once Officer Steven McInchak arrived at the scene of the incident. I informed D/Sgt. Hammar that I would be in immediately to the police station.

6:25 a.m. I arrived at the police station, I was briefed by D/Sgt. Hammar of the incident, it was then that I learned of the names of the individuals involved in the incident. I then telephoned the Michigan State Police and spoke with Dispatcher Bret Lundin who informed me that an investigation team from the State Police would be sent to the police station to begin the investigation into this incident.

I then met with the following Michigan State Police investigators; D/Lt. Jim Smiley and D/Sgt. Patrick Roti and informed them of what was known about the incident.

I was informed that Christina was being taken to the hospital and that a Michigan State Police investigator would be with her.

I then saved the 911 telephone call received by the police department on this incident to prevent it from being recorded over, a copy of the recording was made and turned over to the Michigan State Police.

The Trenton Police Department was contacted and a recording of the police and fire radio discussions made during this incident and was also turned over to the Michigan State Police.

A copy of the Gibraltar Police Department's Taser policy as well as the Use of Force policy was made and Officer Timothy Trush was ordered to obtain taser information requested by the state police for the investigation. These policies and the requested taser information were turned over to the Michigan State Police.

I then spoke briefly with Officer Gary Robinson in the presence of Police Officer Labor Council attorney Thomas Zulch, Officer Robinson was told at this time he would not be asked anything about the incident but would be asked tomorrow to write a report. Officer Robinson was placed on paid leave for an undetermined amount of time.

I made the location of the incident, but never entered the incident scene.

15-1217
PAGE 7

04/17/2015 at 4:00 p.m. I read Garrity Rights to Officer Gary Robinson in the presence of Police Officer Labor Council attorney Thomas Zulch, I allowed Officer Gary Robinson to read the Garrity Rights form himself and then ordered Officer Gary Robinson to write a written report on this incident which he did, a copy of the report was made, it was sealed in an envelope with tape for the Michigan State Police.

04/22/2015 at 8:15 a.m. D/Sgt. Mark Lesinski came to the police station for the sealed envelope containing Officer Gary Robinson's report, it was handed to him.

No further action by Chief Larry Williams.

**SUPPLEMENT – 07/17/2015 – CHIEF WILLIAMS:**

On 07/17/2015 This Writer received a telephone call from Detective Sergeant Pat Roti of the Michigan State Police Department, Roti said the Wayne County Prosecutor's Office determined that no criminal charges would be authorized against Officer Robinson, the investigation was closed. Roti said a letter from the Wayne County Prosecutor's Office stating the same had been received, a copy of this letter was received from Roti and is attached to this report.

On 07/23/2015 Detective Sergeant C. Fellner of the Michigan State Police Department came to the station with the tazer that was involved in this incident. The tazer was turned over to This Writer to be placed back into active service.

No further action in this case needed.

**SUPPLEMENT: 08/24/2015 Lt CANTERBURY:**

On 08/24/2015 at approximately 12:05pm, Trooper D/Sgt. Patrick Roti, came into the station and dropped off the Tazer Prongs and Chads that were collected at the scene. D/Sgt Roti stated that his department has finished their investigation and has no further need for these items.

R/O signed for the packaged prongs and chads, R/O then turned the items over to D/Sgt Hammar.

CASE CLOSED.









1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

15-4606
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
TRENTON
DATE PRONOUNCED DEAD
Apr 16, 2015

| THIS IS TO CERTIFY THAT | PERFORMED A POSTMORTEM EXAMINATION ON THE BODY |
|---|---|
| Jeffrey Hudson, M.D. Assistant Medical Examiner | Kapuscinski, David Michael |
| AT | ON |
| Wayne County Medical Examiner's Office | Apr 17, 2015 |

### SUMMARY & OPINION

It is my opinion that death was caused by cardiac dysrhythmia due to an electrical stun gun wound to the chest.

According to the police narrative, police responded to a residence for a sexual assault in progress. Officers observed the decedent assaulting the victim and after failing to comply with commands to release the victim, an electrical stun gun was deployed, possibly striking the decedent in the right arm, separating him from the victim. After the first stun gun deployment, the decedent reportedly started to get back up and kick at the officer at which time the officer deployed his stun gun a second time. However, there was no reaction from the decedent. The second officer then deployed his stun gun which took the decedent to the ground and he was subsequently handcuffed. The officers began to monitor the decedent's condition. As the decedent's condition deteriorated and he became unresponsive, CPR was initiated. Emergency medical services were summoned and the decedent was transported to Oakwood hospital with advanced cardiac life support in progress. He was pronounced dead approximately 30 minutes after arriving at the hospital.

Subsequent autopsy revealed two electrical stun gun wounds on the body: chest (1), right arm (1). The wounds were arbitrarily numbered for ease of description.

ELECTRICAL STUN GUN WOUND TO THE (ESGW#1):

There was an electrical stun gun wound to the left side of the chest consisting of two probe entrance wounds approximately 5/8 inches apart. Each probe wound was encircled by irregular purple contusions.

ELECTRICAL STUN GUN WOUND TO THE RIGHT ARM (ESGW#2):

There was an electrical stun gun wound to the posterior right arm, just below the elbow, consisting of two probe entrance wounds approximately 5/8 inches apart. The smaller probe wound had an associated feint purple contusion.

Additional injuries included abrasions to the chin, left lower chest, right lower abdomen, right upper arm, penis, and both knees. There were contusions on the chin and posterior left forearm.

Postmortem toxicological studies revealed amphetamine (3000 ng/mL) in the peripheral blood. Amphetamine is a central nervous system stimulant that can produce restlessness, hyperthermia, convulsions, hallucinations, respiratory failure, and cardiac failure. Reported blood concentrations in amphetamine-related fatalities ranged from 500 - 41000 ng/mL (mean, 9000 ng/mL). Additionally, steady-state blood levels of 2000 - 3000 ng/mL had been reported in addicts who consumed approximately 1000 mg daily. Amphetamine is also an adrenergic agonist whose effect is enhanced by stress, such as that experienced in the context of a police encounter. Whether or not the decedent used amphetamine in the past, or with any regularity, is unknown. It is unlikely that the amphetamine present in this case is a cause of death in and of itself.

The manner of death is classified as a homicide.

(Printed Tuesday, June 02, 2015 3:42:10 PM)

EXHIBIT
ROBINSON
5
XN  7-18-18
PENGAD 800-631-6989



1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

10-4000
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
TRENTON
DATE PRONOUNCED DEAD
Apr 16, 2015

Printed by:   slb

Jeffrey Hudson, M.D. Assistant Medical Examiner
June 2, 2015

Carl J. Schmidt, M.D. Chief Medical Examiner
June 2, 2015

(report continues on next page)



1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

15-4606

COUNTY OF DEATH
WAYNE

TOWN OF DEATH
TRENTON

DATE PRONOUNCED DEAD
Apr 16, 2015

---

**Cause of Death:**

Ia.   CARDIAC DYSRHYTHMIA
Ib.   ELECTRICAL STUN GUN WOUND TO THE CHEST

II.   AMPHETAMINE USE

**Other Significant Conditions:**

**Manner of Death:**

Homicide

### NARRATIVE SUMMARY

Case Number: 4606 - 15
Name: David Kapuscinski
Date of Pronounced Death: April 16, 2105
Date of Postmortem Examination: April 17, 2015

EXTERNAL EXAMINATION:

The body was that of a normally developed white male appearing about the recorded age of 39 years.  The body measured 5 feet 9 inches in length and weighed 150 pounds.  The body was cool, rigor mortis was fully developed, and livor mortis was present posteriorly and fixed.  Clothing consisted of a hospital gown.  The head was normocephalic and the scalp hair was brown, close-shaven, and receding.  There was a brown mustache and stubble beard.  The eyes had white sclerae, pale conjunctivae, and brown irides.  The dentition was absent.  No lesions of the oral mucosa were identified.  There were no masses discernable in the neck and the larynx was in the midline.  The thorax was symmetrical.  The abdomen was flat.  The external genitalia were those of an adult circumcised male.  The extremities and back showed no significant deformities.  There were tattoos on the left and right upper arms and left chest.

EVIDENCE OF TREATMENT:

An endotracheal tube was in place.  There were intravascular lines in the anterior right upper arm and the left antecubital fossa.  An intraosseous catheter was in the anterior right lower leg.  Electrocardiogram lead pads and defibrillator pads were on the body.

EVIDENCE OF INJURY:

ELECTRICAL STUN GUN WOUNDS

There were 2 electrical stun gun wounds on the body: chest (1), right arm (1).  The wounds are arbitrarily numbered for ease of description and do not reflect the sequence of firing.

ELECTRICAL STUN GUN WOUND TO THE (ESGW#1):

There was an electrical stun gun wound to the left side of the chest, located 14 1/4 inches below the top of the head and 2 ½ inches left of the midline.  The wound consisted of two probe entrance wounds (3/16 inch x 1/8 inch and 1/8 inch x 1/8 inch) approximately 5/8 inches apart.  Each probe wound was encircled by irregular purple contusions.

(Printed Tuesday, June 02, 2015 1:42:23 PM)



WAYNE COUNTY MEDICAL EXAMINER

1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

FILE CASE NUMBER
15-4606
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
TRENTON
DATE PRONOUNCED DEAD
Apr 16, 2015

---

**ELECTRICAL STUN GUN WOUND TO THE RIGHT ARM (ESGW#2):**

There was an electrical stun gun wound to the posterior right arm, just below the elbow, located 14 3/8 inches below the top of the right shoulder. The wound consisted of two probe entrance wounds (5/16 inches x 1/8 inch and 1/8 inch x 18 inch) approximately 5/8 inches apart. The smaller probe wound had an associated feint purple contusion.

Additional injuries:

There was a 1 inch x 3/4 inch abrasion with associated contusion on the chin, just below the lower lip. A 1 1/2 inch x ½ inch purple contusion was on the posterior left forearm. A 5/16 inch x 1/8 inch abrasion was on the left lower chest. On the right lower abdomen were two linear abrasions (3/16 inch and 1/8 inch). A 3/16 inch round abrasion was on the lateral right upper arm. There were multiple abrasions (1/8 inch - 3/4 inches) involving the ventral and dorsal aspects of the the shaft of the penis as well as the head of the penis. There were multiple scabbed abrasions on the right knee. Two, 1/4 inch scabbed abrasions were on the left knee.

**INTERNAL EXAMINATION:**

An autopsy was performed utilizing the normal thoraco-abdominal and posterior coronal scalp incisions. The pleural, pericardial, and peritoneal cavities had smooth serosal surfaces and the viscera were in their normal anatomical positions. The internal systems were as follows:

Head:
No abnormality was noted in the reflected scalp, calvarium, dura, meninges or the base of the skull. The 1300 gm brain was free of neoplastic and other focal lesions, infarcts, and hemorrhages. The cerebral vascular system was unremarkable.

Neck:
No abnormality was noted in the cervical muscles, hyoid bone, laryngeal cartilages, trachea, or the cervical vertebral column.

Cardiovascular System:
The 375 gm heart had a normal configuration with an unremarkable epicardial surface and a moderate amount of epicardial fat. The coronary arteries had no significant atherosclerotic disease. No acute thrombi were present. Both ventricles were of normal size and their walls were of normal thickness. No focal endomyocardial lesions were present. The papillary muscles and chordae tendineae were not thickened, and the heart valves were unremarkable. The aorta had no significant atherosclerosis. The major arteries and great veins showed normal distribution.

Respiratory System:
The larynx and trachea were unremarkable. The right and left lungs weighed 800 gm and 700 gm, respectively. There was passive congestion in the parenchyma that was accentuated with dependent lividity as well as marked edema. No pulmonary emboli were identified.

Hepatobiliary System:

The 1700 gm liver had firm dark tan surfaces and an unremarkable parenchymal pattern. The gallbladder was not present.

Hemolymphatics:
The 175 gm spleen had smooth surfaces and dark purple firm pulp. There was no significant lymphadenopathy.

Alimentary System:
The tongue, esophagus, stomach, small bowel, appendix and colon were unremarkable. The lining of the stomach had an intact and unremarkable rugal pattern and the contents of the stomach consisted of approximately 50 mL of partially



WAYNE COUNTY MEDICAL EXAMINER
1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

M.E. CASE NUMBER
15-4606
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
TRENTON
DATE PRONOUNCED DEAD
Apr 16, 2015

digested food.

**Pancreas:**
The pancreas showed an unremarkable tan lobulated pattern.

**Endocrine System:**
The thyroid gland had a normal bilobed configuration. The adrenal glands were each unremarkable with golden-yellow cortices.

**Genitourinary System:**
The right and left kidneys each weighed 150 gm. Each kidney had smooth cortical surfaces, normal cortico-medullary regions and no changes in the calyceal systems, pelves, ureters, or bladder.

**Musculoskeletal System:**
All the muscles and axial skeleton were free of any significant abnormalities.

Routine tissue specimens were retained in formalin for one year after autopsy in accordance with the current record retention schedule.

MICROSCOPIC DESCRIPTION

Cassette Summary:
1.  Brain
2.  Lung
3.  Heart
4.  Lung
5.  Liver
6.  Lung
7.  Brain
8.  Lung
9.  Skin / Heart
10. Kidneys

Microscopic Description:

Skin - A section of skin from the chest wound showed streaming of nuclei of the basement membrane consistent with electrothermal injury. There was also hemorrhage corresponding to the areas of probe penetration.

Lung - Sections of the lungs showed alveolar hemorrhage and multiple pigmented alveolar macrophages.

Heart - Heart sections showed mild enlargement of some cardiac myocytes with large, hyperchromatic nuclei. There was also mild fibrosis.

Liver - A section of the liver showed sinusoidal congestion.

Microscopic examination of the brain and kidneys revealed no significant histopathologic changes.

**(End of Report)**

(Printed Tuesday, June 02, 2015 3:05:46 PM)

**Full body, male, anterior and posterior views (ventral and dorsal)**

Name _DAVID KAPUSCINSKI_     Autopsy No. _15-4606_

Age _39_   Race _W_   Sex _M_   Date _4/17, 2015_



ABRISION AND CONTOSION

ESGW #1

CONTUSION

ESGW #

MULTIPLE ABRASIONS

ESGW = ELECTRICAL STUN GUN WOUND

// = ABRASION (SCABBED)

Courtesy of the American Society of Clinical Pathologists, Chicago, Ill.

1 OF 1









EXHIBIT
ROBINSON
9
XN   7·19·18

15-4606

| Seq # | Local Time [dd:mm::yyyy Hr:min:Sec] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1159 | 15 Apr 2002 01:19:51 | Fire | 5 | 29 | 62 |
| 1160 | 15 Apr 2002 01:20:04 | Fire | 5 | 30 | 61 |
| 1161 | 15 Apr 2002 01:20:22 | Fire | 5 | 30 | 61 |
| 1162 | 15 Apr 2002 01:20:30 | Fire | 5 | 31 | 60 |
| 1163 | 16 Apr 2002 14:38:35 | Fire | 1 | 18 | 60 |
| 1164 | 19 Apr 2002 11:26:16 | Fire | 5 | 25 | 60 |
| 1165 | 19 Apr 2002 11:26:23 | Fire | 6 | 26 | 59 |
| 1166 | 19 Apr 2002 11:26:29 | Fire | 5 | 26 | 59 |
| 1167 | 19 Apr 2002 11:26:35 | Fire | 5 | 26 | 59 |
| 1168 | 16 Apr 2015 12:34:18 | Sync | 20 Apr 2002 00:32:41 to 16 Apr 2015 16:34:18 | | |



EXHIBIT

ROBINSON
10

XN   7·19·18

PENGAD 800-631-6989

31