UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID KAPUSCINSKI,

       Plaintiff,

v.

CITY OF GIBRALTAR, ET AL.,

       Defendants.

_____/

Case No. 17-11281

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
ANTHONY P. PATTI

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [22 & 25]

     Two police officers responding to a domestic violence call deployed their tasers against David Kapuscinski early in the morning of April 16, 2015. Mr. Kapuscinski died of cardiac arrythmia shortly thereafter. The incident is an unfortunate reminder that tasers are less-lethal, not non-lethal, weapons. Plaintiff, the personal representative of Mr. Kapuscinski's estate, alleges excessive force and false arrest under 42 U.S.C. § 1983 and Michigan tort law.

### FACTUAL BACKGROUND

     Born on July 8, 1975, David Kapuscinski was 39-years-old at the time of his death. By all accounts he had a hard life, but he had been in a relationship with

Christina[1] since October 17, 2014. Christina later told officers that Kapuscinski was good to her two children and had watched them while she was in a psychiatric hospital. (Pl. Ex. B).

The night of the incident, however, April 15/16, 2015, was marked by uncharacteristic levels of violence on the part of Mr. Kapuscinski. Christina told police how Mr. Kapuscinski assaulted her before the incident with such force that she vomited. (Pl. Ex. B pg. 8). She also told an interviewing officer that Mr. Kapuscinski struck her and shouted at her several times. (Id.). He also hit Christina's son and placed his foot or knee on his neck. (Pl. Ex. J pg. 54-57). Christina's April 16, 2015 witness statement read: "He woke sexually violent. I don't know why this happened. It is completely out of his character. He was forcibly sexual w/ me. He went after my son a bit + hit him." (Id.).

At 3:22 a.m. Officer Nicholas Mitchell of the Rockwood Police Department and Officer Gary Robinson of the Gibraltar Police Department were dispatched to a "domestic in progress" complaint made by a twelve-year-old boy from a residence on Gibraltar Road. (Compl. ¶ 15). They had no knowledge of Mr. Kapuscinski or any of the events that had transpired that night. The dispatcher had told the boy to wait outside the apartment, and when the officers arrived at around

---

[1] Christina did not participate in this lawsuit, and neither her full name nor her children's' names will appear in this opinion.

3:28 a.m. they met the boy outside the apartment building. The boy gave the officers little information save that his apartment number was 16. According to Officer Mitchell's testimony to Michigan State Police ("MSP"), the boy let the officers into the apartment building and pointed to the door. (Pl. Ex. G. at 5:20). The officers went up to the apartment and knocked on the door. A crying young girl answered the door. (Rockwood Def. Ex. B).

The officers quickly reached a bedroom from which commotion could be heard. There they observed an entirely naked man and a half-naked woman lying down on the bed, head to toe, with the man choking the woman with his thighs. (Mitchell Dep. 61; Robinson Dep. 49). Mr. Kapuscinski was rocking back and forth repeating "I'm going to kill her." (Id.). It appeared that Christina could not breath, and that she was trying to say something but only gasping. (Id.). There were feces on the floor from the aforementioned sexual assault. (Robinson Dep. 117).

Both officers pulled out their tasers.[2] According to Officer Mitchell's audio recording, Officer Robinson yelled "Stop" three times and then "Get off" or Get

---

[2] Tasers work by firing two barbed electrodes ("barbs" or "probes") at the target and then discharging a five-second pulse of electricity designed to incapacitate the target. (Robinson Dep. 73-75). That pulse of electrical charge is called a "cycle." Both barbs must connect with the target for a circuit to be established and for the taser to work. (Id.). The taser operator can start another five-second cycle by pressing the trigger while the barbs are connected to the target. (Id.).

off of her" five times. (Rockwood Dep. Ex. B). The sound of Officer Robinson's taser discharge is then audible on the recording. (Id.). Officer Robinson's taser struck Mr. Kapuscinski in the elbow. Christina and Mr. Kapuscinski immediately separated; Christina ran out of the room, and Mr. Kapuscinski fell from the bed to the floor and began "thrashing" and "kicking" (Robinson Dep. 80-83; Mitchell Dep. 101-02).

Officer Robinson deployed his taser for three more cycles, but he testified that it was ineffective because only one barb was attached. When asked why he kept compressing the trigger, Officer Robinson said, "I don't know probably just the stress, pull again not working pull again not working." (Robinson Dep. 71). Officers Robinson and Mitchell both testify that Robinson's first taser deployment only resulted in one prong being attached to Mr. Kapuscinski. (Id. at 73-75).

Plaintiff disputes this characterization of the tasing. Werner Spitz, M.D, opined that based on the autopsy report, both prongs struck Mr. Kapuscinski's elbow. (Pl. Ex. N). Officer Robinson testifies that he thought he made contact with both prongs for a second, but then realized he did not when nothing happened. (Robinson Dep. 65-70). "He went down, started rolling around like he's getting back up again, I try to tase him again, but it wasn't working." (Robinson MSP Interview, Ex. H 3:54).

Since this motion comes under FED. R. CIV. P. 56, the Court will assume that Officer Robinson's taser had full effect on Mr. Kapuscinski. It will not assume that there was a third taser deployment, however, as suggested by Dr. Spitz's interpretation of the autopsy photographs, because Officer Mitchell's uncontroverted taser report logged only a single taser deployment (Pl. Ex. K), and Officer Robinson's taser, the X-26, had only a single cartridge (Robinson Dep. 60). In the face of such undisputed evidence, no "rational trier of fact" could find that there was a third taser deployment based only on an errant cut on Mr. Kapuscinski's abdomen. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

While Officer Robinson was attempting to tase Mr. Kapuscinski, he commanded him twice to get on the ground, twice to stop moving, and seven times to roll over. (Rockwood Def. Ex. B). After he exclaims, "roll over or I'm going to tase you again," Officer Mitchell matter-of-factly observes, "you only got one barb in him." (Id.). Officer Mitchell then fired his taser and hit Mr. Kapuscinski in the chest with one barb and the abdomen with the other. (Pl. Ex. N). Mr. Kapuscinski immediately fell back to the ground. Though he aimed at the "preferred target areas" per his training, which included "arms, abdomen, legs, any of these areas," Officer Mitchell emphasized that it is very difficult to hit a specific body part on a moving target. (Mitchell Dep. 112). (Id.).

Both officers testified that Mr. Kapuscinski attempted to stand up, but never fully reached a vertical position. (Mitchell Dep. 103; Robinson Dep. 82). Officer Mitchell testified that at the moment that he deployed his taser, Mr. Kapuscinski likely had both hands off the ground, and may have had one or both knees off the ground. "I'm not sure if his knees were off the ground or what exact position he was at." (Mitchell Dep. 101-105). At that instant, Mr. Kapuscinski appeared to be "crouching" and bent at the torso at an angle of around 45 degrees, facing the officers. (Id.). Mr. Kapuscinski's hands moved to his knees to try to stabilize himself, and he had a "deranged look on his face." (Id. 106-108). Officer Robinson believed Mr. Kapuscinski was rising to his feet to assault them. (Robinson Dep. 101). Officer Mitchell's taser log records the fatal taser deployment at 3:31:05 a.m., about three minutes after the officers' arrival at the scene. (Pl. Ex. K).

Mr. Kapuscinski was immediately handcuffed after he fell to the ground. (Robinson Dep. 105). The officers then realized Mr. Kapuscinski was not breathing, but he did still have a pulse. (Id. at 108-09). Officer Mitchell went to get a face mask for CPR while Robinson began chest compressions. The Fire Department arrived with an AED, delivered a shock, and carried Mr. Kapuscinski out on a stretcher. He was pronounced dead at South Shore Hospital. The medical examiner's report recorded his height as 5'9'' and his weight as 150 lbs. (Ex. L).

Officer Robinson was 220 lbs. and 6'2'' at the time of the incident and Officer Mitchell was 5'11 and 200 lbs. (Ex. I 46; Ex. J 28). The county examiner classified the death as a homicide. The first cause of death was of cardiac dysrhythmia and "electrical stun gun wound to the chest." The second cause of death was amphetamine use. (Pl. Ex. L pg. 4).

## PROCEDURAL BACKGROUND

Plaintiff filed his complaint on April 24, 2017. (Dkt. # 1). Discovery was completed by August 2018, and, on September 24, 2018, the City of Gibraltar Defendants filed their Motion for Summary Judgment [22]. The City of Rockwood Defendants filed their Motion for Summary Judgment [25] the next day, on September 25, 2018. The Court held a hearing on both motions on April 3, 2019.

## LEGAL STANDARD

"The question on summary judgment is whether the moving party has demonstrated that the evidence available to the court establishes no genuine issue of material fact such that it is entitled to a judgment as a matter of law." *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 (6th Cir. 2009). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477

U.S. 317, 322 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). The nonmoving party "may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations…[but instead] must present affirmative evidence." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (quoting *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995)).

## ANALYSIS

There are two steps to the analysis of a § 1983 excessive force claim on summary judgment. The first asks "whether, considering the allegations in the light most favorable to the injured party, a constitutional right has been violated." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012). The second asks "whether that right was clearly established at the time of the encounter. *Id*.

A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is evaluated under the Fourth Amendment's "objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520 (1979). Courts consider three factors in determining whether the totality of the circumstances justify a seizure. They are 1) the severity of the crime at issue, 2) "whether the suspect poses an immediate threat to the safety of the officer or others" and 3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396-97.

Applying this standard, it is beyond question that Officer Robinson's first taser deployment was reasonable. Both officers testified that Mr. Kapuscinski appeared to be strangling Christina with his thighs and that she couldn't breathe. The officers interrupted a serious crime and, only after verbal commands failed, deployed a taser to protect Christina from strangulation.

Plaintiff tries to inject some ambiguity into this narrative by arguing that based of their MSP interviews, the officers seemed to think that they were walking into a couple having consensual sex. Officer Mitchell said to his MSP interviewer "He had her head in between his thighs, squeezing…the position they were in, the only way I can possible describe it was the 69 sexual position." (Ex I 6:32-42). He further testified that Kapuscinski was repeating, "I'm gonna kill her I'm gonna kill her." (Id. at 7:07). "His face… was pure rage and pure aggression…Never seen that look in someone's face…He was going to kill her…Had we been two minutes late she would have been dead." (Id. at 7:40-48). This version of events also squares with what Christina later told the officers, according to the officers' account—that Mr. Kapuscinski was sexually violent and that she didn't consent to any of his actions. Officer Robinson, who deployed his taser first, was unequivocal that it appeared that he was walking into a deadly assault. (Ex. H). The MSP interviews therefore bolster Officer Robinson's position that he deployed his taser to stop a serious crime. Plaintiff has not produced any other evidence to supports its consensual sex theory.

Officer Mitchell's taser deployment 18 seconds later, though less clear-cut, also fails to constitute excessive force under the *Graham* three-step analysis. The

first prong is obvious. Whether Kapuscinski's strangulation of Christina was attempted murder or sexual assault, it was a severe crime.

The second prong is a closer call. Both officers testified that they considered Kapuscinski a threat to their physical safety, but the analysis is an objective one, so the credibility of the officers' subjective feelings is not at issue. Plaintiff invites the Court to find that Kapuscinski couldn't be a threat because he was a few inches shorter than the officers, only 150 pounds, naked, and unarmed. Such a retrospective criticism would run afoul of the Supreme Court's warning to courts to not impose "20/20 hindsight" on events from "the peace of the judge's chambers." *Graham*, 490 U.S. 396. Both officers testified that Kapuscinski looked crazed and dangerous and appeared ready to attack them. (Mitchell Dep. 108; Robinson Dep. 99). Even if, per Plaintiff's version of the facts, Officer Robinson's taser was effective for all of its cycles, Officer Mitchell still saw an active and energetic threat. He reasonably believed the first taser was ineffective when, shortly before deploying his own taser, he observed to his colleague, "you've only got one barb in him." (Def. Ex. B).

As to the third prong, the Sixth Circuit has held that "it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff v. Gillespie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing

*Hagans v. Franklin Cnty. Sherrif's Office*, 695 F.3d 505, 509 (6th Cir. 2012)). The operative question is to what extent, taken in the light most favorable to Plaintiff, Mr. Kapuscinski was "actively resisting arrest."

Absent actual manifestations of resistance, a suspect is not "actively resisting arrest" merely by disobeying officer commands. It is "excessive force to tase someone whose 'noncompliance was not paired with any signs of verbal hostility or physical resistance.'" *Rudlaff*, 791 F.3d at 642 (citing *Eldridge v. City of Warren*, 533 Fed.App'x 529, 535 (6th Cir. 2013)). *Eldridge* held that merely disobeying officers' commands was not sufficient to justify a tasering, because "in cases where we concluded that an officer's use of force was justifiable because it was in response to active resistance, some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance, neither of which is present here." *Id*. at 533; *see also Kent v. Oakland Cnty*, 810 F.3d 384 (6th Cir. 2016) (holding that a man who refused to submit to officer commands, in his own home, but posed no safety risk, had a constitutional right not to be tased); *Cockrell v. City of Cincinnati*, 468 Fed.App'x 491, 495 (6th Cir. 2012) (holding that noncompliance with verbal commands had to be coupled with some other threatening behavior to justify tasering).

An officer's use of his taser has been held to be a reasonable response to noncompliance when "the suspect was hostile, belligerent, and had thrashed about in an agitating state." *Eldridge*, 533 Fed.App'x at 534 (citing *Foos v. City of Delaware*, 492 Fed.App'x 582 (6th Cir. 2012)). A further act of defiance, such as a suspects' stationary acceleration of his vehicle, should be interpreted as "the capstone that accentuated his active resistance." *Id.* Put simply, an officer's decision to tase a suspect is only reasonable where, considering the broader circumstances of the encounter, the suspect's noncompliance is marked by aggressive or threatening behavior.

Mr. Kapuscinski was certainly hostile, belligerent and thrashing. The officers testified that they observed feces near the bed, a violent assault, and an uncontrollable assailant within feet of them refusing arrest commands. The capstone that marked his active resistance was his decision to stand up after eleven verbal commands to either roll over or remain on the ground. The Fourth Amendment does not require officers to grapple hand-to-hand with a suspect who threatens their physical safety. Officer Mitchell's deployment of his taser, like Officer Robinson's, was constitutionally reasonable.

Because there was no constitutional violation, the Court need not reach the issues of federal qualified immunity and municipal liability. Further, under Michigan law, "if a police officer lawfully arrests an individual, he may use

reasonable force is that individual resists." *Tope v. Howe*, 179 Mich.App. 91 (Mich. Ct. App. 1989). Because both officers used reasonable force to restrain Mr. Kapuscinski, Plaintiff's state law assault and battery claims also fail. Even if they did not, Plaintiff would be barred recovery by M.C.L. 691.1407, which immunizes police officers for injuries caused by good faith discretionary decisions taken in the scope of their authority. *Odom v. Wayne County*, 482 Mich. 459, 478-80 (Mich. 2008). Defendant officers have demonstrated that their conduct was reasonable and free of malice, and they are therefore entitled to state law immunity.

Accordingly,

**IT IS ORDERED** that the City of Gibraltar Defendants' Motion for Summary Judgment [22] is **GRANTED**.

**IT IS FURTHER ORDERED** that the City of Rockwood's Motion for Summary Judgment [25] is **GRANTED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow

Dated: April 25, 2019                    Senior United States District Judge