# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: August 17, 2020

Ms. Stephanie Lee Arndt
Mr. Todd J. Weglarz
Fieger, Fieger, Kenney & Harrington
19390 W. Ten Mile Road
Southfield, MI 48075

Mr. Jeffrey Charles Gerish
Ms. Mary Massaron
Plunkett Cooney
38505 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304

Re: Case No. 19-1582, *Richard Kapuscinski v. City of Gibralter, et al*
Originating Case No. : 2:17-cv-11281

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0482n.06

Case No. 19-1582

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| RICHARD KAPUSCINSKI, Personal Representative of the Estate of David Kapuscinski, <br><br> Plaintiff-Appellant, <br><br> v. <br><br> CITY OF GIBRALTAR; CITY OF ROCKWOOD; OFFICER GARY PAUL ROBINSON; and OFFICER NICHOLAS B. MITCHELL, <br><br> Defendants-Appellees. | **FILED** <br> Aug 17, 2020 <br> DEBORAH S. HUNT, Clerk <br><br> ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN <br><br> O P I N I O N |

**BEFORE:** CLAY, ROGERS, and GRIFFIN, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff Richard Kapuscinski ("Plaintiff") initiated this civil rights lawsuit against Defendants Officer Nicholas Mitchell, Officer Gary Robinson, and their respective cities after the officers allegedly used excessive force against his father, David Kapuscinski ("Kapuscinski"), in violation of 42 U.S.C. § 1983. Plaintiff claims that the officers deployed multiple taser discharges against his father, causing Kapuscinski's death. He appeals the district court's order granting summary judgment for both officers. For the reasons provided below, we **AFFIRM** the district court's order.

Case No. 19-1582, *Kapuscinski v. City of Gibraltar, et al.*

# BACKGROUND

### Factual Background

At approximately 3:30 AM on April 16, 2015, Officer Gary Robinson of the City of Gibraltar Police Department and Officer Nicholas Mitchell of the City of Rockwood Police Department responded to a domestic violence call made by a young boy. When the officers met the child outside the apartment complex where the boy lived, he told them that his mother and her boyfriend were fighting in their apartment. The officers proceeded inside the apartment and were met by a young girl. Although she was in distress and crying, she managed to direct the officers to the source of the disturbance—the back bedroom. Both officers entered the bedroom and saw Kapuscinski and a woman, Christina, on the bed. Kapuscinski was fully nude and Christina was partially undressed. They were lying head-to-toe on the bed.

According to both officers, Christina appeared to be in severe distress. Mitchell reported that Kapuscinski "had a female's head – neck between his thighs, was squeezing while yelling something along the lines of 'I'm going to kill her, I'm going to kill you.'" R. 30-9, Mitchell Depo. Tr., PageID # 549. Mitchell also noted in an interview with Michigan State Police (MSP) following the incident that it appeared to him that the couple were in "the '69' sexual position," R. 30-5, MSP R., PageID # 432. However, when asked in his deposition during discovery in the present case whether it appeared that he was walking in on a sexual act, Mitchell said, "[i]t appeared I was walking in on an assault" and affirmed that he never saw Christina perform a sexual act on Kapuscinski. R. 30-9, Mitchell Depo. Tr., PageID # 553. Mitchell also thought that he heard gasping sounds coming from Christina and that she was having difficulty breathing. He said that "it appeared that she could not talk." *Id*. He believed that her life was in danger.

Case 2:17-cv-12819-AJT-APP ECF No. 43, PageID.818 Filed 08/17/20 Page 4 of 18  Case: 19-1582     Document: 32-2     Filed: 08/17/2020     Page: 4    (4 of 18)

Case No. 19-1582, *Kapuscinski v. City of Gibraltar, et al.*

Robinson described Kapuscinski as "covered in sweat and he had a crazed look on his face. His eyes were opened very wide, and the whites of his eyes are very — or were red." R. 30-10, Robinson Depo. Tr., PageID # 606. The officer repeatedly ordered Kapuscinski to separate from Christina, but he refused. After multiple verbal commands were ignored, Robinson deployed his taser and succeeded in separating the two, whereupon Christina immediately fled the room to apparent safety. Kapuscinski ended up on his back on the bedroom floor.

It is unclear from the record before us whether Robinson successfully tased Kapuscinski. Robinson initially believed that he had lodged both probes of his taser in Kapuscinski, but by the time of his deposition in the present case he asserted that only "one probe hit [Kapuscinski] in the arm," R. 30-10, Robison Depo. Tr., PageID # 611.[1] Even though Robinson claims that he knew his taser was not working, he said he attempted to tase Kapuscinski three more times, hoping that "something would change" and that the taser "would work." *Id.* at 615. Mitchell has consistently maintained that he only saw one probe enter Kapuscinski, near Kapuscinski's right elbow. Mitchell also informed Robinson during the incident that "you only got one barb in there" after noticing that the second probe was missing. R. 30-9, Mitchell Depo. Tr., PageID # 568. According to the audio recording of the incident, this occurred after Robinson's fourth attempt to tase Kapuscinski.

Robinson repeatedly shouted at Kapuscinski to "turn over" from his position on his back and onto his stomach so that he could be handcuffed. R. 30-10, Robison Depo. Tr., PageID # 613. Instead, Kapuscinski began "kicking" in the direction of the officers and then moved into a kneeling or crouching position, "attempting to stand up." R. 30-9, Mitchell Depo. Tr., PageID

---

[1] The "probes" of a taser are what embed in a target's clothing or skin. Both probes must attach in order for a circuit to be completed and a taser discharge to succeed in shocking a target. The probes are alternatively referred to as "darts" or "barbs" in the parties' filings. For simplicity, we use the term "probes" throughout this opinion.

# 560–61. Mitchell then deployed his taser to force Kapuscinski to comply with Robinson's commands to turn over. He provided no advance warning to either Robinson or Kapuscinski that he would be using his taser. Mitchell's attempt was successful. Kapuscinski "went down to the floor" and Robinson was able to handcuff him with his hands behind his back. *Id.* at 566.

Mitchell called an ambulance shortly after discharging his taser. Kapuscinski was non-responsive, and although Robinson could feel a pulse, he began administering CPR while Mitchell went to his vehicle to retrieve a breathing mask. Both officers performed several cycles of chest compressions and Mitchell performed rescue breaths on Kapuscinski while waiting for an ambulance. A Gibraltar Fire Department unit responded and attempted to defibrillate Kapuscinski. Shortly thereafter, Kapuscinski was transported via ambulance to a nearby hospital. He was pronounced dead approximately thirty minutes after arriving at the hospital. The autopsy report confirmed that the use of a taser on Kapuscinski killed him: it identified the cause of death as "cardiac dysrhythmia due to an electrical stun gun wound to the chest" and classified Kapuscinski's death as a homicide. R. 30-12, Autopsy Report, PageID # 669. The report also noted that amphetamine was found in Kapuscinski's blood, but it was unlikely that the presence of amphetamine in his system was "a cause of death in and of itself." *Id.*

**Procedural Background**

Plaintiff filed this action on April 24, 2017, under 42 U.S.C. § 1983. He alleged that through their use of excessive force, Officers Robinson and Mitchell—along with their respective cities—violated Kapuscinski's Fourth and Fourteenth Amendment rights. Plaintiff also accused the officers of assault and battery under state law. After discovery concluded, all four Defendants moved for summary judgment. Defendants claimed that the officers did not use excessive force on Kapuscinski and that even if they had, they were entitled to qualified immunity because there was

no clearly established law at the time of the incident prohibiting their conduct. The district court granted the motions, concluding that Plaintiff did not demonstrate a genuine issue of material fact as to whether the officers' use of their tasers constituted excessive force in violation of Kapuscinski's constitutional rights. The court, having found no constitutional violation, did not consider whether the officers were entitled to qualified immunity because their use of force did not violate clearly established law. It also granted summary judgment for Defendants on Plaintiff's state law claim because the officers used "reasonable force." R. 34, Dist. Ct. Order, PageID # 754. This timely appeal followed.[2]

## DISCUSSION

We review the district court's order granting summary judgment *de novo*. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). To be entitled to summary judgment, the movant must have demonstrated that there was no genuine dispute as to any material fact and that the movant was entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in her favor. *See Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Importantly, a court may not "weigh the evidence and determine the truth of the matter" in deciding a motion for summary judgment.

---

[2] Plaintiff has only briefed the issue of whether the officers were entitled to summary judgment on his § 1983 claim. He has therefore abandoned his claims against the municipal defendants as well as his state law claims against all defendants. *See, e.g.*, *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996) (holding that issues not raised in an appellant's opening brief will not be considered on appeal).

*Anderson*, 477 U.S. at 249. But if the evidence is "merely colorable" or "not significantly probative," then "summary judgment may be granted." *Id.* at 249–50.

Additionally, in determining whether the officers were entitled to qualified immunity on Plaintiff's excessive force claim, we address the following questions, "(1) whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated, and if so, (2) whether that right was clearly established." *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012). If no right was violated, then our inquiry ends and summary judgment was proper. *Id.*

To assess whether the officers' use of force against Kapuscinski violated his constitutional rights, we apply the analysis articulated by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). The Supreme Court held in *Graham* that when an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Id.* at 394. The Court then articulated the "objective reasonableness" test for assessing excessive force claims: "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The Court identified three factors to guide lower courts in assessing the government's interest: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Moreover, the Court explained, the "reasonableness" of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The Court emphasized that the "reasonableness" inquiry must be sensitive to the exigencies of a situation because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. This test is "objective" insofar as "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

We apply these factors to analyze the use of force by Officers Mitchell and Robinson in turn.

### I. Officer Mitchell

#### A. Severity of the Crime

The district court held that the first *Graham* factor, the severity of the crime being investigated by the officers, clearly militates towards finding that Officer Mitchell's use of force was constitutional because he was intervening in a "severe crime." R. 34, Dist. Ct. Order, PageID # 751. The court found that the crime was severe based on the officers' uncontested testimony that Kapuscinski appeared to be strangling Christina with his thighs while repeating, "I'm gonna kill her." *Id.* at 750. The district court noted that Christina told officers after the incident that Kapuscinski had been sexually violent with her earlier and that she did not consent to his actions. *Id.* Thus, the district court reasoned, "[w]hether Kapuscinski's strangulation of Christina was attempted murder or sexual assault, it was a severe crime." *Id.* at 751.

On appeal, Plaintiff observes that the officers were on the scene to investigate a complaint of domestic violence. Plaintiff argues that the officers were investigating a misdemeanor because

- 7 -

this was the first reported domestic violence complaint against Kapuscinski and the first instance of domestic violence is generally a misdemeanor. However, the officers arrived at the scene with no knowledge as to whether Kapuscinski was a first time offender. Therefore, *Brown v. Chapman*, 814 F.3d 447, 459 (6th Cir. 2016), offers little support for Plaintiff's argument, where this Court found that driving without headlights on and failure to provide identification, both misdemeanors, were not "severe enough" to warrant the use of a taser.

Even if Kapuscinski had only been committing a misdemeanor, the officers would not have known that when they were responding to the emergency call. Under state law, domestic violence can be a misdemeanor or felony offense, but that could not have been ascertained until Kapuscinski was identified and the incident was properly investigated. Regardless, upon entering the bedroom, the officers observed Kapuscinski committing a felonious assault. As Officer Mitchell testified, he believed Christina could not breathe or talk, that her life was in danger, and that he was witnessing an assault.

It must also be noted that Christina stated in an interview with police following the incident that the "sex act" observed by the officers was not consensual and that Kapuscinski was harming her. Appellee Mitchell's Br. at 20. However, Christina's statements after the incident should arguably have had no bearing on whether the crime Mitchell witnessed when he entered the bedroom was sufficiently "severe," because such information would have been unknown from the "perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. Nevertheless, her subsequent description of the events serve to confirm the observations of the police officers. And it is what Mitchell did perceive when he entered the room—a potentially deadly assault—that causes this factor to weigh decisively in Mitchell's favor. Consequently, Plaintiff has not created a genuine issue of fact disputing that Christina might have been in life-threatening danger when

the officers entered the bedroom and saw her being strangled by Kapuscinski. Thus, Plaintiff's argument that the officers were only investigating misdemeanor domestic violence is entirely unpersuasive. That was not the crime at issue—Mitchell was responding to a violent assault. Whether Mitchell initially thought it was a "weird sex act" is irrelevant, because upon determining that Christina was having difficulty breathing and hearing Kapuscinski's repeated threats to kill her, he realized the seriousness of the danger she was in. R. 30-9, Mitchell Depo., PageID # 577.

### B. Immediacy of the Threat

With respect to whether Kapuscinski posed an immediate threat to the safety of the officers or others, the district court held that Kapuscinski presented a threat to Mitchell's physical safety because both officers testified that Kapuscinski "looked crazed and dangerous and appeared ready to attack them." R. 34, Dist. Ct. Order, PageID # 751. Additionally, after taking the evidence in the light most favorable to Plaintiff and assuming that all of Robinson's taser discharges were successful, the court acknowledged that because those discharges failed to stop Kapuscinski, "Mitchell still saw an active and energetic threat." *Id.* In the district court's view, Mitchell's statement to Robinson during the incident that "you've only got one barb in him" further showed that a reasonable officer would have felt Kapuscinski remained a serious threat to his safety and that his taser discharge was justified. *Id.*

On appeal, Plaintiff argues first that because both officers were at least fifty pounds heavier than Kapuscinski, "[n]othing prevented either officer from taking him down with a tackle maneuver if they truly felt threatened. They knew he was unarmed – he was naked." Appellant's Br. at 26–27. Plaintiff also emphasizes that Kapuscinski was lying on his back and "did not swing at or charge at the officers." *Id.* at 27. While Plaintiff does concede that while Kapuscinski "may have been obstinate (or rendered insensate and unable to comply)," he argues that Kapuscinski's

body position and lack of weapons meant that he was no threat to the officers "towering above" him. *Id*. In response, Mitchell reported that despite being on his back and on the ground, "Kapuscinski was still kicking, being very aggressive . . . attempting to get up to come after us." Appellee Mitchell's Br. at 21. And as noted previously, the officers stated in their depositions in the present case that Kapuscinski moved into a kneeling or crouching position and appeared to be attempting to stand up, all while disobeying Robinson's verbal commands to roll over.

This Court has held tasing to be a reasonable response to a threat of immediate harm when a suspect disobeys police orders and may be armed, *see, e.g.*, Watson v. City of Marysville, 518 F. App'x 390, 393 (6th Cir. 2013), or when a suspect is "particularly violent or physically resistant, so as to endanger responders," *Kent v. Oakland County*, 810 F.3d 384, 391 (6th Cir. 2016). For example, in *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012), we found that the tasing of a suspect was justified because he was "out of control and continued forcefully to resist arrest." Hagans repeatedly refused to be handcuffed, wrestled with officers who sought to subdue him, attempted to flee, and even tried to grab an officer's taser while being stunned. *Id.* at 507. Conversely, in *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010), we held that "[a]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of [a taser] on a non-resistant person is unreasonable." In outlining the contours of this rule, we favorably cited a decision from the Tenth Circuit approving of the use of a taser on a man who initiated a fight with police and was kicking and biting the officers who were wrestling him to the ground in an effort to subdue him. *Id.* (citing *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007)). We then held that the officer in *Kijowski* was not objectively reasonable in tasing the plaintiff twice, because the plaintiff

- 10 -

was in no way resisting arrest and "a reasonable officer on the scene would not have perceived [the plaintiff] as presenting a risk of harm." *Id.*

Moreover, in *Kent*, we held that an individual did not pose an "immediate threat" to the safety of officers and paramedics on the scene because he was unarmed and there was no evidence that he "was violently thrashing about in an effort to avoid handcuffing or to flee police, such that he might have harmed the deputies and EMTs in the bedroom" or that he "attempted to hit officers or make a display of force." 810 F.3d at 391. At the most, Kent was using "agitated hand gestures" towards the officers. *Id.* We contrasted the facts of the case with those in cases such as *Watson* and *Hagans* to hold that "Kent's actions do not . . . amount to the same immediate threat to safety found to justify tasing under our case law." *Id.*

Taking the evidence in the light most favorable to Plaintiff, a reasonable officer in Mitchell's position would have been justified in perceiving that Kapuscinski posed a serious threat to the officers' physical safety. Although the record indicates that Kapuscinski neither successfully stood up nor assaulted the officers, he refused to comply with their repeated verbal instructions throughout the incident and he behaved in an objectively threatening manner. Rather than obey Robinson's order to roll over so he could be arrested, Kapuscinski kicked towards the officers and began to attempt to stand up in the small bedroom. It is impossible to say conclusively what Kapuscinski would have done had he completely stood up. However, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, it was reasonable for Mitchell to perceive Kapuscinski's actions as a physical threat. The officers had just seen him violently assault and threaten to kill Christina and he was refusing to comply with their instructions to roll over so that he could be safely apprehended.

This conclusion becomes clear after taking the evidence in the light most favorable to Plaintiff and assuming that Robinson's multiple taser discharges were successful in shocking Kapuscinski.[3] That these discharges failed to immobilize Kapuscinski made it reasonable for officers to believe Kapuscinski was "out of control." *Hagans*, 695 F.3d at 511. Unlike the suspect in *Kijowski*, who was peacefully sitting in his vehicle when officers seized him and tased him, 372 F. App'x at 599–600, Kapuscinski prompted the officers' intervention in the present case by assaulting Christina and continuing to act in an aggressive manner towards the officers. Moreover, unlike the actions of the plaintiff in *Kent*, Kapuscinski was "violently thrashing about . . . such that he might have harmed the deputies," and his kicking combined with his sustained disobedience constituted "a display of force." 810 F.3d at 391. Finally, Kapuscinski did not have "his hands up and his back against the bedroom wall when he was tased." *Id.* ("We have held that an individual poses little threat of harm when her hands are in the air indicating submission."). Quite the opposite: Kapuscinski remained in an aggressive posture until Mitchell's taser discharge incapacitated him. Therefore, from the perspective of a reasonable officer, the threat posed by Kapuscinski was sufficiently great that Mitchell's defensive use of a taser was justified.

### C. Resistance to Arrest

The third *Graham* factor considers whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. We have held that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using

---

[3] Plaintiff points out that his medical expert, Dr. Werner Spitz, examined Kapuscinski's post-mortem photos and concluded that there was evidence of more than two taser wounds, "which contradicts Defendants' position they only tased Mr. Kapuscinski twice." Appellant's Br. at 11. That is, however, all Dr. Spitz contradicts. Plaintiff has not refuted the points in the officers' testimony that are critical to assessing the threat he posed—that Kapuscinski was non-compliant with their verbal commands, that he refused to roll over and instead attempted to stand up, and that he appeared extremely belligerent. Plaintiff has provided no evidence, and has not identified anything in the officers' depositions, that contradicts these aspects of their account.

a taser to subdue him." *Hagans*, 695 F.3d at 509. The district court found that Kapuscinski was actively resisting arrest because he "was certainly hostile, belligerent and thrashing." R. 34, Dist. Ct. Order, PageID # 753. It noted that Kapuscinski's violent assault of Christina and the officers' testimony that he was "uncontrollable . . . within feet of them refusing arrest commands" justified this determination. *Id.* Additionally, the court reasoned, "[t]he capstone that marked his active resistance was his decision to stand up after eleven verbal commands to either roll over or remain on the ground." *Id.* It found that officers are not required by the Fourth Amendment "to grapple hand-to-hand with a suspect who threatens their physical safety." *Id.*

This Court has identified active resistance where "some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance." *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013). In *Hagans*, the suspect evinced active resistance by refusing to allow himself to be handcuffed and wrestling with officers. 695 F.3d at 507, 510–11. In *Foos v. City of Delaware*, 492 F. App'x 582, 584–85, 590–91 (6th Cir. 2012), we held there was active resistance where a suspect who had crashed into a concrete pillar revved his engine rather than respond to an officer's attempt to get his attention, reached into his backseat when back-up arrived as if to retrieve a weapon, and continued to thrash about violently after officers broke his car's window with an axe.

In *Eldridge*, this Court stated:

> If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more. It can be a verbal showing of hostility . . . [i]t can also be a deliberate act of defiance using one's own body, as in *Hagans,* or some other mechanism, such as the truck in *Foos.*

533 F. App'x at 535. We then held that a man who was driving erratically and had crashed into a concrete barricade and refused to obey officer commands to exit his vehicle until he was tased was

- 13 -

not actively resisting arrest. *Id.* at 530–31; 535. The suspect remained in his vehicle and assured officers that he was fine. *Id*. at 530–31. He did not evince active resistance because he engaged in no aggressive or physical behavior. *Id.* at 535. Instead, "the only individuals conveying any sense of aggression were the two officers." *Id.* It was later determined that the man was having a hypoglycemic episode. *Id.* at 531.

Moreover, in *Kent*, this Court found no active resistance on the part of the plaintiff while he was being confronted by police in his home. 810 F.3d at 393–94. Paramedics and police officers were at Kent's home because his father was unresponsive. *Id*. at 387. Kent grew increasingly agitated as the paramedics worked on his father because he knew that his father had a living will with a "do not resuscitate" order. However, because Kent could produce no proof of the will, the paramedics attempted to revive his father. *Id.* at 387–88. Officers at the scene ordered Kent to calm down but he refused. *Id.* at 388. When an officer told Kent that he would be tased if he did not control himself, Kent said—with his hands raised and his back to the wall—"Go ahead and Taze me, then." *Id.* The officer did so, and Kent was handcuffed. *Id*. at 388–89. We held that under those circumstances, Kent was not actively resisting the officers when he was tased because was not attempting to flee from the officers and he never resisted handcuffing. *Id. at* 393–94. Ultimately, Kent did no more than fail to comply with an officer's command. *Id.*

In the present case, Kapuscinski resisted arrest by refusing to comply with the officers' demands that he roll over and by physically attempting to stand up. These actions reflect a "deliberate act of defiance using one's own body." *Eldridge*, 533 F. App'x at 535; *see also Hagans*, 695 F.3d at 510–11 (finding active resistance where plaintiff wrestled with officers and refused to be handcuffed). Unlike the situation in *Eldridge*, Officer Mitchell was not the only one "conveying

a[] sense of aggression." 533 F. App'x at 535. In fact, it was Kapuscinski's refusal to comply with officer instructions to release Christina that prompted the deployment of tasers in the first place.

Moreover, while *Foos* involved a driver whose active resistance came in the form of revving his engine and appearing to reach for a weapon, 492 F. App'x at 584–85, 590–91, Kapuscinski similarly failed to respond to an officer's attempt to get his attention and instead began to act belligerently. And wholly unlike *Kent*, Kapuscinski had no reasonable explanation for his hostility towards the officers, nor was Kapuscinski's kicking akin to Kent's "agitated hand gestures." 810 F.3d at 391. Importantly, in that case, Kent ceased his hand movements prior to being tased and instead had his hands raised and his back against the wall—emphasizing his lack of active resistance to the officers. *Id.* at 391–92. Kapuscinski, conversely, did not cease attempting to stand up until Mitchell successfully incapacitated him. Therefore, Kapuscinski was actively resisting arrest.[4]

After considering the three *Graham* factors and taking the evidence in the light most favorable to Plaintiff, we conclude that Mitchell's use of force was reasonable. Kapuscinski's death is undeniably tragic; lethal force was not intended nor was it apparently deemed necessary by the responding officers. However, the law allows officers sufficient breathing room to respond adequately to threats to themselves and others, even when those responses have unintended fatal consequences. Mitchell's taser use fits within that grant of discretion as articulated by the Supreme Court in *Graham* and expounded in numerous cases by this Court, including those cited above.

---

[4] We have said that "[i]n determining whether officers used excessive force, courts have placed great weight on officers' failure to warn a suspect before deploying a taser." *Gradisher v. City of Akron*, 794 F.3d 574, 585 (6th Cir. 2015). Plaintiff does correctly note that Mitchell did not warn Kapuscinski before deploying his taser. However, it is unclear from the record what difference a warning would have made in the present case, or whether there appeared to be time to warn before Kapuscinski charged the officers. Robinson warned Kapuscinski before attempting to tase him a second time and it is clear that Kapuscinski refused to heed any of his commands.

*See, e.g.*, *Hagans*, 695 F.3d at 511 (finding that Hagans' death, caused in part by taser shocks, did not change the fact that the use of a taser against him was reasonable). Thus, summary judgment was appropriately granted to Mitchell.

## II. Officer Robinson

With respect to Robinson's actions during the incident, Plaintiff does not appear to challenge the constitutionality of Robinson's initial tase, but rather claims that Robinson's subsequent taser cycles were objectively unreasonable. This is unsurprising, because Robinson repeatedly ordered Kapuscinski to separate from Christina before tasing him. Given the severe distress Christina appeared to be in and Kapuscinski's failure to comply, this initial taser deployment was clearly reasonable. As for the subsequent discharges, we will take the evidence in the light most favorable to Plaintiff and assume that each tase was successful. But it is clear from the record that those discharges did not subdue Kapuscinski. In fact, that is partially why Mitchell's taser deployment was justified. Moreover, the foregoing *Graham* analysis applies with equal force to Robinson. Each subsequent taser discharge was justified under the same logic: Kapuscinski was resisting arrest, he continued to present an active, energetic threat, and the defensive use of a taser to preserve officer safety was reasonable.

In the alternative, Plaintiff argues that Robinson is supervisorily liable for Mitchell's taser deployment. In *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), we held that an officer can be liable for excessive force employed by a fellow officer if she "supervised the officer who used excessive force, or . . . owed the victim a duty of protection against the use of excessive force." But because Mitchell did not use excessive force against Kapuscinski, Robinson cannot be liable under this doctrine. Consequently, Kapuscinski's alternative claim fails as well. Therefore, summary judgment was properly granted to Robinson.

Case 2:17-cv-11281-AJT-APP ECF No. 43, PageID.824 Filed 08/17/20 Page 18 of 18
Case: 19-1582 Document: 32-2 Filed: 08/17/2020 Page: 7 (18 of 18)

Case No. 19-1582, *Kapuscinski v. City of Gibraltar, et al.*

## CONCLUSION

For the reasons stated above, the judgment of the district court is **AFFIRMED**.

- 17 -